**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**
------------------------------------------------------------x
THE SANBORN LIBRARY LLC,     :
             :
    Plaintiff,     :  **19-CV-2049 (LAK) (OTW)**
             :
    -against-    :  <u>**REPORT & RECOMMENDATION**</u>
             :
ERIS INFORMATION INC., et al.,   :
             :
    Defendants.    :
             :
             :
------------------------------------------------------------x
ERIS INFORMATION INC., et al.,   :
             :
    Counterclaim-Plaintiffs, :
             :
    -against-    :
             :
THE SANBORN LIBRARY LLC and  :
ENVIRONMENTAL DATA RESOURCES, LLC, :
             :
    Counterclaim-Defendants. :
------------------------------------------------------------x

   **ONA T. WANG**, **United States Magistrate Judge**:

   **To the Honorable LEWIS A. KAPLAN, United States District Judge:**

**I.**  **Introduction**

   Plaintiff/counterclaim-defendant The Sanborn Library LLC ("Sanborn") filed a complaint

alleging copyright infringement and violation of the Digital Millennium Copyright Act ("DMCA")

against defendants/counterclaim-plaintiffs ERIS Information Inc., Eco Log Environmental Risk

Information Services, Ltd., and ERIS Information Limited Partnership (collectively, "ERIS"). ERIS

subsequently filed counterclaims against Sanborn and counterclaim-defendant Environmental

Data Resources, LLC (individually, "EDR," and collectively with Sanborn, "EDR-Sanborn") seeking

declarative relief and alleging antitrust violations of the Sherman Act and Clayton Act; false advertising under the Lanham Act; and defamation, product disparagement, trade libel, deceptive acts and practices, false advertising, and tortious interference with prospective business relations under New York law. Before the District Court is EDR-Sanborn's motion to dismiss ERIS's counterclaims pursuant to Fed. R. Civ. P. 12(b)(6). For the reasons discussed below, I recommend the motion to dismiss be **GRANTED in part and DENIED in part as follows**:

- ERIS's product disparagement (Count IX), trade libel (Count XI), and tortious interference with prospective business relations (Count XII) claims should be **DISMISSED**.

- ERIS's Sherman Act and Clayton Act claims (Count IV and V) should proceed, except that any essential facilities or product bundling claims should be **DISMISSED**.

- ERIS's Lanham Act (Count VI), New York General Business Law (Counts VII and VIII), and defamation (Count X) claims should proceed with the limitations detailed below. *See infra* Section III.D.

- ERIS should be granted leave to amend its counterclaims, with its Second Amended Counterclaims due within **fourteen (14)** days of the District Court's ruling on this Report and Recommendation.

II.    **Background**[1]

    A.  **The Parties and the Relevant Market**

Sanborn[2] purports to own "the largest and most comprehensive collection" of fire insurance maps in the world (the "Sanborn Collection," or when referring to maps in the Sanborn Collection, "Sanborn Maps"). ¶ 2 (quoting ECF 12 ¶ 2). Fire insurance maps were initially created to provide insurance underwriters with historical factual information needed to assess a property's risk of being damaged by fire. ¶ 17.  They depict, *inter alia*, the "size, shape, and construction of dwellings, commercial buildings, and factories as well as fire walls, locations of windows and doors, sprinkler systems, . . . types of roofs[,] . . . the widths and names of streets, property boundaries, building uses, and house and block numbers." ¶ 17. Sanborn began creating maps in 1866 and has held a near-100% monopoly on fire insurance maps since the early twentieth century. ¶¶ 3, 18. Today, fire insurance maps are used by environmental professionals conducting site assessments to protect owners of real property from liability for environmental contamination under the Comprehensive Environmental Response, Compensation, and Liability Act of 1980, 42 U.S.C. § 9601 *et seq.* ("CERCLA"). ¶¶ 2, 4.

---

[1] The facts set forth herein are drawn from ERIS's First Amended Counterclaims (the "Counterclaims") (ECF 40) and materials incorporated by reference in the Counterclaims, including the ASTM E1527 standard and EDR's sample "Certified Sanborn Map Report." Decl. of Joshua S. Wolkoff ("Wolkoff Decl.") (ECF 46), Ex. A, C.  *See, e.g., Halebian v. Berv*, 644 F.3d 122, 131 n.7 (2d Cir. 2011) ("[I]t is well established that on a motion to dismiss for failure to state a claim pursuant to Rule 12(b)(6), the court may also rely upon documents attached to the complaint as exhibits and documents incorporated by reference in the complaint.") (internal citations omitted). Citations to "¶" or "¶¶" are to the corresponding paragraph numbers in the Counterclaims.

[2] For simplicity, "Sanborn" is used to refer to The Sanborn Library LLC and its alleged predecessors, including The Sanborn Map Company. ERIS alleges, on information and belief, that EDR is a "sister company" to Sanborn "with a common parent or with a group of common members," but states that "[f]urther discovery" is needed to ascertain the "exact nature" of EDR's relationship with Sanborn. ¶ 16; *see* ¶ 88 (suggesting EDR may own or have owned Sanborn "in whole or in part"). It is also worth noting that ERIS refers to counterclaim-defendants collectively as "EDR-Sanborn" throughout the Counterclaims, though all parties refer to the entities collectively as only "EDR" in their motion to dismiss briefs. As specified above, I refer to the entities collectively as "EDR-Sanborn."

Under CERCLA and its implementing regulations, parties with interests in a commercial real estate holding may face strict liability for environmental contamination unless they undertake an "all appropriate inquiry assessment" of the property, known as a Phase I Environmental Site Assessment ("Phase 1 ESA"), that complies with standards set by the international standards-setting organization ("SSO") ASTM International, namely ASTM E1527. ¶ 4, 23, 25; *see generally* 40 C.F.R. § 312.[3] A Phase I ESA is conducted by an "environmental professional," who inquires into the past ownership and uses of the property, evaluates environmental conditions, and ultimately creates a written report that identifies existing and potential contamination liabilities ("Phase 1 ESA Report"). ¶ 25. These environmental professionals engage the services of data provision companies, such as EDR or ERIS, to provide them with "report packages" containing the necessary historical sources and data needed to assess environmental risk and create a Phase I ESA Report for a given site. ¶ 36. ERIS refers to the "products and services required for the Phase I ESA report . . . as the 'environmental risk assessment data market'" ("ERAD" or the "ERAD market"). ¶ 37.

EDR and ERIS compete, throughout the US, in this market to provide environmental professionals with report packages of ERAD—which include fire insurance maps—used for conducting Phase I ESAs. ¶¶ 37-38.  EDR purchased rights to the more than 1.3 million Sanborn Maps in the Sanborn Collection in 1995 or 1996 and purports to be the exclusive licensee of all

---

[3] ERIS alleges, on information and belief, that "every commercial property sold in this country for $1 million in value or more first undergoes a Phase I ESA before it is purchased" to protect against liability under CERCLA. ¶  25.

Sanborn Maps for commercial use. ¶¶ 26, 30, 40, 47, 49, 56.[4] EDR allegedly holds at least a 70%

market share in the ERAD market. ¶¶ 3, 5, 38, 77, 123-24. ERIS entered the US market in 2013

and is the next largest competitor to EDR with a 10-15% market share. ¶¶ 78, 129. In 2011, ERIS

acquired hundreds of thousands of Sanborn Maps (including a complete set of Sanborn Maps

from 1867-1970) from academic publishers ProQuest and LexisNexis for use and inclusion in

ERIS's ERAD report packages. ¶¶ 82-83.

As described more fully below, ERIS alleges that EDR-Sanborn has "systematically and

intentionally taken steps that have prevented any real and meaningful competition in the

environmental risk assessment data market" through manipulation of industry standards,

failure to license standard-essential products, sham litigation, disparagement, discounted

bundled pricing, and exclusive dealing. ¶¶ 7, 158. ERIS alleges such conduct has "erected a

substantial barrier" to market entry and "dissuaded many entities" from entering or remaining

in the ERAD market. ¶¶ 5, 72, 123, 125, 127-30. EDR-Sanborn's conduct has also allegedly

coerced environmental professionals into obtaining products from EDR rather than from

competitors (such as ERIS), for free, or not at all. ¶¶ 60, 64, 67, 130.

**B.  ASTM E1527**

The ASTM E1527 standard was first set in 1993, two or three years before EDR allegedly

acquired rights to the Sanborn Maps, and has been continuously updated every few years since

that time. ¶¶ 24-26, 40. The standard, in relevant part, requires that "[a]ll obvious uses of the

---

[4] While ERIS alleges that there are more than 1.3 million Sanborn Maps, EDR-Sanborn inconsistently suggests that the number of Sanborn Maps ranges from 1.2 to 1.4 million in its pleadings and the documents incorporated by reference into the Counterclaims. *See* ECF 12 at ¶ 19 (1.2 million); *SANBORN® AND SANBORN MAP®*, EDR Lightbox, https://edrnet.com/prods/sanborn-maps/ (1.3 million); Derek Ezovski, *Free Sanborns – Part 1*, EDR CONNECT, https://connect.edrnet.com/s/article/Free-Sanborns-Part-1-1489082078068 (1.4 million).

property [at issue] shall be identified from the present, back to the property's first developed

use, or back to 1940, whichever is earlier" and explains that "this task requires reviewing only

as many of the [enumerated] standard historical sources . . . as are necessary and both

reasonably ascertainable and likely to be useful." Wolkoff Decl., Ex. A (ASTM Standard § 8.3.2);

¶ 27. Additionally, "[r]elevant supporting documentation shall be included in the [Phase I ESA

Report] or adequately referenced" and "[i]f the environmental professional has chosen to

exclude certain documentation from the report, the environmental professional shall identify in

the report the reasons for doing so (for example, a confidentiality agreement)."  Wolkoff Decl.,

Ex. A (ASTM Standard § 12.2); *see* ¶¶ 27, 31.

One of the enumerated "standard historical sources" are fire insurance maps, which are

defined as "maps produced for private fire insurance map companies that indicate uses of

properties at specified dates and that encompass the property." Wolkoff Decl., Ex. A (ASTM

Standard §§ 3.2.37; 8.3.4.2); ¶ 27. According to ERIS, "the only product that meets this

definition is the EDR-acquired Sanborn Maps." ¶¶ 27, 32. While ASTM E1527 says fire insurance

maps are "often available at local libraries, historical societies, private resellers, or from the

map companies who produced them," Wolkoff Decl., Ex. A (ASTM Standard §§ 3.2.37; 8.3.4.2),

ERIS alleges that (1) not all maps are available at all such sources and (2) even when they are

available, EDR-Sanborn has taken the position that commercial use of Sanborn Maps acquired

from any other sources, including libraries, is against copyright, and that EDR "sells the only

map products that can [legally] be used to satisfy the [ASTM E1527] standard." ¶¶ 27, 30, 32.

ERIS contends that (Sanborn) fire insurance maps are *de facto* necessary to comply with

the standard. As illustrated above, ASTM E1527 does not facially require environmental

professionals to use or physically attach fire insurance maps in Phase I ESAs, which usually

involve various sources, such as street directory searches, aerial photographs, topographical

maps, property tax files, and recorded land title records, among others. ¶ 29. However, due to

their "historical factual significance" and "the nature and accuracy of the factual details

contained" in fire insurance maps, ERIS alleges that "[i]t is standard practice to rely on and

consult fire insurance maps (*i.e.*, Sanborn maps) for the historical facts they portray when

preparing Phase I ESAs" and, further, that it is "impossible" to conduct a competent and

standard-compliant Phase I ESA without searching for, consulting, and physically providing

copies of relevant and available (Sanborn) fire insurance maps. ¶¶ 4, 29, 33. ERIS insists that

"there are no alternative sources for the factual information set forth in those maps" and thus

"[n]o substitute products, alternative map or otherwise, exist that a purchaser can use to

comply with the ASTM E1527 standard and qualify for the liability shield." ¶¶ 4, 25, 33, 39.

ERIS contends that EDR-Sanborn manipulated the ASTM E1527 to incorporate Sanborn

fire insurance maps "without disclosing [to the ASTM committee] the true effect of the

standard that [it] had created." ¶ 35. Specifically, according to ERIS, representatives from EDR,

including former Chief Executive Officer Anthony Buonicore, were "intentionally and heavily"

involved in setting ASTM E1527 and possessed "enough clout" to "institute [EDR's] preferred

requirements." ¶ 27. Buonicore, who held leadership roles at the ASTM, including as committee

chairman in the 1990s, allegedly "lobbied and pushed" for the adoption of Sanborn fire

insurance maps as a (*de facto*) required historical source. ¶¶ 4, 26. Buonicore supposedly took

such steps while knowing—but not disclosing to the relevant ASTM committee—that EDR

would purchase rights to (and claim exclusive control over) all maps capable of meeting the

7

standard. ¶¶ 26, 32, 34-35, 39. ERIS adds that EDR-Sanborn has continued to manipulate the

ASTM standard since 1992, such as by recently proposing to revise the standard's definition of

fire insurance maps to omit that they are "available at local libraries, historical societies, [and]

private resellers" so as to "conceal legitimate sources of Sanborn Maps (especially those clearly

in the public domain) . . .  in an attempt to funnel all requests for such maps to EDR." ¶ 75.

Because of its conduct, ERIS argues that EDR is obliged to at least license any valid copyrights

covering the Sanborn Maps and to do so under fair, reasonable, and non-discriminatory

("FRAND") terms. ¶ 39.

### C.   Copyright Litigation and Statements to the Marketplace

ERIS alleges that EDR-Sanborn has repeatedly and widely stated and advertised—in

EDR's report packages, on EDR's website, and in oral and email communications—that **all**

Sanborn Maps are subject to valid copyright protection; that ERIS is committing copyright

infringement through its report packages; and that obtaining and using Sanborn Maps for a

Phase 1 ESA from ERIS or any source other than EDR-Sanborn is illegal.  ¶¶ 62-72, 101; *see infra*

Section III.D. ERIS alleges that such statements have been made to customers and potential

customers for at least as long as ERIS has been in the ERAD market (*i.e.*, since at least 2013).

On March 6, 2019, Sanborn sued ERIS for copyright infringement under 17 U.S.C. § 101

*et seq*. and violation of the DMCA, 17 U.S.C. § 1202 (the "Copyright Suit"), alleging, *inter alia*,

that ERIS  has acquired a collection of fire insurance maps "built entirely of Sanborn Library's

copyrighted maps," "infringed [Sanborn's] copyrights in each of the Sanborn Maps," and

replaced Sanborn's copyright management information ("CMI") with ERIS's own, false CMI on

each map. (ECF 12 ¶¶ 1, 5, 26, 38, 43, 52, Prayer for Relief A). ERIS alleges EDR has "undertaken

an extensive marketing campaign" since the start of the Copyright Suit, making statements regarding its claims orally, on its website, and in a market-wide email. ¶¶ 94-101.

ERIS acknowledges that it copies and distributes Sanborn Maps, but alleges that there are no "valid or enforceable copyright in most, if not all, of the maps at the center of this case" because they "are either invalid, expired, or unenforceable (if not all three)."[5] ¶ 6. For example, ERIS alleges that many Sanborn Maps are "firmly" and "objectively" in the public domain because they, *inter alia*, (a) "were published before 1924, and thus any copyright in the original and renewal terms would have expired," (b) "were published between 1924 and 1964 and were not effectively renewed," (c) are "updated" maps "copied from the expired-copyrighted works," or (d) were "published without an appropriate copyright notice." ¶¶ 6, 22, 47-49, 64; *see also* ¶¶ 57-60 (providing examples of Sanborn Maps allegedly in the public domain).[6] However, ERIS claims that it is difficult for outsiders to verify EDR-Sanborn's claims about its purported copyright rights because of the "sheer number" of Sanborn copyright registrations and the fact that "Copyright Office records (especially older records) are difficult to find or identify." ¶¶ 7, 54, 93. Further, EDR-Sanborn "refus[es] to ever identify" relevant copyright registrations when making accusations of infringement. ¶¶ 54, 92.[7]

Moreover, EDR-Sanborn has supposedly known "for decades" that the "vast majority" of the maps in the Sanborn Collection are not protected by valid copyrights and has "detailed

---

[5] ERIS also alleges that its conduct is consistent with the terms and conditions (or lack thereof) of ERIS's acquisition of Sanborn Maps from ProQuest and LexisNexis. ¶¶ 83-84, 87.

[6] ERIS also suggests that Sanborn Maps "do not exhibit the creativity and originality required to be copyrightable" and that the use of information in the Sanborn Maps for the "transformative" purpose of creating environmental risk assessment report packages constitutes "quintessential fair use." ¶¶ 6, 50, 73-77.

[7] EDR-Sanborn has had to make such identifications during the course of discovery. *See, e.g.*, December 3, 2019 Tr. (ECF 65) at 3-27.

documentation showing that only few of its maps continue to remain subject to copyright protection." ¶¶ 40, 52, 57, 132, 134. Specifically, ERIS asserts that between 1995 and 1998, around the time that EDR acquired rights to the Sanborn Maps, "EDR undertook a thorough [multi-year] analysis of each copyright registration and each Sanborn map to determine the copyright status of each map," and discovered that most of the copyrights were lapsed or invalid because Sanborn had not been "diligent in registering, updating and/or renewing its copyrights, nor was it diligent in publishing its updated works while providing still effective copyright notice of those works." ¶¶ 102, 132. EDR allegedly created a spreadsheet cataloguing "each and every expired or invalid copyright." ¶ 52.

ERIS alleges that despite knowledge that the vast majority of the alleged copyrights are invalid, non-existent, or expired, EDR-Sanborn has used its misrepresentations and the Copyright Suit (as well as other similar lawsuits) to dissuade competitors from staying or remaining in the market, drive up their costs through legal fees, and "choke" their cash flow by scaring customers away from meeting and doing business with companies other than EDR. ¶¶ 5, 7, 53, 60, 135.[8] Indeed, ERIS states that the Copyright Suit has caused it to lose business opportunities, alleging that an entity ERIS refers to as "Company K" refused to meet with ERIS to see a demonstration of ERIS's products and services, "citing the existence of the lawsuit as a reason." ¶¶ 128, 135.

---

[8] At a cocktail reception weeks before the Copyright Suit was filed, the CEO of Lightbox told ERIS's President that he had "been hired [by EDR] to impede [ERIS's] progress." ¶ 106.

### D.   Product Bundling

As explained above, EDR and ERIS both provide environmental professionals with "report packages containing [ERAD]." ¶ 109. However, these professionals also require report "writer" software in order to generate usable reports from this data. Because "ERIS does not have its own in-house writer," its "customers have to purchase the writer from a separate company at a cost of approximately $150 per package of materials." ¶ 112.

EDR, on the other hand, has in-house report writer software called "Parcel," though ERIS alleges that Parcel "is not as good as the other similar products on the market." ¶¶ 112, 114. While EDR has long sold Parcel separately for between $100-$150 per report generated from a package of materials, EDR is now including its writer software "as part of a bundle" with its package of ERAD for around $180, a price which allegedly "does not cover the cost of every item in the overall bundle." ¶¶ 107, 112-13. EDR is allegedly offering Parcel "as a free perk to capture additional sales," "divert customers from ERIS to EDR," and ultimately "drive ERIS from the market." ¶¶ 112, 115. ERIS states that this has caused ERIS to lose sales to EDR and that, in order to continue to compete in the ERAD market, ERIS will have to lower its prices and/or acquire an in-house writer and sell it at a loss by including it for free in a bundle with its report packages. ¶¶ 107, 113, 117.

### E.   Exclusivity Agreements

EDR is allegedly entering into steeply discounted, long-term exclusive contracts with environmental professionals who perform Phase I ESAs. ¶¶ 118-123. Specifically, ERIS alleges that EDR has already entered into exclusive contracts with at least seven of the ten largest consulting firms, with all ten firms constituting (*i.e.*, purchasing products equaling) 60% of the

(customer) market and the "locked in" seven constituting 25% of the market. ¶¶ 118, 122. EDR has also entered into exclusive contracts with "several smaller consultants," including three former clients of ERIS. ¶ 122. ERIS alleges, on information and belief, that EDR is "actively engaged in negotiations for" additional exclusive contracts, and either already has foreclosed or is at risk of foreclosing over 60% of purchasing in the market through exclusive contracts. ¶¶ 123, 176.

EDR's exclusive contracts last for "several years" and are priced using either an "'all you can eat' annual flat fee"—the customer can purchase as many products as it wants during the contract term for a set price—or a "tiered pricing" model—the customer can purchase products at a flat fee, which decreases as the customer guarantees higher volumes of orders. ¶¶ 119, 121. ERIS alleges losing "several clients" and "several million dollars in lost revenue and profits" due to EDR's exclusive contracts. ¶¶ 121-22. Further, on at least one occasion, ERIS actually "attempted to bid against EDR's exclusive contract and was turned down because ERIS's best price was not even close to EDR's contract price." ¶ 121.

### F. ERIS's Counterclaims

Based on the above allegedly anticompetitive and tortious conduct, on June 17, 2019, ERIS filed counterclaims against EDR-Sanborn, which were subsequently amended on August 16, 2019. ERIS asks for declaratory relief arising from the Copyright Suit in the form of a declaratory judgment that: (1) ERIS has not infringed any valid copyright in any Sanborn Maps (Count I); (2) ERIS has not violated the DMCA with respect to the Sanborn Maps (Count II); and (3) any valid copyrights in any Sanborn Maps are unenforceable due to copyright misuse (Count III). ERIS also alleges antitrust violations of the Sherman Act and Clayton Act (Counts IV and V)

and violations of the Lanham Act for false advertising (Count VI), as well as state law claims for deceptive acts and practices (Count VII), false advertising (VIII), product disparagement (Count IX), defamation (Count X), trade libel (Counts XI), and tortious interference with prospective business relations (Count XII). EDR-Sanborn has moved to dismiss Counts IV through XII of the Counterclaims.[9]

### III.   Analysis

#### A.  Legal Standard

"A motion to dismiss counterclaims under Rule 12(b)(6) is decided under the same standard applied to a motion to dismiss the claims of a complaint." *Dress Barn, Inc. v. Klauber Bros., Inc.*, No. 18-CV-8085(DLC), 2019 WL 1949675, at *2 (S.D.N.Y. Apr. 22, 2019). When presented with a motion to dismiss pursuant to Rule 12(b)(6), a court must accept as true all non-conclusory factual allegations in the complaint, together with the contents of documents "integral" to the complaint and any matters of which courts may take judicial notice, and draw all reasonable inferences in favor of the plaintiff. *See Doe v. Columbia Univ.*, 831 F.3d 46, 48 (2d Cir. 2016); *McCarthy v. Dun & Bradstreet Corp.*, 482 F.3d 184, 191 (2d Cir. 2007). However, "a pleading that offers 'labels and conclusions' or 'a formulaic recitation of the elements of a cause of action will not do.' Nor does a complaint suffice if it tenders 'naked assertion[s]'

---

[9] The undersigned previously denied EDR-Sanborn's motion to stay discovery related to ERIS's Counterclaims pending decision on the motion to dismiss. (ECF 61) (noting, *inter alia*, that "any discovery relating to the [C]ounterclaims would also be related to ERIS's defenses, and thus not amenable to a stay"). Accordingly, fact discovery, including discovery related to the Counterclaims, has been ongoing since 2019 and is nearly complete: the deadline for the completion of (the few remaining) fact witness depositions was most recently extended to September 17, 2021, and the parties have agreed to exchange and respond to contention interrogatories during the six-week period following the close of depositions. (ECF 114 at 3; ECF 125).

devoid of 'further factual enhancement.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting

*Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 557 (2007)).

To survive a Rule 12(b)(6) motion to dismiss, the complaint must contain "sufficient

factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Iqbal*,

556 U.S. at 678 (quoting *Twombly*, 550 U.S. at 570). A claim is facially plausible "when the

plaintiff pleads factual content that allows the court to draw the reasonable inference that the

defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678. Thus, the non-conclusory

factual allegations "must be enough to raise a right to relief above the speculative level."

*Twombly*, 550 U.S. at 555. If the plaintiff has not "nudged [the] claims across the line from

conceivable to plausible, [the] complaint must be dismissed." *Id*. at 570.

"[T]here is no heightened pleading standard in antitrust cases." *Wacker v. JP Morgan*

*Chase & Co.*, 678 F. App'x 27, 29 (2d Cir. Feb. 1, 2017) (summary order) (quoting *Concord*

*Assocs., L.P. v. Entm't Props. Trust*, 817 F.3d 46, 52 (2d Cir. 2016)); *Provepharm, Inc. v. Akorn,*

*Inc.*, No. 17-CV-7087 (SJF) (AKT), 2019 WL 2443185, at *8 (E.D.N.Y. June 11, 2019) (featuring

standards manipulation claim); *In re Keurig Green Mountain Single-Serve Coffee Antitrust Litig*.,

383 F. Supp. 3d 187, 218 (S.D.N.Y. 2019) (featuring sham litigation claim). Though antitrust

claims should be "reviewed carefully" at the pleading stage "because false condemnation of

competitive conduct threatens to 'chill the very conduct the antitrust laws are designed to

protect,'" *In re Keurig*, 383 F. Supp. 3d at 218 (quoting *Verizon Commc'ns Inc. v. Law Offices of*

*Curtis V. Trinko, LLP*, 540 U.S. 398, 414 (2004)), to survive dismissal, the allegations need only

satisfy Federal Rule of Civil Procedure 8(a)'s general requirement of a "short plain statement" of

facts supporting a plausible claim, rather than Rule 9(b)'s stricter requirements, *Concord*

*Assocs.*, 817 F.3d at 52. Moreover, "[i]n antitrust cases in particular, the Supreme Court has stated that 'dismissals prior to giving the plaintiff ample opportunity for discovery should be granted very sparingly.'" *Todd v. Exxon Corp.*, 275 F.3d 191, 198 (2d Cir. 2001) (quoting *George Haug Co. v. Rolls Royce Motor Cars Inc.*, 148 F.3d 136, 139 (2d Cir.1998)).

### B. Sherman Act Section 2 (Count IV)

Section 2 of the Sherman Act ("Section 2") makes it illegal to "monopolize, or attempt to monopolize, or combine or conspire . . . to monopolize ... trade or commerce . . . ." 15 U.S.C. § 2. ERIS alleges that EDR violated Section 2 though (1) monopolization, (2) attempted monopolization, and (3) monopoly leveraging. The elements on ERIS's Section 2 theories vary, as explained below. "Nevertheless, all three offenses require predatory or anticompetitive conduct or an inappropriate use of monopoly power by the defendant." *Ortho Diagnostic Sys., Inc. v. Abbott Lab'ys, Inc.*, 920 F. Supp. 455, 465 (S.D.N.Y. 1996) (Kaplan, J.)

To state a claim for monopolization, a plaintiff must demonstrate that the defendant (1) possessed monopoly power in the relevant market and (2) willfully acquired or maintained that power, *i.e.*, through anticompetitive conduct. *PepsiCo, Inc. v. Coca–Cola Co.*, 315 F.3d 101, 105 (2d Cir. 2002). To state an attempted monopolization claim, a plaintiff must demonstrate that the defendant (1) engaged in predatory or anticompetitive conduct with (2) the specific intent to monopolize and (3) "a dangerous probability of achieving monopoly power." *Id.* (quoting *Spectrum Sports, Inc. v. McQuillan*, 506 U.S. 447, 456 (1993)). Finally, a monopoly leveraging claim requires a plaintiff to establish that the defendant "(1) possessed monopoly power in *one market*; (2) used that power to create a dangerous probability of monopolizing *another* [second] market; and (3) caused injury by such anticompetitive conduct." *A.I.B.*

*Express, Inc. v. FedEx Corp*., 358 F. Supp. 2d 239, 247 (S.D.N.Y. 2004) (emphasis added) (quoting *Trinko*, 540 U.S. at 414).

In its briefing, EDR argues that ERIS has not sufficiently alleged a second relevant market for its monopoly leveraging claim or, more generally, any anticompetitive conduct to support its Section 2 claims.[10] I address the market issue first and then analyze each category of alleged anticompetitive conduct. For the following reasons, I recommend that Count IV be dismissed only insofar as it asserts "essential facilities" or "product bundling" claims. ERIS's Section 2 claims should otherwise be permitted to proceed.

### 1. Monopoly Leveraging and Market Definition

ERIS claims that EDR-Sanborn engaged in monopoly leveraging by using "Sanborn's near 100% monopoly over fire insurance maps to garner more than 70% of the market share nationwide in the [ERAD] market [for EDR] because that [latter] market relies heavily on fire insurance maps for approved historical data." ¶ 124. ERIS claims EDR-Sanborn has accomplished such leveraging though a multitude of anticompetitive conduct, such as manipulation of the ASTM E1527 standard, disparagement of competitors, bundled pricing, and sham litigation. ¶¶ 3, 158.

---

[10] EDR does **not** contest ERIS's allegations regarding definition of the ERAD market, EDR's possession (or dangerous probability of possession) of monopoly power in that market, or EDR's intent to monopolize that market. For the purposes of this motion, I assume that ERIS has sufficiently pleaded these elements, as it is well-settled that "[i]ssues not sufficiently argued in the [parties'] briefs are considered waived." *E.g. Grytsyk v. Morales*, No. 19-CV-3470 (JMF), 2021 WL 1105368, at *6 (S.D.N.Y. Mar. 22, 2021) (collecting cases and quoting *Norton v. Sam's Club*, 145 F.3d 114, 117 (2d Cir. 1998)); *Ball v. New York City Council*, No. 17-CV-4828 (JMF), 2018 WL 4625625, at *3 n.3 (S.D.N.Y. Sept. 26, 2018) (same); *Kassman v. KPMG LLP*, 416 F. Supp. 3d 252, 279 (S.D.N.Y. 2018) (same); *see also Emigra Grp., LLC v. Fragomen, Del Rey, Bernsen & Loewy, LLP*, 612 F. Supp. 2d 330, 351 (S.D.N.Y. 2009) (Kaplan, J.) (assuming that "the so-called Service Market [was] a relevant market" where defendant did not argue otherwise).

EDR's argument that ERIS has not sufficiently pleaded any anticompetitive conduct sufficient to maintain a Section 2 claim will be discussed below. However, EDR separately argues that the fire insurance map market is not a cognizable product market because it does not account for viable substitute-products, and therefore, that ERIS has not met the threshold requirement of pleading *two* relevant markets to support its leveraging claim. *E.g., Ortho Diagnostic Sys. v. Abbott Labs., Inc.*, 822 F. Supp. 145, 154 (S.D.N.Y. 1993) (Kaplan, J.) ("[T]he Second Circuit requires two markets for a leveraging claim."). I recommend against dismissal of ERIS's leveraging claim based on market definition because ERIS has sufficiently pleaded a relevant product market for fire insurance maps.

For purposes of the Sherman Act, a market "must be a market for particular products or services," and "its outer boundaries . . . are determined by the reasonable interchangeability of use or the cross-elasticity of demand between the product itself and substitutes for it." *US Airways, Inc. v. Sabre Holdings Corp.*, 938 F.3d 43, 64 (2d Cir. 2019) (quoting *Brown Shoe Co. v. United States,* 370 U.S. 294, 325 (1962)); *Emigra*, 612 F. Supp. 2d at 351-52.[11] Thus, a relevant market for antitrust purposes "includes the product or service at issue as well as its substitutes." *US Airways*, 938 F.3d at 64.  However, "'a single brand of a product or service' may 'be a relevant market under the Sherman Act' if no substitute exists for the brand's products or services." *Id*. (quoting *Eastman Kodak Co. v. Image Technical Services, Inc*., 504 U.S. 451 (1992)

---

[11] Products will be considered to be reasonably interchangeable "if consumers treat them as acceptable substitutes." *PepsiCo*, 315 F.3d at 105 (citation omitted). "Cross-elasticity of demand exists if consumers would respond to a slight increase in the price of one product by switching to another product." *Todd*, 275 F.3d at 201–02 (citation omitted).

(holding district court erred by dismissing complaint "based on its conclusion that a market which is limited to a defendant's product or service cannot be viable").

The Second Circuit has emphasized that "market definition is a deeply fact-intensive inquiry and courts therefore hesitate to grant motions to dismiss for failure to plead a relevant product market." *Chapman v. N.Y. State Div. for Youth*, 546 F.3d 230, 238 (2d Cir. 2008) (quoting *Todd*, 275 F.3d at 199-200). Courts must do so, however, "where the plaintiff fails to define its proposed relevant market with reference to the rule of reasonable interchangeability and cross-elasticity of demand, or alleges a proposed relevant market that clearly does not encompass all interchangeable substitute products even when all factual inferences are granted in plaintiff's favor." *Id*. (quoting *Queen City Pizza, Inc. v. Domino's Pizza, Inc.*, 124 F.3d 430, 436 (3d Cir. 1997)).

Granting all inferences in ERIS's favor, I find that ERIS has sufficiently alleged a relevant fire insurance map market, dominated by EDR-Sanborn, because it is plausible that no viable substitutes exist for fire insurance maps. Significantly, ERIS alleges that Sanborn controlled nearly 100% of the fire insurance map industry since the early twentieth century, having "created nearly all, if not all" fire insurance maps, and that EDR has acquired and expanded this monopoly as the supposedly exclusive licensee of Sanborn Maps for commercial use. ¶¶ 5, 18, 47, 124. Fire insurance maps are used today to conduct ASTM E1527-compliant Phase I ESAs. While ASTM E1527 facially contemplates the use of various historical sources, including other types of maps (*i.e.*, topographic maps), and does not specifically require the use of fire insurance maps, ERIS repeatedly alleges that the historical significance, accuracy, and nature of information contained in fire insurance maps make them *de facto* necessary for satisfying the

standard's requirements.[12] While discovery will ultimately expose the validity of ERIS's

assertions, EDR has alleged sufficient facts for the District Court to draw a reasonable inference

that there are no viable substitutes for fire insurance maps. Accordingly, ERIS's monopoly

leveraging claim should not fail for failure to plead two relevant markets.[13]

### 2. Anticompetitive Conduct

While ERIS asserts a panoply of allegedly anticompetitive conduct, EDR-Sanborn argues

that ERIS cannot state a Section 2 claim based on any such conduct. Below, I address the

---

[12] *See, e.g.*, ¶ 25 ("[T]he *de facto* standard for complying with ASTM E1527 . . . requires consulting and copying fire insurance maps, comprising those maps that were created by the Sanborn Map Company. No substitute products, alternative map or otherwise, exist that a purchaser can use to comply with the ASTM E1527 standard  and qualify for the liability shield"); ¶ 29 ("[F]ire insurance maps are particularly relevant historical source elements of a Phase I report, given the known historical factual significance of fire insurance maps and the nature and accuracy of the factual details contained in those maps . . . It would be impossible for an environmental professional to conduct a competent Phase I ESA . . .  without searching for, consulting, relying upon and providing copies of relevant fire insurance maps, if they are available for the property"); ¶ 39 ("[T]here are no alternative sources for the factual information set forth in those maps."); *see also* ECF 47 at 9 n.12 ("[W]hile EDR argues that the ASTM Standard 'requires reviewing only as many of the standard historical sources . . . as are necessary and both reasonably ascertainable and likely to be useful,' as a practical matter, where Sanborn Maps are available, they *are* necessary, reasonably ascertainable, and likely to be useful, and thus must be consulted and included in a Phase I ESA.").

[13] While EDR also emphasizes that "fire insurance maps are in fact alleged to fall *within* the larger [ERAD] market," (ECF 51 at 7), "well-defined submarkets may exist which, in themselves, constitute product markets for antitrust purposes." *In re Inclusive Access Course Materials Antitrust Litig.*, No. 20-CV-6339 (DLC), 2021 WL 2419528, at *11 (S.D.N.Y. June 14, 2021) (quoting *Sabre*, 938 F.3d at 64).

parties' arguments regarding each category of conduct.[14] Ultimately, I find that ERIS should be permitted to pursue a Section 2 claim for sham litigation, standard manipulation, and disparagement, but not for failure to license essential facilities or product bundling.

### a. Sham Litigation

ERIS argues that the Copyright Suit is a sham lawsuit used by EDR-Sanborn to harm ERIS and foreclose competition in the ERAD market. ERIS alleges that EDR-Sanborn has always known that the Copyright Suit is objectively baseless because the vast majority of Sanborn Maps are "firmly" in the public domain and lack copyright protection, as evident on the face of the maps and/or the results of an investigation conducted by EDR at the close of the 20th century. *See, e.g.*, ¶¶ 22, 48, 57-61, 132-36. EDR argues that the *Noerr-Pennington* doctrine precludes ERIS from alleging any antitrust claim based on the filing of the Copyright Suit. For the reasons stated below, I recommend that the District Court deny EDR's motion to dismiss as it pertains to ERIS's Section 2 sham litigation claim.

---

[14] Defendants assert that instead of isolating each category of anticompetitive conduct, the District Court should sustain its Sherman Act claims because they are supported by a combined "monopoly broth" of anticompetitive conduct. (ECF 40 at 3). The "monopoly broth" concept recognizes that, in analyzing antitrust claims alleging a multitude of anticompetitive conduct, courts should "avoid 'tightly compartmentalizing the various factual components' of [each claim] and 'wiping the slate clean after scrutiny of each.'" *Valassis Commc'ns, Inc. v. News Corp.*, No. 17-CV-7378 (PKC), 2019 WL 802093, at *9 (S.D.N.Y. Feb. 21, 2019) (quoting *City of Groton v. Connecticut Light & Power Co.*, 662 F.2d 921, 928-29 (2d Cir. 1981)). However, the "monopoly broth" concept has only been mentioned in two cases in this Circuit and, critically, has never been employed as a replacement for an individual review of alleged anticompetitive conduct. *See Groton*, 662 F.2d at 928 ("[W]e must, like the [plaintiffs'] briefs, analyze the various issues individually"); *Valassis*, 2019 WL 802093 at *6 (dismissing plaintiff's antitrust claims insofar as they alleged predatory bidding and explaining that "not all actions of an alleged violator may be properly considered by a jury as ingredients in a 'monopoly broth'"). Moreover, both cases recognize that "it is unlikely that multiple independently lawful acts can come together to create" a monopoly broth, as "it is not the case that 'if there is a fraction of validity to each of [a litigant's] claims and the sum of the fractions is one or more, the plaintiffs have proved a violation of section 1 or section 2 of the Sherman Act.'" *Valassis*, 2019 WL 802093 at *9 (quoting *Groton*, 662 F.2d at 929). Thus, I will proceed to analyze each category of allegedly anticompetitive conduct, keeping in mind the context and possible "synergistic effect" of the conduct. *Id.*

Pursuant to the *Noerr-Pennington* doctrine, parties are "generally immune from antitrust liability for engaging in litigation, even if the litigation might have anticompetitive effects." *Nat'l Jewish Democratic Council v. Adelson*, 417 F. Supp. 3d 416, 430 (S.D.N.Y. 2019); *see In re Elysium Health-Chromadex Litig.*, 354 F. Supp. 3d 330, 335 (S.D.N.Y. 2019), *as amended* (Feb. 7, 2019). However, while the *Noerr-Pennington* doctrine protects a litigant's First Amendment right to petition the courts, immunity will not attach where the challenged litigation is "a mere sham to cover . . . an attempt to interfere directly with the business relationships of a competitor." *Prof'l Real Estate Investors, Inc. v. Columbia Pictures Indus.* ("PRE"), 508 U.S. 49, 56 (1993) (internal citation omitted).

Accordingly, "[a] single lawsuit can violate antitrust law as long as it is both an objective and subjective sham." *In re DDAVP Direct Purchaser Antitrust Litig.*, 585 F.3d 677, 686 (2d Cir. 2009). To state a claim of sham litigation, a litigant must plausibly allege that "the lawsuit [is] objectively baseless in the sense that no reasonable litigant could realistically expect success on the merits." *PRE*, 508 U.S. at 60 (internal citation omitted). If a court finds the challenged litigation is "objectively baseless," then the court "examine[s] the litigant's subjective motivation and focus[es] on whether the baseless lawsuit conceals an attempt to interfere directly with the business relationships of a competitor." *Id.*[15]  While courts in this District have observed that the sham exception should be construed narrowly and, *where possible*, decided on the pleadings "in order to avoid chilling a litigant's exercise of the right to petition," *Twin City Bakery Workers & Welfare Fund v. Astra Aktiebolag*, 207 F. Supp. 2d 221, 223 (S.D.N.Y.

---

[15] This two-step test has been described as placing a "heavy thumb on the scale in favor of the [antitrust] defendant." *Elysium*, 345 F. Supp. 3d at 336 (quoting *Hanover 3201 Realty, LLC v. Vill. Supermarkets, Inc.*, 806 F.3d 162, 180 (3d Cir. 2015)).

2002), it has also recognized that the applicability of the sham exception is often regarded as a question of fact for the jury, *see Elysium*, 345 F. Supp. 3d at 336, and has repeatedly denied motions to dismiss sham litigation claims, *e.g.*, *In re Keurig*, 383 F. Supp. 3d at 234 (denying motion to dismiss antitrust claim challenging allegedly baseless patent litigation).[16]

The parties, focusing on the first prong, disagree whether a party must allege that an *entire* lawsuit is objectively meritless in order to escape *Noerr-Pennington* immunity. ERIS argues that liability may be premised on a **single objectively meritless** claim. Conversely, EDR-Sanborn argues that they are immune from liability if the Copyright Suit alleges a **single colorable** claim, and thus that the District Court must dismiss ERIS's sham litigation claim because ERIS does not allege that the Copyright Suit is objectively baseless *in toto*, and even affirmatively recognizes that the suit may concern a "small subset of potentially colorable infringement claims." (ECF 47 at 15; *see* ¶¶ 40, 132-33). While the parties each cite copious non-binding caselaw from various districts to support their arguments, (ECF 45 at 8-9; 47 at 5-7;

---

[16] *See Louisiana Wholesale Drug Co. v. Sanofi-Aventis*, No. 07-CV-7343 (HB), 2008 WL 169362, at *5 (S.D.N.Y. Jan. 18, 2008) (denying motion to dismiss antitrust claim challenging an allegedly sham FDA Citizen-Petition where the complaint and administrative record established "triable issues of fact concerning the reasonability and viability" of the petition); *ICOS Vision Sys. Corp., N.V. v. Scanner Techs. Corp.*, No. 05-CV-6322 (DC), 2006 WL 838990, at *5 (S.D.N.Y. Mar. 29, 2006) ("If, as alleged, [defendant] knew that [the statute] did not apply and threatened [patent infringement] litigation for the sole purpose of harming [plaintiff], then its threats were neither objectively reasonable nor taken in good faith. This is all that need be alleged at this early stage of the litigation . . . . If, after discovery, [plaintiff] is unable to present evidence from which a reasonable jury could find that [defendant] knew that its threats of infringement litigation were baseless, the claims may be dismissed at summary judgment."); *see also Alternative Electrodes, LLC v. Empi, Inc.,* 597 F. Supp. 2d 322, 331 (E.D.N.Y. 2009) ("Plaintiff alleges that the litigation was both subjectively and objectively baseless and plausibly supports this claim with the assertion that there could be no valid patent claim due to the existence of 'prior art.' At this stage of litigation, such allegations are sufficient to withstand a motion to dismiss.").

51 at 3), courts in this Circuit have not directly spoken to whether a sham litigation claim can be based on an underlying lawsuit featuring both sham and non-sham claims.[17]

Given the unsettled state of the law on this issue and the procedural posture of this action, I recommend that the District Court not resolve this issue at the pleading stage. In making this recommendation, I find the reasoning of *Intel Corp. v. Via Techs., Inc.* to be particularly instructive:

> The Court can imagine good arguments both ways. On the one hand, a plaintiff who adds a baseless claim to an otherwise bona fide lawsuit presumably does so for a reason, i.e., presumably to obtain an additional strategic advantage over and above those flowing from the assertion of non-sham counts. To immunize such bad-faith conduct because it is joined with good-faith conduct would eviscerate most of the sham litigation exception. Especially in patent litigation, an overreaching plaintiff will usually have a large portfolio of patents to press. It would be comparatively easy to find a colorable claim to join with baseless claims. On the other hand, evaluation and segregation of counts into "objectively bad" versus "objectively good" claims as well as "subjectively bad" versus "subjectively good" claims could require large amounts of work for a jury, not to mention claim-construction hearings (on patents no longer part of the case-in-chief). In a mixed-claim scenario, it would also be necessary for a jury to isolate and to trace the harms resulting solely by reason of the wrongful components of the litigation.
>
> **Given the uncertain state of the law on this issue, this order will not resolve it at the pleading stage. Rather, discovery will go forward. Discovery may reveal that the incremental effects of the supposed sham components were negligible or may show that they dominated the original complaint. Discovery may shed light on the actual factual pattern in need of a rule. While ultimately the Court may (or may not) agree with [Plaintiff's] sweeping categorical rule of immunity, it should not do so at the pleading stage.**

---

[17] However, the District of Connecticut has noted that application of the sham exception should be based on the "measure [of] merit" of the "strongest claim" rather than the "weakest aspect" of a lawsuit. *Uniroyal Chem. Co. v. Syngenta Crop Prot., Inc.*, No. 3:02-CV 2253 (AHN), 2006 WL 516749, at *6 (D. Conn. Mar. 1, 2006) (refusing to apply sham exception based on an allegedly unreasonable request for equitable relief because "the mere fact that a plaintiff has sought one form of relief that may be objectively unreasonable cannot vitiate the First Amendment protections afforded underlying claims that are not objectively without merit").

No. 99-03062 (WHA), 2001 WL 777085, at *5–6 (N.D. Cal. Mar. 20, 2001) (denying motion to dismiss sham litigation claim). The *Intel* court's course of action seems appropriate here, where EDR-Sanborn has acknowledged that some Sanborn Maps have "lapsed into the public domain," (ECF 45 at 1), and fact discovery—which has nearly concluded—will soon shed light on the *extent* to which the allegedly infringing maps are objectively in the public domain. Accordingly, the District Court should deny EDR-Sanborn's motion to dismiss at this juncture. EDR-Sanborn may raise the issue of *Noerr-Pennington* immunity at a later point following the close of discovery, such as in a motion for summary judgment.[18]

### b. Standards Manipulation

ERIS argues that EDR-Sanborn intentionally monopolized or attempted to monopolize the ERAD market by manipulating the ASTM E1527 standard. ERIS alleges that EDR, through CEO Anthony Buonicore, influenced the ASTM to set a standard that *de facto* requires fire insurance maps be consulted and copied in the preparation of Phase I ESA Reports, while knowing—but not disclosing—that EDR would later purchase supposedly exclusive rights to all maps capable of meeting the standard. ¶¶ 25-35.[19]   I recommend that the District Court deny EDR-Sanborn's motion to dismiss as it pertains to ERIS's Section 2 standards manipulation claim.

---

[18] While EDR also argues that ERIS's sham litigation allegations are undermined by the fact that ERIS did not file a motion to dismiss the Copyright Suit, (ECF 45 at 9), courts have previously emphasized that this is not "fatal to a sham litigation claim." *In re Keurig*, 383 F. Supp. 3d at 232.

[19] *See also*, *e.g.*, ¶ 60 ("In essence, by engineering the relevant standards to require consultation with, and the reproduction of, relevant Sanborn Maps, EDR-Sanborn has effectively required that if a customer desires the liability shield under CERCLA, only it, and it alone, can be the storehouse, source and 'curator' of maps from the Sanborn Collection—and the collection of rote historical facts set forth therein without any substitute products available on the market.").

"Intentional misrepresentations designed to deceive a standard-setting organization can constitute an antitrust violation." *Amphastar Pharm., Inc. v. Momenta Pharm., Inc.*, 297 F. Supp. 3d 222, 230 (D. Mass. 2018) (explaining that "[b]y incorporating patented technology into a standard, the patent-holder obtains market power because adoption of the standard eliminates alternatives to the patented technology"). While the Second Circuit has not addressed the elements of standard manipulation claims, in 2019, the Eastern District of New York found that a counterclaim-plaintiff made a sufficient showing of anticompetitive conduct by alleging facts from which it could be reasonably inferred that: (1) the counterclaim-defendant sought to maintain monopoly power and substantially foreclose competition in the relevant market by (2) soliciting an SSO to change its standard (3) without disclosing its intellectual property rights in the manufacturing process necessary to meet that standard and (4) but for counterclaim-defendant's conduct, the SSO would not have adopted the revised standard. *See Provepharm,* 2019 WL 2443185, at *10, 13. EDR suggests, in substance, that ERIS has not made a sufficient showing regarding the third and fourth elements.

EDR-Sanborn firsts argues that ERIS has not plausibly alleged Sanborn Maps to be necessary or essential to satisfying the ASTM E1527 standard, insisting that Sanborn Maps cannot be categorized as "essential IP" because ASTM E1527 expressly "allows consultants to comply with the standard's requirements *without consulting and attaching* fire insurance maps (let alone those maps that [EDR-Sanborn] specifically holds copyrights in) to a Phase I Environmental Site Assessment." (ECF 45 at 10). However, as discussed above, ERIS repeatedly and plausibly alleges that the standard makes fire insurance maps—defined so that "the only product that meets th[e] definition is the EDR-acquired Sanborn Maps"—*de facto* essential as a

matter of practice, meaning that it is practically "impossible" to satisfy the standard without using and including such maps. *See supra* Section III.B.2.a.  While discovery will shine light on the validity of these allegations, ERIS has alleged sufficient facts for the District Court to draw a reasonable inference that Sanborn Maps are necessary to satisfying the ASTM E1527 standard.

EDR-Sanborn next argues that it had no duty to disclose not-yet-existing intellectual property rights, let alone rights not acquired until two or three years after the standard was first set. However, EDR (through Buonicore) was at some point duty-bound to disclose its impending control of the allegedly standard-essential Sanborn Maps—when the standard was set or at least before it "garnered significant market acceptance"—in light of Buonicore's membership and leadership in the ASTM and role in setting the standard. *See Provepharm,* 2019 WL 2443185, at *13 (collecting cases and quoting *Actividentity Corp. v. Intercede Grp. PLC*, No. 08-CV-4577 (VRW), 2009 WL 8674284, at * 4 (N.D. Cal. Sept. 11, 2009) (rejecting argument that SSO member's failure to disclose must occur "prior to the issuance of a standard," and sustaining monopolization claim for failure to disclose before the standard "garnered significant market acceptance" and the market became "locked in" to the standard); ¶ 32 (alleging that Section 19.2.5 of the ASTM Policies and Procedures bars committees from "bring[ing] about the standardization of any product or service for the purpose or with the effect of . . . preventing the manufacture or sale of any product or service not conforming to a specified standard"). Moreover, ERIS alleges that at the time the standard was set, EDR at least "knew" that it would soon have "complete control of the only maps that could satisfy the standard," and was "simultaneously and surreptitiously working" towards the acquisition. ¶¶ 32, 34, 39-40. Thus, ERIS does not allege a hypothetical future intention or a mere desire to control the Sanborn

Maps, but rather asserts something concrete, though not yet finalized. Assuming ERIS's allegations to be true, I find that it would be overly technical to allow EDR to avoid a duty to disclose merely because its control over the Sanborn Maps was consummated following the creation of the ASTM standard.[20]

Lastly, EDR-Sanborn argues that ERIS has not met its pleading burden since it has not alleged that the ASTM was considering an "alternative technology." (ECF 45 at 12). However, like the court in *Provepharm*, I am "not necessarily persuaded that this is a proper pleading standard, as opposed to an evidentiary standard." *Provepharm*, 2019 WL 2443185, at *12 n.16. At this point in the proceedings, it is sufficient that ERIS has plausibly alleged that but for EDR's conduct and failure to disclose, the ASTM would not have adopted ASTM E1527 or would have adopted a different standard, particularly in light of ASTM's policies. Thus, ERIS's allegations are ultimately sufficient to survive a motion to dismiss.[21]

### c. Disparagement

ERIS also alleges that EDR-Sanborn has caused ERIS competitive harm by making false and misleading statements to the effect that EDR-Sanborn owns copyrights to *all* Sanborn Maps

---

[20] *Cf. Townshend v. Rockwell Int'l Corp.*, No. 99-CV-0400 (SBA), 2000 WL 433505, at *11 (N.D. Cal. Mar. 28, 2000) (finding counterclaim-plaintiff did not sufficiently allege anticompetitive conduct before an SSO where counterclaim-defendants' patents issued after adoption of the relevant standard, counterclaim-defendants had disclosed their pending patent applications to the SSO, and counterclaim-plaintiff did not argue that the SSO could have adopted a standard that did not encompass counter-defendants' technology).

[21] EDR argues that standards manipulation claims are subject to a heightened pleading standard under Rule 9(b). However, EDR's argument is based on non-binding case law that predates cases such as *Provepharm*. *See* ECF 45 at 10 (citing *Lotes Co. v. Hon Hai Precision Indus. Co.*, No. 12-CV-7465 (SAS), 2013 WL 2099227, at *5 (S.D.N.Y. May 14, 2013) (relying on *Apple Inc. v. Samsung Elecs. Co.*, Ltd., No. 11-CV-01846, 2012 WL 1672493 (N.D.Cal. May 14, 2012) for the proposition that "deception on the SSO theory of anti-competitive conduct is subject to the heightened pleading standards for fraud") and *ChriMar Sys. v. Cisco Sys.*, 72 F. Supp. 3d 1012, 1019 (N.D. Cal. 2014)).

and that it is unlawful to use *any* Sanborn Map acquired from ERIS for a Phase I ESA. I find that

ERIS's Section 2 disparagement allegations are sufficient to survive a motion to dismiss.

False and misleading statements may give rise to actionable antitrust claims. *See In re*

*Keurig,* 383 F. Supp. 3d at 240. Still, a "monopolization claim based on misleading advertising

must overcome a presumption that the effect on competition of such a practice was *de*

*minimis.*" *Nat'l Ass'n of Pharm. Mfrs., Inc. v. Ayerst Labs.,* 850 F.2d 904, 916 (2d Cir. 1988)

(internal citations omitted). The Second Circuit has directed courts to consider several factors in

determining whether a plaintiff has overcome this presumption, including whether the

representations: "were (1) clearly false, (2) clearly material, (3) clearly likely to induce

reasonable reliance, (4) made to buyers without knowledge of the subject matter, (5) continued

for prolonged periods, and (6) not readily susceptible of neutralization or other offset by rivals."

*Ayerst,* 850 F.2d at 916 (internal citations omitted).

Challenges to these factors are better suited for decision on summary judgment, with

the aid of discovery. *Keurig,* 383 F. Supp. 3d at 240. At the motion to dismiss stage, plausible

allegations that representations were "false and misleading in certain respects," have been

found to be sufficient "to go forward with the discovery process to substantiate its claim that

the [representations were] clearly false, clearly material, and clearly likely to induce reasonable

reliance." *Ayerst,* 850 F.2d at 916 (reversing dismissal and explaining that "in the present case

the several factors . . . noted above cannot be adequately evaluated until the discovery process

has moved forward to a greater extent than it has thus far"); *Keurig,* 383 F. Supp. 3d at 240-41

(denying dismissal and finding that "attacks [regarding] certain specifics" of plaintiffs'

allegations "are more appropriately raised on summary judgment, after discovery"); *Alternative*

*Electrodes*, 597 F. Supp. 2d at 332 (denying dismissal and finding that plaintiff was "entitled to discovery in order to substantiate its claims").[22]

Here, ERIS has plausibly alleged that EDR repeatedly made false and misleading statements, such as on its website, to (potential) customers regarding the copyright status of **all** Sanborn Maps and the impermissibility of ERIS's use of **any** such maps. *See* ¶¶ 94-103, 105; *infra* Section III.D (cataloguing the relevant statements). Customers cannot easily verify the truth of such statements because of the "sheer number" of Sanborn's copyright registrations and the fact that "Copyright Office records (especially older records) are difficult to find or identify." ¶¶ 7, 54, 101; *see* ¶ 134 (stating that "the fact that no [copyright] renewal was ever filed . . . is not readily publicly available"). Because Sanborn Maps are supposedly essential to the ASTM E1527 standard, EDR's statements have allegedly harmed ERIS, as well as smaller competitors in the ERAD market, and created substantial barriers to market entry. ¶¶ 128-29. Thus, construing the allegations most favorably to ERIS and drawing reasonable inferences in its favor, dismissal at this stage is unwarranted and ERIS is entitled to utilize what it has learned in discovery to substantiate its disparagement claim.

### d. Essential Facilities

ERIS argues that Sanborn Maps are "essential facilities" in the ERAD market that EDR-Sanborn has failed to license in violation of Section 2. I recommend that the District Court dismiss ERIS's essential facilities claim.

---

[22] *Cf. Reed Const. Data Inc. v. McGraw-Hill Companies, Inc.*, 49 F. Supp. 3d 385, 421-22 (S.D.N.Y. 2014), *aff'd*, 638 F. App'x 43 (2d Cir. 2016) (granting summary judgment in favor of defendant based on presumption that disparagement had *de minimis* effect pursuant to the *Ayerst* factors).

To state a Section 2 essential facilities claim, a plaintiff must allege: "(1) control of the essential facility by a monopolist; (2) a competitor's inability practically or reasonably to duplicate the essential facility; (3) the denial of the use of the facility to a competitor; and (4) the feasibility of providing the facility." *Twin Labs., Inc. v. Weider Health & Fitness*, 900 F.2d 566, 569 (2d Cir.1990). Thus, a successful plaintiff must assert "more than inconvenience, or even some economic loss," but rather that there are no feasible alternatives to the facility, that its denial "inflicts a severe handicap on . . . market entrants," and that the defendant-monopolist is the "only" entity with which the litigant "feasibly can do business" to access the facility. *Id.*; *Eatoni Ergonomics, Inc. v. Research in Motion Corp.*, 486 F. App'x 186, 190 (2d Cir. 2012) (summary order). However, "the continued viability of the essential facilities doctrine has been called into question in recent years," *TrueEX, LLC v. MarkitSERV Ltd.*, 266 F. Supp. 3d 705, 723 & n.124 (S.D.N.Y. 2017) (Kaplan, J.), and courts in this Circuit have not sustained a claim under the doctrine since the Supreme Court's ruling in *Verizon v. Trinko*, LLP, 540 U.S. at 407-08 ("We have never recognized such a doctrine and we find no need either to recognize it or to repudiate it here.").

To the extent that a Section 2 essential facilities claim remains viable, ERIS has at least made plausible allegations to satisfy the first and fourth prongs of the *Twin* standard. For the same reasons I find that ERIS has plausibly alleged Sanborn Maps to be *de facto* standard-essential, *see supra* Sections III.B.2.a & b, ERIS plausibly alleges that Sanborn Maps constitute an essential facility. *See Twin Labs.*, 900 F.2d at 569 (noting that essential facilities are usually "facilities that are a natural monopoly, facilities whose duplication is forbidden by law, and perhaps those that are publicly subsidized," and that "[i]n cases finding liability in other

categories . . . the facility in question . . . was effectively the only one in town."). ERIS has also

plausibly alleged that it would be feasible for EDR-Sanborn to provide it with access to Sanborn

Maps by at least not asserting copyright over maps it allegedly knows to be in the public

domain, as well as licensing any under valid copyright. While EDR-Sanborn repeatedly argues

that it is not obliged to do so, it fails to make any non-conclusory arguments regarding

infeasibility. *Am. Tel. & Tel. Co. v. N. Am. Indus. of New York, Inc.*, 772 F. Supp. 777, 785-86

(S.D.N.Y. 1991) (refusing to dismiss essential facilities claim where defendant-monopolist

"provided no evidence on [its] motion [to dismiss] that it cannot provide [the essential] services

to" plaintiff-competitor).

Whether ERIS has sufficiently alleged its inability to duplicate Sanborn Maps, by creating

or recreating non-Sanborn fire insurance maps or a standard-complaint substitute, is a closer

call. While the Counterclaims state that it would be "overly laborious," "time-consuming," and

"painstaking" for "**consumers**" such as "**individual environmental professionals**" to "*search for

and collect*" fire insurance maps and other types of ERAD, without the assistance of data

provision firms like EDR and ERIS, they do not speak to what is or is not feasible for competitors

such as ERIS. ¶¶ 36, 81 (emphasis added).[23] *Cf. TrueEX*, 266 F. Supp. 3d at 723 (finding plaintiffs

had not shown likelihood of success on their essential facilities claim where it would take "time

and money" to duplicate a facility); *RxUSA Wholesale Inc. v. Alcon Labs.*, 391 F. App'x 59, 61 (2d

Cir. 2010) (summary order) (finding that plaintiff's "essential facilities claim fails . . . at the very

---

[23] While ERIS states, in its opposition brief, that it has "factually allege[d] that the duplication of the Sanborn Maps would be economically infeasible," ERIS merely cites to ¶ 36 and ¶ 81 for this proposition, which are inapposite, as explained above.

least because [plaintiff] is able to obtain pharmaceutical products from other sources, albeit at a higher price").

Even more apparent, however, is ERIS's failure to allege that it actually sought and was denied access to Sanborn Maps from EDR-Sanborn. While this element may be satisfied by something less than an "outright refusal to deal," *Delaware & Hudson Ry. Co. v. Consol. Rail Corp.*, 902 F.2d 174, 180 (2d Cir. 1990) (finding that [i]t is sufficient if the terms of the offer to deal are unreasonable"), ERIS only alleges that EDR "appears unwilling to license its copyrights or sell the maps" to competitors without alleging facts supporting this conclusion. ¶ 39; *cf*. *TrueEX*, 266 F. Supp. 3d at 724 ("Because reasonable access to the essential facility exist[ed]— even if not in a way that [was] conducive to [plaintiff's] existing business model—[plaintiff] cannot establish an essential facilities claim.") (quoting *MetroNet Servs. Corp. v. Qwest Corp*., 383 F.3d 1124, 1132 (9th Cir. 2004)). While ERIS may be able to sufficiently amend the Counterclaims to ameliorate these pleading deficits, ERIS currently fails to plausibly state an essential facilities Section 2 claim.

### e. Product Bundling

ERIS alleges that EDR is offering Parcel—EDR's in-house writer software used to generate reports from packages of ERAD—as a perk in a "product bundle" with its ERAD packages to divert customers from ERIS and ultimately squeeze ERIS out of the ERAD market. ¶¶ 112-17. However, ERIS's "bundled discount" allegations fail to state a viable Section 2 claim.

*Ortho Diagnostic Sys., Inc. v. Abbott Labs., Inc*. provides the relevant framework for analyzing ERIS's bundling claim. In this Circuit, pricing is generally not considered to be predatory or anticompetitive unless the prices at issue are below the defendant's average

variable cost. *Info. Res., Inc. v. Dun & Bradstreet Corp.*, 359 F. Supp. 2d 307, 307 (S.D.N.Y. 2004);

*see Affinity LLC v. GfK Mediamark Rsch. & Intel., LLC*, No. 12-CV-1728 (RJS), 2013 WL 1189317,

at *3 (S.D.N.Y. Mar. 25, 2013), *aff'd*, 547 F. App'x 54 (2d Cir. 2013). However, in *Ortho*, Judge

Kaplan considered whether the average variable cost standard invariably applies to claims

challenging package or bundled discounts:

> [In] a case in which a monopolist **(1)** faces competition on only part of a complementary group of products, **(2)** offers the products both as a package and individually, and **(3)** effectively forces its competitors to absorb the differential between the bundled and unbundled prices of the product in which the monopolist has market power [a Section 2 plaintiff] must allege and prove either that **(a)** the monopolist has priced below its average variable cost or **(b)** the plaintiff is at least as efficient a producer of the competitive product as the defendant, but that the defendant's pricing makes it unprofitable for the plaintiff to continue to produce. **Any other rule would entail too substantial a risk that the antitrust laws would be used to protect an inefficient competitor against price competition that would afford substantial benefits to consumers.**

920 F. Supp. at 466 (emphasis added) (noting that "care must be exercised to avoid judicial

actions that penalize or threaten to penalize beneficial price cutting in an unduly zealous effort

to punish less desirable forms").[24]

    As an initial matter, ERIS fails to allege that EDR "faces competition on only part of a

complementary group of products" in the challenged bundle. ERIS alleges a product bundle

consisting of: (1) ERAD report packages (available from both EDR and ERIS) and (2) in-house

report writing software (available from EDR, but not ERIS). ¶ 112; ECF 46 at 14. Pursuant to the

first part of the *Ortho* standard, ERIS must allege that EDR's bundle involves a product over

---

[24] In *Ortho*, Judge Kaplan emphasized that pricing is an "exceptionally sensitive area" because while "price cutting can be used by a dominant firm with superior staying power to drive its competitors out of business with the intention thereafter of using its market power to restrict output, raise prices, and recoup the losses sustained in the competitive battle," it is also "a classic, and a socially desirable, form of competition" that "make[s] more goods available to more people and thus result[s] in greater overall benefits to society." *Id.* at 465-66.

which it holds monopoly power **and** a product (here, ERAD) over which it faces—but seeks to foreclose—competition with ERIS, *i.e.*, by forcing ERIS to absorb the difference between the bundled and unbundled price of the monopoly product. *See Ortho*, 920 F. Supp. at 458, 469 (alleging defendant's pricing for a bundle of blood screening tests took advantage of defendant's monopoly in some tests to foreclose or impair competition in the sale of tests offered by both parties).[25] Alternatively stated, "*Ortho* . . . does not analyze bundled pricing for a non-monopolized, non-competing product." (ECF 45 at 16). However, EDR's in-house report writing software is just that: EDR is not alleged to be a monopolist of report writing software nor a competitor with ERIS with respect to such software. Accordingly, ERIS has not satisfied the first part of the *Ortho* standard.

Additionally, while ERIS must plausibly allege either (a) that EDR priced below its average variable cost or (b) that ERIS is an equally efficient producer of ERAD but that EDR's pricing makes it unprofitable to compete, EDR makes no non-conclusory allegations regarding EDR's costs. ¶ 121; *see Astra Media Grp., LLC v. Clear Channel Taxi Media, LLC*, 414 F. App'x 334, 336 (2d Cir.2011) (upholding dismissal where plaintiff failed to plead defendant's actual

---

[25] *See SmithKline Corp. v. Eli Lilly & Co.*, 575 F.2d 1056, 1065 (3d Cir.1978) (in case relied upon by *Ortho*, finding that defendant-pharmaceutical company violated Section 2 by bundling the sale of monopoly cephalosporin antibiotics (Keflin and Keflex) with the sale of its competitive cephalosporin antibiotic (Kefzol) to drive Kefzol-competitor-plaintiff out of the market); *Virgin Atl. Airways Ltd. v. British Airways PLC*, 69 F. Supp. 2d 571, 578, 580 n.8 (S.D.N.Y. 1999), *aff'd*, 257 F.3d 256 (2d Cir. 2001) (featuring challenge to defendant-airline's incentive agreements because "the bundling feature . . . c[ould] cause an incentivized customer who flies on routes on which [defendant] has a monopoly as well as routes on which [defendant] faces competition to fly with [defendant] on the competitive routes," but granting summary judgment for defendant because plaintiff failed to factually support its bundling theory).

costs).[26] Further, while ERIS alleges that EDR's bundles have caused ERIS to lose sales to EDR and created pressure to lower its prices and/or match EDR's bundle, ¶¶ 107, 113, 117, ERIS does not allege that it cannot continue to sell ERAD profitably, *see Ortho*, 920 F. Supp. 470 (dismissing claim where plaintiff conceded that defendant's "package leaves [plaintiff] able to sell its products at a profit, albeit not as large a profit as previously").[27] Accordingly, ERIS has not alleged facts raising a reasonable inference that EDR's bundles represent anticompetitive price cutting.

### C.   Sherman Act Section 1 and Clayton Act Section 3 Claims (Counterclaim V)

ERIS claims EDR is violating Section 1 of the Sherman Act and Section 3 of the Clayton Act by entering into long-term, exclusive contracts with environmental consultants in order to "lock up" the ERAD market. ¶¶ 119-23. While EDR argues that ERIS cannot state an antitrust

---

[26] *See MiniFrame Ltd. v. Microsoft Corp.*, 11-CV-7419 RJS, 2013 WL 1385704, at *6 (S.D.N.Y. Mar. 28, 2013), *aff'd*, 551 F. App'x 1 (2d Cir. 2013) (dismissing pricing claim where plaintiff did not plausibly allege that defendant suffered losses on its pricing scheme); *Affinity*, 2013 WL 1189317, at *4 (same); *see also Info. Res., Inc.*, 359 F. Supp. 2d at 307 (noting that "[w]hen price discounts in one market are bundled with the price charged in a second market, the discounts must be applied to the price in the second market in determining whether that price is below that product's average variable cost").

[27] ERIS's reliance on *LePage's Inc. v. 3M*, 324 F.3d 141 (3d Cir.2003) to support its bundling allegations is inapposite. *Id.*at 177 (Greenberg, J., dissenting) (emphasizing that plaintiff had "not satisfied the stricter tests devised by other courts considering bundled rebates," including the *Ortho* standard). The *LePage*'s standard for bundled discounts has not been adopted by other circuits and has been interpreted narrowly by the Third Circuit. *See ZF Meritor, LLC v. Eaton Corp.*, 696 F.3d 254, 274 n.11 (3d Cir. 2012) (interpreting *LePage's* narrowly in light of intervening Supreme Court precedent); *Cascade Health Sols. v. PeaceHealth*, 515 F.3d 883, 897-905 (9th Cir. 2008) (discussing differences between the exclusionary effects approach in *LePage*'s and cost-based approaches, such as *Ortho*'s, and emphasizing that the bipartisan Antitrust Modernization Commission, created by Congress in 2002, "noted [that] the fundamental problem with the *LePage*'s standard is that it does not consider whether the bundled discounts constitute competition on the merits, but simply concludes that all bundled discounts offered by a monopolist are anticompetitive with respect to its competitors who do not manufacture an equally diverse product line" and thus "could protect a less efficient competitor at the expense of consumer welfare").

claim based on such contracts because ERIS has not alleged harm to competition, ERIS has

made sufficient allegations to survive its low burden on a motion to dismiss.[28]

Under Section 1 of the Sherman Act: "Every contract, combination in the form of trust

or otherwise, or conspiracy, in restraint of trade or commerce among the several States . . . is

declared to be illegal." 15 U.S.C. § 1. Accordingly, a litigant bringing a Section 1 claim must

allege: "(1) a combination or some form of concerted action between at least two legally

distinct economic entities that (2) unreasonably restrains trade." *Geneva Pharm. Tech. Corp. v.*

*Barr Labs. Inc*., 386 F.3d 485, 506 (2d Cir.2004).

Similarly, under Section 3 of the Clayton Act, it is "unlawful . . .  to . . .  make a sale or

contract for sale of goods . . . on the condition, agreement, or understanding that the . . .

purchaser thereof shall not use or deal in the goods . . . of a competitor or competitors of

the . . . seller" *if* "the effect . . . may be to substantially lessen competition or tend to create a

monopoly in any line of commerce." 15 U.S.C. § 14. Clayton Act Section 3 claims are analyzed in

essentially the same manner (besides the additional requirement of a "sale or contract for sale

of goods"[29]) as Sherman Act Section 1 claims challenging exclusivity agreements; accordingly,

both EDR-Sanborn and ERIS analyze these claims together. *See CDC Techs., Inc. v. IDEXX Lab.,*

---

[28] To the extent ERIS also seeks to pursue a Section 2 exclusive dealing claim (¶ 158), it should likewise be sustained. As an initial matter, because EDR-Sanborn did not address such a claim in its opening brief and only mentioned it in one footnote in its reply brief, EDR-Sanborn arguably waived any argument in favor of dismissal. *See supra* note 10. Regardless, exclusive dealing claims are subjected to the same substantial foreclosure analysis under both sections (as EDR acknowledges), and, thus, ERIS's allegations survive dismissal for the reasons set out below. *Maxon Hyundai Mazda v. Carfax, Inc*., No. 13-CV-2680 (AJN), 2014 WL 4988268, at *9 (S.D.N.Y. Sept. 29, 2014) (finding, after sustaining plaintiff's Section 1 Claim, that "the analysis [regarding whether defendant participated in anticompetitive conduct for purposes of Section 2] is essentially the same as it was for Section 1 above. The requisite anticompetitive action alleged in the Complaint is the formation of exclusive dealing contracts that foreclose a significant share of the market."); ECF 51 at 8 n.16.

[29] EDR-Sanborn has waived any argument based on this factor. *See supra* note 10.

*Inc.*, 186 F.3d 74, 79 (2d Cir. 1999); *Comm. Data Servers, Inc. v. IBM*, 262 F. Supp. 2d 50, 78

(S.D.N.Y. 2003). EDR-Sanborn's principal argument is that both claims should be dismissed

because ERIS does not plausibly allege that the exclusive contracts at issue restrain trade.

Because of their potentially procompetitive benefits, exclusive dealing agreements are

considered "presumptively legal" and the question of whether they unreasonably restrain trade

is analyzed under the rule of reason. *Maxon*, 2014 WL 4988268, at *9 (quoting *CDC Techs.*, 186

F.3d at 80). Under the rule of reason, plaintiffs bear an initial burden of demonstrating that the

agreements have an actual adverse effect on competition. *Id.* "Thus, to survive a motion to

dismiss they must plead plausible allegations that, if true, would show such an adverse effect; if

Plaintiffs then provide evidence of anticompetitive effects, Defendant will later have the

opportunity to show the procompetitive effects of the agreements." *Id.*

To meet their burden, ERIS must plausibly allege that a substantial share of the ERAD

market has been foreclosed by EDR's exclusivity agreements. *Id.* at *13; *Geneva Pharm.*, 386

F.3d at 508 ("Exclusive dealing is an unreasonable restraint of trade and a § 1 violation only

when the agreement freezes out a significant fraction of buyers or sellers from the market."). In

determining substantial market foreclosure, courts place great weight on the percentage of the

market foreclosed by the agreements at issue, and foreclosure percentages below 30 to 40

percent are generally insufficient. *See Maxon*, 2014 WL 4988268, at *14; *Am. Express Travel

Related Servs. Co. v. Visa U.S.A.*, No. 04-CV-8967 (BSJ), 2005 WL 1515399, at *3 (S.D.N.Y. June

23, 2005). However, courts also consider non-numeric factors, such as the duration and

terminability of the agreements and whether there are significant barriers to entry into the

relevant market. *Mazda v. Carfax, Inc.*, No. 13-CV-2680 (AJN), 2016 WL 7231941, at *5 (S.D.N.Y.

Dec. 9, 2016), *aff'd sub nom*. *Maxon Hyundai Mazda, et al. v. Carfax, Inc*., 726 F. App'x 66 (2d Cir. 2018).

Here, ERIS has plausibly alleged that EDR has substantially foreclosed the ERAD market through exclusivity agreements. By generally alleging, on information and belief, that EDR has foreclosed 60% of purchasing in the market using exclusivity agreements, and specifically alleging that (a) EDR has locked *at least* seven of the ten largest potential customers in the market into exclusivity agreements, (b) these ten customers constitute 60% of the purchasing in the market and the "locked in" seven constitute 25% of the purchasing, and (c) EDR has also locked several smaller customers into such agreements, ERIS raises a reasonable inference that EDR has foreclosed a substantial share of the ERAD market. ¶¶ 118, 122-23.  *See In re Keurig*, 383 F. Supp. 3d at 236-37 (explaining that "[a]t the motion to dismiss stage, such specific mathematical pleading is unnecessary" and that "[t]he extent to which competitors were excluded . . . is fact-dependent and not properly disposed of on a motion to dismiss"); *see also E.I. DuPont de Nemours & Co. v. Kolon Indus*., 637 F.3d 435, 452 n.12 (4th Cir. 2011) ("While [counterclaim-plaintiff] did not allege a specific percentage of market foreclosure in its Counterclaim, it would be problematic to reject its Counterclaim, with its extensive factual allegations, solely on that basis at the pre-discovery, motion-to-dismiss stage, when [counterclaim-plaintiff] likely has insufficient information to calculate a precise number.").

ERIS's other allegations also support a reasonable inference of substantial foreclosure. For example, EDR's contracts are alleged to last several years. *See Am. Express*, 2005 WL 1515399, at *3 ("[T]he shorter an agreement's term and the easier it is to terminate, the more likely that it will be upheld."). ERIS also alleges significant barriers to market entry, in light of

the other anticompetitive conduct alleged in the complaint. These allegations are sufficient at the motion to dismiss stage. *Compare Mazda*, 2014 WL 4988268, at *13-14 (denying motion to dismiss where plaintiff estimated more than 30% market foreclosure by allegedly long-term agreements), *with Mazda*, 2016 WL 7231941, at *14-15 (later granting summary judgment in favor of defendant in the same case where discovery revealed less than 30% foreclosure by exclusivity agreements, most of which lasted less than three years, and plaintiff failed to provide evidence of barriers to market entry).[30]

### D.   Counterclaims VI-XII: Tort and Lanham Act Claims

ERIS's tort and Lanham Act claims (Counts VI through XII) center on four categories of written and oral statements about EDR-Sanborn and its products and/or ERIS and its products. Before analyzing ERIS's claims, I briefly describe each contested statement:

1. **Copyright Management Information ("CMI")**: ERIS asserts that EDR has wrongfully included CMI—consisting of Sanborn's corporate logo, a copyright date, and a legend stating that "[o]nly Environmental Data Resources (EDR) is authorized to grant rights for commercial reproduction of maps by the Sanborn

---

[30] I reject EDR's argument that its exclusivity agreements cannot be anticompetitive because ERIS attempted to bid against at least one of EDR's exclusive contracts and lost. ¶ 121. The cases cited by EDR are inapposite: In *Balaklaw v. Lovell*, the Circuit affirmed summary judgment in favor of defendants and found no evidence of market foreclosure where an exclusivity agreement was freely terminable on six-months' notice and was entered into after an open, competitive bidding process. 14 F.3d 793, 796, 799, 801 (2d Cir. 1994). Relying on *Lovell*, Judge Sweet found, on a motion to dismiss, that exclusive contracts were not anticompetitive where, as alleged, they were not fully exclusive and were of limited duration (no more than three years), and defendant entertained bids at the conclusion of each agreement's term. *Spinelli v. Nat'l Football League*, 96 F. Supp. 3d 81, 117-18 (S.D.N.Y. 2015). Still, the *Spinelli* court acknowledged that a plaintiff can plausibly allege exclusivity agreements to be anticompetitive by "alleg[ing] facts showing exceptional circumstances, such as evidence of predatory practices or a unique opportunity to leverage two distinct monopolies." *Id.* at 118 (internal citations omitted). Here, the exclusivity agreements are not alleged to be of short duration or (invariably) subject to an open, competitive bidding process, and ERIS plausibly alleges that EDR is engaging in predatory practices harming competition in the ERAD market.

Library LLC, the copyright holder for the collection"—on **each and every** Sanborn

Map, even those in the public domain based on their publication date or lack of

timely copyright renewal. ¶ 62. Such CMI can be publicly viewed on **all** maps in a

sample "Certified Sanborn Map Report" available on EDR's website. ¶ 63;

Wolkoff Decl., Ex. C. ERIS alleges that EDR-Sanborn includes this "patently false"

CMI on public domain Sanborn Maps in order to "unduly restrict[] the

dissemination of these uncopyrighted and uncopyrightable maps and coerc[e]

environmental consultants, governments, and others to turn to EDR—and only

EDR—for copies of these public domain maps." ¶ 64.

2. **Blog Post**: ERIS also alleges that the below language, appearing in a two-part

blog post available on EDR's website, wrongly suggests that all Sanborn Maps[31]

are protected by copyright:

> Finally, an issue that many people are not aware of is the fact **that when Sanborn Maps . . . are not procured via EDR and The Sanborn Library, it is against copyright to include them in a Phase I or similar report**. Yet we are aware of many instances **where companies are using the actual maps in reports illegally**. In fact, many of our clients are also dealing with the same limitations with Google Maps, Polk City Directories and other tools that can be used for research. While they can be used for reference, all of these sources are protected by copyright infringement laws and **are not allowed to be used for commercial purposes such as Phase I ESA reports**. **Many folks are not even aware that they are violating a copyright law when they include them, but it is true**. You would think that those who promote and market the use of "Free Sanborn

---

[31] The Blog Post does not directly define "Sanborn Maps" but instead seems to use the term to refer to all maps published by Sanborn. *See* Ezovski, *supra* note 4 ("As many people familiar with Environmental Data Resources know, EDR purchased the complete Sanborn Library in 1996 . . . . By doing this, EDR secured the largest, most complete collection of 1.4 million Sanborn Maps in the country (which it still is today). However, since then, many people in our industry have been trying to 'skirt around' the copyright issue of Sanborns."). The Blog Post nowhere suggests that any Sanborn Maps lack copyright protection.

Maps" would be so kind to mention this "*minor*" detail. ¶ 65 (emphases in Counterclaims) (quoting language and providing links).

3. **Oral Statements**. ERIS challenges three sub-categories of oral statements by EDR to customers and potential customers:

   a. **Oral Statement 1**: "[T]he lawsuit is an 'open and shut case' and . . . when it is over, ERIS will not be able to provide 'any fire insurance maps.'" ¶¶ 101, 126, 159.

   b. **Oral Statement 2**: "EDR-Sanborn is the owner of copyrights in all of the Sanborn Maps." ¶¶ 101, 105.

   c. **Oral Statement 3**: **"**ERIS is acting illegally and in violation of all of EDR's copyrights" and Sanborn Maps acquired from any source other than EDR for use in a Phase I ESA are "illicit and unlawful." ¶¶ 70, 101, 105, 182, 203.

4. **Litigation Statements**. Lastly, ERIS also challenges written statements, made in March 2019 on EDR's website and in an industry-wide email, stating that, *inter alia*: EDR "filed a copyright infringement action against [ERIS] in order to stop its

unlawful use of our Sanborn Map® collection"[32] and EDR "believe[s] that ERIS is illegally copying, selling and distributing our Sanborn Maps without our permission and that its actions constitute copyright infringement." ¶¶ 94-100.

Although it is not fully clear from the Counterclaims which particular statements form the basis of which claims, ERIS's brief clarifies that the Blog Post, Oral Statements 1 and 3, and the Litigation Statements—statements supposedly about ERIS and its products—form the basis of its Defamation (Count X), Product Disparagement (Count IX), and Trade Libel (Count XI) claims. (ECF 47 at 20-21). Alternatively, ERIS states that **all** of the above-mentioned statements form the basis of its Lanham Act (Count VI), New York General Business Law (Count VII and VIII), and tortious interference (Count XII) claims. (*Id.* at 20-21, 26).

### 1.   Statements of Fact vs. Statements of Opinion

Before undertaking a claim-by-claim analysis, I will address EDR-Sanborn's general argument that the contested statements are not actionable as a matter of law because they are all properly characterized as statements of pure opinion. With the exception of Oral Statement

---

[32] The Litigation Statements do not directly define the "Sanborn Map® collection" but seem to use the term to refer to all maps published by Sanborn and acquired by EDR. *See* ¶¶ 94-100 ("We acquired the Sanborn Map collection in 1996. The maps were carefully crafted by cartographers . . . This craftsmanship is reflected in each Sanborn Map, and we are proud to serve as the owner and custodian of this important historical resource."). Sanborn uses the term similarly in the Copyright Suit complaint (which is linked in the Litigation Statements). *See* ECF 12 ¶ 16 ("EDR's offerings include . . . the complete catalog of fire insurance maps originally published by Sanborn Library's predecessor in-interest, the Sanborn Map Company (the 'Sanborn Maps').)"; ¶ 19 ("Today, digital copies of the Sanborn Maps can be purchased for commercial use exclusively through EDR, on an a-la-carte basis, through a variety of customizable report packages. In all, there are roughly 1.2 million Sanborn Maps in Sanborn Library's collection."); *see also* ¶ 5 ("ERIS has amassed a collection of nearly one million fire insurance maps which, upon information and belief, is built entirely of Sanborn Library's copyrighted maps."); Prayer for Relief A (asking for "[a] declaration that [ERIS] ha[s] directly and/or indirectly infringed [Sanborn's] copyrights in each of the Sanborn Maps).

1, I find that the contested statements are properly characterized as statements of fact or mixed opinion.[33]

"The Lanham Act does not proscribe liability for mere [or pure] opinions, nor do opinions give rise to liability under state law for defamation [or] deceptive acts and practices." *See GeigTech E. Bay LLC v. Lutron Elecs. Co.*, No. 18-CV-5290 (CM), 2019 WL 1768965, at *8 (S.D.N.Y. Apr. 4, 2019) (collecting cases). However, a statement of opinion "that implies that it is based upon facts which justify the opinion but are unknown to those reading or hearing it" may be actionable as a "mixed opinion." *Davis v. Boeheim*, 24 N.Y.3d 262, 269-70 (2014) (internal citations omitted). "Distinguishing between fact and opinion is a question of law" for courts to decide. *Id.*

In determining whether a statement constitutes an opinion or factual representation, courts must consider whether, in the view of an objective, reasonable listener or reader: (1) "the specific language in issue has a precise meaning which is readily understood," (2) "the statements are capable of being proven true or false," and (3) "either the full context of the communication in which the statement appears or the broader social context and surrounding circumstances are such as to signal [to] . . . readers or listeners that what is being read or heard is likely to be opinion, not fact." *Id*. at 270 (internal citations omitted); *accord Mr. Chow N. Y. v. Ste. Jour Azur S.A.*, 759 F.2d 219, 224 (2d Cir. 1985). The "dispositive inquiry" is "whether the

---

[33] At the motion to dismiss stage, courts typically evaluate each challenged statement (or set of statements) and determine whether it is actionable. "If the Court finds that some of the statements are actionable but others are not, then the Court may dismiss the claims based on the nonactionable statements and allow the claims based on the actionable statements to go forward . . . [D]iscovery w[ill] then proceed for any statements held to be actionable, but not for any statements that fail to support a claim." *Biro v. Conde Nast*, 883 F. Supp. 2d 441, 457 (S.D.N.Y. 2012) (granting motion to dismiss claims with respect to some statements and denying motion with respect to others); *see Watson v. NY Doe 1*, 439 F. Supp. 3d 152, 160-62 (S.D.N.Y. 2020) (same); *Treppel v. Biovail Corp.*, No. 03-CV-3002, 2004 WL 2339759, at *17 (S.D.N.Y. Oct. 15, 2004) (same).

challenged statement can reasonably be construed to be stating or implying facts about the . . . plaintiff." *Flamm v. Am. Ass'n of Univ. Women*, 201 F.3d 144, 146 (2d Cir. 2000); *Davis*, N.Y.3d at 269-270.

 EDR's alleged statement to customers that the Copyright Suit is an "open and shut case" and will lead ERIS to not being able to sell any fire insurance maps in the future ("Oral Statement 1") is puffery, or "defensive salvo in this ongoing [legal] battle." *Karp v. Hill & Knowlton, Inc*., 631 F. Supp. 360, 365 (S.D.N.Y. 1986). A description of a case as "open and shut" does not have a precise meaning and thus cannot be proven true or false, and statements regarding the outcome of ongoing litigation are nothing more than conjecture or speculation. *See Live Face on Web, LLC v. Five Boro Mold Specialist Inc.*, No. 15-CV-4779 (LTS) (SN), 2016 WL 1717218, at *2 (S.D.N.Y. Apr. 28, 2016) (finding "hyperbolic and imprecise" statements describing case as "frivolous" to be non-actionable opinion and noting that "[c]ourts have consistently found that statements calling into question the legitimacy of litigation are non-actionable statements of opinion"); *Scholastic, Inc. v. Stouffer*, 124 F. Supp. 2d 836, 850 (S.D.N.Y. 2000) (finding statements that legal claims were "absurd," "ridiculous" and "meritless" to be non-actionable opinion); *Karp*, 631 F. Supp. at 365 (finding statement interpreting Second Circuit opinion as supporting [a company's] claim to be non-actionable opinion where "whether the Second Circuit approved of [the] claims on the merits [was] still an open question"); *Gotbetter v. Dow Jones & Co.*, 687 N.Y.S.2d 43, 44 (1999) (finding defense counsel's statement calling plaintiff's lawsuit "baseless" to be non-actionable opinion); *see also Moya v. United Airlines, Inc.*, No. 18-CV-14829, 2019 WL 351904, at *4 (D.N.J. Jan. 29, 2019) (collecting cases

for the proposition that "[c]ourts generally find parties' statements regarding the probable outcome of a litigation to be non-actionable opinion").

However, the remaining challenged statements make or imply a factual representation that EDR-Sanborn holds valid copyright rights in *all* Sanborn Maps. Oral Statement 3 and the Litigation Statements also convey a factual representation that because EDR-Sanborn holds copyrights in all Sanborn Maps, ERIS's use and inclusion of Sanborn Maps in its products infringes on EDR-Sanborn's copyrights. Relevant terms such as "copyright" and "infringement" have precise meanings, and whether EDR holds and ERIS is infringing upon currently-valid copyrights is, *at least in relevant part*, susceptible to proof by way of verifiable facts, such as the date the maps were originally published and whether renewals were (timely) made; alternatively stated, that a map is within the term of copyright protection, is too old to be protected, or was not timely or properly renewed can be objectively proven true or false. *See Perfect Pearl Co. v. Majestic Pearl & Stone, Inc*., 887 F. Supp. 2d 519, 539-40 (S.D.N.Y. 2012) (finding use of "®" registration symbol on promotional materials after trademark registration had lapsed constituted an actionable, false statement).

Additionally, context cuts both ways. While a reasonable reader or listener might discount such statements as the biased opinion of a legal adversary and business competitor, they also may assume that EDR-Sanborn is "is privy to undisclosed and damning information, the details of which formed the basis for statements." *GeigTech*, 2019 WL 1768965 at *8 (finding company president's statements that competitor "poached [the company's] patented designs" and engaged in "blatant infringement," published in press release announcing lawsuit, to be actionable); *cf. Lombardo v. Dr. Seuss Enter., L.P.*, No. 16-CV-9974 (AKH), 2017 WL

1378413, at *7 (S.D.N.Y. Apr. 7, 2017) (finding company's cease and desist letter stating, *inter alia*, "upon information and belief, the Infringing Work appears to be based on or derived from" defendant's book was not actionable because a reasonable reader "could not believe that defendant sent the letters in order to assert false statements of fact about plaintiffs" rather than to "notify the recipients of its legal opinion"). Thus, even to the extent that such statements can be classified as opinions, readers and listeners could reasonably assume such statements are based on undisclosed facts concerning, for example, EDR-Sanborn's renewal of their alleged copyrights.

### 2. Defamation (Count X)

As stated above, ERIS alleges defamation liability based on the Blog Post, Oral Statements 1 and 3, and the Litigation Statements. EDR argues that ERIS's defamation claim fails because (a) the Blog Post is not a statement "of and concerning" ERIS; (b) the Oral Statements are inadequately identified and (c) the Litigation Statements (and Oral Statement 3) fall under New York's "fair report" privilege. I agree with EDR's first two arguments and thus recommend that this claim be dismissed insofar as it is based on the Blog Post and the Oral Statements. Alternatively stated, ERIS should be permitted to proceed with a defamation claim based only on the Litigation Statements.

"Defamation is the injury to one's reputation either by written expression, which is libel, or by oral expression, which is slander." *Idema v. Wagner*, 120 F. Supp. 2d 361, 365 (S.D.N.Y.2000), *aff'd*, 29 Fed. Appx. 676 (2d Cir.2002). Under New York law, a defamation claim must allege: (1) a false and defamatory, factual statement "of and concerning" the plaintiff (2) that was published to a third party without authorization or privilege; (3) through fault on the

46

part of the defendant; and (4) and either special damages or *per se* actionability. *Id*.; *Kamchi v. Weissman*, 1 N.Y.S.3d 169, 180 (2d Dep't 2014). Additionally, plaintiff must "identify adequately who actually made the allegedly [defamatory] statements, when they were made and to whom they were communicated." *Watson*, 439 F. Supp. 3d at 163 (internal citations omitted).

### a.  Blog Post

As an initial matter, ERIS has not sufficiently alleged that the Blog Post is a statement "of and concerning" ERIS.  While "it is not necessary for the plaintiff[] to be named in the publication, [the plaintiff] must plead and prove that the statement referred to [the plaintiff] and that a person [familiar with the parties and subject] hearing or reading the statement reasonably could have interpreted it as such." *Three Amigos SJL Rest., Inc. v. CBS News Inc.*, 65 N.E.3d 35, 37 (2016); *see Elias v. Rolling Stone LLC*, 872 F.3d 97, 105 (2d Cir. 2017). "This burden is not a light one," and whether a statement can reasonably be interpreted to be "of and concerning" a particular party is a question of law generally resolved at the pleading stage. *Three Amigos*, 65 N.E.3d at 37; *see Elias*, 872 F.3d at 105.

Additionally, under the "group libel doctrine," statements regarding a small, "specifically-defined group" may reasonably be interpreted as being "of and concerning" an individual member of such group, *Three Amigos*, 65 N.E.3d at 38, whereas "an impersonal reproach of an indeterminate class is not actionable," *Gross v. Cantor*, 200 N.E. 592, 593 (1936); *Diaz v. NBC Universal, Inc.*, 536 F. Supp. 2d 337, 343 (S.D.N.Y. 2008), *aff'd*, 337 F. App'x 94 (2d Cir. 2009) ("Under the group libel doctrine, when a reference is made to a large group of people, no individual within that group can fairly say that the statement is about him, nor can

the 'group' as a whole state a claim for defamation."). New York courts apply an "intensity of suspicion" test to determine whether statements made against a group are actionable under a group libel theory, considering factors such as the size of the group, its definiteness in number and composition, its degree of organization and prominence, and the degree to which the defamatory comments focus on individual members. *See Elias*, 872 F.3d at 108; *Anyanwu v. Columbia Broad. Sys.*, Inc., 887 F. Supp. 690, 693 (S.D.N.Y. 1995); *Brady v. Ottaway Newspapers, Inc.*, 445 N.Y.S.2d 786, 790 (2d Dep't 1981).

Here, the Blog Post can reasonably be interpreted as being "of and concerning" everyone that uses or has used Sanborn Maps not procured from EDR for commercial purposes. This group seems to include data provision firms such as ERIS, who provide ERAD report packages including Sanborn Maps to environmental professionals, as well as the environmental professionals who then use these packages to create Phase I ESA Reports. While ERIS's opposition asserts (in a single sentence) that the Blog Post makes implied statements about ERIS,[34] ERIS has not pleaded any facts suggesting that a reasonable reader would understand the Blog Post to be referring to ERIS individually. *Chicherchia v. Cleary*, 616 N.Y.S.2d 647, 648 (2d Dep't 1994) ("[W]here extrinsic facts are relied upon to prove such reference the party alleging defamation must show that it is reasonable to conclude that the publication refers to him or her and the extrinsic facts upon which that conclusion is based were known to those who read or heard the publication."). Moreover, ERIS has not alleged any information regarding the (approximate) size or definitiveness/stability of the referenced group to enable application

---

[34] Any argument for defamation liability based on the Blog Post may also be deemed waived or abandoned due to ERIS's failure to sufficiently address it in its opposition brief. *See supra* note 10; ECF 47 at 26.

of the "small group libel doctrine." *Elias*, 872 F.3d at 108 (noting that "successful small group

defamation claims typically involve groups with twenty-five or fewer members," though New

York courts have allowed claims to go forward where the relevant group included 53 members).

Thus, the District Court should reject ERIS's conclusory statement that the Blog Post makes an

implied representation about ERIS.

### b. Oral Statements

Next, I find that EDR cannot base defamation liability on the Oral Statements[35] because

ERIS fails to plead the identity of a single individual who made such statements or to provide

any details regarding when they were made or to whom they were communicated.

It is well-settled that allegations regarding defamatory statements or

misrepresentations must provide some identifying information regarding the relevant

statements, who made them, when they were made, and to whom they were communicated.

*See, e.g.*, *Evliyaoglu Tekstil A.S. v. Turko Textile LLC*, No. 19-CV-10769 (LJL), 2020 WL 7774377,

at *3 (S.D.N.Y. Dec. 30, 2020) ("A long line of cases in this District holds that a defamation claim

is only sufficient if it adequately identifies the purported communication, and an indication of

who made the communication, when it was made, and to whom it was communicated.")

(internal citations omitted).[36]

---

[35] I have already found Oral Statement 1 to constitute unactionable opinion. *See supra* Section III.D.1.

[36] Under New York procedural law, a plaintiff must plead defamatory statements with greater particularity. N.Y. C.P.L.R. 3016(a) ("In an action for libel or slander, the particular words complained of shall be set forth in the complaint . . . ."). While federal courts instead subject defamation claims to the more "liberal pleading standards of Fed R. Civ. P. 8," courts in this Circuit have repeatedly emphasized that "[e]ven under the more lenient federal standard, however, the [litigant] must at least 'identify the allegedly defamatory statements, the person who made the statements, the time when the statements were made, and the third parties to whom the statements were published.'" *Neal v. Asta Funding, Inc*., 13-CV-2176 (VB), 2014 WL 3887760, at *3 (S.D.N.Y. June 17, 2014) (quoting *Mobile Data Shred. Inc. v. United Bank of Switzerland,* 2000 WL 351516, at *6 (S.D.N.Y. Apr. 5, 2000)); *see Alvarado v. Mount Pleasant Cottage Sch. Dist*., 404 F. Supp. 3d 763, 790 (S.D.N.Y. 2019).

ERIS alleges that certain oral statements were made by "EDR and its agents and representatives" to "consumers and potential consumers," but does not provide even approximate dates of any instances that such comments were made. ¶¶ 68, 70, 101-103; 126; 159. Moreover, EDR provides no indication of who at EDR made the statements and to which customers and potential customers the statements were made. ERIS cannot survive a motion to dismiss based on these oral statements without providing further identifying information. *See Adyb Engineered for Life, Inc. v. Edan Admin. Servs. Ltd.*, No. 1:19-CV-7800 (MKV), 2021 WL 1177532, at *25 (S.D.N.Y. Mar. 29, 2021) (granting motion to dismiss where plaintiff "vaguely" alleged that defendant's owner sent emails to "representatives" of a company without identifying those representatives or when the emails were sent); *MCM Prod. USA, Inc. v. Botton*, No. 16-CV-1616, 2016 WL 5107044, at *6 (S.D.N.Y. Sept. 19, 2016) (granting motion to dismiss where counterclaim-plaintiffs merely "allege[d] that an unidentified [counterclaim-defendant] employee told an unidentified customer of [counterclaim-plaintiffs] that the . . . goods sold by [counterclaim-plaintiffs] were counterfeit and defective," without providing the date, time, or location of the statement or identifying information for the employee-speaker or customer-listener); *Neal*, 2014 WL 3887760, at *3 (granting motion to dismiss and finding that "plaintiff's failure to identify the anonymous 'employee or agent of [defendant-organization]' responsible for making the statement [was] fatal to his [defamation] claim"); *Biomed Pharms., Inc. v. Oxford Health Plans* (N.Y.), Inc., 775 F. Supp. 2d 730, 739 (S.D.N.Y. 2011) (granting motion to dismiss where plaintiff alleged "only vaguely that [the statements] were made to unidentified patients of [plaintiff], unidentified physicians, and unidentified individuals at the [state agency]"); *Camp Summit of Summitville, Inc. v. Visinski*, No.

06-CV-4994 (CM) (GAY), 2007 WL 1152894, at *10 (S.D.N.Y. Apr. 16, 2007) (granting motion to dismiss where counterclaim-plaintiff "neither allege[d] who at [counterclaim-defendant's organization] made the defamatory remarks, nor to whom the comments were made").[37]

### c.   Litigation Statements

Lastly, at this point in the proceedings, I do not find that EDR-Sanborn is immunized from defamation liability based on New York's "fair report" litigation privilege. Accordingly, ERIS's defamation claim may proceed only based on the Litigation Statements.

Under Section 74 of New York's Civil Rights Law, absolute privilege attaches to any statement giving a substantially fair and accurate reporting of judicial proceedings. N.Y. Civ. Rights Law § 74. However, in *Williams v. Williams*, the New York Court of Appeals clarified that Section 74 does not permit a person or entity to "maliciously institute a judicial proceeding alleging false and defamatory charges, and to then circulate a press release or other communication based thereon and escape liability by invoking the statute." 246 N.E.2d 333, 337 (1969); *Sparrow Fund Mgmt. LP v. MiMedx Grp., Inc.*, No. 18-CV-4921 (PGG) (KHP), 2020 WL 1330283, at *7 (S.D.N.Y. Mar. 22, 2020) ("[S]tatements made as part of a sham or 'maliciously instituted' action, or communications about such an action, are not privileged."); *Flomenhaft v. Finkelstein*, 8 N.Y.S.3d 161, 165 (1st Dep't 2015) ("[T]he privilege is capable of abuse and will not be conferred where the underlying lawsuit was a sham action brought solely to defame the defendant"). Still, courts have emphasized that *Williams* created a "narrow" exception that "does not apply in the absence of any allegation that the . . . [underlying] action

---

[37] ERIS has now had the opportunity to take discovery on these statements, which are also relevant to ERIS's affirmative defense of copyright misuse that EDR-Sanborn has not moved to strike.

was brought maliciously and solely for the purpose of later defaming the plaintiff." *Fuji Photo Film U.S.A., Inc. v. McNulty*, 669 F. Supp. 2d. 405, 412 (S.D.N.Y.2009) (internal citations omitted).

Here, ERIS alleges that EDR-Sanborn intentionally filed a sham lawsuit against ERIS and publicized its allegations on EDR's website and via email in order to injure ERIS and drive away customers. ¶¶ 94-102, 132-136. As discussed above, the Copyright Suit remains pending and has neither been subjected to dispositive motion practice nor been decided to be (or not be) a sham as a matter of law. *See supra* Section III.B.2.a. Thus, "[w]hether the [Copyright Suit] meet[s] [the *Williams*] standard is an open question of fact that cannot be resolved on a motion to dismiss." *Frydman v. Verschleiser*, 172 F. Supp. 3d 653, 673 (S.D.N.Y. 2016) (dismissing defamation claim pursuant to New York's fair report privilege only insofar as it was related to a dismissed state court lawsuit because the state court's denial of sanctions established that the suit was not a sham, but refusing to dismiss defamation claim insofar as it was related to two pending lawsuits); *see Long v. Marubeni Am. Corp.*, 406 F. Supp. 2d 285, 296 (S.D.N.Y. 2005) (explaining that "[d]evelopment of a factual record, and further developments in this lawsuit, may well permit the Court to conclude that the [allegedly defamatory] e-mail was absolutely privileged [under Section 74], but the applicability of the privilege cannot be ascertained solely from the facts alleged in plaintiffs' complaint"). Accordingly, *at least at this stage of the case*, the fair report privilege does not immunize EDR from any defamation liability.[38]

---

[38] EDR-Sanborn also argues that ERIS's defamation, as well as all other claims made in Counts VI-XII, should be dismissed pursuant to the *Noerr-Pennington* doctrine insofar as they are based on the Litigation Statements. (ECF 45 at 31 & n. 24). However, for the reasons stated in Section III.B.2.a, any dismissal based on *Noerr-Pennington* immunity should not be granted at this point in the litigation.

### 3.  Product Disparagement and Trade Libel (Counts IX and XI)

EDR-Sanborn argues that ERIS's Product Disparagement (Count IX) and Trade Libel

(Count XI) claims fail for the same reasons its defamation claim fails, *as well as for the*

*additional reason that ERIS fails to plead special damages.* I recommend that these claims

(Counts IX and XI) be dismissed *in toto* for failure to plead special damages.

Under New York law, "[t]rade libel or product disparagement is an action to recover for

words or conduct which tend to disparage or negatively reflect upon the condition, value or

quality of a product or property." *Angio-Med. Corp. v. Eli Lilly & Co.*, 720 F. Supp. 269, 274

(S.D.N.Y.1989); *Bilinski v. Keith Haring Found., Inc.*, 96 F. Supp. 3d 35, 51 & n.15 (S.D.N.Y. 2015),

*aff'd in part*, 632 F. App'x 637 (2d Cir. 2015) (observing that defamation of a product, under

New York law, is "described interchangeably as trade libel, injurious falsehood, and product

disparagement"). To recover for such a claim, a "plaintiff must show that the defendant

published a[] . . . defamatory statement directed at the quality of a business's goods *and must*

*prove that the statements caused special damages*." *Fashion Boutique of Short Hills, Inc. v.*

*Fendi USA, Inc.*, 314 F.3d 48, 59 (2d Cir. 2002) (emphasis added).

As Judge Liman recently emphasized, "[a]n adequate pleading of special damages must

clear several hurdles." *Soter Techs., LLC v. IP Video Corp.*, No. 20-CV-5007 (LJL), 2021 WL

744511, at *13 (S.D.N.Y. Feb. 26, 2021). Special damages are "limited to losses having pecuniary

or economic value, and must be fully and accurately stated, with sufficient particularity to

identify actual losses." *Enigma Software Grp. USA, LLC v. Bleeping Computer LLC*, 194 F. Supp.

3d 263, 292 (S.D.N.Y. 2016) (quoting *Kirby v. Wildenstein*, 784 F. Supp. 1112, 1116 (S.D.N.Y.

1992)). "[S]pecial damages must [also] be the natural and immediate consequence of the

disparaging statements to be recoverable." *Kirby*, 784 F. Supp. at 1116 (internal citations omitted). Further, "[w]here loss of customers constitutes the alleged special damages, the individuals 'who ceased to be customers, or who refused to purchase, must be named' and the exact damages itemized." *Fashion Boutique*, 314 F.3d at 57 (quoting *Drug Research Corp. v. Curtis Publ'g Co.*, 166 N.E.2d 319, 322 (1960)); *Dentsply Int'l Inc. v. Dental Brands for Less LLC*, No. 15-CV-8775 (LGS), 2016 WL 6310777, at *6 (S.D.N.Y. Oct. 27, 2016) (explaining that "general allegations of lost sales from unidentified customers are insufficient" and "[r]ound figures or a general allegation of a dollar amount . . . will not suffice"). Because whether a plaintiff has suffered special damages "goes to the cause of an action itself and not merely to the recovery . . . Courts considering product disparagement claims have therefore applied this requirement strictly, granting motions to dismiss . . . for failure to allege special damages with the requisite specificity." *Enigma Software Grp.*, 194 F. Supp. 3d at 292 (quoting *Computech Int'l, Inc. v. Compaq Computer Corp.*, 2002 WL 31398933, at *6 (S.D.N.Y. Oct. 24, 2002)).

With respect to damages, ERIS has only alleged injury "in an amount to be determined at trial" with one example: "an inability to achieve any sales with Company K, which has refused to do business with ERIS because of this lawsuit and EDR's statements to the public about this lawsuit." ¶¶ 226, 242-43; *see* ¶ 128 (explaining that "an individual at Company K told a sales agent for ERIS that they were not interested in meeting with ERIS to see a demonstration of ERIS's products and services because of this lawsuit"). EDR has not actually named any lost customers—let alone customers lost due to product disparagement specifically, rather than the Copyright Suit—nor made any attempt to quantify its damages resulting from the allegedly

disparaging statements. Given the stringent requirement to plead special damages, ERIS'

allegations are too general to avoid dismissal.[39]

ERIS's argument that it is exempt from pleading special damages lacks merit. ERIS

argues that it need not allege special damage with particularity because "the nature of ERIS's

business and the widespread dissemination of disparaging statements" makes it

"impossible . . . at this stage" for ERIS to identify lost customers. (ECF 47 at 30-31). However,

the cases relied on by ERIS—*Charles Atlas, Ltd. v. Time-Life Books, Inc.*, 570 F. Supp. 150

(S.D.N.Y.1983) and *Romeo & Juliette Laser Hair Removal, Inc. v. Assara I LLC*, No. 08-CV-442

(TPG) (FM), 2014 WL 4723299 (S.D.N.Y. Sept. 23, 2014)—are inapposite and do not excuse

ERIS's failure to quantify its damages.

In *Charles*, Judge Goettel held that the plaintiff did not need to identify lost customers

because the plaintiff made sales to an amorphous customer base only through mail orders,

making it "virtually impossible to identify those who did not order the plaintiff's product

because . . . [i]n all likelihood, such people would simply have failed to order, thus leaving no

record of their identity." *Charles*, 570 F. Supp. at 156; *cf. Verizon Directories Corp. v. Yellow

Book USA, Inc.*, 309 F. Supp. 2d 401, 408 (E.D.N.Y. 2004) (dismissing product disparagement

---

[39] *See, e.g.*, *Soter*, 2021 WL 744511, at *13 (finding insufficient plaintiff's conclusory allegation that "[a]s a natural and immediate consequence of [the] disparaging statements [alleged], [plaintiff] suffered monetary losses in the amount of at least $1990," because plaintiff provided "no further explanation," did not identify the lost customer other than as a "school on the west coast," and did not present facts showing that a sale was imminent or foreseeable); *Enigma Software Grp.*, 194 F. Supp. 3d at 292 (finding "far too generalized" plaintiff's allegation that it "has and will continue to suffer significant monetary and reputational injury in amounts that will be proven at trial but that are believed to exceed $75,000"); *Kirby*, 784 F. Supp. at 1116, 1118 (finding plaintiff's "vague allegations" that it sustained $250,000 in damages as a result of disparaging remarks about a painting it sought to sell, without "specify[ing] the losses underlying that figure" or identifying anyone who did not bid on the painting because of the alleged disparagement, were "clearly inadequate" to plead special damages); *Drug Research Corp.*, 166 N.E.2d at 441 (holding that plaintiff failed to plead special damages where it alleged damages of $5 million because "[s]uch round figures, with no attempt at itemization, must be deemed to be a representation of general damages").

claim for not identifying lost customers where plaintiff "ma[de] no representation that it is in the nature of its business not to have direct contact with its customers"). Critically, however, Judge Goettel found that "plaintiff ha[d] pleaded special damages adequately" by identifying an exact amount of lost sales and revenues, as well as an exact amount of "special advertising expenses" incurred to counteract the alleged product disparagement. *Id.* at 155. ERIS, on the other hand, has not attempted to quantify its lost sales or provided any other enumeration of special damages. Moreover, it appears that the only New York decision to (at least explicitly) adopt the exception to the requirement of naming lost customers established by *Charles* was reversed on appeal because "[p]laintiffs failed to plead . . . special damages with the requisite specificity." *Prince v. Fox Tel. Stas., Inc.*, 941 N.Y.S.2d 488, 488 (2012); *Bilinski,* 96 F. Supp. 3d at 52 (noting that *Charles* predates *Prince* and finding that "[n]one of the authorities cited by plaintiffs [including *Charles*] excuse[d] their failure to identify the amount of lost sales").

Later, in *Romeo & Juliette*, Judge Griesa held that the plaintiff was not required to allege special damages to state a claim of product disparagement arising from anonymous reviews made on websites, such as "Yelp.com," because it was "impossible at [the motion to dismiss] stage" for plaintiff to identify lost customers. 2014 WL 4723299, at *6. Notably, *Romeo & Juliette* relied on *Charles*, which—as noted above—predates *Prince*. Moreover, while the court in *Romeo & Juliette* exempted the plaintiff from itemizing damages (rather than merely from naming lost customers, as done in *Charles*), the weight of authority indicates that even where it is impossible for plaintiffs to identify lost customers, "plaintiffs must do more than estimate damages." *Bilinski*, 632 F. App'x 637 at 642-42 (collecting cases). Here, ERIS has not even provided such an estimate. Lastly, whereas the nature of the *Romeo & Juliette* plaintiff's

business as a laser hair-removal establishment serving limitless consumers in New York made it impossible for the plaintiff to identify customers lost due to anonymous disparaging posts on online forums, ERIS's complaint raises no such inference. Instead, ERIS's reference to "Company K" and various customer relationships with which EDR allegedly interfered, as well as ERIS's admitted familiarity and contact with the companies that make up the majority of the market's customer-base, suggest that it *is* possible for ERIS to identify lost customers and plead special damages. *See* ¶¶ 69, 118, 121-23, 128, 135, 243; *Bilinski*, 632 F. App'x at 642 ("In light of plaintiffs' allegations regarding [a] lost sale to a museum with whose representative he has spoken, plaintiffs do not plausibly allege the impossibility of identification."); *Fashion Boutique of Short Hills, Inc. v. Fendi USA, Inc.*, 75 F. Supp. 2d 235, 240 (S.D.N.Y. 1999), *aff'd*, 314 F.3d 48 (2d Cir. 2002) (finding identification possible where plaintiff maintained a customer list and could contact lost customers to determine why they stopped shopping at plaintiff's store).

### 4. Lanham Act (Count VI)

ERIS alleges violations of Section 43(a) of the Lanham Act based on all four categories of challenged statements. For the reasons set forth below, I recommend that ERIS's Lanham Act claim be dismissed with regard to the Oral Statements.

Section 43 of the Lanham Act provides, in relevant part, for civil liability if a defendant's "commercial advertising or promotion[] misrepresents the nature, characteristics, qualities, or geographic origin of his or her or another person's good, services, or commercial activities." 15 U.S.C. § 1125(a)(1)(B). To prove liability, "a plaintiff must establish that the challenged message is (1) either literally or impliedly false, (2) material, (3) placed in interstate commerce, and (4) the cause of actual or likely injury to the plaintiff." *Church & Dwight Co. v. SPD Swiss Precision*

*Diagnostics, GmBH*, 843 F.3d 48, 65 (2d Cir. 2016). In addition to the arguments regarding

opinion statements and *Noerr-Pennington* immunity addressed above, *see supra* Section III.D.1

and note 38, EDR-Sanborn argues that ERIS's Lanham Act claim fails in two respects: (a) the Oral

Statements are too indefinite to support a claim and (b) neither the Blog Post nor the CMI make

false statements about EDR-Sanborn's goods, services, or commercial activities.

### a.   The Oral Statements

EDR-Sanborn argues that the Oral Statements cannot form the basis of Section 43

liability because ERIS does not allege who made these statements, when they were made, or to

whom they were made. I interpret this argument as positing that ERIS has not sufficiently

identified these statements as "commercial advertising or promotion." I agree.

As a threshold matter, Section 43 expressly only applies to "commercial advertising or

promotion." Though not limited to representations made as part of a classic advertising

campaign, commercial advertising or promotion must be "(1) commercial speech, as defined by

the First Amendment, (2) made 'for the purpose of influencing consumers to buy defendant's

goods or services,' and (3) 'disseminated sufficiently to the relevant purchasing public.'" *Globe

Cotyarn Pvt. Ltd. v. Next Creations Holdings LLC*, No. 18-CV-04208 (ER), 2019 WL 498303, at *4

(S.D.N.Y. Feb. 8, 2019) (quoting *Boule v. Hutton*, 328 F.3d 84, 90-91 (2d Cir. 2003)).

Critically, pursuant to the third prong, "businesses harmed by isolated disparaging

statements do not have redress under the Lanham Act." *Fashion Boutique*, 314 F.3d at 57

(finding "twenty-seven oral statements regarding plaintiff's products in a marketplace of

thousands of customers" were not disseminated sufficiently widely to constitute commercial

adverting or promotions). While the Second Circuit has not set an exact number or percentage

of customers that must be exposed to the challenged statement for it to qualify as sufficiently disseminated, courts in this District have found that a plaintiff cannot rely on conclusory allegations of widespread dissemination to unidentified customers. *Globe Cotyarn Pvt. Ltd.*, 2019 WL 498303, at *4 (canvassing caselaw and concluding allegations regarding messages sent to two identified customers in a marketplace of an unidentified size and "naked assertions" of messages sent to other unidentified customers did not sufficiently plead the dissemination prong); *Solmetex, LLC v. Dental Recycling of N. Am., Inc*., No. 17-CV-860 (JSR), 2017 WL 2840282, at *3 (S.D.N.Y. June 26, 2017) (rejecting conclusory allegations of widespread dissemination made without detail and "solely upon information and belief").

ERIS's Counterclaims states, "on information and belief," that the Oral Statements were made by EDR's agents to customers and potential customers "routinely," "repeatedly," "on a frequent basis" and as part of "an extensive marketing campaign." ¶¶ 68, 71, 82, 101, 105. However, these bare assertions regarding a belief of widespread dissemination and existence of an oral marketing campaign, without more, are not enough to plead sufficient dissemination. *Solmetex*, LLC, 2017 WL 2840282, at *3 (explaining that while allegations solely on information on belief are appropriate "where the facts are peculiarly within the possession and control of the defendant or where the belief is based on factual information that makes the inference of culpability plausible, such allegations must be accompanied by a statement of the facts upon which the belief is founded") (internal citations omitted). Accordingly, EDR-Sanborn's motion to dismiss any Lanham Act false advertising claim based on the Oral Statements should be granted. *See Weight Watchers Int'l, Inc. v. Noom, Inc.*, 403 F. Supp. 3d 361, 376 (S.D.N.Y. 2019)

(dismissing one category of statements based on insufficient public dissemination); *In re Elysium Health-Chromadex Litig.*, 2018 WL 4907590, at *9 (S.D.N.Y. Sept. 27, 2018) (same).

### b. The Blog Post and CMI

Next, I find that ERIS has plausibly alleged that the Blog Post and CMI make false statements about the Sanborn Maps supposedly owned and exclusively licensed by EDR-Sanborn. An allegation of false advertisement "may be based on at least one of two theories: [1] that the challenged advertisement is literally false, *i.e.*, false on its face, or [2] that the advertisement, while not literally false, is nevertheless likely to mislead or confuse consumers." *Chanel, Inc. v. RealReal, Inc.*, 449 F. Supp. 3d 422, 442 (S.D.N.Y. 2020) (quoting *Tiffany (NJ) Inc. v. eBay Inc.*, 600 F.3d 93, 103 (2d Cir. 2010)). Under the second "impliedly false" prong, "[t]he Court may presume that the advertisement is misleading where the defendant's misrepresentation is intentional." *Turbon Int'l, Inc. v. Hewlett-Packard Co.*, 769 F. Supp. 2d 262, 268 (S.D.N.Y. 2011). Under either prong, the misrepresentation must be "material," in that it would influence consumers' purchasing decisions. *Id*.

ERIS alleges that the Blog Post and CMI falsely represent that **all** Sanborn Maps are protected by copyright and can only be legally used in Phase 1 ESA Reports when obtained from EDR-Sanborn, though EDR-Sanborn knows that many Sanborn Maps are in the public domain. As already detailed above, the Blog Post categorically states, among other things, that "[w]hen Sanborn Maps . . . are not procured via EDR and The Sanborn Library, it is against copyright to include them in a Phase I or similar report," and the CMI consists of Sanborn's corporate logo, a copyright date, and a legend stating that "[o]nly Environmental Data Resources (EDR) is authorized to grant rights for commercial reproduction of maps by the Sanborn Library LLC, the

copyright holder for the collection." ¶¶ 62, 65. Critically, the CMI is allegedly included on and

with ***each and every*** Sanborn Map provided by EDR, including those published before 1924 or

whose copyright protection was not timely renewed; for example, in the Sample Report

available on EDR's website, the CMI is physically included on all enclosed maps, including those

dating back to 1890. ¶¶ 62-64. Drawing all inferences in favor of ERIS, and considering each

statement in context, I find that ERIS has plausibly alleged that the Blog Post and CMI make

literally false or deliberately misleading representations about Sanborn Maps, at least some of

which are plausibly in the public domain. Moreover, because Sanborn Maps are used today for

Phase 1 ESA Reports and are supposedly necessary for generating standard-compliant Reports,

ERIS has also plausibly alleged that these misrepresentations are material in that they would

influence the purchasing decisions of consumers in the ERAD market.

### 5.   New York's General Business Law (Counts VII and VIII)

EDR-Sanborn next argues that the District Court should dismiss ERIS's New York General

Business Law § 349 and § 350 (individually, "Section 349" and "Section 350," or together,

"GBL") claims for failure to adequately plead consumer injury. I recommend against dismissal

on this ground. Like ERIS's Lanham Act claims, ERIS's GBL claims may proceed except with

respect to the Oral Statements. *See Mimedx Grp., Inc. v. Osiris Therapeutics, Inc.*, No. 16-CV-

3645 (KPF), 2017 WL 3129799, at *14 (S.D.N.Y. July 21, 2017) (collecting cases for the

proposition that GBL claims are analyzed under substantially the same standard as claims under

Section 43 of the Lanham Act, including with regard to the requirement of commercial or

consumer-oriented conduct); *In re Elysium Health-Chromadex Litig.*, 2018 WL 4907590, at *13

(holding that counterclaim-plaintiff's Section 349 claim may proceed only "on the basis of the

statements above that the Court deemed sufficiently pleaded to sustain a Lanham Act claim");
ECF 45 at 32 n.25 and ECF 47 at 26 (analyzing GBL and Lanham Act claims together).

Section 349 and Section 350 are "directed at wrongs against the consuming public." *Car-Freshner Corp. v. D & J Distributing and Mfg., Inc.*, 2014 WL 3900564, at *4 (S.D.N.Y. Aug. 8, 2014) (quoting *Oswego Laborers' Local 214 Pension Fund v. Marine Midland Bank*, 647 N.E.2d 741, 744 (1995)). Section 349 prohibits "[d]eceptive acts or practices in the conduct of any business, trade or commerce or in the furnishing of any service in this state." Section 350 prohibits "[f]alse advertising in the conduct of any business, trade or commerce or in the furnishing of any service in this state."

To state a claim under Section 349, a plaintiff must allege "(1) the [challenged] act or practice was consumer-oriented; (2) the [challenged] act or practice was misleading in a material respect; and (3) the plaintiff was injured as a result.*" Spagnola v. Chubb Corp.*, 574 F.3d 64, 74 (2d Cir. 2009). "The standard for recovery under General Business Law § 350, while specific to false advertising, is otherwise identical to section 349." *New World Sols., Inc. v. NameMedia Inc.*, 150 F. Supp. 3d 287, 330 (S.D.N.Y. 2015) (collecting cases). Under both sections, the standard is objective, meaning that the challenged act or practice must be likely to mislead a reasonable consumer under the circumstances. *Cline v. TouchTunes Music Corp.*, 211 F. Supp. 3d 628, 635 (S.D.N.Y. 2016) (Kaplan, J.).

Critically, while business competitors may bring suit under these sections if there is "some harm to the public at large," in order "to successfully state a claim under Section 349 'the gravamen of the complaint must be consumer injury or harm to the public interest.'" *Electra v. 59 Murray Enterprises, Inc.*, 987 F.3d 233, 258 (2d Cir. 2021) (quoting *Securitron*

*Magnalock Corp. v. Schnabolk*, 65 F.3d 256, 264 (2d Cir. 1995)). While this requirement "has

been construed liberally," *New York v. Feldman*, 210 F. Supp. 2d 294, 301 (S.D.N.Y. 2002), the

public or consumer harm caused by the challenged conduct must be more than mere consumer

confusion. *Mayes v. Summit Entm't Corp*., 287 F. Supp. 3d 200, 208 (E.D.N.Y. 2018).

Here, ERIS alleges that EDR's statements falsely represent that all Sanborn Maps are

under copyright and must be obtained from EDR, and that any of ERIS's products containing

Sanborn Maps are unlawful. EDR's statements were supposedly made to "to misinform and

create confusion among . . . consumers." ¶ 203. ERIS has also alleged injury other than mere

consumer confusion: harm to consumers via reduced competition in the market for

environmental risk assessment data. *See Actava TV, Inc. v. Joint Stock Co. "Channel One Russia*

*Worldwide*," 412 F. Supp. 3d 338, 353 (S.D.N.Y. 2019) (finding that competitor-plaintiff plausibly

alleged consumer injury beyond mere confusion where defendant's conduct "caused damage

to competition . . ., harming consumers via the reduced competition in the market"). ERIS's

complaint is replete with allegations that EDR's misrepresentations have harmed competition

by, for example, dissuading entities from entering or remaining in the market. ¶¶ 5, 7, 46, 56,

60, 64-65, 71-72, 130. Moreover, ERIS suggests that consumers are economically harmed by

being misled into believing that they must pay EDR for maps in the public domain that can be

lawfully copied for free. ¶¶ 27, 30, 65, 67. Thus, while EDR-Sanborn argues that the gravamen

of the harm alleged by ERIS is to ERIS's own business by way of lost customers and sales to EDR,

I recommend against dismissal of ERIS's GBL claims because "[a]t this stage, the facts

alleged . . . are sufficient to make it plausible that [EDR-Sanborn's] conduct carries with it

'significant ramifications for the public at large.'" *Actava*, 412 F. Supp. 3d at 353.

### 6.  Tortious Interference (Count XII)

Lastly, EDR-Sanborn argues that ERIS's tortious interference claim is inadequately pleaded in all respects. I recommend that this claim be dismissed for failure to sufficiently plead a business relationship with a third party with which EDR-Sanborn intentionally interfered.

To state a claim for tortious interference with prospective economic advance under New York Law, ERIS must allege that: (1) "it had a business relationship with a third party"; (2) EDR-Sanborn "knew of that relationship and intentionally interfered with it"; (3) EDR-Sanborn "acted solely out of malice, or used dishonest, unfair, or improper means"; and (4) EDR-Sanborn's "interference caused injury to the relationship." *Kirch v. Liberty Media Corp.*, 449 F.3d 388, 400 (2d Cir. 2006) (quoting *Carvel Corp. v. Noonan*, 350 F.3d 6, 17 (2d Cir. 2003).

As an initial matter, ERIS's claim easily satisfies the third requirement by alleging "improper means." Generally, in order to satisfy this element, "the defendant's conduct must amount to a crime or an independent tort." *Carvel Corp. v. Noonan*, 818 N.E.2d 1100, 1103 (2004) (answering certified question from Second Circuit).[40] Here, I have already found that ERIS has adequately stated claims for antitrust violations, defamation, false advertising, and deceptive practices based on some of the same conduct and statements underlying ERIS's tortious interference claim. As both parties acknowledge, if the District Court adopts my recommendations regarding those claims, the District Court must also find that ERIS has

---

[40] "There is at least one exception to the general rule that the defendant's conduct must be criminal or independently tortious: If the plaintiff can demonstrate that the 'defendant engage[d] in conduct for the sole purpose of inflicting intentional harm on plaintiffs,' then the wrongful means element of the test is satisfied." *Gym Door Repairs, Inc. v. Young Equip. Sales, Inc.*, 206 F. Supp. 3d 869, 908 (S.D.N.Y. 2016) (quoting *Carvel*, 818 N.E.2d at 1103).

adequately pleaded improper conduct for purposes of its tortious interference claim. (ECF 45 at 35; ECF 47 at 34-35; ECF 51 at 15).

ERIS has not adequately alleged, however, causation or a relevant business relationship with a third party. In a few cases, courts have only required that a plaintiff allege a "reasonable expectancy" of contracting with a particular third-party, which "can result from mere negotiations." *See, e.g.*, *Glob. Packaging Servs., LLC v. Glob. Printing & Packaging*, 248 F. Supp. 3d 487, 494 (S.D.N.Y. 2017) (quoting *Strapex Corp. v. Metaverpa N.V.*, 607 F. Supp. 1047, 1050 (S.D.N.Y. 1985)). The weight of authority in this Circuit and the New York Appellate Divisions, however, indicates that a plaintiff must further allege that it "would have entered into an economic relationship [with a specific third party] but for the defendant's wrongful conduct." *See, e.g.*, *Downtown Music Publ'g LLC v. Peloton Interactive, Inc*., 436 F. Supp. 3d 754, 766 & n.6 (S.D.N.Y. 2020) (quoting *Premium Mortg. Corp. v. Equifax, Inc.*, 583 F.3d 103, 107 (2d Cir. 2009)) (rejecting argument that a "reasonable expectancy" was sufficient to state a tortious interference claim); *Shawe v. Kramer Levin Naftalis & Frankel LLP*, 91 N.Y.S. 3d 369, 373 (1st Dep't 2018) (affirming dismissal where plaintiff made conclusory allegations of a potential business relationship and did not "allege, as required, that but for defendants' conduct plaintiff would have had an economic relationship with the" third party); *Zetes v. Stephens*, 969 N.Y.S.2d 298, 304 (4th Dep't 2013) ("[A] plaintiff is required to identify a specific customer that the

plaintiff would have obtained 'but for' the defendant's wrongful conduct."); N.Y. Pattern Jury Instructions 3:57 (2020) (collecting cases addressing causation).[41]

Here, ERIS provides only one example of a business relationship with which EDR has interfered: ERIS's relationship with Company K. ¶¶ 128, 135, 249, 251.[42] However, ERIS has not suggested a reasonable expectation of transacting with Company K, let alone (as required) that that a transaction with Company K would have been consummated but for EDR's alleged interference. Instead, ERIS only pleads that "Company K has refused to do business with ERIS" and that "an individual at Company K told a sales agent for ERIS that they were not interested *in meeting* with ERIS to see a demonstration of ERIS's products and services" because of (EDR's statements regarding) this lawsuit. *Id.* (emphasis added). ERIS has not alleged that it was actively involved in negotiations with Company K or any other particular prospective customer

---

[41] Indeed, courts in this District routinely grant motions to dismiss tortious interference claims for failure to allege but for causation. *See, e.g.*, *Chahine v. City of New York*, No. 19-CV-0276 (DLC), 2020 WL 2555228, at *4 (S.D.N.Y. May 20, 2020); *Nat'l Air Cargo Grp., Inc. v. Maersk Line Ltd.*, No. 17-CV-8659 (KPF), 2019 WL 4735426, at *10 (S.D.N.Y. Sept. 27, 2019); *Arcadia Biosciences, Inc. v. Vilmorin & Cie*, 356 F. Supp. 3d 379, 405 (S.D.N.Y. 2019); *see also J&R Multifamily Grp., Ltd. v. U.S. Bank Nat'l Ass'n as Tr. for Registered Holders of UBS-Barclays Com. Mortg. Tr. 2012-C4, Com. Mortg. Pass-Through Certificates, Series 2012-C4*, No. 19-CV-1878 (PKC), 2019 WL 6619329, at *6 (S.D.N.Y. Dec. 5, 2019) (finding an "actual conflict" between New York and Texas substantive tortious interference law because New York law requires an allegation of but for causation whereas Texas only requires plaintiff to allege a "reasonable probability" of entering into a transaction).

[42] ERIS cites to cases supporting its contention that it need not reveal, in its pleading, the real name of Company K. *E.g. Tatintisan v. Vorotyntsev*, 2019 WL 1746004, at *6 (S.D.N.Y. Apr. 18, 2019) (plaintiff not required to plead name of third party where plaintiff identified a specific, existing relationship and offered to provide defendant with name); *Brill Physical Therapy, P.C. v. Leaf*, 2011 WL 11074836, at *3 (Sup. Ct. Aug. 4, 2011) (plaintiff not required to plead specific names of third parties); *Bilinski*, 96 F. Supp. 3d at 51 (finding that *Brill* "stands at most for the proposition that a plaintiffs [sic] need not identify the name of the buyer in [its] pleading"). However, even if ERIS is excused from revealing the ***name*** of relevant third parties, ERIS is still required to identify prospective business relations with *specific* third parties. *See, e.g. Gallagher v. N.Y.C. Health & Hosps. Corp.*, No. 16-CV-4389 (GBD), 2017 WL 4326042, at *5 (S.D.N.Y. Sept. 20, 2017) (emphasizing that a plaintiff "must specify some particular, existing relationship through which [it] would have done business but for the allegedly tortuous behavior.") (internal citation omitted); *Vigoda v. DCA Prods. Plus Inc.*, 741 N.Y.S.2d 20, 23 (2002) (same).

or that an economic relationship would have been consummated between ERIS and any particular customer but for EDR's statements.

Moreover, Plaintiff alleges no facts suggesting that EDR-Sanborn knew of ERIS's business relationship with Company K, let alone intentionally interfered with that relationship. ERIS's vague and conclusory statement that "Counterclaim Defendants had knowledge of ERIS's business relations" is insufficient. *See, e.g., Wolff v. Rare Medium, Inc.,* 171 F. Supp. 2d 354, 360 (S.D.N.Y. 2001) (dismissing tortious interference claim featuring only conclusory assertions of knowledge, noting that "even on a motion to dismiss, is not required to accept conclusory allegations—particularly allegations such as those asserted here, characterizing or attributing a state of mind of another person"); N.Y. Pattern Jury Instr. Civil 3:57 (noting that defendant is required to have knowledge of the prospective business relationship, though not specific terms thereof). Accordingly, ERIS has failed to state a claim under New York law for tortious interference with prospective business relations.

## IV.    Leave to Amend

In its opposition brief, ERIS requests leave to amend in the event that EDR's motion to dismiss is granted in whole or in part. District courts "ha[ve] broad discretion in determining whether to grant leave to amend," *Gurary v. Winehouse*, 235 F.3d 792, 801 (2d Cir. 2000), and leave to amend should generally be "freely give[n] . . . when justice so requires." Fed. R. Civ. P. 15(a)(2). "Where the possibility exists that [a pleading] defect can be cured" and amendment would not be futile, "leave to amend should normally be granted." *Isaac v. City of New York*, No. 17-CV-1021 (PGG), 2018 WL 1322196, at *8 (S.D.N.Y. Mar. 13, 2018) (internal citations

omitted); *see Hayden v. County of Nassau*, 180 F.3d 42, 53 (2d Cir. 1999) ("When a motion to dismiss is granted, the usual practice is to grant leave to amend the complaint.").

Based on the current record, I cannot conclude that leave to amend ERIS's Counterclaims would be futile.[43] Accordingly, I recommend that ERIS be granted leave to amend, and that ERIS's Second Amended Counterclaims be due within **fourteen (14)** days of District Court's ruling on this Report and Recommendation.

## V.    Conclusion

For the foregoing reasons, I recommend that EDR-Sanborn's motion to dismiss be **GRANTED in part and DENIED in part**, as follows: (1) EDR-Sanborn's motion to dismiss should be granted with respect to ERIS's product disparagement (Count IX), trade libel (Count XI), and tortious interference with prospective business relations (Count XII) claims; (2) it should also be granted with respect to ERIS's Lanham Act (Count VI) and New York General Business Law (Counts VII and VIII) claims **insofar** as they are based on allegations regarding the Oral Statements, and with respect to ERIS's defamation (Count X) claim **insofar** as it is based on the Blog Post and Oral Statements; and (3) it should lastly be granted as to ERIS's Sherman Act Section 2 (Count IV) essential facilities and bundling claims. ERIS's Lanham Act (Count VI) and New York General Business Law (Counts VII and VIII), defamation (Count X), and Sherman Act and Clayton Act (Count IV and V) claims should otherwise proceed.

---

[43] Indeed, EDR-Sanborn does not argue that amendment would be futile. Instead, EDR-Sanborn states that any dismissal should be with prejudice because "ERIS has amended its counterclaims once and declined to do so a second time" during the parties' meet and confer process. (ECF 45 at 35; ECF 47 at 35).

## VI.    Objections

In accordance with 28 U.S.C. § 636(b)(1) and Fed. R. Civ. P. 72(b), the parties shall have **fourteen (14)** days (including weekends and holidays) from receipt of this Report to file written objections. *See* Fed. R. Civ. P. 6 (allowing three (3) additional days for service by mail). A party may respond to any objections within **fourteen (14)** days after being served. Objections, and any responses to objections, shall be addressed to the Hon. Lewis A. Kaplan. Any requests for an extension of time for filing objections must be directed to Judge Kaplan.

**FAILURE TO FILE OBJECTIONS WITHIN FOURTEEN (14) DAYS WILL RESULT IN A WAIVER OF OBJECTIONS AND WILL PRECLUDE APPELLATE REVIEW.** *See Thomas v. Arn*, 474 U.S. 140, 155 (1985); *IUE AFL-CIO Pension Fund v. Herrmann*, 9 F.3d 1049, 1054 (2d Cir. 1993); *Frank v. Johnson*, 968 F.2d 298, 300 (2d Cir. 1992); *Wesolek v. Canadair Ltd.*, 838 F.2d 55, 58 (2d Cir. 1988); *McCarthy v. Manson*, 714 F.2d 234, 237-38 (2d Cir. 1983).

Respectfully submitted,

*s/ Ona T. Wang*

Dated: August 30, 2021
     New York, New York

**Ona T. Wang**
United States Magistrate Judge