UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| THE SANBORN LIBRARY LLC,<br><br>　　　　　　　Plaintiff and Counterclaim-<br>　　　　　　　Defendant, and<br><br>ENVIRONMENTAL DATA RESOURCES, LLC,<br><br>　　　　　　　Counterclaim-Defendant,<br><br>　　　v.<br><br>ERIS INFORMATION INC., ERIS INFORMATION<br>LIMITED PARTNERSHIP, and ECO LOG<br>ENVIRONMENTAL RISK INFORMATION SERVICES<br>LTD.,<br><br>　　　　　　　Defendants and Counterclaim<br>　　　　　　　Plaintiffs. | No. 1:19-cv-02049-JHR-OTW<br><br><br>**REDACTED – Unredacted<br>Version Filed Under Seal** |

## MEMORANDUM OF LAW IN SUPPORT OF
## ERIS' MOTION FOR SUMMARY JUDGMENT

## TABLE OF CONTENTS

PRELIMINARY STATEMENT ..................................................................................................... 1

STATEMENT OF FACTS ............................................................................................................ 1

LEGAL STANDARD ................................................................................................................... 1

ARGUMENT ................................................................................................................................ 3

I.     EDR Lacks Standing to Assert Its Claims Because It Does Not Own the Asserted
Copyrights in the Accused Sanborn Maps ........................................................................... 3

     A.    Relevant Laws Pertaining to Authorship, Ownership, and Transfer of
Copyright ................................................................................................................. 4

          1.    The Copyright Act of 1909 ......................................................................... 4

          2.    The Copyright Act of 1976 ......................................................................... 5

          3.    Copyright Notice Requirements .................................................................. 7

               a.    The 1909 Act .................................................................................. 8
               b.    The 1976 Act .................................................................................. 9

     B.    EDR Does Not Own Pre-1973 Maps Because There Was No Assignment of
the Copyrights in the Sanborn Maps from Sanborn II to Sanborn III ...................... 10

          1.    The Interpretation of the 1973 Documents Is a Question of Law ................ 11

          2.    The 1973 Documents Do Not Assign the Copyrights in Pre-June 1973
Sanborn Maps to Sanborn III ..................................................................... 13

          3.    The 1973 Documents Relate Only to Sanborn Maps in the "Map
Library" ...................................................................................................... 17

     C.    EDR Also Does Not Own Any Post-1978 Sanborn Maps Because There Is
No Evidence that Those Maps Were Works Made for Hire .......................................18

     D.    EDR Does Not Own the Copyrights in Any Sanborn Maps Because It Cannot
Show that Any Such Maps Were Present in the Sanborn Facility in 1996 ................. 21

          1.    EDR's 1996 Acquisition of the Sanborn Map Company Involved
Only Sanborn Maps Located at the "Sanborn Facility" ............................... 21

               a.    The 1996 APA Was an Agreement to Assign Certain Assets
including "Assignable" Intellectual Property, not a Present
Assignment of Copyrights to the Sanborn Maps ............................... 21

     b. The 1996 APA Did Not Designate Any Given Sanborn Maps
      as "Assignable" Intellectual Property to Begin With ..........................22
     c. The 1996 Assignment Was a Present Assignment of Only
      Sanborn Maps Located in the "Sanborn Facility" in Pelham,
      New York ..........................................................................................23

    2. EDR Has Provided No Evidence that Any Particular Sanborn Maps
     Were Located in the Sanborn Facility in June 1996..........................................25

  E. The Mis-Noticed Maps Are in the Public Domain and Owned By No One ..............26

    1. No Copyright Notice Appears on Correction Slips.........................................26

    2. Certain Sanborn Maps with Handwritten/Stamped Dates Added to
     Them Are in the Public Domain..........................................................................27

    3. The Copyrights in Pre-1978 Sanborn Maps Whose Copyright Notice
     Is Not Affixed to the Title Page or Page Immediately Following Are
     Invalid .................................................................................................................29

    4. The Copyright Notices on Several Post-1978 Works Are Not Affixed
     in Such Manner and Location as to Give Reasonable Notice of the
     Claim of Copyright..............................................................................................30

II. EDR's Claims Are Barred By Estoppel .........................................................................31

  A. EDR Has Long Known of ERIS' Allegedly Infringing Sales .......................32

  B. ERIS Had a Right to Believe It Could Rely on EDR's Acquiescence in ERIS'
   Use of Fire Insurance Maps, Following Its Initial Cease and Desist
   Correspondence ..............................................................................................32

    1. EDR's Conduct Forming the Basis of ERIS' Estoppel Defense ....................33

    2. ERIS Had a Right to Rely on EDR's Conduct ..................................................36

  C. ERIS Was Ignorant of the Fact that EDR Considered ERIS' Activities
   Infringing ..........................................................................................................38

  D. ERIS Relied on EDR's Conduct to Its Detriment ...........................................39

III. EDR Cannot Establish Its Claims for Violation of the DMCA.....................................41

  A. The Digital Millennium Copyright Act............................................................41

  B. ERIS Cannot Be Liable for Falsification of CMI under Section 1202(a) ..................44

1. The DMCA Does Not Apply to Any Alleged CMI Conveyed with a Distinct Work .................................................................................44

2. ERIS Does Not Meet the Scienter Requirements of Section 1202(a). ...........46

C. ERIS Cannot Be Liable for Removal of CMI under Section 1202(b).........................48

1. The Missing CMI Was Not "Removed"..............................................................48

2. The First Three Categories of Missing CMI Are Not Found on the Body of, or Area Around, the Map Sheets Reproduced in ERIS' FIM Reports .................................................................................................................50

3. The Missing CMI Was Not "Removed" by ERIS...............................................52

4. The Missing CMI Was Not "Removed" in the United States ...........................54

5. ERIS Does Not Meet the Scienter Requirements of Section 1202(b) .............56

a. ERIS Did Not Intentionally Remove CMI ...........................................56
b. ERIS Did Not Know, or Have Reasonable Grounds to Know, that Any Alleged Removal of the Missing CMI Would Induce, Enable, Facilitate, or Conceal an Infringement .....................................58

IV. Conclusion ................................................................................................................................60

## TABLE OF AUTHORITIES

Page(s)

**Cases**

*A.C. Aukerman Co. v. R.L. Chaides Constr. Co.,*
   960 F.2d 1020 (Fed. Cir. 1992)...............................................................35, 36, 40

*Agence France Presse v. Morel,*
   2014 WL 3963124 (S.D.N.Y. Aug. 13, 2014).........................................47, 49, 50, 55

*Alan Ross Machinery Corp. v. Machinio Corp.,*
   2019 WL 1317664 (N.D. Ill. Mar. 22, 2019)..............................................................50

*Alexander & Alexander Servs., Inc. v. These Certain Underwriters at Lloyd's,*
   136 F.3d 82 (2d Cir. 1998)..............................................................................12

*Am. Code Co. v. Bensinger,*
   282 F.2d 829 (2d Cir. 1922)..........................................................................9, 29

*Apollo Global Mgmt., LLC v. Bokf, NA (In re MPM Silicones, L.L.C.),*
   874 F.3d 787 (2d Cir. 2017).............................................................................11

*Aspex Eyewear, Inc. v. Clariti Eyewear, Inc.,*
   2008 WL 5049744 (S.D.N.Y. Nov. 26, 2008)................................................................35

*Aymes v. Bonelli,*
   980 F.2d 857 (2d Cir. 1992)...........................................................................7, 20

*Bank of N.Y. Mellon Tr. Co., N.A. v. Morgan Stanley Mortg. Capital, Inc.,*
   821 F.3d 297 (2d Cir. 2016)..........................................................................16, 24

*Bausch & Lomb Inc. v. Mimetogen Pharms., Inc.,*
   2017 WL 2835250 (W.D.N.Y. June 30, 2017)...........................................................16, 24

*Bd. of Trs. of Leland Stanford Junior Univ. v. Roche Molecular Sys., Inc.,*
   583 F.3d 832 (Fed. Cir. 2009)..........................................................................22

*Berk v. St. Vincent's Hosp. & Med. Ctr.,*
   380 F. Supp. 2d 334 (S.D.N.Y. 2005).....................................................................2

*Brattleboro Publ'g Co. v. Winmill Publ'g Corp.,*
   369 F.2d 565 (2d Cir. 1966)..............................................................................6

*Bravado Int'l Grp. Merch. Servs., Inc. v. Sean Broihier & Assoc.,*
   2015 WL 13915022 (C.D. Cal. Aug. 17, 2015)...........................................................13

*Byron v. Chevrolet Motor Div. of Gen. Motors Corp.,*
   1995 WL 465130 (S.D.N.Y. Aug. 7, 1995)...............................................................35

*Celotex Corp. v. Catrett,*
   477 U.S. 317 (1986)......................................................................................2

*Community for Creative Non-Violence v. Reid,*
  490 U.S. 730 (1989)............................................................................5, 6, 7, 20

*Crowley v. Jones,*
  608 F. Supp. 3d 78, 2022 WL 2237453 (S.D.N.Y. June 22, 2022)...........................................44

*Dallal v. N.Y. Times Co.,*
  2006 WL 463386 (2d Cir. Feb. 17, 2006)...........................................................31, 33

*Dallas Aerospace, Inc. v. CIS Air Corp.,*
  352 F.3d 775 (2d Cir. 2003)..............................................................................2

*DeCarlo v. Archie Comic Publ'ns, Inc.,*
  127 F. Supp. 2d 497 (S.D.N.Y. 2001)...................................................31, 32, 33, 36

*Dermansky v. Tel. Media, LLC,*
  2020 WL 1233943 (E.D.N.Y. Mar. 13, 2020)...........................................................55

*Dist. Atty. of N.Y. Cty. v. Republic of the Philippines,*
  307 F. Supp. 3d 171 (S.D.N.Y. 2018)....................................................................2

*Drauglis v. Kappa Map Group, LLC,*
  128 F. Supp. 3d 46 (D.D.C. 2015).......................................................................51

*E.E.O.C. v. Arabian Am. Oil Co.,*
  499 U.S. 244 (1991)......................................................................................54

*Eternity Global Master Fund, Ltd. v. Morgan Guar. Trust Co. of N.Y.,*
  375 F.3d 168 (2d Cir. 2004)..............................................................................11

*Falkner v. Gen. Motors LLC,*
  393 F. Supp. 3d 927 (C.D. Cal. 2018) ..............................................................49, 50

*Faulkner Press, L.L.C. v. Class Notes, L.L.C.,*
  756 F. Supp. 2d 1352 (N.D. Fla. Nov. 23, 2010)...................................................45, 49

*Feist Publ'ns, Inc. v. Rural Tel. Serv. Co.,*
  499 U.S. 340 (1991)..................................................................................3, 21

*Feuer v. Cornerstone Hotels Corp.,*
  2017 WL 3841841 (E.D.N.Y. Aug. 4, 2017)...............................................................3

*Fischer v. Forrest,*
  968 F.3d 216 (2d Cir. 2020)........................................................................passim

*Fleischer Studios, Inc. v. Ralph A. Freundlich, Inc.,*
  73 F.2d 276 (2d Cir. 1934)................................................................................8

*Frank B. Hall & Co. of N.Y. v. Orient Overseas Assoc's,*
  48 N.Y.2d 958 (1979)....................................................................................16

*Galli v. Metz,*
  973 F.2d 145 (2d Cir. 1992)..............................................................................12

*Geiler v. Brooklyn-Manhattan Transit Corp.,*
  18 N.Y.S.2d 788 (Sup. Ct. 1939).........................................................................22

*Gordon v. Vincent Youmans, Inc.*,
  358 F.2d 261 (2d Cir. 1965)........................................................................5

*Grecco v. Age Fotostock Amm., Inc.*,
  2021 WL 455599 (S.D.N.Y. Oct. 5, 2021)..................................................3

*Hammer v. First Unum Life Ins. Co.*,
  2004 WL 1900334 (S.D.N.Y. Aug. 25, 2004)...........................................34

*Hatalmud v. Spellings*,
  505 F.3d 139 (2d Cir. 2007).....................................................................11

*Horror Inc. v. Miller*,
  15 F. 4th 232 (2d Cir. 2021) ......................................................................7

*Int'l Media Films, Inc. v. Lucas Ent'mt, Inc.*,
  703 F. Supp. 2d 456 (S.D.N.Y. 2010).........................................................3

*Int'l Multifoods Corp. v. Comm. Union Ins. Co.*,
  309 F.3d 76 (2d Cir. 2002).......................................................................11

*JA Apparel Corp. v. Abboud*,
  568 F.3d 390 (2d Cir. 2009).....................................................................12

*John Wiley & Sons, Inc. v. DRK Photo*,
  882 F.3d 394 (2d Cir. 2018).....................................................................35

*Kelly v. Arriba Soft Corp.*,
  77 F. Supp. 2d 1116 (C.D. Cal. 1999) .....................................................57

*Kirk Kara Corp. v. Stone & Metal Corp.*,
  2020 WL 5991503 (C.D. Cal. Aug. 14, 2020)..........................................50

*Kleinberg v. Radian Grp.*,
  2002 WL 31422884 (S.D.N.Y. Oct. 29, 2002) ..........................................16

*Krechmer v. Tantaros*,
  747 F. App'x 6 (2d Cir. 2018) ...................................................................43

*Lantern Press, Inc. v. Am. Publishers Co.*,
  419 F. Supp. 1267 (E.D.N.Y. 1976) ..........................................................15

*Laser Kitten, LLC v. Marc Jacobs Int'l, LLC*,
  2018 WL 4830091 (S.D.N.Y. Oct. 4, 2018)..............................................42

*Leatherman Tool Grp. Inc. v. Cooper Indus., Inc.*,
  131 F.3d 1011 (Fed. Cir. 1997).................................................................13

*LEGO A/S v. Best-Lock Constr. Toys, Inc.*,
  404 F. Supp. 3d 583 (D. Conn. 2019).......................................................35

*Leigh v. Gerber*,
  86 F. Supp. 320 (S.D.N.Y. 1949) ..........................................................9, 29

*Levitin v. Sony Music Entm't*,
  101 F. Supp. 3d 376 (S.D.N.Y. 2015)........................................................55

*Lipton v. Nature Co.*,
  71 F.3d 464 (2d Cir. 1995)..................................................................................................2

*M Seven Sys. Ltd. v. Leap Wireless Int'l Ltd.*,
  2014 WL 12026065 (S.D. Cal. June 4, 2014)....................................................................54

*Mango v. BuzzFeed, Inc.*,
  356 F. Supp. 3d 368 (S.D.N.Y. 2019).........................................................................43, 48

*Mango v. Buzzfeed, Inc.*,
  970 F.3d 167 (2d Cir. 2020).......................................................................................*passim*

*Meiri v. Dacon*,
  759 F.2d 989 (2d Cir. 1985)..................................................................................................2

*Mellon Bank, N.A. v. United Bank Corp. of N.Y.*,
  31 F.3d 113 (2d Cir. 1994).................................................................................................12

*Michael Grecco Prods., Inc. v. Time USA, LLC*,
  2021 WL 3192543 (S.D.N.Y. July 27, 2021)...................................................................44

*Millennium Funding, Inc. v. 1701 Mgmt. LLC*,
  2022 WL 901745 (S.D. Fla. Mar. 28, 2022).....................................................................53

*Morgan Tire of Sacramento, Inc. v. Goodyear Tire & Rubber Co.*,
  60 F. Supp. 3d 1109 (E.D. Cal. 2014)...............................................................................34

*Motta v. Samuel Weiser, Inc.*,
  768 F.2d 481 (1st Cir. 1985).................................................................................................3

*Munro v. Fairchild Tropical Botanic Garden, Inc.*,
  2022 WL 452257 (S.D. Fla. Jan. 13, 2022).................................................................49, 50

*Murphy v. Millennium Radio Grp. LLC*,
  2010 WL 1372408 (D.N.J. Mar. 31, 2010)........................................................................53

*Neponsit Holding Corp. v. Ansorge*,
  214 N.Y.S. 91 (App. Div. 1926)........................................................................................22

*NFL Enters. LLC v. Comcast Cable Commc'ns, LLC*,
  851 N.Y.S.2d 551 (1st Dep't 2008) .............................................................................16, 24

*Omni Quartz, Ltd. v. CVS Corp.*,
  287 F.3d 61 (2d Cir. 2002).................................................................................................17

*One Stop 34, LLC v. Stimdel Props. (FL), Inc.*,
  2021 WL 8344133 (E.D.N.Y. Sep. 4, 2021)......................................................................18

*Orchard Hill Master Fund Ltd. v. SBA Commc'ns Corp.*,
  830 F.3d 152 (2d Cir. 2016)...............................................................................................12

*P.C. Films Corp. v. MGM/UA Home Video Inc.*,
  138 F.3d 453 (2d Cir. 1998).....................................................................................5, 13, 17

*Park v. Skidmore, Owings & Merrill LLP*,
  2019 WL 9228987 (S.D.N.Y. Sept. 30, 2019)..............................................................44, 45

*Pers. Keepsakes, Inc. v. Personalizationmall.com, Inc.,*
2012 WL 414803 (N.D. Ill. Feb. 8, 2012) ............................................................50, 51

*Phillies v. Harrison/Erickson,*
2021 WL 5936523 (S.D.N.Y. Aug. 10, 2021) ..............................................................31

*Playboy Enterprises, Inc. v. Dumas,*
960 F. Supp. 710 (S.D.N.Y. 1997) ...............................................................................19

*Post v. Killington, Ltd.,*
424 F. App'x 27 (2d Cir. 2011) .....................................................................................17

*Prince Grp., Inc. v. MTS Prods.,*
1998 WL 273099 (S.D.N.Y. May 27, 1998) ..................................................................3

*R&D Hotel, LLC v. McDonald's USA, LLC,*
2016 WL 3866408 (S.D.N.Y. July 12, 2016) ...............................................................12

*Ramos v. Baldor Specialty Foods, Inc.,*
687 F.3d 554 (2d Cir. 2012) ...........................................................................................2

*Sayers v. Rochester Tel. Corp. Suppl. Mgmt. Pension Plan,*
7 F.3d 1091 (2d Cir. 1993) ...........................................................................................12

*Schatt v. Curtis Management Group, Inc.,*
764 F. Supp. 902 (S.D.N.Y. 1991) .........................................................................10, 29

*Schiffer Publ'g, Ltd. v. Chronicle Books, LLC,*
2004 WL 2583817 (E.D. Pa. Nov. 12, 2004) ..............................................................51

*Small v. Weissberg,*
7 Misc. 2d 492 (City Ct. 1957) .....................................................................................22

*Sony Corp. of Am. v. Universal City Studios,*
464 U.S. 417 (1984) ......................................................................................................35

*Spandex House, Inc. v. Hartford Fire Ins. Co.,*
816 F. App'x 611 (2d Cir. 2020) ...................................................................................12

*Stevens Shipping & Terminal Co. v. Japan Rainbow, II MV,*
334 F.3d 439 (5th Cir. 2003) ........................................................................................34

*Stevens v. CoreLogic, Inc.,*
194 F. Supp. 3d 1046 (C.D. Cal. 2016) ........................................................................57

*Stevens v. Corelogic, Inc.,*
899 F.3d 666 (9th Cir. 2018) .............................................................................3, 44, 58

*Stross v. PR Advisors, Inc.,*
2019 WL 5697225 (N.D. Tex. Oct. 31, 2019) ..............................................................53

*Subafilms, Ltd. v. MGM-Pathe Commc'ns Co.,*
24 F.3d 1088 (9th Cir. 1994) ........................................................................................54

*Umbach v. Carrington Inv. Partners (US), LP,*
851 F.3d 147 (2d Cir. 2017) .........................................................................................12

*Universal City Studios, Inc. v. Corley,*
273 F.3d 429 (2d Cir. 2001)..........................................................................................................42

*Update Art, Inc. v. Modiin Pub., Ltd.,*
843 F.2d 67 (2d Cir. 1988)..............................................................................................54, 55, 56

*Viacom Int'l, Inc. v. YouTube, Inc.,*
676 F.3d 19 (2d Cir. 2012)............................................................................................................42

*Victor Elias Photography, LLC v. Ice Portal, Inc.,*
43 F.4th 1313 (11th Cir. 2022) ..........................................................................................3, 44, 58

*Vill. of Sylvan Beach v. Travelers Indem. Co.,*
55 F.3d 114 (2d Cir. 1995)............................................................................................................11

*Waite v. UMG Recordings, Inc.,*
2023 WL 1069690 (S.D.N.Y. Jan. 27, 2023) ..............................................................................20

*Ward v. Nat'l Geographic Soc'y,*
208 F. Supp. 2d 429 (S.D.N.Y. 2002).....................................................................................3, 47

*Watson v. Kappa Map Grp., LLC,*
2015 WL 3932425 (N.D. Ga. June 25, 2015)..............................................................................51

*Wechsler v. Hunt Health Sys., Ltd.,*
1999 WL 672902 (S.D.N.Y. Aug. 27, 1999)..................................................................................3

*Well-Made Toy Mfg. Corp. v. Lotus Onda Indus. Co.,*
2003 WL 42001 (S.D.N.Y. Jan. 6, 2003) ....................................................................................54

*Wu v. John Wiley & Sons, Inc.,*
2015 WL 5254885 (S.D.N.Y. Sept. 10, 2015)..............................................................................53

*Zuma Press, Inc. v. Getty Images(US), Inc.,*
845 F. App'x 54 (2d Cir. 2021) .............................................................................................3, 57

**Statutes**

17 U.S.C. § 1 (1909)........................................................................................................................4

17 U.S.C. § 9 (1909).............................................................................................................. *passim*

17 U.S.C. § 10 (amended 1947)....................................................................................8, 26, 28, 29

17 U.S.C. §§ 18-19 (1909)..............................................................................................................8

17 U.S.C. § 19 (amended 1947)......................................................................................................8

17 U.S.C. §§ 19-20 (amended 1947) .........................................................................................8, 29

17 U.S.C. § 23 (1909) .................................................................................................................4, 29

17 U.S.C. § 27 (1909) ....................................................................................................................14

17 U.S.C. § 28 (1909) ......................................................................................................................4

17 U.S.C. § 42...................................................................................................................................4

17 U.S.C. § 62 (1909) ........................................................................................................6

17 U.S.C. § 101 ...................................................................................................6, 18, 19

17 U.S.C. § 201(a) ........................................................................................................6, 18

17 U.S.C. § 201(b) (1978) ............................................................................................6, 18

17 U.S.C. § 201(d)(1)-(2) ...................................................................................................6

17 U.S.C. § 204(a) (1978) ........................................................................................4, 6, 18

17 U.S.C. § 302 (1978) ......................................................................................................5

17 U.S.C. § 304(a) (1978) .............................................................................................5, 29

17 U.S.C. § 401(a) (1976) ................................................................................9, 26, 28, 29

17 U.S.C. § 401(a)-(c) (as enacted 1976) .........................................................................30

17 U.S.C. § 401(b) ..............................................................................................................9

17 U.S.C. § 401(b)-(c) .......................................................................................................31

17 U.S.C. § 401(c) ..............................................................................................................9

17 U.S.C. § 406(b) (1976) .................................................................................................10

17 U.S.C. § 501(b) ..............................................................................................................3

17 U.S.C. § 1202 ...............................................................................................................42

17 U.S.C. § 1202(a) .....................................................................................................41, 43

17 U.S.C. § 1202(b) ....................................................................................................*passim*

17 U.S.C. § 1202(b)(1) ......................................................................................................48

17 U.S.C. § 1202(c) .....................................................................................................42, 45

Pub. L. No. 60-349, 35 Stat. 1075, 17 U.S.C. § 1 *et seq.* (1909).......................................4

Pub. L. No. 94–553, 90 Stat. 2541, 17 U.S.C. § 101 *et seq.* (1976) (effective
        1978).........................................................................................................................5

Pub. L. No. 100-568, 102 Stat. 2853 .................................................................................7

Pub. L. No. 102-166 § 109, 105 Stat. 1071 (1991)..........................................................54

Pub. L. No. 105-298, § 102, 112 Stat. 2827 (1998)............................................................5

**Other Authorities**

37 C.F.R. § 201.4(b)(2)(i) (1996) .....................................................................................24

37 C.F.R. § 201.20 (1981) ..................................................................................................9

37 C.F.R. § 202.2(b)(2) (1960)...........................................................................................8

1 Nimmer § 1.01[B][3][a] (rev. ed. Supp. 2013) ...............................................................5

3 Melville B. Nimmer & David Nimmer, Nimmer on Copyright § 10.01[A] (2022) ................................................................................................................4

4 Nimmer on Copyright § 12A.10[B][1][a] ...................................................................49

4 Nimmer on Copyright § 13.07[A] .............................................................................31

Berne Convention for the Protection of Literary and Artistic Works, art. 5(2), Sept. 28, 1979, S. Treaty Doc. No. 99-27 ..............................................................7

Black's Law Dictionary (10th ed. 2014) ......................................................................49

*Compendium II of Copyright Office Practices* § 1609 (1988) .......................................24

Fed. R. Civ. P. 1 ..........................................................................................................2

Fed. R. Civ. P. 26(e) ...................................................................................................26

Fed. R. Civ. P. 37(c) ...................................................................................................26

Fed. R. Civ. P. 56(a) ....................................................................................................2

H.R. Rep. No. 94-1476 (1976).........................................................................5, 10, 30

H.R. Rep. No. 105-551(I), (1998)................................................................................42

S. Comm. on the Judiciary, 86th Cong., 2d Sess., Copyright Law Revision Study No. 7: Notice of Copyright 19 (Comm. Print 1960)............................................................8

S. Rep. 105-190 (1998)..................................................................................42, 46, 50

*Webster's Third New International Dictionary* 1921 (2002 ed.)...................................49

WIPO Copyright Treaty (WCT) Notification No. 87, Sept. 25, 2018, available at https://www.wipo.int/treaties///wct/ treaty_wct_87.html.......................................55

WIPO Performances and Phonograms Treaty (WPPT) Notification No. 92, Sept. 25, 2018, available at https://www.wipo.int/treaties/en/notifications/wppt/treaty_wppt_92.html .............55

## PRELIMINARY STATEMENT

Defendants and Counterclaimants ERIS Information Inc., ERIS Information Limited Partnership, and Eco Log Environmental Risk Information Services Ltd. (collectively, "Defendants" or "ERIS") move for summary judgment on Plaintiff The Sanborn Library LLC's ("Plaintiff," "TSL," or, individually or collectively with Counterclaim-Defendant Environmental Data Resources, LLC, "EDR") claims for copyright infringement and/or violation of the Digital Millennium Copyright Act ("DMCA"). First, TSL's claims are barred, in whole or in substantial part, because TSL does not own most or all of the copyrights asserted in this case and thus lacks standing to sue. Second, TSL's claims are barred, in whole or in substantial part, under the doctrine of equitable estoppel. Third, TSL has no evidence, and cannot adduce evidence, that several crucial elements of a DMCA violation are or can be met, thus entitling ERIS to judgment on TSL's DMCA claims as a matter of law.

## STATEMENT OF FACTS

ERIS respectfully refers the Court to its Rule 56.1 Statement of Facts filed herewith ("56.1 Statement" or "SF"). **Section I** of the 56.1 Statement summarizes EDR's claims that are subject to this motion. In brief, TSL accuses ERIS of infringing its purported copyrights in many fire insurance maps produced by the historical Sanborn Map Company ("Sanborn Maps"), and of violating the DMCA through ERIS' provision of fire insurance map reports ("FIM Reports") and other products to its customers. SF ¶¶ 11-33. **Section II** of the 56.1 Statement relates to TSL's claim to own copyrights in the Sanborn Maps and the gaps in the chain of title thereto. **Section III** of the 56.1 Statement relates to ERIS and its products in the environmental risk assessment data ("ERAD") market. **Section IV** of the 56.1 Statement is directed to the interactions between EDR and ERIS as ERIS entered the U.S. market.

## LEGAL STANDARD

"Summary judgment procedure is properly regarded not as a disfavored procedural shortcut,

but rather as an integral part of the Federal Rules as a whole, which are designed 'to secure the just, speedy and inexpensive determination of every action.'" *Celotex Corp. v. Catrett*, 477 U.S. 317, 327 (1986) (quoting Fed. R. Civ. P. 1). The Federal Rules of Civil Procedure provide that courts "shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "A fact is material if it might affect the outcome of the suit under the governing law, and an issue of fact is genuine if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Ramos v. Baldor Specialty Foods, Inc.*, 687 F.3d 554, 558 (2d Cir. 2012).

While a court "must construe the facts in the light most favorable to the non-moving party and must resolve all ambiguities and draw all reasonable inferences against the movant," *Dallas Aerospace, Inc. v. CIS Air Corp.*, 352 F.3d 775, 780 (2d Cir. 2003), it "should not accord the non-moving party the benefit of 'unreasonable inferences, or inferences at war with undisputed facts.'" *Dist. Atty. of N.Y. Cty. v. Republic of the Philippines*, 307 F. Supp. 3d 171, 188 (S.D.N.Y. 2018) (quoting *Berk v. St. Vincent's Hosp. & Med. Ctr.*, 380 F. Supp. 2d 334, 342 (S.D.N.Y. 2005)).

Some (but not all) of the grounds on which ERIS seeks summary judgment on EDR's DMCA claims involve EDR's failure to adduce evidence sufficient to raise a genuine dispute of material fact about ERIS' scienter, or state of mind. "Although courts are generally reluctant to dispose of a case on summary judgment when mental state is at issue, it is permissible to do so where there are sufficient undisputed material facts on the record to make the question appropriate for summary judgment." *Lipton v. Nature Co.*, 71 F.3d 464, 472 (2d Cir. 1995). "The summary judgment rule would be rendered sterile … if the mere incantation of intent or state of mind would operate as a talisman to defeat an otherwise valid motion." *Meiri v. Dacon*, 759 F.2d 989, 998 (2d Cir.), *cert. denied*, 474 U.S. 829 (1985). Indeed, a plaintiff's failure or inability to meet its burden as to a defendant's scienter is one of the most

common reasons that courts grant summary judgment on DMCA claims.[1]

In this motion, ERIS relies on EDR's responses to contention interrogatories, setting forth EDR's contentions for its copyright infringement and DMCA claims, and that its claims are not barred by ERIS' estoppel defense ("Interrogatory Responses"). SF ¶¶ 11, 20, 337. Those Interrogatory Responses estop EDR "from later seeking to assert positions omitted from, or otherwise at variance with, those responses." *Wechsler v. Hunt Health Sys., Ltd.*, 1999 WL 672902, at *2 (S.D.N.Y. Aug. 27, 1999).[2] Accordingly, ERIS reserves the right to move to strike any position advanced by EDR's opposition to this motion that is either not reflected in, or that is contradicted by, its Interrogatory Responses.

## ARGUMENT

## I.    EDR LACKS STANDING TO ASSERT ITS CLAIMS BECAUSE IT DOES NOT OWN THE ASSERTED COPYRIGHTS IN THE ACCUSED SANBORN MAPS

It is EDR's burden to prove that it actually *owns* the copyrights it asserts against ERIS. *Feist Publ'ns, Inc. v. Rural Tel. Serv. Co.*, 499 U.S. 340, 361 (1991) (plaintiff must prove "ownership of a valid copyright"). Only "[t]he legal or beneficial owner of an exclusive right under a copyright is entitled" to sue for infringement. 17 U.S.C. § 501(b). "If a plaintiff is not the author of the copyrighted work then he or she must establish a proprietary right through the chain of title in order to support a valid claim to the copyright." *Motta v. Samuel Weiser, Inc.*, 768 F.2d 481, 484 (1st Cir. 1985); *see also Int'l Media Films, Inc. v. Lucas Ent'mt, Inc.*, 703 F. Supp. 2d 456, 463 (S.D.N.Y. 2010) ("[A] transferee

---

[1] *See, e.g., Victor Elias Photography, LLC v. Ice Portal, Inc.*, 43 F.4th 1313, 1325 (11th Cir. 2022), *cert. denied*, No. 22-559, 598 U.S. __ (2023); *Stevens v. Corelogic, Inc.*, 899 F.3d 666, 676 (9th Cir. 2018); *Zuma Press, Inc. v. Getty Images(US), Inc.*, 845 F. App'x 54, 58 (2d Cir. 2021); *Grecco v. Age Fotostock Amm., Inc.*, 2021 WL 455599, at *8 (S.D.N.Y. Oct. 5, 2021); *Ward v. Nat'l Geographic Soc'y*, 208 F. Supp. 2d 429, 450 (S.D.N.Y. 2002) (Kaplan, J.).

[2] *See also, e.g., Feuer v. Cornerstone Hotels Corp.*, 2017 WL 3841841, at *9 (E.D.N.Y. Aug. 4, 2017) ("[R]esponses to contention interrogatories are also distinct and formal admissions that estop a party from making assertions later that are in contradiction or otherwise at variance with those responses.") (cleaned up); *Prince Grp., Inc. v. MTS Prods.*, 1998 WL 273099, at *3 (S.D.N.Y. May 27, 1998) ("[J]udicial admissions, such as … answers to contention interrogatories, are answered with the assistance of counsel and have the effect of precluding entire legal issues from a case.").

plaintiff in a copyright infringement action must prove that the copyright was properly transferred to the plaintiff."). Under both governing Copyright Acts, any assignment of copyright ownership must be in writing, signed by the assignor. 17 U.S.C. § 28 (1909); 17 U.S.C. § 204(a) (1978). Here, there are key gaps in the alleged chain of title asserted by TSL, the current alleged owner.

### A.   Relevant Laws Pertaining to Authorship, Ownership, and Transfer of Copyright

#### 1.   The Copyright Act of 1909

The Copyright Act of 1909, Pub. L. No. 60-349, 35 Stat. 1075, 17 U.S.C. § 1 *et seq.* (1909) (the "1909 Act") was a landmark statute that marked the first major revision to U.S. copyright law since 1790. It gave the copyright owner (then called the "proprietor") a bundle of exclusive rights, including the rights to "print, reprint, publish, copy, and vend the copyrighted work," to "translate the copyrighted work into other languages or dialects, or make any other version thereof," to "deliver or authorize the delivery of the copyrighted work in public for profit," and so on. 17 U.S.C. § 1 (1909).[3] Federal copyright protection was secured by publication of the work with a copyright notice in a specified form. *Id.* § 9. Once secured, the copyright would "endure for twenty-eight years from the date of first publication" (the "original term"). *Id.* § 23. If the copyright proprietor desired, during the final year of the original term, it could renew and extend the copyright in such work for a "further term of twenty-eight years" by applying for such a renewal with the Copyright Office. *Id.*

Under the 1909 Act, a proprietor could assign the copyright in a work "by an instrument in writing signed by the proprietor of the copyright." *Id.* § 42. But the doctrine of "indivisibility" provided that the copyright owner owned an indivisible "bundle of rights" in their copyrighted work, such that the copyright was "incapable of assignment in parts." 3 Melville B. Nimmer & David Nimmer, Nimmer on Copyright § 10.01[A] (2022) ("Nimmer"). "Under the Copyright Act of 1909, a transfer

---

[3] The 1909 Act was amended several times before the Copyright Act of 1976 was enacted. Unless otherwise stated, citations to the 1909 Act are to its originally enacted form, to the extent such provisions survived the amendments to the 1909 Act.

of anything *less* than the totality of rights commanded by copyright was automatically a *license* rather than an *assignment* [of] the copyright." *P.C. Films Corp. v. MGM/UA Home Video Inc.*, 138 F.3d 453, 456 (2d Cir. 1998).[4] Other than these requirements, interpretation of copyright assignments are governed by state law. *See Gordon v. Vincent Youmans, Inc.*, 358 F.2d 261, 271 (2d Cir. 1965) ("Principles of contract law generally are applicable in the construction of copyright assignments, licenses and other transfers of rights."); 1 Nimmer § 1.01[B][3][a] (rev. ed. Supp. 2013) ("[T]he vast bulk of copyright contractual issues must be resolved under state law[.]").

      **2.**    **The Copyright Act of 1976**

The Copyright Act of 1976, Pub. L. No. 94–553, 90 Stat. 2541, 17 U.S.C. § 101 *et seq.* (1976) (effective 1978) (the "1976 Act"), supplanted the 1909 Act. It became (and remains) the copyright law of the United States. The 1976 Act was a "general revision of the United States Copyright Law[.]" H.R. Rep. No. 94-1476 at 47 (1976) ("House Report"). The 1976 Act "almost completely revised existing copyright law," and was "the product of two decades of negotiation by representatives of creators and copyright-using industries, supervised by the Copyright Office and, to a lesser extent, by Congress." *Community for Creative Non-Violence v. Reid*, 490 U.S. 730, 743 (1989).

As part of that revision, for works created after January 1, 1978, Congress did away with the two-term durational scheme of the 1909 Act. Rather, those works were given a single term of copyright, lasting for the life of the author plus 50 years—or 75 years after publication in the case of certain works, such as "works made for hire" (described below). 17 U.S.C. § 302 (1978) (as enacted). However, for works copyrighted *before* January 1, 1978, Congress retained the two-term durational structure of the 1909 Act, and extended the renewal term by 19 years. *Id.* § 304(a).[5]

---

[4] Unless otherwise indicated, all emphases to quoted material in this memorandum have been added.

[5] In 1998, Congress amended the Copyright Act to extend the term of all subsisting copyright terms by an additional 20 years. *See* Sonny Bono Copyright Term Extension Act, Pub. L. No. 105-298, § 102, 112 Stat. 2827 (1998). Again, unless otherwise stated, citations to the 1976 Act are to its originally enacted form.

As another part of that revision, Congress clarified and changed how one comes to own the copyright in a work. Under the 1976 Act, copyright initially vests in the "author or authors of the work." *Id.* § 201(a). The Supreme Court recognized the "general rule [that] the author is the party who actually creates the work, that is, the person who translates an idea into a fixed, tangible expression entitled to copyright protection." *Reid*, 490 U.S. at 737. As with the 1909 Act, copyright ownership must be transferred in writing, signed by the copyright owner. 17 U.S.C. § 204(a). But the 1976 Act scrapped the idea that copyright rights are *indivisible*—and allowed ownership to be transferred "in whole or in part," such that any of the exclusive rights under the copyright, or subdivision of those rights, "may be transferred … and owned separately." *Id.* § 201(d)(1)-(2).

Moreover, the 1976 Act codified the definition of a "work made for hire." *Id.* § 101. While the 1909 Act specified that "the word 'author' shall include an employer in the case of works made for hire," it did not define that latter term. 17 U.S.C. § 62 (1909). As eventually interpreted by the courts, under the 1909 Act, a work could be "made for hire" if it was merely made at the instance and expense of a hiring or commissioning party, even if the individual creator was not an "employee" of that party. *See, e.g., Brattleboro Publ'g Co. v. Winmill Publ'g Corp.*, 369 F.2d 565, 567-68 (2d Cir. 1966).

Similarly, under the 1976 Act, "the employer or other person for whom the work was prepared is considered the author" of that work. 17 U.S.C. § 201(b) (1978). But unlike the 1909 Act, the phrase "work made for hire" was specifically defined in the 1976 Act:

> A "work made for hire" is—
>
> (1) a work prepared by an employee within the scope of his or her employment; or
> (2) a work specially ordered or commissioned for use as a contribution to a collective work, as a part of a motion picture or other audiovisual work, as a translation, as a supplementary work, as a compilation, as an instructional text, as a test, as answer material for a test, or as an atlas, if the parties expressly agree in a written instrument signed by them that the work shall be considered a work made for hire.

*Id.* § 101. In *Reid*, the Supreme Court rejected the idea that "an employment relationship exists …

whenever [the hiring party] has the right to control or supervise the artist's work." 490 U.S. at 748. Instead, it directed courts to "ascertain, using principles of general common law of agency, whether the work was prepared by an employee or an independent contractor." *Id.* at 751. To make this determination, the Supreme Court outlined a set of non-exclusive factors to be considered:

> In determining whether a hired party is an employee under the general common law of agency, we consider the hiring party's right to control the manner and means by which the product is accomplished. Among the other factors relevant to this inquiry are the skill required; the source of the instrumentalities and tools; the location of the work; the duration of the relationship between the parties; whether the hiring party has the right to assign additional projects to the hired party; the extent of the hired party's discretion over when and how long to work; the method of payment; the hired party's role in hiring and paying assistants; whether the work is part of the regular business of the hiring party; whether the hiring party is in business; the provision of employee benefits; and the tax treatment of the hired party.

*Id.* at 751-52 (citations omitted). The Second Circuit further explained that, while "no one factor is dispositive," a few of the factors, including "the provision of employee benefits" and "the tax treatment of the hired party," would be "significant in virtually every situation." *Aymes v. Bonelli*, 980 F.2d 857, 861 (2d Cir. 1992); *see also id.* at 863 ("[E]very case since *Reid* that has applied the test has found the hired party to be an independent contractor where the hiring party failed to extend benefits or pay social security taxes."); *Horror Inc. v. Miller*, 15 F. 4th 232, 253 (2d Cir. 2021) ("This court has held that the parties' tax treatment of their relationship is, along with employee benefits, 'highly indicative' of whether a worker should be treated as a conventional employee for copyright purposes.") (citing *Aymes*, 980 F.2d at 862).

### 3.    Copyright Notice Requirements

Before March 1, 1989, a published work needed to have a valid copyright notice to register and maintain copyright protection.[6] These notice requirements have varied over time.

---

[6] On March 1, 1989, the United States effectively acceded to the Berne Convention for the Protection of Literary and Artistic Works. Pub. L. No. 100-568, 102 Stat. 2853. Under the Berne Convention, the "enjoyment and exercise" of copyright rights was not to be "subject to any formality," such as the copyright notice requirements previously under United States law. Berne

####     a.     The 1909 Act

Under the 1909 Act, to secure federal copyright protection, a published work must have

contained a copyright notice "affixed to *each copy thereof* published or offered for sale in the United

States by authority of the copyright proprietor[.]" 17 U.S.C. § 9 (1909); 17 U.S.C. § 10 (amended

1947). The form and placement of the copyright notice was prescribed by the 1909 Act; for books or

printed publications, it must have been placed on the work's title page or the page immediately

following.  17 U.S.C. §§ 18-19 (1909); 17 U.S.C. §§ 19-20 (amended 1947).

Under the 1909 Act, the required form of the notice depended on the type, or "class," of work:

> The notice of copyright required by section 10 of this title shall consist either of the
> word "Copyright", the abbreviation "Copr.", or the symbol ©, accompanied by the
> name of the copyright proprietor, and if the work be a printed literary, musical, or
> dramatic work, the notice shall include also the year in which the copyright was secured
> by publication. In the case, however, of copies of works specified in subsections (f) to
> (k), inclusive, of section 5 of this title, the notice may consist of the letter C enclosed
> within a circle, thus ©, accompanied by the initials, monogram, mark, or symbol of the
> copyright proprietor[.]

17 U.S.C. § 19 (amended 1947). Thus, for maps (registrable under class (f), *see id.* § 5), a copyright

notice need not include a publication date; rather, including a year date in the notice was *optional*. *Id.*;

*see also* S. Comm. on the Judiciary, 86th Cong., 2d Sess., Copyright Law Revision Study No. 7: Notice

of Copyright 19 (Comm. Print 1960) ("CLR Study No. 7") (for types of works other than printed

literary, musical, or dramatic works, "use of the date is optional, and omission of the date will not affect

the validity of the copyright") (citing *Fleischer Studios, Inc. v. Ralph A. Freundlich, Inc.*, 73 F.2d 276

(2d Cir. 1934), *cert. denied*, 294 U.S. 717 (1935)). Because the statute required the elements of the

notice to "accompan[y]" each other, 17 U.S.C. § 19 (amended 1947), where the "elements of the notice

[were] so dispersed," this was a "defect" in the notice that prevented copyright registration. 37 C.F.R.

§ 202.2(b)(2) (1960).

---

Convention for the Protection of Literary and Artistic Works, art. 5(2), Sept. 28, 1979, S. Treaty Doc. No. 99-27.

While omitting a year date in a copyright notice would not *invalidate* the copyright in a map work, *including* the year date in a copyright notice had consequences. If a copyright proprietor elected to include a year date in a given copyright notice, and that date antedated the work's actual date of first publication, the work is treated as if it were first published on the year date given in the notice; "the mistake is in favor of the public" and "the loss, if any, is on the copyright owner, whose term of protection is computed from the earlier date." CLR Study No. 7 at 19-20 (citing cases). This is true *even if* the work was in a class for which a year date was not required. *See, e.g.*, *Leigh v. Gerber*, 86 F. Supp. 320, 322 (S.D.N.Y. 1949) (holding that the copyright notice on a "painting" which antedated the true year of first publication of the painting was a "misdating of the copyright notice ... in favor of the public") (citing *Am. Code Co. v. Bensinger*, 282 F.2d 829, 836 (2d Cir. 1922)).

### b.   The 1976 Act

Similarly, under the Copyright Act of 1976, until March 1, 1989, a published work must have contained a copyright notice "placed on *all publicly distributed copies* from which the work can be visually perceived[.]" 17 U.S.C. § 401(a) (1976). The form of the copyright notice was prescribed by statute. In particular, unlike the 1909 Act, *all* types of works must have included (a) the symbol ©, or the word "Copyright" or the abbreviation "Copr."; (b) the year of first publication of the work; and (c) the name of the copyright owner. *Id.* § 401(b). Further, the notice needed to be "affixed to the copies in such manner and location as to give reasonable notice of the claim of copyright." *Id.* § 401(c). The Copyright Office promulgated regulations setting forth examples of methods of affixation and positions of the notice that would satisfy the statutory requirement. *Id.*; 37 C.F.R. § 201.20 (1981). While not exhaustive, those examples, along with prior regulations on the form of notice under the 1909 Act, *see* 37 C.F.R. §201.20 (1960), provided guidance as to what positions of the copyright notice would or would not "give reasonable notice of the claim of copyright." While "[d]irect contiguity or juxtaposition of the elements" of the copyright notice "is no longer necessary" (compared to works

copyrighted under the 1909 Act), "if the elements are too widely separated for their relation to be apparent, or if uncertainty is created by the presence of other names or dates, [it should] be treated as if the name or date, and hence the notice itself had been omitted altogether." House Report at 150.

The 1976 Act treated antedated copyright notices the same as the 1909 Act did. In particular, "[w]hen the year date in the notice . . . is earlier than the year in which publication first occurred, any period computed from the year of first publication . . . is to be computed from the year in the notice." 17 U.S.C. § 406(b) (1976) (as amended); *see also* House Report at 149 ("In the case of an antedated notice, where the year in the notice is earlier than the year of first publication, the bill adopts the established judicial principle that any statutory term measured from the year of publication will be computed from the year given in the notice."). Thus, in *Schatt v. Curtis Management Group, Inc.*, the court held that photographs of the actor James Dean, which bore a copyright notice including a 1955 year date, were in the public domain—even though the 1955 date was a mistake and the first publication of those photographs was actually in 1982. 764 F. Supp. 902, 910 (S.D.N.Y. 1991).[7]

## B. EDR Does Not Own Pre-1973 Maps Because There Was No Assignment of the Copyrights in the Sanborn Maps from Sanborn II to Sanborn III

With the above precepts in mind, ERIS now turns to the specific gaps in the chain of title from the original "Sanborn Map Company" to TSL. The first such gap concerns 4,901 Sanborn Maps created before June 1, 1973 ("pre-June 1973 Sanborn Maps"). About 93.5% percent of the copyrights asserted by EDR against ERIS fall into this category. SF ¶¶ 51.

Historically, three separate entities have been named the "Sanborn Map Company," referred to herein as "Sanborn I," "Sanborn II," and "Sanborn III." SF ¶¶ 35-50.[8] As of the deadline for completing

---

[7] The court nonetheless denied the defendants' motion for summary judgment, because "defendants' papers d[id] not identify the specific photographs involved." *Id.*

[8] "Sanborn I" refers to the original "Sanborn Map and Publishing Company" established in 1875, which changed its name to the "Sanborn Map Company" in 1902. SF ¶¶ 35-40. "Sanborn II" refers to the "Pelham Map Company, Inc.," which changed its name to the "Sanborn Map Company, Inc." in 1959. SF ¶¶ 41-45. "Sanborn III" refers to the entity initially

document production, the earliest document EDR produced that purported to establish its chain of title to the copyrights in the Sanborn Maps dated back to only the incorporation date of Sanborn III—June 1, 1973. SF ¶ 52; *see* Dkt. 160 ("Motion to Compel") at 12-13. When ERIS raised this issue with the Court, EDR belatedly produced a set of documents purporting to show transfers of title from Sanborn I to Sanborn II, and from Sanborn II to Sanborn III. SF ¶ 53. EDR identified two such documents that it claimed "assigned" the copyrights in the Sanborn Maps from Sanborn II to Sanborn III: An Asset Purchase Agreement dated May 7, 1973 ("1973 APA"), and a Bill of Sale dated June 1, 1973 ("Bill of Sale") (collectively, the "1973 Documents"). *See* Dkt. 168 at 17; Dkt. 172-2, 172-4.

EDR is wrong. None of the 1973 Documents operate to assign the copyrights in any pre-June 1973 Sanborn Maps to Sanborn III as a matter of law. Summary judgment should be entered in ERIS' favor at least on the pre-June 1973 Sanborn Maps.

### 1.   The Interpretation of the 1973 Documents Is a Question of Law

The 1973 Documents are governed by New York law. SF ¶ 65. The fundamental precept of contract interpretation is to give effect to the parties' intentions. *Apollo Global Mgmt., LLC v. Bokf, NA (In re MPM Silicones, L.L.C.)*, 874 F.3d 787, 795 (2d Cir. 2017). "[T]he best evidence of intent is the contract itself." *Eternity Global Master Fund, Ltd. v. Morgan Guar. Trust Co. of N.Y.*, 375 F.3d 168, 177 (2d Cir. 2004). If language in a contractual agreement is "complete, clear, and unambiguous, [it] evidences the clear intention of the parties." *Hatalmud v. Spellings*, 505 F.3d 139, 146 (2d Cir. 2007). New York law requires courts to enforce unambiguous contracts as written. *Vill. of Sylvan Beach v. Travelers Indem. Co.*, 55 F.3d 114, 115 (2d Cir. 1995). Thus, the threshold question courts must consider upon beginning to interpret a contract is whether disputed contractual provisions are ambiguous. *Int'l Multifoods Corp. v. Comm. Union Ins. Co.*, 309 F.3d 76, 83 (2d Cir. 2002); *Alexander*

---

incorporated as "Sunshine Map Company, Inc.," which was renamed "Sanborn Map Company, Inc." in 1973. SF ¶¶ 46-50.

& Alexander Servs., Inc. v. These Certain Underwriters at Lloyd's, 136 F.3d 82, 86 (2d Cir. 1998).

A contract is ambiguous when its terms are reasonably susceptible to more than one interpretation. *Mellon Bank, N.A. v. United Bank Corp. of N.Y.*, 31 F.3d 113, 115 (2d Cir. 1994); *Sayers v. Rochester Tel. Corp. Suppl. Mgmt. Pension Plan*, 7 F.3d 1091, 1095 (2d Cir. 1993). "A contract is not rendered ambiguous simply because the parties do not agree upon its proper construction." *Umbach v. Carrington Inv. Partners (US), LP*, 851 F.3d 147, 158 (2d Cir. 2017). "Ambiguity does not exist where the court can determine the meaning of a contract without any other guide than a knowledge of the simple fact on which, from the nature of language in general, its meaning depends." *Id.*; *see also R&D Hotel, LLC v. McDonald's USA, LLC*, 2016 WL 3866408, at *2 (S.D.N.Y. July 12, 2016) (Kaplan, J.) (citation omitted). Determining whether ambiguity exists within the contract in the first place is typically constrained to an examination of the document itself. *JA Apparel Corp. v. Abboud*, 568 F.3d 390, 396 (2d Cir. 2009) ("Ambiguity is determined by looking within the four corners of the document, not to outside sources.") (citation omitted).

When looking to the "entire integrated agreement," the court in determining whether ambiguity is present must "safeguard against adopting an interpretation that would render any individual provision superfluous." *Sayers*, 7 F.3d at 1095. Under New York law, any interpretation that would render a provision "meaningless . . . is not preferred and will be avoided if possible." *Galli v. Metz*, 973 F.2d 145, 149 (2d Cir. 1992) (citation omitted). Any interpretation that would distort the plain meaning of text is also considered unreasonable. *See Spandex House, Inc. v. Hartford Fire Ins. Co.*, 816 F. App'x 611, 614 (2d Cir. 2020). Thus, courts determine ambiguity by invoking the "normal rules of contract interpretation: words and phrases should be given their plain meaning and a contract should be construed as to give full meaning and effect to all of its provisions." *Orchard Hill Master Fund Ltd. v. SBA Commc'ns Corp.*, 830 F.3d 152, 157 (2d Cir. 2016).

### 2. The 1973 Documents Do Not Assign the Copyrights in Pre-June 1973 Sanborn Maps to Sanborn III

As the 1973 APA explicitly recites, Sanborn II (the "Seller") was "engaged in the business of manufacturing, revising, and selling maps," and "desire[d] to sell *certain of the assets* used by it . . . in carrying on said business." SF ¶ 54. Sanborn III "desire[d] to acquire *such assets*." SF ¶ 55. Thus, it is undisputed that Sanborn II did not merge into Sanborn III. Sanborn II did not sell all, or even substantially all, of its assets to Sanborn III. And Sanborn II did not even sell *all* of the "assets used by it … in carrying on [its] business" of "manufacturing, revising, and selling maps." Rather, the APA was very specific in listing the assets Sanborn III acquired from Sanborn II. Only "the following assets used by the Seller … in the conduct of said map business at Pelham, New York," enumerated in subparagraphs (a) through (e) of Paragraph 1, were to be acquired. SF ¶¶ 56. The parties "intended that the within sale shall include *only* the assets set forth in subdivisions (a) through (e) of . . . Paragraph 1," and thereby excluded from the scope of the sale any assets and liabilities that were *not* specifically listed in those five subdivisions. SF ¶ 57. The Bill of Sale *actually* operated to assign to Sanborn III only the same assets that Sanborn II *agreed* to assign in the 1973 APA. SF ¶¶ 66-67.

The question here is whether the *specifically itemized* assets acquired by Sanborn III included the *copyrights* in the pre-June 1973 Sanborn Maps now asserted against ERIS. To answer this question, two things must be kept in mind. First, a copyright is an "exclusive right"—i.e., "a right to exclude, not to use." *Bravado Int'l Grp. Merch. Servs., Inc. v. Sean Broihier & Assoc.*, 2015 WL 13915022, at *7 (C.D. Cal. Aug. 17, 2015).[9] Second, as noted in Section I.A.1 above, a copyright assignment must convey "the totality of the rights commanded by copyright," or else the conveyance was "automatically a license," even if it purported to be an assignment. *P.C. Films*, 138 F.3d at 456.

---

[9] *See also Leatherman Tool Grp. Inc. v. Cooper Indus., Inc.*, 131 F.3d 1011, 1015 (Fed. Cir. 1997) (analogous "federal patent laws do not create any affirmative right to make, use, or sell anything," but rather, include the right to "*exclude* every one from making, using, or vending the thing patented, without the permission of the patentee").

Thus, for Sanborn III to have acquired the copyrights in and to the pre-June 1973 Sanborn Maps, the 1973 Documents must have conveyed the *totality* (not just a part) of the *right to exclude others* from copying the Sanborn Maps (not just the right to use those maps). The language of the 1973 Documents clearly and unambiguously fails to do that.

Of the five specifically enumerated assets to be acquired in the APA, only two mention maps at all: those in Paragraphs 1(b) and 1(e). Paragraphs 1(a), 1(c), and 1(d) are clearly inapplicable. Paragraph 1(b) reads as follows:

> All inventory of finished maps, corrections and partly finished maps, the Sanborn Insurance Map library, all raw materials consisting of film, drafting paper, acetate and miscellaneous supplies of the Seller on hand at said premises as described in Exhibit "B" attached hereto and incorporated herein by reference for all purposes[.]

SF ¶ 56. The entirety of Exhibit B to the 1973 APA, referenced in that Subsection, reads as follows:

> The following items of **personal property** now located in the premises at 629 Fifth Avenue, Pelham, New York:
>
> 1. All inventory of diagramatic maps, whether finished or with corrections, or partly finished.
>
> 2. The Sanborn Map Library consisting of insurance maps and other diagramatic maps.
>
> 3. All film supplies.
>
> 4. All drafting paper.
>
> 5. All acetate and any other miscellaneous supplies of the Seller on hand at said premises.

SF ¶ 57. That the foregoing list is described as (and limited to) "personal property" and is specified to be "located in the premises at 629 Fifth Avenue, Pelham, New York," unambiguously indicates that Exhibit B and Section 1(b) of the 1973 APA did not encompass any *intangible* intellectual property rights such as copyrights. *See, e.g.*, 17 U.S.C. § 27 (1909) (as amended) ("The copyright is distinct from the property in the material object copyrighted, and the sale or conveyance, by gift or otherwise,

14

of the material object shall not of itself constitute a transfer of the copyright").[10]

Paragraph 1(e) provides that the assets to be assigned from Sanborn II to Sanborn III would include the following:

> All of the following assets of the Seller's map business, whether reflected on Seller's books or otherwise: all tradenames, including the name 'Sanborn Map', order records, sales data and customer lists, and the *rights to market products from the map library to existing and potential customers.*

SF ¶ 56. In opposing ERIS' Motion to Compel, EDR argued that the italicized language above (plus the "Sanborn Insurance Map library" referenced in Paragraph 1(b) and the authority to "take any and all action in connection with any of such property and assets") constituted "an assignment of all rights to exploit the Sanborn Maps, granting [Sanborn III] the exclusive rights to reproduce and distribute the maps, and integrate them with REDI's products." Dkt. 168 at 17. Again, EDR is wrong.

Paragraph 1(e) uses very precise language to describe the rights conveyed: "[T]he rights to *market* products from the map library to existing and potential customers." SF ¶ 56. The parties to the agreement thus implicitly acknowledged the existence of *other* rights, not captured within that language, that were *not* conveyed, i.e., rights associated with "the map library," *other than* "the rights to market" products therefrom.

Moreover, the plain language of Paragraph 1(e) refers to *only* the right to *use* certain maps in a certain way; *not* the right to *exclude others' use* of such maps. The precision of the language employed, by itself, thus indicates the conveyance of *only* the right to *sell* or *use*, not the right to *exclude* sales or use of, a set of Sanborn Maps in the "map library"; and even then, only a *subset* of such alleged rights.

In contrast, in Paragraph 13 of the 1973 APA, Sanborn II agreed that:

> . . . To the best of Seller's knowledge and belief:

---

[10] *See also Lantern Press, Inc. v. Am. Publishers Co.*, 419 F. Supp. 1267, 1271 (E.D.N.Y. 1976) ("Section 27 was directed to making clear the idea that the copyright was not identical with the copyrighted work but existed separately from it as the intangible right to exclude all others from printing, publishing, copying, or vending the work.")

(a) The names "Sanborn" and "Sanborn Map Company" and the use thereof by Seller do not infringe on any patents, trademarks or ***copyrights***, or any other rights, of any person;

(b) No products manufactured or sold by Seller infringes on any patents, trademarks or ***copyrights***, or any other rights, of any person; and

(c) Seller has the *sole and exclusive right* to manufacture and market its maps *under the names "Sanborn" and "Sanborn Map Company"* and Seller does not know of or have any reason to believe that there are any claims of third parties to the use of any such names or any similar names.

SF ¶ 61-62. Clearly, the parties to the 1973 APA ***specifically*** used the word "copyright" when referring to the (complete) bundle of rights to exclude others from uses listed in the Copyright Act. Similarly, when those parties intended to refer to an *exclusive right*, they used those specific words. The only time the 1973 APA refers to Sanborn II's "exclusive right" is in connection with its right to manufacture and market maps "under the names 'Sanborn' and 'Sanborn Map Company'"; that phrase is never used to convey any right to exclude others from copying Sanborn Maps as a general matter.

"[W]here contract provisions use different language, courts must assume the parties intended different meanings." *Bank of N.Y. Mellon Tr. Co., N.A. v. Morgan Stanley Mortg. Capital, Inc.*, 821 F.3d 297, 309 (2d Cir. 2016) (citing *Frank B. Hall & Co. of N.Y. v. Orient Overseas Assoc's*, 48 N.Y.2d 958, 979 (1979)).[11] "Indeed, even the use of *similar but not identical* language in a contract implies that the parties intended different meanings." *Bausch & Lomb Inc. v. Mimetogen Pharms., Inc.*, 2017 WL 2835250, at *12 (W.D.N.Y. June 30, 2017). Thus, when the 1973 APA used "copyright" and "exclusive right" in Paragraph 13 and "the rights to market products from the map library" in Paragraph 1(e), that difference must be deemed to be intentional. Accordingly, Sanborn III's acquisition of "the rights to market products from the map library" must refer to less than the *copyrights* in and to all pre-

---

[11] *See also NFL Enters. LLC v. Comcast Cable Commc'ns, LLC*, 851 N.Y.S.2d 551, 557 (1st Dep't 2008) ("The use of different terms in the same agreement strongly implies that the terms are to be accorded different meanings."); *Kleinberg v. Radian Grp.*, 2002 WL 31422884, at *6 (S.D.N.Y. Oct. 29, 2002) (holding that failing to use express terminology in a disputed provision when the same terminology was used elsewhere in the agreement indicates an intent *not* to use that terminology).

existing Sanborn Maps—i.e., at most, a license to use those maps without interference from Sanborn. *See P.C. Films*, 138 F.3d at 456 (under the 1909 Act, "a transfer of anything less than the totality of rights commanded by copyright was automatically a license rather than an assignment."). And the parties' Bill of Sale only conveyed title to only the specific assets, property, and rights expressly set forth in Paragraphs 1(a) through 1(e) of the 1973 APA. SF ¶ 66-67.

### 3. The 1973 Documents Relate Only to Sanborn Maps in the "Map Library"

Moreover, whether or not the 1973 Documents amounted to an "assignment" of rights, the 1973 APA did not purport to convey any rights associated with maps that were *not* in "the map library." The use of the definite article "the" in front of "map library" in Paragraph 1(e) necessarily refers to the "Sanborn Map Library" located at 629 Fifth Avenue, Pelham, New York, introduced in Paragraph 1(b). *See, e.g., Post v. Killington, Ltd.*, 424 F. App'x 27, 29 (2d Cir. 2011) ("The use of the definite article in the phrase referencing the term of obligation—'so long as *the* corporation shall operate in that area under an agreement with the State of Vermont'—clearly references the only corporation previously identified" (emphasis in original)). This is no small distinction; most of the pre-June 1973 Sanborn Maps were microfilmed in the 1980s from the Library of Congress' holdings, not Sanborn II's internal archives in Pelham, New York. SF ¶ 14. EDR has produced *no* evidence that *any* of the pre-June 1973 Sanborn Maps it asserts against ERIS were in the "map library" referred to in the 1973 APA.

As the scope of the assets conveyed to Sanborn III is specific and unambiguous, no extrinsic evidence is admissible to interpret the meaning of the 1973 Documents, and any such purported evidence proffered by EDR should be rejected. *See, e.g., Omni Quartz, Ltd. v. CVS Corp.*, 287 F.3d 61, 64 (2d Cir. 2002) ("It is well established that a court may not admit extrinsic evidence in order to determine the meaning of an unambiguous contract."); *One Stop 34, LLC v. Stimdel Props. (FL), Inc.*,

17

2021 WL 8344133 at *6 (E.D.N.Y. Sep. 4, 2021) (same).[12]

Within the four corners of the 1973 Documents, absolutely nothing exhibits any intent of either of the parties to *assign* any copyright rights with respect to Sanborn Maps—much less Sanborn Maps outside of the "map library." Those writings—i.e., the 1973 APA and the Bill of Sale—thus do not suffice to transfer any copyright ownership from Sanborn II to Sanborn III. Accordingly, summary judgment must be granted—at least with respect to the pre-June 1973 Sanborn Maps.

**C.    EDR Also Does Not Own Any Post-1978 Sanborn Maps Because There Is No Evidence that Those Maps Were Works Made for Hire**

The second gap in the chain of title between the Sanborn Maps' drafters and TSL concerns 263 Sanborn Maps made on or after January 1, 1978 ("post-1978 Sanborn Maps")—the date the 1976 Act became law. SF ¶ 70. As stated in Section I.A.2 above, under the 1976 Act, the author of a work is its initial owner, and it can only be transferred to another by a signed, written instrument. 17 U.S.C. §§ 201(a), 204(a). EDR has not produced or identified *any* written instrument signed by *any* draftsperson(s) of the post-1978 Sanborn Maps, much less one that purports to assign those maps to a Sanborn Map Company-related entity. SF ¶ 74.

But EDR claims that the post-1978 Sanborn Maps are "works made for hire." SF ¶ 71. If true, this would make "the employer or other person for whom [the Sanborn Map in question] was prepared" the "author" of that map. 17 U.S.C. § 201(b). As stated in Section I.A.2 above, the 1976 Act has a two-pronged definition of "work made for hire." *Id.* § 101. The second prong of that definition, applicable to works created by independent contractors, also requires evidence of a signed writing specifically

---

[12] Notably, EDR █████████████████████████████████████████████████████████████

███████████████████████ SF ¶¶ 68-69. ███████████████████████████████████████████████

█████████████████████████████████████████████████████████████████████████████ EDR's

attempt to manufacture a factual issue by belatedly offering extrinsic proof of an alleged transfer of title, *see* Dkt. 172, 172-01 through -09, cannot overcome the unambiguous language of the 1973 Documents and should be squarely rejected.

designating the maps as commissioned works for hire. *See, e.g., Playboy Enterprises, Inc. v. Dumas*, 960 F. Supp. 710, 719 (S.D.N.Y. 1997), *aff'd*, 159 F.3d 1347 (2d Cir. 1998) ("A work-for-hire not created pursuant to an employment relationship must be 'specially ordered and commissioned' and the parties must 'expressly agree in a written instrument signed by them that the work shall be considered a work made for hire.'") (citation omitted). Again, EDR has not produced or identified *any* instrument signed by *any* draftsperson(s) of the post-1978 Sanborn Maps, much less one that designates *any* map as a work made for hire. SF ¶ 74.

Thus, the only way that ownership of the post-1978 Sanborn Maps could vest in the Sanborn Map Company—to enable their subsequent conveyance to EDR—would be if those maps were "works made for hire" under the first prong of the statutory definition: works "prepared by an employee within the scope of his or her employment." 17 U.S.C. § 101. But EDR was told, during its acquisition of the Sanborn business in 1996, that ███████████████████████████████████

██████████████████████████████ SF ¶ 72. Accordingly, EDR must, for each asserted Sanborn Map, produce evidence that *that* particular map was created by an employee, as opposed to an independent contractor. EDR has not done so—and cannot do so.

To begin with, EDR has not provided any evidence to *identify* any individual creator(s) of each asserted post-1978 Sanborn Map or to trace any specific map to any given creator—much less evidence that such creators were employees and not independent contractors. EDR did not disclose any of the draftsmen of the Sanborn Maps in its Initial Disclosures, or otherwise identified who they are or their relationship with the Sanborn Map Company. SF ¶¶ 73-78. For example, EDR produced no employment agreements with any draftsmen, or any hiring or employment policies or employment agreements of the Sanborn Map Company at the time those maps were created (or at any other time). SF ¶¶ 74-76.

Similarly, despite ERIS' express requests, EDR has neither produced nor identified, in its initial disclosures, interrogatory responses, or elsewhere, any documents, witnesses, or other evidence bearing on any of the factors to be considered in determining whether the draftsmen were considered "employees" under the *Reid* test. *See Reid*, 490 U.S. at 751-52; SF ¶¶ 77-78. Among other things, despite the crucial importance of employee benefits and tax treatment to the work-for-hire determination, *see Aymes*, 980 F.2d at 861, 863, EDR has not produced any evidence showing that the Sanborn Map Company paid such benefits or withheld taxes on behalf of any putative "employees." SF ¶¶ 77.

This Court has recently held that whether individual works are "works made for hire" is *not* determinable on a generalized basis. *See Waite v. UMG Recordings, Inc.*, 2023 WL 1069690, at *5-6 (S.D.N.Y. Jan. 27, 2023) (Kaplan, J.). In *Waite*, a group of recording artists filed a putative class action against their record labels on the basis that their recordings were not "works made for hire" under *Reid* and instead belonged to the artists after they exercised their statutory termination rights. *Id.* at *1, *4. Judge Kaplan held that "[a]pplying the *Reid* test … requires evaluating evidence unique to each artist" and answering a series of "artist-specific questions," which would need to be weighed "on a case-by-case basis[.]" *Id.* at *5. Accordingly, Judge Kaplan denied class certification, holding that the work-for-hire determination would "depend on facts peculiar to each proposed class member." *Id.* at *6.

Similarly, whether the creator of any given Sanborn Map was an "employee" of the Sanborn Map Company "depend[s] on facts peculiar to" that creator—such as the creator's identity and specific relationship with the Sanborn Map Company. *See id.* EDR must provide evidence sufficient for a jury to answer creator-specific questions, such as those posed by Judge Kaplan in *Waite*. But EDR cannot do so. Accordingly, it *cannot* meet its burden to prove that it owns the copyrights to any post-1978 Sanborn Maps as alleged works made for hire. Accordingly, summary judgment must be granted at

20

least with respect to the post-1978 Sanborn Maps.

**D.     EDR Does Not Own the Copyrights in Any Sanborn Maps Because It Cannot Show that Any Such Maps Were Present in the Sanborn Facility in 1996**

The third glaring omission in the chain of title concerns the alleged assignment of the Sanborn Maps as part of EDR's acquisition of the Sanborn Mapping and Geographic Information Service from its previous owner, TRW-REDI. EDR contends that, as part of that acquisition, the copyrights to *all* Sanborn Maps in existence were assigned to EDR. SF ¶ 79. Again, EDR is wrong: (1) The alleged transfer of Sanborn Map copyrights in 1996 to EDR could *only* have effectively transferred maps that were located in the Sanborn Map Company's facility in Pelham, New York as of closing; and (2) EDR cannot identify any given maps that were in the Sanborn Facility at that time. SF ¶¶ 79-102. Accordingly, EDR cannot satisfy the first element of a copyright claim—"ownership of a valid copyright," *Feist*, 499 U.S. at 361—and summary judgment must be granted to ERIS as to *all* Sanborn Maps.

**1.     EDR's 1996 Acquisition of the Sanborn Map Company Involved Only Sanborn Maps Located at the "Sanborn Facility"**

EDR has identified two sets of documents as purporting to support a transfer of title between TRW REDI and EDR (the "1996 Documents"). SF ¶ 80. First, EDR identifies a "Closing Compilation" which includes an Asset Purchase Agreement dated June 20, 1996 (the "1996 APA") and executed versions of its accompanying exhibits. *Id.* Second, EDR identifies a document recorded with the Copyright Office, including a document recordation cover sheet and schedule. *Id.* That document is an "Assignment of Copyrights" attached as Exhibit R to the 1996 APA ("1996 Assignment"), and an incomplete version of the 1996 APA, without exhibits. *Id.*

**a.     The 1996 APA Was an Agreement to Assign Certain Assets including "Assignable" Intellectual Property, not a Present Assignment of Copyrights to the Sanborn Maps**

The 1996 APA is governed by, and thus must be interpreted under, New York law. SF ¶ 90; *see*

21

Section I.B.1, *supra*. Contrary to EDR's arguments to date, the 1996 APA does *not* constitute a present assignment of copyrights in any of the Sanborn Maps or any other intellectual property. Article 2.1 of the agreement states that TRW REDI *"will … assign"* to EDR various "Acquired Assets," including some broadly defined "Intellectual Property" as well as title to the physical "Sanborn Fire Insurance Maps." SF ¶¶ 81-83. Article 2.1 is unambiguously written in the future tense. *See Small v. Weissberg*, 7 Misc. 2d 492, 495-96 (City Ct. 1957) ("All the language is in the future tense. The instrument is open to only one interpretation—that the parties are bound for something to happen in the future."). Thus, Article 2.1 amounts to an "agreement to assign" the Acquired Assets, and not an actual assignment of those assets. Both New York law and federal intellectual property law recognize the difference between an agreement to assign property and a present assignment of that property.[13] Furthermore, the 1996 APA refers to *separate* instruments of conveyance, and TRW REDI's obligation to deliver those separate documents *and* to execute and deliver *additional* instruments of conveyance, none of which have been produced. SF ¶¶ 86-87. Accordingly, the 1996 APA was a mere *agreement to assign* the Acquired Assets; it was *not* the instrument of conveyance, and thus does not confer *any* ownership of the maps upon EDR, much less *any* copyright rights in the maps.

> **b.      The 1996 APA Did Not Designate Any Given Sanborn Maps as "Assignable" Intellectual Property to Begin With**

In fact, there is no evidence that even the "Assigned Assets" promised to be conveyed to EDR in the 1996 APA includes *any* copyrights in the Sanborn Maps *at all*. To be sure, the 1996 APA defines the "Acquired Assets" as including "all Intellectual Property"[14]—but *only* "[s]ubject to the provisions

---

[13] *See, e.g., Bd. of Trs. of Leland Stanford Junior Univ. v. Roche Molecular Sys., Inc.*, 583 F.3d 832, 841-42 (Fed. Cir. 2009), *aff'd*, 563 U.S. 776 (2011) (holding an agreement to assign "reflects a mere promise to assign rights in the future, not an immediate transfer of" ownership); *Geiler v. Brooklyn-Manhattan Transit Corp.*, 18 N.Y.S.2d 788, 790 (Sup. Ct. 1939) ("In short, the consummation of the plan and agreement are dependent on the happening of certain future events, and, therefore, by the very nature of its provisions the transaction is not an absolute sale but a *contract to sell*") (emphasis in original); *Neponsit Holding Corp. v. Ansorge*, 214 N.Y.S. 91, 96 (App. Div. 1926) ("The general rule … is that anything short of passing the title is not a sale but an agreement to sell") (citations omitted).

[14] "Intellectual Property," in turn, is defined to include "all copyrightable works, all copyrights and all applications,

of Section 2.3 hereof" and *only* "to the extent assignable[.]" SF ¶ 83. The APA does not explicitly

define what makes an item of Intellectual Property "assignable." But it is clearly not possible to

"assign" a piece of property for which the assignor does not have valid title.[15] And, elsewhere in the

1996 APA, TRW REDI clarified the extent of what it considered to be its title to the Sanborn Maps:

> TRW REDI hereby represents and warrants to Purchaser that the following statements
> are correct and complete as of the Effective Date and will be correct and complete as
> of the Closing Date…:
>
> …
>
> (j)      **Title:** TRW REDI has good and marketable title to the Acquired Assets, except
> for those listed in Exhibit E, *provided that title to the Sanborn Insurance Maps only
> means physical possession thereto*[.]

SF ¶ 88. To hammer the point home, Exhibit E to the 1996 APA reads in relevant part as follows:

> Exceptions to Acquired Assets
>
> …
>
> 2.      *Purchaser will obtain only physical title to the Sanborn Fire Insurance
> Maps*; the parties acknowledge that many are in the public domain.

SF ¶ 89. Thus, TRW REDI represented and EDR agreed that the Acquired Assets included only

*physical title to*, not *copyright in*, any Sanborn Maps. This indicates that, under the 1996 APA, the

copyrights in the Sanborn Maps were not "assignable" and thus were not included within the definition

of "Intellectual Property."

### c.      The 1996 Assignment Was a Present Assignment of Only Sanborn Maps Located in the "Sanborn Facility" in Pelham, New York

In the meantime, the 1996 Assignment purports to be a present assignment of "all right, title,

and interest in the copyrights in the Sanborn Fire Insurance Maps (as defined in said [1996 APA]) and

the registrations, if any, thereof." SF ¶ 91. In turn, (i) "Sanborn Fire Insurance Maps" is defined in the

---

registrations, and renewals in connection therewith[.]" SF ¶ 84.

[15] For this reason, the 1996 Documents also cannot be construed to transfer any copyrights to EDR that were not effectively transferred to EDR's predecessor in view of the gap arising from the ineffective transfer in the 1973 Documents. *See* Section I.B, *supra*.

1996 APA as "[t]hose certain maps produced by Sanborn, or its predecessors or Bromley, Perris, Browne, Hopkins and Barlow or their respective predecessors, located at the Sanborn Facility"; and (ii) "Sanborn Facility" is defined in the 1996 APA as "[t]he office and warehouse space located at 629 Fifth Avenue, Pelham, New York 10803, which houses Sanborn and its operations." SF ¶¶ 92-93. Thus, on its face, the 1996 Assignment purports to transfer only the copyrights in those Sanborn Maps *that were physically located at the Sanborn Facility (629 Fifth Avenue, Pelham, New York 10803)* as of June 20, 1996, the date of the purported assignment.[16] In other words, the set of copyrights that TRW REDI *actually* conveyed to EDR in the 1996 Assignment is unambiguously not coextensive with the set of copyrights that TRW REDI may have *promised* to convey to EDR in the 1996 APA.

This conclusion is in accordance with standard canons of construction under New York Law. The plain language of the Assignment expressing what was conveyed to EDR is *different* than the language of the 1996 APA expressing what TRW REDI had *promised* to convey to EDR. SF ¶¶ 81-84, 91-93. This difference is presumed to be intentional.[17] In fact, the 1996 APA specifically contemplates that "reasonable *additional instruments* of conveyance" would need to be executed, in order to "more completely to sell, transfer, and assign to [EDR] … Ownership to the Acquired Assets." SF ¶ 86. This is consistent with the notion that the 1996 Assignment was not intended to completely assign every copyright in the Sanborn Maps that might have been within the definition of "Acquired Assets," and

---

[16] While EDR recorded a portion of the 1996 APA (without exhibits) with the Copyright Office, along with the Assignment of Copyrights, that does not indicate that the 1996 APA is itself the instrument of conveyance. "To be recordable, [a] document must be complete by its own terms," and "[a] document that contains a reference to any … materials as being attached to the document or made a part of it shall be recordable only if the attachment is also submitted for recordation with the document or if the reference is deleted by the parties to the document." 37 C.F.R. § 201.4(b)(2)(i) (1996); *see also Compendium II of Copyright Office Practices* § 1609 (1988). In this case, the Assignment of Copyrights includes terms that are defined in the 1996 APA, and thus, the 1996 APA (without exhibits) was required to be included with the Assignment of Copyrights in order to make the latter document "complete." SF ¶ __.

[17] *See Bank of N.Y. Mellon Tr. Co.*, 821 F.3d at 309 ("[W]here contract provisions use different language, courts must assume the parties intended different meanings"); *NFL Enters. LLC*, 851 N.Y.S.2d at 557 ("The use of different terms in the same agreement strongly implies that the terms are to be accorded different meanings"); *Bausch & Lomb*, 2017 WL 2835250, at *12 ("even the use of *similar but not identical* language in a contract implies that the parties intended different meanings").

that further instruments were necessary. EDR has produced no such further instruments.

In short, any copyrights actually assigned to EDR through the 1996 Assignment are not coextensive with the copyrights that may have been promised to EDR in the 1996 APA. As a matter of law, the 1996 Assignment must be construed to convey to EDR *only* copyrights in Sanborn Maps physically present in the Sanborn Facility in Pelham, New York at the time of the assignment.

### 2.     EDR Has Provided No Evidence that Any Particular Sanborn Maps Were Located in the Sanborn Facility in June 1996

It is clear that not all of the Sanborn Maps were located at the Sanborn Facility as of June 20, 1996. EDR established a "Library loan program" to obtain Sanborn Maps that EDR did not then possess from public libraries. SF ¶ 97. In fact, several Sanborn Maps asserted against ERIS maintained their public library barcodes on the title page. *Id.* And it is undisputed that the source of the "Chadwyck-Healy" or "LOC" collection of Sanborn Maps was the set of maps housed at the Library of Congress—not the Sanborn Map Company's or TRW REDI's offices. SF ¶ 14. In an interrogatory, ERIS requested that EDR identify which Sanborn Maps were in fact "located at the Sanborn Facility" as of June 20, 1996. SF ¶ 96. EDR refused:

> Counterclaim-Defendants object to this Interrogatory to the extent it seeks information in the possession, custody, or control of any person or entity other than Counterclaim-Defendants. Plaintiff further objects to this Interrogatory on the grounds that it is improperly compound and consists of at least two discrete subparts. Plaintiff further objects to this Interrogatory on the grounds that it seeks information that is neither relevant to any claim or defense, nor proportional to the needs of the case, and interposed solely for the purpose of harassing Plaintiff. *The physical possession and/or location of maps at Sanborn Map Company's facility in Pelham, New York on June 20, 1996, including with respect to any maps not asserted in the case, has no bearing on any of the claims or defenses in this case, and accordingly, Plaintiff will not answer this Interrogatory.*

*Id.* Of course, EDR is as incorrect as it is evasive. As described in Section I.D.1.c above, the physical possession of maps at the Sanborn Facility is critical to EDR's claims, because EDR was assigned the copyrights to only those maps located at that Sanborn Facility. And because EDR did not (and likely

cannot) identify any maps that were located at the Sanborn Facility on June 26, 1996, in response to ERIS' Interrogatory, EDR should be precluded from doing so now. Fed. R. Civ. P. 26(e), 37(c).

Accordingly, EDR cannot offer evidence that any of the Sanborn Maps were conveyed from TRW REDI to EDR as part of the 1996 asset sale. Thus, EDR cannot meet its burden to prove ownership of any specific Sanborn Map copyrights, and summary judgment should be granted as to all claims and all Sanborn Maps asserted by EDR against ERIS.[18]

### E.  The Mis-Noticed Maps Are in the Public Domain and Owned By No One

The fourth "gap" in the chain of title to the asserted Sanborn Maps concerns maps that have defects associated with the copyright notices affixed to those maps ("Mis-Noticed Maps"). SF ¶¶ 103-124. Because of the defects in the copyright notices in these maps, neither TSL, nor anyone else, can claim to own title to the copyrights in these Mis-Noticed Maps. Summary judgment should thus be granted on EDR's claims related to each of the Mis-Noticed Maps for the reasons discussed below.

### 1.  No Copyright Notice Appears on Correction Slips

As EDR admits, the Sanborn Maps were updated frequently, by use of what has been referred to as "overlays" or "correction slips," which were generally applied to a customer's maps by a Sanborn Map Company employee. SF ¶ 104. Because it was the correction slips themselves that were published, those slips were required to include the statutorily-mandated copyright notice affixed thereto. *See* 17 U.S.C. § 9 (1909); 17 U.S.C. § 10 (amended 1947); 17 U.S.C. § 401(a) (1976).

EDR has alleged that ERIS infringes Mis-Noticed Maps that have been updated with correction slips. SF ¶ 105. In interrogatory responses, EDR has pointed to only the title page(s), or first interior

---

[18] To the extent EDR argues that the set of documents recorded with the Copyright Office on July 21, 1997 (EDR00034794-34957) identifies the Sanborn Maps being transferred to EDR, this argument is without support. Schedule A attached to the recorded set of documents, which purports to list out the maps being recorded, SF ¶ 100, was apparently prepared after-the-fact for recordation purposes and/or for securing a loan in or around February 1997. SF ¶¶ 98-102. And EDR has provided no evidence showing that the lists in the Schedule were compiled from the physical inventory of the maps located at the Sanborn Facility as of June 20, 1996, as opposed to from another source such as copyright records obtained from the Copyright Office, or otherwise maintained by TRW REDI or a third party.

page(s), of the asserted map books as containing any operative copyright notice. SF ¶ 106. But EDR does not contend, and has not provided any evidence to show, that the *correction slips* themselves, as applied to the actual maps, contained the required copyright notice. SF ¶ 107. Thus, there is no evidence that the published correction slips contained an adequate notice, and any copyright protection for the alleged authorship contained in those correction slips was lost to the public domain. Accordingly, summary judgment should be granted as to these maps.

### 2.    Certain Sanborn Maps with Handwritten/Stamped Dates Added to Them Are in the Public Domain

EDR has alleged that ERIS infringes Mis-Noticed Maps comprising previously published Sanborn Map books with correction slips affixed to them, which were microfilmed as part of the "UPA" Collection. SF ¶ 108. The original Sanborn Map books were published, and sometimes updated, with *printed* copyright notices on the title page. SF ¶ 109. In some cases, when the Sanborn Map Company added correction slips to the atlases, an additional *printed* copyright notice was "pasted" onto the title page in the same manner as the correction slips themselves. *Id.* But for Sanborn Maps in the UPA Collection, the title page also had a date, including a *handwritten or stamped* year, in many cases preceded by a word or term such as "Revised" or "Rev." SF ¶ 110. An excerpt from a title page of such an asserted map is shown below:



As discussed in Section I.A.3.a-b above, to maintain a valid copyright, a published work must have contained a notice "affixed to *each copy thereof*" or "placed on *all publicly distributed copies*[.]" 17 U.S.C. § 9 (1909); 17 U.S.C. § 10 (amended 1947); 17 U.S.C. § 401(a) (1976). While the Copyright Office registered these maps assuming that the handwritten or stamped year was included on *each* published copy, SF ¶¶ 111, there is actually no evidence that this is the case. SF ¶ 112. EDR could not possibly have had personal knowledge of the copyright notices affixed to each published copy (as opposed to the archival copy in EDR's possession) years before EDR acquired the maps.

In fact, EDR's own evidence suggests quite the opposite. None of the Sanborn Map books included in the LOC Collection contain a hand-written, stamped year date. SF ¶ 113. In fact, where the LOC Collection and UPA Collection shared the same Sanborn Maps, the UPA version had a hand-written, stamped year date—but the LOC version did not. SF ¶ 114. Moreover, outside of EDR's and ERIS' collections, third parties' copies of hard-copy, bound Sanborn Map books that have been revised do not contain the hand-written date. SF ¶ 115. Thus, the evidence reflects that the hand-written year

28

dates on the title pages or other initial pages of Sanborn Map books identified in Paragraph 108 of the 56.1 Statement are present *only* in one place: on the specific copies in the internal archives of TRW REDI that were microfilmed in the early 1990s to form the UPA Collection.

Accordingly, the earlier, printed date that was included on *all* published copies of the maps governs, *see* 17 U.S.C. § 9 (1909); 17 U.S.C. § 10 (amended 1947); 17 U.S.C. § 401(a) (1976), and must be used to compute the copyright term of the entire work, including later-added revisions (even if the year date was not *required* to be included). *See, e.g., Leigh*, 86 F. Supp. at 322; *Bensinger*, 282 F.2d at 836; *Schatt*, 764 F. Supp. at 910. Thus, in the example above, even though the map book at issue contains revisions through 1981, the copyright term is calculated as if it were published in 1955. This means that the copyright (underlying 1955 map *and* the revisions through 1981) would have expired in 1983, *unless* a renewal was filed within a year of expiration. 17 U.S.C. § 23 (1909); 17 U.S.C. § 304(a) (1978). As EDR has produced no evidence of such a renewal, both the 1955 underlying map and 1981 revised map fell into the public domain. The same is true for all maps identified in Paragraph 108 of the 56.1 Statement, for which summary judgment should be granted.

### 3. The Copyrights in Pre-1978 Sanborn Maps Whose Copyright Notice Is Not Affixed to the Title Page or Page Immediately Following Are Invalid

Again, under the 1909 Act, to secure federal copyright protection, a published work must have contained a copyright notice "affixed to *each copy thereof* published or offered for sale in the United States by authority of the copyright proprietor[.]" 17 U.S.C. § 10 (amended 1947). The copyright notice was to be in a form prescribed by statute, and for books or printed publications, placed on the work's title page or the page immediately following. *Id.* §§ 19-20.

The Sanborn Map atlases were and are printed publications. However, the copyright notices on works identified in Paragraph 116 to the 56.1 Statement were not placed on the title page or the page immediately following the title page, as required by statute. SF ¶¶ 116-117. For example, many

of the copyright notices identified by EDR for these works were placed on a key map or an interior map of the corresponding Sanborn Map book. SF ¶ 117. The evidence suggests that for these maps, a title page *existed* (even if that page was not microfilmed) and was followed by at least one additional page, such as an index page. *Id.* Accordingly, the copyright notice was not placed in the position required by the 1909 Act, placing the corresponding Sanborn Map book squarely in the public domain.

> ### 4.   The Copyright Notices on Several Post-1978 Works Are Not Affixed in Such Manner and Location as to Give Reasonable Notice of the Claim of Copyright

Before March 1, 1989, under the 1976 Act, a published work must have contained a copyright notice "placed on *all publicly distributed copies* from which the work can be visually perceived" in a prescribed form, and "affixed *to the copies* in such manner and location as to give reasonable notice of the claim of copyright." 17 U.S.C. § 401(a)-(c) (as enacted 1976). The Mis-Noticed Maps identified in Paragraph 118 to the 56.1 Statement are not protected by copyright, because the copyright notices identified by EDR for those maps do not meet this requirement and are therefore defective.

For example, maps from the UPA Collection that have a stamped or handwritten year date for the revisions do not give reasonable notice of the claim of copyright to map authorship from that handwritten year. SF ¶ 119. Even if all published copies to this Sanborn Map book contained the hand-written and stamped year date,[19] this still did not provide adequate notice that copyright was claimed on any of the revisions from that hand-written year (as opposed to, for example, revisions in which copyright was not claimed)—including because the elements of the notice were "too widely separated" or "uncertainty is created by the presence of other … dates." House Report at 150.

As another example, in many cases, EDR identifies a purportedly operative copyright notice

---

[19] As discussed in Section I.E.2 above, EDR has produced no evidence that the hand-written and stamped year date appeared on all published copies of the map book; indeed, the evidence suggests that such information appeared on only the physical copy contained in Sanborn Map Company's archives at the time the UPA Collection was microfilmed.

on a page other than the title page or page following it (an "interior page")—many times appearing in tiny, barely-visible print underneath a "scale bar" somewhere on that page. SF ¶ 120. In many cases, the title page for that same Sanborn Map book would contain a facially invalid copyright notice because, for instance, it did not contain a year, as required under the 1976 Act. SF ¶ 121. The copyright notice identified by EDR does not give reasonable notice of the claim of copyright for the same reason.

These Mis-Noticed Maps suffer from one or more of these infirmities. Paragraphs 119 through 124 of the 56.1 Statement set forth specific examples of the ways in which the copyright notices in these maps are not in the proper form and/or "affixed to the copies in such manner and location as to give reasonable notice of the claim of copyright." 17 U.S.C. § 401(b)-(c). For all of these reasons, alone or in combination with one another, the copyright notice EDR identifies does not give reasonable notice of the claim of copyright in these Mis-Noticed Maps.

## II.    EDR'S CLAIMS ARE BARRED BY ESTOPPEL

"Principles of estoppel applicable elsewhere in the law apply equally to copyright infringement actions." 4 Nimmer on Copyright § 13.07[A]. "[A] copyright defendant invoking equitable estoppel must show that: 1) the plaintiff had knowledge of defendant's infringing acts, 2) the plaintiff either intended that defendant rely on his acts or omissions or acted or failed to act in such a manner that defendant had a right to believe that it was intended to rely on plaintiff's conduct, 3) the defendant was ignorant of the true facts, and 4) the defendant relied on plaintiff's conduct to its detriment." *Dallal v. N.Y. Times Co.*, 2006 WL 463386, at *1 (2d Cir. Feb. 17, 2006); *see also DeCarlo v. Archie Comic Publ'ns, Inc.*, 127 F. Supp. 2d 497, 509 (S.D.N.Y. 2001) (Kaplan, J.) (same).

"Equitable estoppel, as an equitable defense, may be decided by the court and not a jury, and the court is fully empowered to grant summary judgment if there are no triable fact issues and the court concludes that equitable relief is warranted." *Phillies v. Harrison/Erickson*, 2021 WL 5936523, at *15 (S.D.N.Y. Aug. 10, 2021) (internal quotation marks and citation omitted); *see also DeCarlo*, 127 F.

Supp. 2d at 511 n.81 ("If there is no evidence upon which a trier of fact reasonably could find for the plaintiff the [estoppel] issue may be decided upon a motion for summary judgment"). As discussed below, there is no genuine dispute of material fact that ERIS has met all of the elements of estoppel, and is entitled to summary judgment on that defense.

### A. EDR Has Long Known of ERIS' Allegedly Infringing Sales

It is undisputed that the first element of EDR's estoppel defense is met. EDR has had knowledge of ERIS' allegedly infringing activity since at least early 2013, even before ERIS formally launched its services in the U.S. SF ¶¶ 274-282. Specifically, by at least January 2013, if not before, EDR became aware of ERIS' intention to enter into the U.S. market to supply fire insurance maps. *Id.* ¶¶ 274-275. By May 2013, EDR specifically knew of ERIS entering the U.S. market and advertising its product portfolios to U.S. customers. *Id.* ¶ 276. EDR also knew that ERIS advertised its ability to provide database reports and packages with "over 960,000 historical" fire insurance maps from its own collection. *Id.* Indeed, in defending its acquisition of FirstSearch during an FTC investigation, EDR

*Id.* ¶¶ 278-281. EDR further monitored ERIS' entry into the U.S. market, surreptitiously ordering products from ERIS. *Id.* ¶¶ 282. EDR learned that ERIS bought its maps from ProQuest and LexisNexis, EDR's licensees. *Id.* ¶¶ 277. And indeed, at an ASTM meeting in October 2013, Mark Mattei of ERIS informed Jon Walker of EDR that ERIS was offering nearly 1 million fire insurance maps in connection with its environmental data reports and report packages, *and* that ERIS had consulted with counsel who had advised ERIS that none of the maps it was offering infringed on EDR's copyrights. *Id.* ¶¶ 283-284. Thus, the first element of estoppel is easily established.

### B. ERIS Had a Right to Believe It Could Rely on EDR's Acquiescence in ERIS' Use of Fire Insurance Maps, Following Its Initial Cease and Desist Correspondence

The second element of estoppel is also easily established: EDR "acted or failed to act in such

a manner that [ERIS] had a right to believe that it was intended to rely on plaintiff's conduct." *Dallal*, 2006 WL 463386, at \*1; *DeCarlo*, 127 F. Supp. 2d at 509.

### 1. EDR's Conduct Forming the Basis of ERIS' Estoppel Defense

EDR's "act[ions]" and "conduct" pertinent to this element include EDR's immediate threats to enforce their alleged copyrights in the Sanborn Maps against ERIS in late 2013—followed by not only nearly six years of silence, but also by an affirmative offer by EDR's parent company, DMGT, to either buy ERIS outright, or to license *other* alleged intellectual property—without so much as even *mentioning* Sanborn Maps or fire insurance maps in general. *See* SF ¶¶ 283-315.

Following Jon Walker's meeting with Mark Mattei at the October 2013 ASTM conference, Mr. Walker exchanged emails with Mr. Mattei and Carol LeNoury, alleging that ERIS infringed its copyrights in Sanborn Maps and stating that EDR's counsel would follow up. SF ¶ 285. ERIS responded to EDR's allegations within a week. *Id.* In November 2013, Paul Vogt, general counsel of EDR's parent company, DMGI, sent a cease-and-desist letter to ERIS alleging that ERIS infringed the copyrights in the Sanborn Maps. *Id.* ¶ 287. In particular, Mr. Vogt wrote:

> I am writing this letter to remind ERIS as it expands its business into the United States that EDR maintains copyrights within its Sanborn Map collection and that absent EDR's express written permission, ERIS is not permitted to copy or use any of the Sanborn Maps under copyright. **EDR will take all actions it deems appropriate, including actions under the US Copyright Laws, to enforce its copyrights and to obtain damages against anyone who infringes or misappropriates such copyrights**.

*Id.* ERIS wrote back a few weeks later through its counsel, Jovan Jovanovic, requesting that EDR identify which maps EDR believed ERIS was infringing. *Id.* ¶¶ 288-290. Mr. Jovanovic sent the response letter to the fax number provided on Mr. Vogt's letterhead, since that letterhead failed to identify any email address for Mr. Vogt. Notably, Mr. Jovanovic received from DMGI's office a fax confirmation receipt showing that the fax was delivered. *Id.* ¶ 291. However, EDR did not respond. *Id.* ¶¶ 294, 305. After that fax, at the January 2014 EBA Annual Conference, Carol LeNoury spoke to Mr.

Walker about EDR's infringement allegations, the letter from Mr. Vogt, and the fact that Mr. Jovanovic had responded. *Id.* ¶¶ 292-293. Ms. LeNoury asked if Mr. Walker would like a copy of Mr. Jovanovic's letter, and Mr. Walker replied that it "would not be necessary." *Id.* ¶ 293.[20] Despite the foregoing, and despite threatening in 2013 that "EDR will take all actions . . . under the US Copyright Laws[] to enforce its copyrights" that ERIS was purportedly infringing, *id.* ¶ 287, EDR made no efforts to follow through on Mr. Vogt's letter until nearly six years later—just before filing this lawsuit in 2019. *Id.* ¶¶ 294-295, 305.

In fact, in 2014, less than a year after Mr. Vogt's letter, EDR's parent company, DMGI, met with ERIS regarding a variety of potential business relationships or transactions. *Id.* ¶ 306. Among other things, **DMGI offered to acquire ERIS**. *Id.* ¶ 308. DMGI also proposed that ERIS license *other* intellectual property from EDR that EDR claimed to own, including EDR's library of City Directories (another standard ASTM historical source). *Id.* EDR executives were involved in those negotiations, including Rob Barber, EDR's CEO. *Id.* ¶ 307. During those discussions, neither Mr. Barber nor DMGI representatives ever mentioned Mr. Vogt's letter in particular, or the notion that ERIS was allegedly infringing any of EDR's Sanborn Map copyrights in general—even though the licensing of other allegedly-EDR-owned copyrights was discussed at the same time. *Id.* ¶¶ 309-311. Even though ▌

▌

▌. *Id.* ¶ 312.

Courts *routinely* hold that EDR's conduct is of the very type that gives rise to estoppel. The

---

[20] Federal courts hold that a confirmation that a fax reached its destination, such as a confirmation page, creates a rebuttable presumption that the fax was received. *Stevens Shipping & Terminal Co. v. Japan Rainbow, II MV*, 334 F.3d 439, 444 (5th Cir. 2003); *Morgan Tire of Sacramento, Inc. v. Goodyear Tire & Rubber Co.*, 60 F. Supp. 3d 1109, 1117 (E.D. Cal. 2014); *see also Hammer v. First Unum Life Ins. Co.*, No. 01 Civ. 9307 (RCC), 2004 WL 1900334, at *2 n.2 (S.D.N.Y. Aug. 25, 2004) (mem. op.) (noting that a fax confirmation page confirmed that a letter was sent on a specific date). Mere denial of receipt of the fax does not suffice to rebut that presumption. *See Stevens Shipping*, 334 F.3d at 442–43, 444. In any case, because an EDR principal involved with EDR's assertion of copyright infringement against ERIS was expressly advised of Mr. Jovanovic's timely response, EDR should be deemed to have at least constructively received that response.

Federal Circuit has held that the "*most common situation*" estopping intellectual property rightsholders is where they "specifically object[] to the activities currently asserted as infringement in the suit and then do[] not follow up for years." *A.C. Aukerman Co. v. R.L. Chaides Constr. Co.*, 960 F.2d 1020, 1042 (Fed. Cir. 1992).[21] In *Byron v. Chevrolet Motor Div. of Gen. Motors Corp.*, the court granted summary judgment to a copyright defendant, holding that a copyright claimant who sent two cease and desist letters and then did not file suit for six years was barred by estoppel. 1995 WL 465130, at *10 n.11 (S.D.N.Y. Aug. 7, 1995). And in *Aspex Eyewear, Inc. v. Clariti Eyewear, Inc.*, then-District Judge Chin granted summary judgment that a patentee's claims were estopped where the plaintiff "placed [the defendant] 'on notice' about several of its patents … and declared its policy and intention to 'fully and vigorously enforce our rights,'" but after the defendant "sought additional information about which claims might be involved," the plaintiff "did not mention any of the patents again" for three years. 2008 WL 5049744, at *5 (S.D.N.Y. Nov. 26, 2008), *aff'd*, 605 F.3d 1305 (Fed. Cir. 2010).

EDR has already portrayed its conduct to this Court as mere "[i]naction standing on its own[.]" Dec. 7, 2022 Hr'g Tr. at 15:25-16:1; June 23, 2022 Hr'g Tr. at 43:2 ("ERIS cannot rely on any inaction by EDR."). As the case law above demonstrates, a threat of enforcement *followed by* inaction (and, in this case, an offer to acquire or license *other* IP to a company) does not equate to "inaction standing on its own," but rather, amounts to *affirmatively misleading action*. As Judge Kaplan recognized:

> Silence or inaction in the face of an explicit contrary assumption by the opposing party may be sufficient to induce justifiable reliance by a defendant that a plaintiff will not later assert a claim. Moreover, the duty to speak need not be a purely legal one. It is, instead, a duty of good faith: When one party in a relationship with another has an opportunity to speak in order to avoid harm or injury to the other party and fails to do so to the ultimate prejudice of the other party, he will be estopped from relying thereafter on that relationship.

---

[21] While *Aukerman* was a patent case, "[i]n the copyright context, courts have also looked to *Aukerman* for guidance." *LEGO A/S v. Best-Lock Constr. Toys, Inc.*, 404 F. Supp. 3d 583, 618 (D. Conn. 2019). This may be due to the "historic kinship" between patent and copyright law, "a kinship that is reflected in the Constitution." *John Wiley & Sons, Inc. v. DRK Photo*, 882 F.3d 394, 409 (2d Cir. 2018) (quoting *Sony Corp. of Am. v. Universal City Studios*, 464 U.S. 417, 439 (1984)).

*DeCarlo*, 127 F. Supp. 2d at 510 (cleaned up); *see also, e.g., Aukerman*, 960 F.2d at 1042 ("plaintiff's inaction … combined with other facts respecting the relationship or contacts between the parties" can "give rise to the necessary inference that the claim against the defendant is abandoned.").

Here, EDR failed *for 5½ years* to follow up on Mr. Vogt's letter threatening enforcement of its alleged copyrights—despite knowing that ERIS had been informed by counsel that its activities were not infringing, and having at least constructive notice that ERIS responded, in writing, to Mr. Vogt's letter, such that ERIS made an "explicit contrary assumption" that EDR would "not assert a claim." SF ¶¶ 316-317. Later, when EDR was negotiating with ERIS' parent company regarding acquiring or licensing its City Directories to ERIS, it had an "opportunity to speak in order to avoid harm or injury" to ERIS by raising the Sanborn Map issue again. SF ¶¶ 306-312; *DeCarlo*, 127 F. Supp. 2d at 510. Indeed,                           . SF ¶ 312. But it did not do so, *id.*, "to the ultimate prejudice of" ERIS. *DeCarlo*, 127 F. Supp. 2d at 510.

## 2. ERIS Had a Right to Rely on EDR's Conduct

EDR's conduct, described above, induced ERIS to believe that EDR was of the opinion that ERIS' actions did not violate EDR's alleged copyright rights in the Sanborn Maps—either because the maps were not under copyright, not copyrightable to begin with, lawfully sold to ERIS for ERIS' contemplated use, used permissibly under the fair use doctrine, or for other reasons—and thus that EDR had no intention of pursuing action against ERIS for its supplying fire insurance maps in connection with its environmental data reports. SF ¶¶ 316-317. EDR had vowed to "take all actions . . . under the US Copyright Laws[] to enforce its copyrights and to obtain damages against anyone who infringes or misappropriates such copyrights." *Id.* ¶ 287. Having not taken *any* action at all in any of the next 5½ years (and having proposed a transaction involving the licensing of *other* intellectual property without raising any such alleged infringement), ERIS reasonably assumed that EDR deemed ERIS' conduct not to be unlawful, and further reasonably assumed EDR would not take action against

ERIS. *Id.* ¶¶ 316-317.

There can be no *genuine* dispute that ERIS' belief—that EDR had decided not to pursue legal action against ERIS for its inclusion of fire insurance maps with its environmental data reports—was reasonable. First, following Mr. Vogt's November 2013 letter, EDR's executives had, ███████████

██████████████████████████████████████████. SF ¶ 302. Rob Barber, EDR's

former CEO until 2015, wanted the company "██████████████████████████████████████

██████████████████████████████████████" and "██████████████████████████████████████

██████████" *Id.* EDR's *actual* decision to forego litigation against ERIS supports the reasonableness

of ERIS' belief that EDR would not sue, and reliance on EDR's conduct indicating the same.

Second, ██████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████████████

███████████████. SF ¶¶ 297-300. ██████████████████████████████████

████████████████████████ supports the reasonableness of ERIS' belief that ██████████████

█████████████—i.e., that copyright status, copyrightability, or fair use, among others, would be

viable defenses to any ill-advised lawsuit and of its reliance on EDR's conduct indicating the same.

Third, the circumstances under which ERIS acquired its collection of fire insurance maps only underscored that ERIS' belief was reasonable. As explained in the 56.1 Statement, those circumstances included: (i) the fact that the ASTM Standard included fire insurance maps (i.e., Sanborn Maps) as a standard (indeed, *essential*) historical source, defined the maps as being available from libraries, historical societies, and private resellers, and that EDR never objected to that definition, SF ¶¶ 131-133; (ii) the fact that ██████████████████████████████████████████████████

███████████████████████████████████████████████████████████████████████

██████████████ SF ¶¶ 207-213; (iii) the fact that EDR failed to respond to a competitor's

("NETR") challenge to the copyright status of the Sanborn maps, an event which became known to ERIS, SF ¶¶ 217-220; (iv) the legal advice provided to ERIS by Mr. Jovanovic that the Sanborn Maps were out of copyright, not copyrightable, and/or that ERIS' proposed use of fire insurance maps was a fair use, among other things, SF ¶¶ 221-237; (v) the fact that ProQuest, EDR's own "fiduciary" and agent, told ERIS that its proposed use of the fire insurance maps was a fair use, in line with what ERIS' attorney told ERIS, SF ¶¶ 238-255; and (vi) the fact that ERIS, to be sure its conduct was legal, negotiated a license with ProQuest to its collection of fire insurance maps, which expressly approved the very activities that ERIS proposed to undertake as a "fair use" of those maps, and treated the maps it acquired from LexisNexis in the exact same way once ProQuest acquired LexisNexis' collection. SF ¶¶ 238-273. These facts show that ERIS reasonably relied on EDR's conduct following Mr. Vogt's November 2013 letter, and that EDR's actions and inaction toward ERIS thereafter were consistent with ERIS' understanding that EDR would *not* file suit. Accordingly, the second element of estoppel has also been met.

### C.   ERIS Was Ignorant of the Fact that EDR Considered ERIS' Activities Infringing

The third element of estoppel—the requirement that ERIS be "ignorant of the true facts"—is also met here. Until shortly before the filing of this lawsuit, ERIS had no knowledge (apart from Mr. Vogt's letter) that EDR considered ERIS' conduct unlawful or intended to sue ERIS for infringement. SF ¶ 316-317. While EDR told the industry that it "owned" copyrights to the Sanborn Map collection, ERIS reasonably believed EDR was bluffing, in order to maintain its dominance over the ERAD market. *Id.* When EDR failed to reply to Mr. Jovanovic's inquiry about the scope of EDR's threat to "take all actions … to enforce its copyrights" in Paul Vogt's November 2013 letter—and instead engaged in talks about acquiring ERIS or licensing different IP to ERIS—ERIS reasonably believed that it had called EDR's bluff, and that it could compete in the ERAD market unmolested. *Id.*. Indeed, when ERIS was assessing the risk of obtaining more fire insurance maps from libraries in 2017 and

2018—a risk previously described as being "less than negligible," SF ¶ 263—ERIS concluded that EDR would not do so because "the Fair Use issue works in our favour." SF ¶ 331. Accordingly, ERIS did not know of the "true fact" that EDR believed ERIS' conduct to be unlawful and would file suit.

### D.    ERIS Relied on EDR's Conduct to Its Detriment

There is no genuine dispute that ERIS relied on EDR's failure to follow up on Mr. Vogt's November 2013 letter, its failure to reply to Mr. Jovanovic's response to that letter, and its failure to raise the Sanborn Map copyright issues during commercial discussions with ERIS in 2014 (or at any time thereafter). Over the 5½ years since Mr. Vogt's letter, ERIS continued to invest in the U.S. market, including by acquiring more resources and assets and investing in more facilities, personnel and technological innovations for its products in the ERAD market. SF ¶¶ 316-331. At every turn, EDR actively monitored ERIS' growth, expansion, and development, and regularly acknowledged ERIS' substantial investments and its impressive feats in quickly bringing new and effective products to market. *Id.* ¶ 332. At no time until February 2019 did EDR ever renew its infringement accusations directly with ERIS, or follow up on its 2013 cease-and-desist letter. *Id.* ¶¶ 294-295, 305, 313-315. Instead, EDR chose to silently monitor (and marvel at) ERIS' progress in the U.S. for over five years. *Id.* ¶¶ 282, 332.

There is further no genuine dispute that ERIS' reliance on EDR's conduct was to ERIS' detriment. For example, during the period between Mr. Vogt's letter and February 2019, ERIS made substantial investments in enlarging its national sales and marketing network, and by improving and expanding its environmental data products, including its fire insurance map offerings, that are now at risk due to EDR's belated, resurrected infringement contentions. *Id.* ¶¶ 318-331. Had EDR filed this lawsuit or followed up on its allegations of infringement sooner, there is no genuine dispute that ERIS would not have made the investments in its U.S. business that it did, in the way that it did. *Id.* ¶¶ 333-334. Moreover, ERIS has suffered evidentiary prejudice, because evidence that was previously in

EDR's possession, such as emails to and from departed employees and its electronic database that meticulously tracked copyright registration records, has conveniently disappeared, and because Jon Walker, a key figure in EDR's decision-making and ERIS' communications with EDR about the alleged infringement, has passed away. *Id.* ¶¶ 335-336. Such evidentiary loss constitutes a detriment sufficient to trigger estoppel. *See, e.g., Aukerman*, 960 F.2d at 1033 ("Evidentiary, or 'defense' prejudice, may arise by reason of a defendant's inability to present a full and fair defense on the merits due to the loss of records, the death of a witness, or the unreliability of memories of long past events, thereby undermining the court's ability to judge the facts."), 1043 ("loss of evidence" sufficient prejudice to estop plaintiff).

EDR does not dispute that ERIS *in fact* relied on EDR's conduct to its detriment; rather, EDR only contends that ERIS' reliance on EDR's conduct was somehow not justifiable or not "reasonable." SF ¶ 337. That is the same inquiry as whether ERIS had a "right to rely" on EDR's conduct under the second estoppel factor. As discussed in Section II.B.2 above, ERIS was justified in relying on EDR's inaction, and reasonably believed that EDR was bluffing as to the extent of its copyright rights and did not intend to sue ERIS for infringement. EDR posits that the *only* thing that ERIS could have done to estop EDR is to ask EDR for permission to use the Sanborn Maps. *See* Dkt. 193 at 2 ("ERIS never sought EDR's permission to use the Sanborn Maps[.]"); June 23, 2022 Hr'g Tr. at 43:18-19 ("ERIS never contacted EDR for permission."); Dec. 7, 2022 Hr'g Tr. at 16:6-8 (ERIS "had the means to reach out to EDR to ask"). This is nonsense. ERIS obtained advice of counsel, was licensed by ProQuest (EDR's licensee), and promptly responded to Mr. Vogt's November 2013 letter with a responsive inquiry, which EDR's Vice President of Sales was reminded of a short time thereafter. SF ¶¶ 207-273, 283-296. This sequence of actions constitutes the required diligence to make ERIS' reliance on EDR's conduct reasonable. No other conclusion can reasonably be drawn.

40

## III.    EDR CANNOT ESTABLISH ITS CLAIMS FOR VIOLATION OF THE DMCA

Paragraphs 127-205 of the 56.1 Statement describe ERIS' basic environmental data products and how they are created. ERIS' products include a "Database Report" and what will be referred to as a "FIM Report." SF ¶¶ 148, 162. EDR claims that ERIS violates the DMCA in seven different ways. First, EDR identifies two categories of so-called copyright management information, or "CMI," that ERIS has allegedly "falsified" in violation of 17 U.S.C. § 1202(a): A "disclaimer" statement that ERIS includes on a summary page of each of ERIS' FIM Reports (the "FIM Report Disclaimer"), and several statements at the bottom of the Table of Contents in ERIS' Database Report (the "Database Report Disclaimer") (collectively, the "Disclaimers"). *Id.* ¶¶ 21-24. Second, EDR identifies five categories of CMI (collectively, the "Missing CMI") that were present in the original Sanborn Map books, but were "not otherwise included in the corresponding fire insurance map report sold by ERIS ... to customers located in the United States." *Id.* ¶ 25.[22] Because they were not included in the FIM Report, EDR contends that this Missing CMI was "removed" or "deleted" in violation of 17 U.S.C. § 1202(b). *Id.*

EDR's lack of ownership and ERIS' estoppel defense, described above, precludes EDR from succeeding on both its infringement *and* DMCA claims. But none of EDR's DMCA theories have merit for additional DMCA-specific reasons, discussed below. Thus, ERIS should be granted summary judgment on EDR's DMCA claims.

### A.    The Digital Millennium Copyright Act

The DMCA was enacted in 1998 to "implement two international treaties resulting from the

---

[22] The types of Missing CMI that were allegedly removed include (i) a "Sanborn Map Copyright Notice" appearing on the title page or first page of each Sanborn Map Book; (ii) "Sanborn Map Terms and Conditions" appearing on the same title page or first page; (iii) "Microfilm Terms and Conditions" appearing on separate frames of the microfilm reels from which the Sanborn Maps contained in each FIM Report were reproduced (collectively, categories (i)-(iii) are referred to as "Exterior CMI"); (iv) "Interior Page Copyright Statements"—for example, a copyright notice appearing below the scale bar on certain map sheets from Sanborn Map Books or volumes that were partially reproduced in ERIS' FIM Reports; and (v) a "Compass Rose" which contained the name of the Sanborn Map Company embedded in it (collectively, categories (iv) and (v) are referred to as "Interior CMI"). SF ¶¶ 26-30.

1996 World Intellectual Property Organization ('WIPO') Convention," and to "update the copyright laws of the United States for the 'digital age.'" *Fischer v. Forrest*, 968 F.3d 216, 222 (2d Cir. 2020) ("*Fischer II*") (quoting *Viacom Int'l, Inc. v. YouTube, Inc.*, 676 F.3d 19, 26 (2d Cir. 2012)). "Fearful that the ease with which pirates could copy and distribute a copyrightable work in digital form was overwhelming the capacity of conventional copyright enforcement to find and enjoin unlawfully copied material, Congress sought to combat copyright piracy in its earlier stages, before the work was even copied." *Mango v. Buzzfeed, Inc.*, 970 F.3d 167, 171 (2d Cir. 2020) ("*Mango II*") (quoting *Universal City Studios, Inc. v. Corley*, 273 F.3d 429, 435 (2d Cir. 2001)).

The DMCA section at issue here, 17 U.S.C. § 1202, "was 'required by both WIPO Treaties to ensure the integrity of the electronic marketplace by preventing fraud and misinformation,'" and is intended "to protect consumers from misinformation as well as authors and copyright owners from interference with the private licensing process." *Id.* (quoting H.R. Rep. No. 105-551(I), at 10-11 (1998); *see also* S. Rep. 105-190 (1998)). Section 1202 prohibits certain falsification, removal, or alteration of CMI, defined by the DMCA as including a number of categories of information about a work, such as its title, author, owner, and terms and conditions for its use, "conveyed in connection with copies ... of a work, ... except that such term does not include any personally identifying information about a user of a work or of a copy ... of a work[.]" 17 U.S.C. § 1202(c). The legislative history notes that CMI is important "in tracking and monitoring uses of copyrighted works, as well as licensing of rights and indicating attribution, creation and ownership." S. Rep. 105-190, at 16 (1998). "The point of CMI is to inform the public that something is copyrighted." *Laser Kitten, LLC v. Marc Jacobs Int'l, LLC*, 2018 WL 4830091, at *4 (S.D.N.Y. Oct. 4, 2018) (citation omitted). In 2020, the Second Circuit further held that, in determining whether an item of information that literally falls within the eight categories in the definition constitutes CMI under the law, the court is to look at the *context*

in which that information is used. *Fischer II*, 968 F.3d at 224 ("In short: context matters."); *see also id.*

at 223 ("While an author's name can constitute CMI, not every mention of the name does.").

Section 1202(a) of the DMCA prohibits certain knowing *falsifications* of CMI:

No person shall knowingly and with the intent to induce, enable, facilitate, or conceal infringement—(1) provide copyright management information that is false, or (2) distribute or import for distribution copyright management information that is false.

17 U.S.C. § 1202(a). Section 1202(b) prohibits certain *removal* or *alterations* of CMI:

No person shall, without the authority of the copyright owner or the law—

(1) intentionally remove or alter any copyright management information,

(2) distribute or import for distribution copyright management information knowing that the copyright management information has been removed or altered without authority of the copyright owner or the law, or

(3) distribute, import for distribution, or publicly perform works, copies of works, or phonorecords, knowing that [CMI] has been removed or altered without authority of the copyright owner or the law,

knowing, or, with respect to civil remedies under section 1203, having reasonable grounds to know, that it will induce, enable, facilitate, or conceal an infringement of any right under this title.

17 U.S.C. § 1202(b).

To be liable for a DMCA violation, a defendant must meet a "double-scienter" requirement.

*Mango II*, 930 F.3d at 171. To violate Section 1202(a), a defendant must "knowingly provid[e] false

copyright information" *and* do so "with the intent to induce, enable, facilitate, or conceal an

infringement." *Krechmer v. Tantaros*, 747 F. App'x 6, 9 (2d Cir. 2018). To violate Section 1202(b)(1)

requires "(1) the existence of CMI on the [infringed work]; (2) removal and/or alteration of that

information; and (3) that the removal and/or alteration was done intentionally." *Mango v. BuzzFeed,

Inc.*, 356 F. Supp. 3d 368, 376 (S.D.N.Y. 2019) (cleaned up) ("*Mango I*"). The defendant must also

know, or have reasonable grounds to know, that such a removal or alteration would "induce, enable,

facilitate, or conceal an infringement[.]" 17 U.S.C. § 1202(b); *Mango II*, 970 F.3d at 171. "To avoid

43

superfluity, the mental state requirement in Section 1202(b) must have a more specific application than the universal possibility of encouraging infringement; specific allegations as to how identifiable infringements 'will' be affected are necessary." *Stevens*, 899 F.3d at 674. "In short, the statute's plain language requires *some identifiable connection* between the defendant's actions and the infringement or the likelihood of infringement. To hold otherwise would create a standard under which the defendant would always know that its actions would 'induce, enable, facilitate, or conceal' infringement because distributing protected images wrongly cleansed of CMI would always make infringement easier in some general sense." *Victor Elias*, 43 F.4th at 1325 (citing *Stevens*, 899 F.3d at 673, 674)).

**B.      ERIS Cannot Be Liable for Falsification of CMI under Section 1202(a)**

ERIS cannot be liable under Section 1202(a) because (i) the DMCA simply does not apply where CMI such as ERIS' Disclaimers is added to a wholly distinct ERIS work; and (ii) there is no genuine dispute of material fact that ERIS did not have the requisite scienter to violate Section 1202(a).

**1.      The DMCA Does Not Apply to Any Alleged CMI Conveyed with a Distinct Work**

In the Second Circuit, "a party that puts its own CMI on work distinct from work owned by a copyright holder is not liable under Section 1202(a), even if the party's work incorporates the copyright holder's work." *Michael Grecco Prods., Inc. v. Time USA, LLC*, 2021 WL 3192543, at *5 (S.D.N.Y. July 27, 2021) (citing *Park v. Skidmore, Owings & Merrill LLP*, 2019 WL 9228987, at *11 (S.D.N.Y. Sept. 30, 2019)). "[W]here an allegedly infringing work is derivative to the original, a defendant does not violate the DMCA by printing his own name on the derivative work, even if the derivative work is an act of infringement." *Crowley v. Jones*, 608 F. Supp. 3d 78, __, 2022 WL 2237453, at *7 (S.D.N.Y. June 22, 2022) (citing *Park*). "In other words, a defendant 'cannot violate the DMCA by associating its name' with a derivative work that 'is unquestionably a distinct work,' even if the derivative work

infringes a copyright." *Id.* (quoting *Park*, 2019 WL 9228987, at *11).[23]

Here, there is no dispute that ERIS creates its FIM Reports by excerpting, from ERIS' collection of fire insurance maps, certain relevant map sheets (or parts thereof) near a target property, and by compiling the excerpted maps into a single document. SF ¶¶ 163-165, 174-179. Clearly, the ERIS FIM Report is a distinct product from the historical Sanborn Map books that EDR claims were infringed. The FIM Report Disclaimer appears at the beginning of the FIM Report. *Id.* ¶ 181. The above authority holds that the DMCA does not apply to the FIM Report Disclaimer, i.e., to ERIS' use of CMI on its *own* reports, even if they include portions of copyrighted fire insurance maps (alongside public domain ones).

The Database Report Disclaimer is even *more* removed from the allegedly infringing maps. Indeed, the Database Report Disclaimer is contained in the Database Report—a completely different document that contains no fire insurance maps. *Id.* ¶¶ 152-153. ERIS intends the Database Report Disclaimer to refer *only* to material in the Database Report. *Id.* ¶¶ 159-161. ERIS is entitled to include CMI on its own reports. The DMCA does not apply to the Database Report Disclaimer, either.

The rationale for not applying the DMCA to CMI in a defendant's distinct work (as opposed to wholesale copies of a plaintiff's work) is grounded in the text of the DMCA. The DMCA defines CMI as information regarding, *e.g.*, the title, author, or owner of a copyrighted work, "conveyed in connection with" that work. 17 U.S.C. § 1202(c). CMI applied to a defendant's distinct work is designed to be viewed "in connection with" *the defendant's own work*, not any work of plaintiff's that may happen to be incorporated therein. As the Second Circuit held: "In short: context matters." *Fischer II*, 968 F.3d at 224. The FIM Report Disclaimer and Database Report Disclaimer are CMI only *in the*

---

[23] *See also Faulkner Press, L.L.C. v. Class Notes, L.L.C.*, 756 F. Supp. 2d 1352, 1359–60 (N.D. Fla. Nov. 23, 2010) ("Class Notes did not add false [CMI] in violation of the DMCA by printing 'Einstein's Notes (c)' on its note packages," which are "a different product from Dr. Moulton's work even if, as Faulkner Press alleges, they included materials from Dr. Moulton's work. No alteration was made to Dr. Moulton's product or original work, so there was no violation of the DMCA[.]").

*context of* ERIS' distinct FIM Report and Database Report, *not* in the context of Sanborn Maps included in only some of those reports.

Second, a violation of Section 1202(a) requires the CMI to be "false." A defendant's CMI as applied to a defendant's distinct work is not "false" with respect to that work—even if the defendant's work incorporates an infringing work within it. Again, "context matters." *Fischer II*, 968 F.3d at 224. In this case, the FIM Report Disclaimer and Database Report Disclaimer are not false with respect to ERIS' distinct FIM Reports and Database Reports. They *truly* convey terms and conditions for an ERIS customer's purchase and use of those reports, in that they are obligations that such a customer must *truly* agree to incur in consideration for the provision of those reports. SF ¶¶ 154-155, 180-181.

Third, declining to apply the DMCA to CMI in a defendant's distinct work (as opposed to wholesale copies of a plaintiff's work) comports with the legislative history. The Senate Report accompanying the DMCA remarked:

> Due to the *ease with which digital works can be copied and distributed worldwide virtually instantaneously*, copyright owners will hesitate to make their works readily available on the Internet without reasonable assurance that they will be protected against *massive piracy*. Legislation implementing the treaties provides this protection and creates the legal platform for launching the global digital on-line marketplace for copyrighted works.

S. Rep. 105-190, at 8. As the Second Circuit has recognized, the DMCA was enacted to combat "the ease with which *pirates* could copy and distribute a copyrightable work in digital form[.]" *Mango II*, 970 F.3d at 171 (citation omitted). There is no indication that Congress intended the DMCA to be applied against the incorporation of *portions* of copyrighted works in other distinct works, which cannot reasonably be characterized as "piracy." If such incorporation is an *infringement*, traditional causes of action and remedies remain available to enforce a copyright owner's rights. For these reasons, this Court should hold that the DMCA simply does not prohibit the ERIS Disclaimers accused here.

### 2. ERIS Does Not Meet the Scienter Requirements of Section 1202(a).

To violate Section 1202(a), "the defendant must both know that the CMI is false, *and* provide or distribute the false CMI with the intent to induce, enable, facilitate, or conceal infringement." *Agence France Presse v. Morel*, 2014 WL 3963124, at *7 (S.D.N.Y. Aug. 13, 2014) (citing *Ward*, 208 F. Supp. 2d at 449 (Kaplan, J.)). There is no genuine dispute that ERIS does not meet either prong of this double-scienter requirement.

With respect to the first prong, even if EDR could prove that the Disclaimers constitute "false CMI" relative to the Sanborn Maps contained in the associated FIM Report (as discussed above, they do not), there is no genuine dispute of material fact that ERIS did not *know* the Disclaimers were false.

*Ward* is instructive. There, the defendant, National Geographic, included its own copyright notice on each page of its "Complete National Graphic" electronic product, a compilation of its magazines from various eras. 208 F. Supp. 2d at 433. The plaintiff, an independent contractor who provided material for the National Geographic magazine, contended that the defendant falsified CMI by including its copyright notice on pages containing the plaintiff's contributions, because the plaintiff owned the copyright in those contributions. *Id.* at 449. Yet, Judge Kaplan granted the defendant's motion for summary judgment and dismissed the DMCA claims, holding that the plaintiff "failed to adduce evidence which, if credited, would justify a finding that defendants knew NGS's copyright notice was false when placed in proximity to plaintiff's photographs and texts." *Id.* at 450. Judge Kaplan arrived at this holding even though the defendant allegedly possessed "documents that gave it no authority to publish what it did[.]" *Id.* The Court still held that plaintiff's evidence "would not permit a reasonable trier of fact to determine that NGS 'knew' that the plaintiff owned the copyright." *Id.*

The same is true here. ERIS' Disclaimers were meant to be *contractual* restrictions only, applying to the distinct ERIS reports. SF ¶¶ 154-155, 180-181. ERIS did not intend for its Disclaimers to designate anything about *copyright-based* restrictions relating to the Sanborn Maps themselves. SF

¶¶ 159-161, 183. EDR relies on an ERIS document to establish the required scienter, SF ¶ 184, but the document specifically explains why ERIS' executives *didn't* believe the use of the maps was unlawful, and then states, in that context: "I don't want to put anything in our disclaimer about possible copyright." *Id.* Thus, there is no evidence from which a reasonable trier of fact could conclude that ERIS *knowingly* provided "false CMI" with respect to the specific Sanborn Map books that are accused of being infringed; as this document demonstrates, ERIS desired that their Disclaimers *not* constitute CMI to begin with. *Id.*

Similarly, there is no genuine dispute of material fact that ERIS did not *specifically intend* that the Disclaimers induce, enable, facilitate, or conceal infringement. Indeed, ERIS did not believe that its use of fire insurance maps was infringing to begin with; it obtained legal advice of non-infringement, and, just to be sure, entered into a license with ProQuest to ensure it was authorized to use the maps it purchased in the way it had contemplated. SF ¶¶ 207-273. In fact, the language of the FIM Report Disclaimer was intended to ensure that ERIS complied with the terms of ERIS' license with ProQuest. *Id.* ¶ 183. There is no evidence in the record from which a reasonable factfinder could find otherwise. And, of course, FIMs were not contemplated in connection with the Database Report Disclaimer at all. *Id.* ¶¶ 159-161. Thus, summary judgment should be granted with respect to EDR's claim for falsification of CMI.

### C.     ERIS Cannot Be Liable for Removal of CMI under Section 1202(b)

As a matter of law, ERIS cannot be deemed liable for removal of the five categories of Missing CMI that EDR contends were unlawfully removed in violation of 17 U.S.C. § 1202(b).

#### 1.     The Missing CMI Was Not "Removed"

Assuming, *arguendo*, that the five categories of Missing CMI constitute "copyright management information" under the DMCA, to prevail on its Section 1202(b) claim, EDR must show that ERIS "remove[d]" that CMI, and did so "intentionally." 17 U.S.C. § 1202(b)(1); *Mango I*, 356 F.

Supp. 3d at 376. ERIS did not do so, and there is no genuine dispute of material fact to the contrary. The method by which Sanborn Maps were digitized, geo-referenced, and ultimately included in ERIS' FIM Reports is set forth in Paragraphs __ of the 56.1 Statement. This method does not involve "removal" of CMI as that term is used in the DMCA.

To "remove" CMI, "a defendant must take some action with respect to pre-existing CMI." *Morel*, 2014 WL 3963124, at \*8 (citing *Webster's Third New International Dictionary* 1921 (2002 ed.) (defining "remove" as "to move by lifting, pushing aside, or taking away or off")). "[I]t is clear from the plain language of § 1202(b) that the defendant itself must 'remove' or 'alter' CMI—that is, must affirmatively take away or modify something that was already there." *Munro v. Fairchild Tropical Botanic Garden, Inc.*, 2022 WL 452257, at \*10 (S.D. Fla. Jan. 13, 2022) (citing *Remove*, Merriam-Webster Dictionary ("to get rid of; eliminate")); *see also Falkner v. Gen. Motors LLC*, 393 F. Supp. 3d 927, 938 (C.D. Cal. 2018) ("Black's Law Dictionary (10th ed. 2014) defines 'removal' as the 'transfer or moving of a person or thing from one location, position, or residence to another.'"). As explained by the leading treatise on copyright law, Section 1202 was "intended to prevent the 'defac[ing] or deform[ing]' of protected works, such as 'defacing or altering the title page of a book' or 'delet[ing] … the electronic information that may accompany a computer file containing a copyrightable composition.'" *Falkner*, 393 F. Supp. 3d at 938-39 (quoting 4 Nimmer on Copyright § 12A.10[B][1][a]) (alterations in original)).

Conversely, "where the CMI has not been affirmatively removed from the plaintiff's original work and some of the work's elements are merely copied into a different form compiled by the defendant, there is no CMI violation under § 1202(b)." *Munro*, 2022 WL 452257, at \*9 (citing *Faulkner Press*, 756 F. Supp. 2d at 1359). Where a defendant "did not make *identical* copies of Plaintiff's works and then remove the engraved CMI," no DMCA violation will lie. *Kirk Kara Corp.*

49

*v. Stone & Metal Corp.*, 2020 WL 5991503, at *6 (C.D. Cal. Aug. 14, 2020) (emphasis in original). These decisions conform with the legislative history, as the DMCA sought to stop wholesale "piracy," not merely incorporating an earlier work into a later distinct one, even if the later work infringes the earlier one, or omits the earlier work's CMI. *See Mango II*, 970 F.3d at 171; S. Rep. 105-190 at 8.

Here, ERIS' FIM Reports, and the FIM database from which they are generated, merely reproduce sheets of fire insurance maps for a given area, *excerpted* from one or more fire insurance map books, which in most cases were found on microfilm that ERIS legitimately acquired from ProQuest and LexisNexis. SF ¶¶ 163-165, 174-179. Thus, the Missing CMI was not "removed." It was not "move[d] by lifting, pushing aside, or taking away or off," "got[ten] rid of," "eliminated," or "transfer[red] or move[d] … from one location, position, or residence to another." *Morel*, 2014 WL 3963124, at *8; *Munro*, 2022 WL 452257, at *10; *Falkner*, 393 F. Supp. 3d at 938 (all citing dictionary definitions of "remove"). Indeed, to ERIS' knowledge, all of the Missing CMI remains on the original microfilm from which the Sanborn Map sheets were excerpted and included in ERIS' reports. SF ¶¶ 189-191. And there is no dispute that ERIS did not create "*identical*" copies of either the Sanborn Map books or the microfilm compilations, with any CMI removed. *Kirk Kara*, 2020 WL 5991503, at *6 (emphasis in original).

### 2. The First Three Categories of Missing CMI Are Not Found on the Body of, or Area Around, the Map Sheets Reproduced in ERIS' FIM Reports

To be actionable, removal of CMI must be "from the 'body' or the 'area around' the work" that is allegedly infringed. *Alan Ross Machinery Corp. v. Machinio Corp.*, 2019 WL 1317664, at *3 (N.D. Ill. Mar. 22, 2019) (quoting *Pers. Keepsakes, Inc. v. Personalizationmall.com, Inc.*, 2012 WL 414803, at *7 (N.D. Ill. Feb. 8, 2012)). This rule is "consistent with the text of the statute, which requires the CMI to be 'conveyed' with the copyrighted work," and "prevents a 'gotcha' system where a picture or piece of text has no CMI near it but the plaintiff relies on a general copyright notice buried elsewhere

on the website." *Id.* (quoting *Pers. Keepsakes,* 2012 WL 414803, at *7). For example, *Schiffer Publ'g, Ltd. v. Chronicle Books, LLC,* 2004 WL 2583817 (E.D. Pa. Nov. 12, 2004), involved allegations of infringement of copyrights in, and violation of the DMCA with respect to, plaintiffs' photographs in defendants' book. The photographs were themselves included in books which contained a copyright notice on the books' inside covers, which was not reproduced in defendants' book. *Id.* at *4. The photographs themselves "did not contain any copyright management information whatsoever, either on or near the images themselves." *Id.* at *14. The court granted summary judgment to defendants on plaintiffs' DMCA claim, holding that "to be actionable under §1202(b), a defendant must remove copyright management information from the 'body' of, or area around, plaintiff's work itself." *Id.* Similarly, in *Drauglis v. Kappa Map Group, LLC,* 128 F. Supp. 3d 46, 61 (D.D.C. 2015), the court held that a copyright notice on the inside of an atlas was not "conveyed in connection with" the plaintiff's photograph, which appeared on the outside cover of the atlas, "in a way that makes that information CMI," because the copyright notice "was not in the body of, or the area around, the Photograph[.]" The same result was reached in *Watson v. Kappa Map Grp., LLC,* 2015 WL 3932425, at *2 (N.D. Ga. June 25, 2015), where the court held that the defendant's copyright notice on the inside of the map was "not on or next to the image" on the outside, and therefore "relates to the entire map, not the specific image" which was the subject of the suit, and thus "does not qualify as CMI."

In this case, at least the Exterior CMI does not relate to the specific Sanborn Map *sheets* (or parts of sheets) included in ERIS' FIM Reports. The "Sanborn Map Copyright Notice" and "Sanborn Map Terms and Conditions" are located on the title page or other initial page of the specific Sanborn Map *book* in which the reproduced sheets first appeared. SF ¶¶ 26, 28. Thus, like the copyright notices in *Schiffer, Drauglis,* and *Watson,* the first three categories of Missing CMI alleged here are connected only to the Sanborn Map book as a whole—not the specific cartography in the Sanborn Map sheets

included in ERIS' FIM Reports. The "Microfilm Terms and Conditions" are even further removed from the reproduced material at issue—*that* alleged CMI does not even appear in the original Sanborn Map book. SF ¶ 27. Rather, those terms and conditions are found on frames of the *microfiche* of the LOC Collection and/or UPA Collection that ERIS purchased *added by the compilers of those collections*. *Id.* Accordingly, ERIS cannot be liable for alleged "removal" of CMI.

### 3. The Missing CMI Was Not "Removed" by ERIS

Assuming, *arguendo*, that the acts resulting in the Missing CMI not appearing in ERIS' FIM Reports constitute "removal" of that CMI, ERIS did not perform those acts itself. Rather, GVIC Communications Corp. ("GVIC"), ERIS' majority owner, contracted with GIS Consortium India Pvt. Ltd. ("GISC"), to geo-reference and stitch the digitized Sanborn Maps to build ERIS' fire insurance map mosaic. SF ¶ 194. ERIS provided images of fire insurance map sheets to GISC. *Id.* ¶ 195. GISC, in turn, performed the technical process of geo-referencing and stitching the map sheets together to create the mosaic. *Id.* ¶¶ 196-199. While ERIS provided general input and guidance regarding the final GISC deliverables, GIS did all the work and made the specific technical decisions itself. *Id.* ¶¶ 197-198. The title pages of the Sanborn Map books (where the Sanborn Map Copyright Notice and the Sanborn Map Terms and Conditions appeared) and the extra frames of the microfilm containing the Microfilm Terms and Conditions had no mappable data; thus, there was nothing for GISC to georeference. *Id.* ¶ 200. And, in the process of stitching interior sheets to form the mosaic, GISC may have excised *certain* Interior CMI therefrom. SF ¶ 201. However, GISC was guided by industry-standard practices, and in any event, made all of the decisions as to what to clip itself. SF ¶¶ 197-198, 203-204. When GISC provided the files comprising the seamless fire insurance map mosaics to ERIS, the Missing CMI was not included therein. SF ¶ 199. Thus, ERIS did not remove, and cannot be liable for removal of, CMI under Section 1202(b).

ERIS expects EDR will claim that ERIS should still be liable for GISC's conduct because

GISC's activities were done "at the direction of and on behalf of" ERIS. SF ¶ 206.[24] That claim is meritless, because it sounds in *secondary* or *indirect liability*—i.e., contributory, vicarious, or inducement-based liability. Claims for indirect violations of the DMCA are not novel.[25] But EDR has not pleaded any theories of secondary liability under the DMCA. Rather, EDR's Complaint *squarely* alleges that ERIS, *itself*, and *only* ERIS, directly violated the DMCA by "intentionally removing Sanborn Library's copyright notice from the Sanborn Maps." Dkt. 12 ¶ 36.[26]

"Courts in this Circuit routinely address contributory and vicarious copyright [violations] as separate claims from direct [violations]." *Wu v. John Wiley & Sons, Inc.*, 2015 WL 5254885, at *13 (S.D.N.Y. Sept. 10, 2015) (collecting cases). In *Wu*, the court granted summary judgment on the plaintiff's direct copyright infringement claim, holding that the defendant was not liable for use of the plaintiff's photo in certain books that were published by the defendant's foreign subsidiaries. *Id.* at *12 ("Wu has identified no countervailing evidence to suggest that Wiley itself published these books."). The court *rejected* the plaintiff's argument that the defendant "should be liable on a theory of vicarious or contributory infringement," because the plaintiff's complaint was "devoid of claims that [the defendant] contributed to or was otherwise responsible for alleged acts of copyright infringement by others." *Id.* at *12-13.

---

[24] ERIS presumes that EDR's reference to "GVIC Communications Corp." in its Interrogatory Response was intended to refer to GISC.

[25] *See, e.g.*, *Millennium Funding, Inc. v. 1701 Mgmt. LLC*, 2022 WL 901745, at *6 (S.D. Fla. Mar. 28, 2022) ("Copyright Plaintiffs sufficiently alleged secondary liability for DMCA violations against LiquidVPN Defendants under theories of contributory and vicarious liability."); *Stross v. PR Advisors, Inc.*, 2019 WL 5697225, at *2 (N.D. Tex. Oct. 31, 2019) (addressing claim for "vicarious violation of the Digital Millennium Copyright Act"); *Murphy v. Millennium Radio Grp. LLC*, 2010 WL 1372408, at *2 (D.N.J. Mar. 31, 2010) (alleging separate counts for "Violation of the DMCA Against Millennium" and "Vicarious Infringement of the Digital [Millennium] Copyright Act Against Millennium").

[26] *See also id.* ¶ 38 ("ERIS has also knowingly and willfully removed . . . the original CMI conveyed in connection with each Sanborn Map."), 53 ("Upon information and belief, Defendants have intentionally removed Sanborn Library's CMI"), 54 ("Upon information and belief, Defendants' removal of the CMI from the infringing fire insurance maps was intentional"), 56 ("Upon information and belief, the alteration and/or removal of CMI was made by Defendants intentionally"), 57 ("As a direct and proximate result of ERIS's . . . removal of CMI, Sanborn Library is entitled to damages"), 60 ("Sanborn Library has suffered and will continue to suffer irreparable harm as a result of Defendants' continued . . . removal and/or alteration of Sanborn Library's CMI on Sanborn Maps.")

There is no reason that the pleading requirements discussed in *Wu* (where the alleged direct and indirect infringer had a parent-subsidiary relationship) should apply solely to claims of copyright infringement but not to claims for violation of the DMCA (where, in this case, there is no such relationship between ERIS and GISC). Like *Wu*, EDR's Amended Complaint is "devoid of claims that [ERIS] contributed to or was otherwise responsible for alleged [DMCA violations] by others," *id.*, and thus, EDR's DMCA claims should meet the same fate—summary judgment.

### 4.    The Missing CMI Was Not "Removed" in the United States

Moreover, even if (contrary to fact) the Missing CMI was "removed" and ERIS can somehow be liable for GIS' purported "removal," any such activity was performed in India—not in the United States. SF ¶¶ 194-195, 199. "It is well established that copyright laws generally do not have extraterritorial application." *Update Art, Inc. v. Modiin Pub., Ltd.*, 843 F.2d 67, 73 (2d Cir. 1988). The principle applies to the DMCA. *See, e.g., M Seven Sys. Ltd. v. Leap Wireless Int'l Ltd.*, 2014 WL 12026065, at *6 (S.D. Cal. June 4, 2014) ("If the modification [of a copyright notice] occurred in South Korea or in another foreign nation, then the DMCA would have no application, because 'United States' copyright laws have no application to extraterritorial infringement'") (quoting *Subafilms, Ltd. v. MGM-Pathe Commc'ns Co.*, 24 F.3d 1088, 1095 (9th Cir. 1994))). "The courts have treated this as a jurisdictional issue." *Well-Made Toy Mfg. Corp. v. Lotus Onda Indus. Co.*, 2003 WL 42001, at *5 (S.D.N.Y. Jan. 6, 2003). This precept is also in accordance with interpretation of United States laws generally. As the Supreme Court held, "[i]t is a longstanding principle of American law that legislation of Congress, unless a contrary intent appears, is meant to apply only within the territorial jurisdiction of the United States." *E.E.O.C. v. Arabian Am. Oil Co.*, 499 U.S. 244 (1991) (citation omitted), *abrogated by statute on other grounds*, Pub. L. No. 102-166 § 109, 105 Stat. 1071 (1991). No such intent appears in the legislative history to the DMCA; in fact, rather than project application of United States law outward, the DMCA was enacted to conform *domestic* law to the requirements of

international treaties then-recently adopted by WIPO. *Fischer II*, 968 F.3d at 26; *Mango II*, 970 F.3d at 171.

Significantly, India—where GIS allegedly removed the Missing CMI at issue beginning in 2015, SF ¶ 194—did not accede to the two WIPO treaties at issue until September 25, 2018, and those treaties did not come into force in India until December 25, 2018. *See* WIPO Copyright Treaty (WCT) Notification No. 87, Sept. 25, 2018, available at https://www.wipo.int/treaties/en/notifications/wct/ treaty_wct_87.html; WIPO Performances and Phonograms Treaty (WPPT) Notification No. 92, Sept. 25, 2018, available at https://www.wipo.int/treaties/en/notifications/wppt/treaty_wppt_92.html. There is no indication that Congress intended the DMCA, which was enacted to implement the WIPO treaties in the U.S., to be enforced against activities in other countries which had not yet ratified those treaties.

EDR may argue that an "exception" to the principle against extraterritoriality applies "when the type of infringement permits further reproduction abroad—such as the unauthorized manufacture of copyrighted material in the United States." *Update Art*, 843 F.2d at 73. Under this "predicate act" doctrine, "an individual, who commits an act of infringement in the U.S., which permits further reproduction outside of the U.S. . . . is liable for infringement under the U.S. Copyright Act" for those foreign acts of reproduction. *Levitin v. Sony Music Entm't*, 101 F. Supp. 3d 376, 385 (S.D.N.Y. 2015).

But courts have applied the predicate act doctrine *only* where the act constituting a *domestic* violation (e.g., infringing reproduction) leads to acts of the *same type of violation* in foreign countries (e.g., further reproduction). EDR has cited no authority, and ERIS knows of no authority, holding that a predicate act of *copyright infringement* in the United States would permit recovery for a *different* type of act—removal of CMI under the DMCA—performed abroad. "The Copyright Act and the DMCA protect different interests." *Morel*, 2014 WL 3963124, at *10 (S.D.N.Y. Aug. 13, 2014); *see also Dermansky v. Tel. Media, LLC*, 2020 WL 1233943, at *6 n.6 (E.D.N.Y. Mar. 13, 2020) (holding

that "the DMCA and Copyright Act have different elements and are intended to deter somewhat different conduct"). Thus, while the predicate act doctrine might impose liability where the alleged domestic and foreign conduct are of the same kind (i.e., infringement "permit[ting] further *reproduction* abroad," *Update Art*, 843 F.2d at 73), there is no basis for an alleged domestic "predicate act" of one kind (infringement) to permit liability for acts of a different kind (i.e., alleged removal of CMI). Accordingly, this Court does not have jurisdiction over acts of CMI removal performed in India.

### 5.    ERIS Does Not Meet the Scienter Requirements of Section 1202(b)

#### a.    ERIS Did Not Intentionally Remove CMI

There is no genuine dispute that ERIS did not *intentionally* remove CMI. ERIS merely gave the microfilm to GISC with instructions to geo-reference the maps thereon and stitch them into a single "map" file for a given area. SF ¶¶ 196-199, 203-204. GISC geo-referenced and stitched the maps using standard techniques for doing so. *Id.* ¶197. The Exterior CMI appears on portions of the original Sanborn Map microfilm that had no historical map information on them. *Id.* ¶ 200. Thus, even if GISC's conduct was attributed to ERIS, the failure to include the Exterior CMI in ERIS' reports was not due to any "intentional" removal of that CMI, but was due to GISC finding nothing geo-referenceable on the pages or slides with that alleged CMI on them. *Id.*.

The Interior CMI—the "interior page copyright statements" and the "Compass Rose"—were also not "intentionally" removed. There are two reasons that the Interior CMI may not appear in an ERIS' FIM Report. First, as noted above, GISC used standard techniques to geo-reference and stitch the Sanborn Maps together to create a new work. *Id.* ¶ 197. To the extent Interior CMI is neither within the geo-referenceable portion of the page, nor appeared where map sheets were joined together, that Interior CMI would have been cropped out in that procedure—not because anyone noticed it as CMI and decided to intentionally remove it. *Id.* ¶ 201. Second, ERIS' customers order FIM Reports (and other database and historical records) by selecting a target site or area of interest. *Id.* ¶ 174. An

algorithm in ERIS' system calculates a buffer distance around that area and retrieves only those map sheets, or portions thereof, falling within the buffer. *Id.* ¶¶ 174-176. If Interior CMI appeared on a *different* part of an asserted map sheet than the part appearing in the FIM Report, it would naturally not appear in the FIM Report because it would not fall within the geographic buffer captured by the algorithm. *Id.* ¶¶ 177-178.

The law is clear that when CMI is missing due to an automated process as opposed to human volition, the CMI is not removed "intentionally" as required by Section 1202(b). *See, e.g., Stevens v. CoreLogic, Inc.*, 194 F. Supp. 3d 1046, 1052–53 (C.D. Cal. 2016), *aff'd*, 899 F.3d 666 (9th Cir. 2018) (granting summary judgment on 1202(b)(1) claim where "Plaintiffs present no evidence that CoreLogic intentionally removed CMI, as opposed to removal being an unintended side effect of the fact that the software platform was based on a library that failed to retain metadata by default"); *Kelly v. Arriba Soft Corp.*, 77 F. Supp. 2d 1116, 1122 (C.D. Cal. 1999) ("Plaintiff has not offered any evidence showing Defendant's actions were intentional, rather than merely an unintended side effect of the Ditto crawler's operation."), *aff'd in part, rev'd on other grounds*, 336 F.3d 811 (9th Cir. 2003).[27]

This is what has happened here. The Interior CMI is located too far from the customer's target property to be found within the buffer. SF ¶¶ 177-178. In contrast, when Interior CMI *does* fall within the buffer, it is captured in the portions of map sheets reproduced in ERIS' FIM Reports, and therefore appears within them; visible CMI can still be found on other FIM Reports produced by ERIS. *Id.* ¶ 179. Had ERIS wanted to *intentionally* remove CMI to facilitate any alleged infringement, it would presumably have removed all of the alleged CMI here also. The fact that the CMI is visible where it

---

[27] *See also Zuma Press*, 845 F. App'x at 58 (affirming grant of summary judgment on 1202(b)(3) claim, based on defendant's alleged removal of CMI, because "no reasonable juror could conclude that Getty knowingly removed or altered Plaintiffs' CMI without authority" where "images at issue were comingled with" other authorized images, and "[a] reasonable juror could find only that the purported changes to Plaintiffs' CMI resulted not from some intentional act of which Getty was aware but from aberrations and mistakes in the automatic migration process itself, during which Getty processed approximately 7,000,000 images.").

falls within the buffer, and missing where it falls outside of the buffer, proves the absence of *intentional* conduct to remove Interior CMI.

> **b.      ERIS Did Not Know, or Have Reasonable Grounds to Know, that Any Alleged Removal of the Missing CMI Would Induce, Enable, Facilitate, or Conceal an Infringement**

To the extent ERIS is responsible for the alleged intentional removal of the Missing CMI from the Sanborn Maps in its FIM Reports, ERIS did not know, nor did it have reasonable grounds to know, that such removal would induce, enable, facilitate, or conceal an infringement. In the first place, ERIS did not know—and *still* does not believe—that it is infringing any copyrights in the Sanborn Maps. As discussed above, ERIS obtained legal advice that its provision of FIM Reports to environmental professionals was lawful; it negotiated terms and conditions from ProQuest to ensure that the maps ERIS purchased could lawfully be used in FIM Reports; and ERIS promptly responded to Paul Vogt's letter threatening to enforce EDR's copyrights in the Sanborn Maps with an inquiry seeking details, but never heard back. SF ¶¶ 207-273, 283-295. Thus, ERIS had no reasonable grounds to know that any alleged removal of the Missing CMI, even assuming ERIS was responsible for it, would induce, enable, facilitate, or conceal infringement that it did not believe was occurring.

Second, EDR has adduced no evidence connecting any given occurrence of allegedly "removal" of Missing CMI with any specific alleged infringements being "induce[d]," "enable[d]," "facilitate[d]," or "conceal[ed]." 17 U.S.C. § 1202(b); *see also Victor Elias*, 43 F.4th at 1325 ("In short, the statute's plain language requires *some identifiable connection* between the defendant's actions and the infringement or the likelihood of infringement"); *Stevens*, 899 F.3d at 674 ("[A] plaintiff bringing a Section 1202(b) claim must make an affirmative showing, such as by demonstrating a past 'pattern of conduct' or 'modus operandi,' that the defendant was aware or had reasonable grounds to be aware of the probable future impact of its actions."). Indeed, in its Interrogatory Responses directed to its CMI removal claims, EDR does not even contend that ERIS knew or had reasonable grounds to know

that removal of the Missing CMI would induce, enable, facilitate, or conceal an infringement. SF ¶ 32. EDR does not even *attempt* to provide facts, witnesses, or documents supporting this contention. *Id.* EDR generically contends that "ERIS intentionally decided not to include anything in its reports about potential copyright protection in the Sanborn Maps because it would 'dissuade' customers from buying fire insurance map reports from ERIS." *Id.* But the only document or testimony about *dissuasion* refers to ERIS' perceived need for a disclaimer on the FIM Report and what it should say—*not* the presence or absence of any of the Missing CMI. *Id.* ¶ 184. The remaining evidence in EDR's Interrogatory Response relates, if at all, to how *some* of the Missing CMI mentioned in the Complaint (i.e., Interior CMI) ended up not being included in the FIM Report. It has nothing to do with whether ERIS actually or constructively knew that the non-inclusion of any particular Missing CMI would induce, enable, facilitate, or conceal infringement.

Third, no such connection between the alleged removal of Missing CMI and any future infringement, or future concealment of present infringement, could *plausibly* exist. The only infringement alleged anywhere in EDR's Complaint or in its Interrogatory responses is ERIS' creation of its fire insurance map database and sale of FIM Reports, containing allegedly copyrighted fire insurance maps, to its customers. *Id.* ¶ 33.[28] The fact that Missing CMI is not included in the FIM Reports delivered to customers could not possibly have induced, enabled, or facilitated those alleged infringement, because the FIMs were already supplied in those reports. Moreover, while the Second Circuit has held that "future concealment" of past infringement may be actionable, *see Mango II*, 970 F.3d at 172, the notion that alleged removal of the Missing CMI might "conceal" ERIS' alleged infringements is equally implausible. ERIS' customers order Database Reports along with related historical sources, including FIM Reports, to conduct environmental due diligence on a target property

---

[28] In other words, EDR does *not* contend that ERIS induces, enables, facilitates, or conceals alleged infringement by *others*.

and nearby areas. SF ¶¶ 137-147. ERIS' customers already know that almost all (if not all) fire insurance maps available from ERIS were produced by the historical Sanborn Map Company. ERIS does not hide this and, if asked, will inform its customers that it is legally entitled to supply such maps (for fair use reasons and otherwise). *Id.* ¶¶ 169-170. And ERIS' customers have been subjected to the barrage of EDR marketing propaganda that EDR owns the copyright in the entire Sanborn Map "collection" and using maps from other vendors (such as ERIS) is unlawful, *id.* ¶ 19; those customers choose to purchase from ERIS anyway. The hypothetical inclusion of any category of Missing CMI in ERIS' FIM Reports would provide no more information to ERIS' customers about ERIS' alleged infringement than they already have; accordingly, the *exclusion* of that CMI cannot plausibly be said to "conceal" (i.e., hide) such infringement. In any case, EDR has failed to identify any evidence that such a concealment has occurred. *Id.* ¶ 32.

Accordingly, ERIS does not have the mental state required to meet the second half of the double-scienter requirement, and EDR can present no genuine dispute of material fact to the contrary.

## IV.    CONCLUSION

For at least the foregoing reasons, ERIS respectfully requests that the Court grant its motion for summary judgment on ownership, estoppel and DMCA grounds, and dismiss TSL's claims.

Respectfully submitted,

New York, NY
March 3, 2023

**GREENBERG TRAURIG, LLP**

By:  /s/ *Justin A. MacLean*

Richard D. Harris (*pro hac vice*)
harrisr@gtlaw.com
Barry R. Horwitz (*pro hac vice*)
Barry.Horwitz@gtlaw.com
Jacqueline Brousseau (*pro hac vice*)
Jacqueline.Brousseau@gtlaw.com
GREENBERG TRAURIG, LLP

77 West Wacker Drive, Suite 3100
Chicago, IL 60601
Tel: (312) 456-8400

Justin A. MacLean
Justin.MacLean@gtlaw.com
Yi-Lu Jade Chen
chenja@gtlaw.com
One Vanderbilt Avenue
New York, NY 10017
Tel.: (212) 801-9200

Gregory J. Casas (*pro hac vice*)
casasg@gtlaw.com
300 West 6th Street, Suite 2050
Austin, TX 78701
Tel.: (512) 320-7200

*Attorneys for Defendants ERIS Information Inc.,*
*ERIS Information Limited Partnership and Eco Log*
*Environmental Risk Information Services Ltd.*