UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

THE SANBORN LIBRARY LLC,

                    Plaintiff,

       - against -

ERIS INFORMATION INC., ECO LOG
ENVIRONMENTAL RISK INFORMATION
SERVICES LTD., and ERIS INFORMATION
LIMITED PARTNERSHIP,

                Defendants.

---

ERIS INFORMATION INC., ECO LOG
ENVIRONMENTAL RISK INFORMATION
SERVICES LTD., and ERIS INFORMATION
LIMITED PARTNERSHIP,

                Counterclaim-Plaintiffs,

       - against -

THE SANBORN LIBRARY LLC and
ENVIRONMENTAL DATA RESOURCES,
LLC,

                Counterclaim-Defendants.

No: 1:19-cv-02049-JAR-OTW

**HIGHLY CONFIDENTIAL -
OUTSIDE COUNSEL'S EYES
ONLY**

**MEMORANDUM OF LAW IN OPPOSITION
TO ERIS' MOTION FOR SUMMARY JUDGMENT AND IN
SUPPORT OF SANBORN'S CROSS-MOTION FOR SUMMARY JUDGMENT**

## <u>TABLE OF CONTENTS</u>

TABLE OF AUTHORITIES ................................................................................................. iii

PRELIMINARY STATEMENT ........................................................................................... 1

ARGUMENT ........................................................................................................................ 3

I.        SANBORN OWNS THE COPYRIGHTS IN THE ASSERTED MAPS ......................... 3

        A.     Chain of Title ...................................................................................................... 3

               1.     The 1973 asset purchase documents unambiguously establish that all pre-June 1, 1973 copyrights were transferred from Sanborn II to Sanborn III ........................................................................................... 3

                        a.     The intrinsic evidence .................................................................. 4

                        b.     The extrinsic evidence confirms that all pre-June 1,1973 copyrights were transferred from Sanborn II to Sanborn III ........ 13

                        c.     The "map library" referred to in the 1973 APA is not limited to Sanborn maps at the Pelham Facility as of June 1, 1973 ........... 15

                        d.     The pre-June 1, 1973 Sanborn maps were at the Pelham Facility. 16

               2.     The 1996 asset purchase documents unambiguously establish that all of the Sanborn map copyrights were transferred from Sanborn III to EDR Sanborn ....................................................................................... 17

                        a.     The intrinsic evidence ................................................................ 17

                        b.     The extrinsic evidence ................................................................ 21

                        c.     All asserted Sanborn maps were at the Pelham Facility as of June 20, 1996 .................................................................................... 21

               3.     There is no genuine issue that Sanborn is the owner of all of the asserted copyrights .......................................................................................... 22

        B.     All 6,162 Asserted Works are Works for Hire ...................................................... 22

                1.     The Post-1978 maps are works made for hire under the 1976 Act ........... 23

                2.     The Pre-1978 Maps are works made for hire under the 1909 Act ............. 25

         C.     Copyright Notice on all 6,162 Asserted Works is Proper ...................................... 25

                1.     820 Works Are Not Separate Publications That Require Separate Notice ................................................................ 26

                2.     For 636 Challenged Works Based on Omitted Notice, Handwritten Dates Were Not Omitted From Copies of the Asserted Works. ................ 27

a.    532 Works Subject to the 1909 Copyright Act Did not Omit Notice .................................................................................27

b.    104 Works Subject to the 1976 Act Did Not Omit Notice ...........28

3.    For 29 Challenged Works Based on Missing Pages, None are Missing, and Notice Was Properly Affixed to the Title Page or Page Immediately After .............................................................................29

4.    For 156 Challenged Works Based on Dispersed or Illegible Notice, All Elements are Reasonably a Part of the Notice and are Legible ..........30

5.    Copyright Notice is Proper as to All Asserted Works .........................................31

II.    ERIS' EQUITABLE ESTOPPEL DEFENSE FAILS ........................................................32

A.    ERIS was not ignorant of Sanborn's copyrights ..............................32

B.    There was no justifiable reliance on Sanborn's conduct or inactions ...................34

C.    Sanborn was never silent and did not make any misrepresentations ...................37

D.    ERIS' extensive, willful copying tip the equities in Sanborn's favor ...................39

III.    ERIS VIOLATED THE DMCA ........................................................40

A.    ERIS Violated Section 1202(a) by Falsifying CMI ........................40

1.    ERIS' "distinct" derivative work argument lacks statutory and evidentiary support and is not recognized by the Second Circuit or any circuit court ........................................................40

2.    The record is replete with evidence that ERIS had the requisite scienter ........................................................45

B.    ERIS Violated Section 1202(b) by Distributing Copyrighted Works Knowing CMI Was Removed ........................................................50

1.    ERIS "removed" five categories of CMI from identical Sanborn Maps ...50

2.    All of the CMI was conveyed in connection with the Sanborn Maps .......53

3.    ERIS cannot escape direct liability under Section 1202(b)(3) by improperly recasting Sanborn's claim as one for indirect liability under Section 1202(b)(1) ........................................................55

4.    The location of removal is irrelevant to a Section 1202(b)(3) violation....57

5.    ERIS knowingly removed CMI and knew (or should have known) that the removal would facilitate infringement .........................................58

CONCLUSION ........................................................60

## TABLE OF AUTHORITIES

Page(s)

**Cases**

*104 Works Subject to the*
*1976 Act Did Not Omit Notice* ......................................................................... 28

*A.C. Aukerman Co. v. R. L. Chaides Constr. Co.*,
960 F.2d 1020 (Fed. Cir. 1992) .......................................................... 1, 38, 39

*ABKCO Music, Inc. v. Sagan*,
50 F.4th 309 (2d Cir. 2022) ........................................................................... 32

*Ada Design Alliance, Inc. v. Renberg*,
Nos. 90-35493, 1991 WL 158675 (9th Cir. Aug. 20, 1991) ........................... 30

*ADR Int'l Ltd. v. Inst. for Supply Mgmt., Inc.*,
No. 4:22-CV-01914, 2023 WL 2719446 (S.D. Tex. Feb. 24, 2023) ...................... 42, 43, 52

*Advanced Hydraulics, Inc. v. Otis Elevator Co.*,
525 F.2d 477 (7th Cir. 1975) .......................................................................... 39

*Advanta-Star Auto. Research Corp. of Am. v. Reynolds Ford, Inc.*,
No. CIV-19-912-G, 2020 WL 5823537 (W.D. Okla. Sept. 30, 2020) .................... 54

*Agence Fr. Presse v. Morel ("Morel I")*,
934 F. Supp. 2d 547 (S.D.N.Y. 2013) ............................................................. 49

*Agence France Presse v. Morel ("Morel II")*,
No. 10-cv-2730 (AJN), 2014 WL 3963124 (S.D.N.Y. Aug. 13, 2014) ............ 48, 49, 50, 60

*Alan Ross Mach. Corp. v. Machinio Corp.*,
No. 17-cv-3569, 2019 WL 1317664 (N.D. Ill. Mar. 22, 2019) ...................... 54

*Am. Travel & Hotel Directory Co. v. Gehring Publishing Co.*,
4 F.2d 415 (S.D.N.Y. 1925) ........................................................................... 30

*Anderson v. Liberty Lobby, Inc.*,
477 U.S. 242 (1985) ...................................................................................... 32

*AP v. Meltwater U.S. Holdings, Inc.*,
931 F. Supp. 2d (S.D.N.Y. 2013) .............................................................. 35, 38

*Apollo Global Mgmt., LLC v. Bokf, NA (In re MPM Silicones, L.L.C.)*,
874 F.3d 787 (2d Cir. 2017) ........................................................................... 13

*Aspex Eyewear, Inc. v. Clariti Eyewear, Inc.*,
No. 07 Civ. 2373(DC), 2008 WL 5049744 (S.D.N.Y. Nov. 26, 2008), *aff'd,* 605 F.3d
1305 (Fed. Cir. 2010) ................................................................................ 39, 40

iii

*AT&T Corp. v. Microsoft Corp.*,
No. 01 Civ. 4872 WHP, 2004 WL 188078 (S.D.N.Y. Feb. 2, 2004) .................................... 32

*Atlas Partners, LLC v. STMicroelectronics, Int'l N.V.*,
No. 14-cv-7134 (VM), 2015 WL 4940126 (S.D.N.Y. Aug. 10, 2015) ............................... 13

*Aymes v. Bonelli*,
980 F.2d 857 (2d Cir. 1992) ........................................................................................ 23, 24

*Bank of N.Y. Mellon Tr. Co., N.A. v. Morgan Stanley Mortg. Capital, Inc.*,
821 F.3d 297 (2d Cir. 2016) .............................................................................................. 12

*Bank of N.Y. Tr., N.A. v. Franklin Advisers, Inc.*,
674 F. Supp. 2d 458 (S.D.N.Y. 2009) ............................................................................... 15

*Bausch & Lomb Inc. v. Mimetogen Pharms., Inc.*,
No. 14-CV-6640-FPG, 2017 WL 2835250 (W.D.N.Y. June 30, 2017) ............................. 12

*Bd. of Trs. of Leland Stanford Junior Univ. v. Roche Molecular Sys., Inc.*,
583 F.3d 832 (Fed. Cir. 2009), *aff'd*, 563 U.S. 776 (2011) ................................................ 20

*In re Becker*,
407 F.3d 89 (2d Cir. 2005) ................................................................................................ 35

*Block v. Plaut*,
87 F. Supp. 49 (N.D. Ill. 1949) .......................................................................................... 30

*Bruce Munro & Bruce Munro v. Fairchild Tropical Botanic Garden*,
No. 20-20079-CIV-SINGHAL/LOUIS, 2022 WL 452257 (S.D. Fla. Jan. 13, 2022) ......................... 54

*Byron v. Chevrolet Motor Div. of Gen Motors Corp.*,
No. 93 CIV. 1116 (AJP), 1995 WL 465130 (S.D.N.Y. Aug. 7, 1995) ............................... 39

*Cherry River Music Co. v. Simitar Enm't, Inc.*,
38 F. Supp. 2d 310 (S.D.N.Y. 1999) ................................................................................. 36

*Clear Channel Outdoor, LLC v. City of New Rochelle*,
No. 20-cv-9296 (NSR) (AEK), 2022 WL 17249412 (S.D.N.Y. Nov. 28, 2022) ................ 39

*Clomon v. Jackson*,
988 F.2d 1314 (2d Cir. 1993) ............................................................................................ 57

*Cmty. for Creative Non-Violence v. Reid*,
490 U.S. 730 (1985) .............................................................................................. 2, 23, 24

*Cooley v. Penguin Group (USA), Inc.*,
31 F. Supp. 3d 599 (S.D.N.Y. 2014) ........................................................................... 32, 37

*Cornell Research Found., Inc. v. Hewlett-Packard Co.*,
No. 5:01–CV–1974, 2007 WL 4349135 (N.D.N.Y. Jan. 31, 2007) .................................... 37

iv

*Cortner v. Israel*,
  732 F.2d 267 (2d Cir. 1984) ................................................................................................ 3

*Crowley v. Jones*,
  608 F. Supp. 3d 78 (S.D.N.Y. 2022) .......................................................................... 41, 42

*Dallal v. New York Times Co.*,
  No. 05-2924, 2006 WL 463386 (2nd Cir. 2006) ............................................................. 37

*DeCarlo v. Archie Comic Publ'ns, Inc.*,
  127 F. Supp. 2d 497 (S.D.N.Y. 2001) ............................................................................. 39

*Dollcraft Indus. v. Well-Made Toy Mfg. Co.*,
  479 F. Supp. 1105 (E.D.N.Y. 1978) ........................................................................... 27, 29

*Dow Jones & Co. v. Juwai Ltd.*,
  No. 21-cv-7284 (PKC), 2023 WL 2561588 (S.D.N.Y. Mar. 17, 2023) ........................... 58

*Drauglis v. Kappa Map Group, LLC*,
  128 F. Supp. 3d 46 (D.D.C. 2015) ................................................................................... 54

*Dreni v. PrinterOn Am. Corp.*,
  No. 1:18-cv-12017-MKV, 2021 WL 4066635 (S.D.N.Y. Sept. 3, 2021) .......................... 15

*Dreyfuss v. eTelecare Glob. Sols.-U.S., Inc.*,
  No. 08 Civ. 1115 (RJS), 2010 WL 4058143 (S.D.N.Y. Sept. 30, 2010) .......................... 15

*Durham Industries, Inc. v. Tomy Corp.*,
  630 F.2d 905 (2d Cir. 1980) ............................................................................................ 44

*E. Mishan & Sons, Inc. v. Marycana, Inc.*,
  662 F. Supp. 1339 (S.D.N.Y. 1987) ................................................................................. 29

*Eden Toys, Inc. v. Florelee Undergarment Co., Inc.*,
  697 F.2d 27 (2d Cir. 1982) .............................................................................................. 12

*Estate of Shaw v. Marcus*
  No. 7:14-cv-3849 (NSR), 2015 WL 5610959 (S.D.N.Y. Sept. 22, 2015) ........................ 12

*Faulkner Press LLC. v. Class Notes, LLC.*,
  756 F. Supp. 2d 1352 (N.D. Fla. 2010) ...................................................................... 41, 42

*First Fin. Marketing Serv. Group, Inc. v. Field Promotions, Inc.*,
  286 F. Supp. 295 (S.D.N.Y. 1968) .......................................................................... *passim*

*Fischer v. Forrest*,
  968 F.3d 216 (2d Cir. 2020) ....................................................................................... 41, 42

*Fleisher Studios, Inc. v. Ralph A. Freundlich, Inc.*,
  73 F.2d 276 (2d Cir. 1934) .............................................................................................. 30

*Freeman v. The Trade Register,*
  173 F. 419 (C.C.W.D. Wash. 1909) ..................................................................... 29

*Friedman v. Live Nation Merch., Inc.,*
  833 F.3d 1180 (9th Cir. 2016) ...................................................................... 56, 57

*Gardner v. Nike, Inc.,*
  110 F. Supp. 2d 1282 (C. D. Ca. 2000) ............................................................. 11

*Gardner v. Nike, Inc.,*
  279 F.3d 774 (9th Cir. 2002) .......................................................................... 10

*Gasser Chair Co. v. Infanti Chair Mfg. Corp.,*
  60 F.3d 770 (Fed. Cir. 1995) ..................................................................... 37, 39

*Gaste v. Kaiserman,*
  863 F.2d 1061 (2d Cir. 1988) .................................................................... 27, 28

*GC2 Inc. v. Int'l Game Tech,*
  391 F. Supp. 3d 828 (N.D. Ill. 2019) ............................................................... 42

*Geiler v. Brooklyn-Manhattan Transit Corp*
  18 N.Y.S.2d 788 (Sup. Ct. 1939) ..................................................................... 20

*Gilbert v. Related Mgmt. Co.,*
  162 F.3d 1147 (2d Cir. 1998) .......................................................................... 15

*Hampton v. Paramount Pictures Corp.,*
  279 F.2d 100 (9th Cir. 1960) .......................................................................... 35

*Hemstreet v. Computer Entry Sys. Corp.,*
  972 F.2d 1290 (Fed. Cir. 1992) .................................................................. 36, 37

*Hirshon v. United Artists Corp.,*
  243 F.2d 640 (D.C. Cir. 1957) ......................................................................... 10

*Holland Loader Co., LLC v. FlSmidth A/S,*
  313 F. Supp. 3d 447 (S.D.N.Y. 2018) ............................................................ 4, 16

*Hottel Corp. v. Seaman Corp.,*
  833 F.2d 1570 (Fed. Cir. 1987) ....................................................................... 39

*Huffman v. Activision Publ'g,*
  No. 2:19-cv-00050-RWS-RSP, 2021 WL 2141352 (E.D. Tex. May 26, 2021)................ 43

*Huffman v. Activision Publ.,*
  No. 2:10-cv-00050-RWS-RSP, 2020 WL 8678493 (E.D. Tex. Dec. 14, 2020).......... 42, 43

*Iconics, Inc. v. Massaro,*
  192 F. Supp. 3d 254 .............................................................................. 46, 50, 53

*ITC Ltd. v. Punchgini, Inc.*,
   482 F.3d 135 (2d Cir. 2007) ........................................................................................ 46

*Janik v. SMG Media, Inc.*,
   No. 16 Civ. 7308 (JGK) (AJP), 2018 WL 345111 (S.D.N.Y. Jan. 10, 2018) ..................... 53

*Jeehoon Park v. Skidmore, Owings & Merrill LLP*,
   No. 17-cv-4473 (RJS), 2019 WL 9228987 (S.D.N.Y. Sept. 30, 2019) ......................... 41, 42

*John G. Danielson, Inc. v. Winchester-Conant Props.*,
   186 F. Supp. 2d 1 (D. Mass. 2002) .................................................................................. 8

*John Wiley & Sons, Inc. v. DRK Photo*,
   882 F.3d 394 (2d Cir. 2018) .......................................................................................... 3

*Kirk Kara Corp. v. W. Stone & Metal Corp.*,
   No. CV 20-1931-DMG (Ex), 2020 WL 5991503 (C.D. Cal. Aug. 14, 2020) ...................... 52

*Kleinberg v. Radian Grp., Inc.*,
   No. 01 Civ. 9295 (RMB)(GWG), 2002 WL 31422884 (S.D.N.Y. Oct. 29, 2002) ............. 12

*Lantern Press, Inc. v. Am. Publishers Co.*,
   419 F. Supp. 1267 (E.D.N.Y. 1976) ............................................................................... 10

*Lego v. A/S v. Best-Lock Constr. Toys, Inc.*,
   874 F. Supp. 2d 75 (D. Conn. 2012) ......................................................................... 32, 33

*Lipper Holdings, LLC v. Trident Holdings, LLC*,
   1 A.D.3d 170, 766 N.Y.S.2d 561 (N.Y. App. Div. 2003) .................................................. 13

*Lottie Joplin Thomas Trust v. Crown Publrs., Inc.*,
   456 F. Supp. 531 (S.D.N.Y. 1977) ................................................................................. 32

*Lydiard-Peterson Co. v. Woodman*,
   204 F. 921 (8th Cir. 1913) ............................................................................................ 27

*Mango v. BuzzFeed, Inc.*,
   970 F.3d 167 (2d Cir. 2020) .......................................................................... 50, 56, 57, 60

*Martha Graham Sch. & Dance Found., Inc. v. Martha Graham Ctr. of Contemporary
Dance, Inc.*,
   380 F.3d 624 (2d Cir. 2004) ..................................................................................... 24, 25

*Matthew Bender & Co. v. West Publ. Co.*,
   158 F.3d 693 (2d Cir. 1998) ......................................................................................... 44

*MBIA Ins., Corp. v. Patriarch Partners VIII, LLC*,
   842 F. Supp. 2d 682 (S.D.N.Y. 2012) ............................................................................. 4

*Medical Broadcasting Co. v. Flaiz*,
   No. Civ.A. 02–8554, 2003 WL 22838094 (E.D. Pa. Nov. 25, 2003) .................................. 48

*Meyers v. Asics Corp.*,
    974 F.2d 1304 (Fed. Cir. 1992) ....................................................................................... 36

*Michael Grecco Prods. v. Time USA, LLC*,
    No. 20 Civ. 4875 (NRB), 2021 WL 3192543 (S.D.N.Y. July 27, 2021) ...................... 41, 42

*Michael Grecco Prods. v. Valuewalk LLC*,
    345 F. Supp. 3d 482 (S.D.N.Y. 2018) .............................................................................. 56

*Misbourne Pictures, Ltd. v. Johnson*,
    90 F. Supp. 978 (S.D.N.Y. 1950) ..................................................................................... 10

*Nat'l Comics Publs., Inc. v. Fawcett Publs., Inc.*,
    191 F.2d 594 (2d Cir. 1951) ............................................................................... 26, 28, 29

*Neponsit Holding Corp. v. Ansorge*,
    215 A.D. 371 (N.Y. App. Div. 1926) ............................................................................... 20

*New York Marine & Gen. Ins. Co. v. Lafarge N. Am., Inc.*,
    599 F.3d 102 (2nd Cir. 2010) ........................................................................................... 15

*NFL Enters, LLC v. Comcast Cable Commc'ns, LLC*,
    851 N.Y.S.2d 551 (N.Y. App. Div. 2008) ........................................................................ 12

*P.C. Films Corp. v. MGM/UA Home Video Inc.*,
    138 F.3d 453 (2d Cir. 1998) ............................................................................................. 10

*Patterson v. Century Productions, Inc.*,
    93 F.2d 489 (2d Cir. 1937) ............................................................................................... 27

*Pavlica v. Behr*,
    397 F. Supp. 2d 519 (S.D.N.Y. 2005) ................................................................. 33, 34, 36

*Pers. Keepsakes, Inc. v. PersonalizationMall.com, Inc.*,
    No. 11 C 5177, 2012 WL 414803 (N.D. Ill. Feb. 8, 2012) ............................................. 54

*Peter Mayer Publrs. v. Shilovskay*,
    11 F. Supp. 3d 421 (S.D.N.Y. 2014) ............................................................................... 44

*Petersen v. Diesel Power Gear LLC*,
    No. 1:21-cv-08827 (SDA), 2023 WL 2430407 (S.D.N.Y. March 9, 2023) ...................... 46

*Petrella v. MGM*,
    572 U.S. 663 (2014) .................................................................................................... 32, 38

*Pierson v. Infinity Music & Entm't, Inc.*,
    300 F. Supp. 3d 390 (D. Conn. 2018) ........................................................................ 44, 46

*Pinkham v. Sara Lee Corp.*,
    983 F.2d 824 (8th Cir. 1992) ............................................................................................ 30

*Playboy Enters., Inc. v. Dumas*,
   53 F.3d 549 (2d Cir. 1995) .................................................................................. 25

*Post v. Killington*,
   424 Fed. Appx. 27 (2d Cir. 2011) ........................................................................ 16

*Puddu v. Buonamici Statuary, Inc.*,
   450 F.2d 401 (2d Cir. 1971) ................................................................................ 31

*Quinn-Nolan v. Schulte, Roth & Zabel*,
   No. 00 CIV. 7936(SHS), 2002 WL 1758920 (S.D.N.Y. 2002) ........................... 46

*Sabatini v. Commissioner*,
   98 F.2d 753 (2nd. Cir. 1938) ............................................................................... 10

*Schiffer Publ'g, Ltd. v. Chronicle Books, LLC*,
   No. Civ.A. 03–4962, 2004 WL 2583817 (E.D. Pa. Nov. 12, 2004) ................... 54

*Schiller & Schmidt, Inc. v. Nordisco Corp.*,
   969 F. 2d 410 (7th Cir. 1992) ................................................................................ 9

*SellPoolSuppliesOnline.com LLC v. Ugly Pools Ariz. Inc.*,
   No. CV-15-01856-PHX-BSB, 2017 WL 6420464 (D. Ariz. June 9, 2017) ........ 46

*Shugrue v. Continental Airlines, Inc.*,
   977 F. Supp. 280 (S.D.N.Y. 1997) ......................................................................... 8

*Sims v. Amazon*,
   No. 2:20-cv-04389-FLA (ASx), 2022 WL 739524 (C.D. Cal. Jan. 27, 2022) .............................. 56, 57

*Small v. Weissberg*,
   7 Misc. 2d 492 (City Ct. 1957) ............................................................................ 20

*Smith v. Law Off. of Richard St. Paul*
   No. 22 CV 5648 (VB), 2023 WL 3570606 (S.D.N.Y. May 18, 2023) ................. 54

*Sprint Communs. Co. L.P. v. Time Warner Cable, Inc.*,
   No. 11-2686-JWL, 2017 WL 978107 (D. Kan. Mar. 14, 2017) .......................... 40

*Stevens v. CoreLogic, Inc.*,
   194 F. Supp. 3d 1046 (S.D. Cal. 2016) ................................................................ 59

*Thomas Wilson & Co. v. Irving J. Dorfman Co.*,
   433 F.2d 409 (2d Cir. 1970) ................................................................................ 28

*Tiffany (NJ) Inc. v. eBay, Inc.*,
   600 F.3d 93 (2d Cir. 2010) .................................................................................. 46

*Tolliver v. McCants*,
   684 F. Supp. 2d 343 (S.D.N.Y. 2010) ............................................................ 34, 35

*Tomelleri v. Zazzle, Inc.*,
   No. 13-CV-02576-EFM-TJJ, WL 2015 8375083, at *14 (D. Kan. Dec. 9, 2015) .................. 53, 54, 55

*United States v. Hamdi*,
   432 F.3d 115 (2d Cir. 2005) ........................................................................................................ 6

*Vargas v. Viacom Intl., Inc.*,
   No. 18 Civ. 474 (LLS), 2018 WL 6920769 (S.D.N.Y. Nov. 30, 2018) ......................................... 9, 10

*Viacom Int'l, Inc. v. YouTube, Inc.*,
   676 F.3d 19 (2d Cir. 2012) ...................................................................................................... 46

*Wafer Shave Inc. v. Gillette Co.*,
   857 F. Supp. 112 (D. Mass. 1993) ............................................................................................. 40

*Waite v. UMG Recordings, Inc.*,
   No. 19-cv-01091 (LAK), 2023 WL 1069690 (S.D.N.Y. Jan. 27, 2023) ...................................... 24

*Ward v. Nat'l Geographic Soc.*,
   208 F. Supp. 2d 429 (S.D.N.Y. 2002) ................................................................................... 45, 50

*Watson v. Kappa Map Group, LLC*,
   No. 1:14–CV–100–TWT, 2015 WL 3932425 (N.D. Ga. June 25, 2015) ..................................... 54

*Woods v. Bourne Co.*,
   60 F.3d 978 (2d Cir. 1995) ...................................................................................................... 43

*Wrench v. Universal Pictures Co.*,
   104 F. Supp. 374 (S.D.N.Y. 1952) ............................................................................................. 30

*Yurman Design, Inc. v. Golden Treasure Imports, Inc.*,
   275 F. Supp. 2d 506 (S.D.N.Y. 2003) ..................................................................................... 22

*Zuma Press, Inc. v. Getty Images (US), Inc.*,
   845 F. App'x 54 (2d Cir. 2021) ............................................................................................ 59, 60

**Statutes**

17 U.S.C. § 19 (1909) ................................................................................................................ 29, 30

17 U.S.C. § 20 (1909) ........................................................................................................... 28, 29, 30

17 U.S.C. § 21 (amended 1947) .................................................................................................... 28

17 U.S.C. § 101 ......................................................................................................................... 27, 43

17 U.S.C. § 106 ............................................................................................................................. 48

17 U.S.C. § 209 (1947) ..................................................................................................................... 2

17 U.S.C. § 401(a) (1976) .............................................................................................................. 27

17 U.S.C. § 401(b) ................................................................................................... 31

17 U.S.C. § 401(c) ................................................................................................... 30

17 U.S.C. § 401(d) ................................................................................................... 33

17 U.S.C. § 405(a)(1) (1976) ............................................................................. 28, 29

17 U.S.C. § 410(1976) ............................................................................................... 2

17 U.S.C. § 410(c) ................................................................................................... 31

17 U.S.C. § 501(b) ..................................................................................................... 3

17 U.S.C. § 1202(b)(3) ..................................................................................... *passim*

17 U.S.C. § 1202(c) ............................................................................................ 43, 55

17 U.S.C. § 1202 (c)(2)-(3) ..................................................................................... 51

17 U.S.C. § 1202(c)(3) ................................................................................. 47, 50, 51

17 U.S.C. § 1202(c)(6) ....................................................................................... 44, 51

**Other Authorities**

Fed. R. Civ. P. 15(b)(2) ............................................................................................ 57

Fed. R. Civ. P. 23 ..................................................................................................... 24

Fed. R. Civ. P. 56(a) and (c)(1) ............................................................................... 26

Lou R. Kling & Eileen T. Nugent, Negotiated Acquisitions of Companies,
   Subsidiaries and Divisions § 1.04 (2009) ....................................................... 17

Nimmer on Copyright ................................................................................. 10, 11, 54

## PRELIMINARY STATEMENT[1]

ERIS is no innocent actor.  It concededly copied nearly 1 million Sanborn fire insurance maps for distribution and profit, fully aware that a large number of them are protected by copyright, and that it could be sued by for infringement at any time.  Despite its awareness, ERIS never sought a license from Sanborn.  Instead, it proceeded with the maps, hoping to boost its bottom line and hoping that its concerns would not materialize.  And it did so while falsely assuring Sanborn and the marketplace that none infringe.  Yet, ERIS has the moxie to ask the Court to exercise its powers at equity to bar Sanborn's claims.  But, "[h]e who seeks equity must do equity.'" *A.C. Aukerman Co. v. R. L. Chaides Constr. Co.*, 960 F.2d 1020, 1038 (Fed. Cir. 1992).  ERIS' estoppel defense fails as a matter of law on at least three of its elements, each providing an independent ground for dismissal, without any need to reach the equities.

ERIS has no answer for its brazen copying, other than to raise a grab bag of other defenses.  It relies on erroneous interpretations of the law, misquoted evidence, and contradictory, unsubstantiated declarations drafted long after the fact and belied by ERIS' contemporaneous documents.  For example, ERIS pays lip service to the law requiring that an agreement must be read as a whole in order to determine the intent of the parties, but then cherry picks language from two asset purchases, one in 1973 and one in 1996, so myopically that it disregards significant portions of the intrinsic evidence, all in an attempt to salvage its argument that Sanborn does not own the copyrights.  ERIS theorizes that the 1973 asset sale was actually a license and that some unidentified licensor retained the bare right to sue.  That theory, which is

---

[1] Unless otherwise indicated, all references to "Sanborn" means the plaintiff in this action, The Sanborn Library LLC, and each of its predecessors-in-interest.  Submitted herewith are: (1) Sanborn's Rule 56.1 Counter-Statement in Opposition to ERIS' Motion for Summary Judgment ("SCF"); (2) Sanborn's Rule 56.1 Statement in Support of Sanborn's Cross-Motion for Summary Judgment ("SF"); (3) the Declaration of Joshua S. Wolkoff, with Exhibits 1-120; (4) the Declaration of Steven L. Pease, with Exhibits 1-8; and (5) Sanborn's Request for Judicial Notice.  "EF" refers to ERIS' Rule 56.1 Statement.

contrary to law, flies in the face of what the intrinsic evidence establishes: that the entire map business, including the copyrights, was sold.  For the 1996 asset purchase, ERIS puts its head in the sand and does not confront (or even acknowledge) the bill of the sale, which, on its face, transferred the copyrights, along with the rest of the map business.

Next, ERIS conjures up the argument that a subset of the copyrights are not owned by Sanborn because they were purportedly created by independent contractors.  But the evidence on this, which ERIS does not mention or discuss, establishes that there is no genuine issue that Sanborn employees made the maps.  Each of the applicable work for hire *Reid* factors favors Sanborn.  ERIS also challenges the notice on 850 works, including by comparing a handful of examples to other, different, unasserted works and asks the Court to "figure it all out."  For both its work for hire and notice defenses, ERIS forgets that Sanborn's works enjoy a presumption of validity and that it, therefore, bears the burden of proof. 17 U.S.C. § 209 (1947); 17 U.S.C. § 410 (1976).  Moreover, even without the presumption, Sanborn is entitled to judgment as a matter of law on these defenses.

Finally, ERIS attempts to evade liability under the DMCA by completely misstating the law of this Circuit, analyzing the violations under the wrong subparts, mischaracterizing Sanborn's CMI falsification claim as one for false attribution, and ignoring the piles of evidence confirming that ERIS made verbatim copies of Sanborn maps, and conveyed CMI in connection with those copies knowing it was false, in order to sell more Sanborn maps.  Despite its repeated incantations that "context matters" (*See*, *e.g.*, Br. at 45), it makes no effort to put the law or the facts into context.  To do so would require ERIS to confront its own CMI, which unequivocally grants ERIS' customers a license to use the maps, while falsely assuring them that the copyrights are owned by ERIS or its licensors.  ERIS also knew precisely what it was doing when it

distributed Sanborn maps stripped of its CMI and may not point the finger at its contractor in India to avoid responsibility. After repeatedly acknowledging – and fearing litigation – ERIS sought to convince itself and the world that it could sell copyrighted Sanborn maps. The DMCA's double-scienter requirement must be left for the factfinder.

Sanborn respectfully requests that ERIS' motion for summary judgment be denied in its entirety and that Sanborn's cross-motion be granted with respect to ownership and dismissing the following defenses: (1) Second Defense (Invalidity or Expiration of Copyright) insofar it relates to improper notice; (2) Ninth Defense (Estoppel); and (3) Nineteenth Defense (Non-Ownership).

## <u>ARGUMENT</u>

## I.   SANBORN OWNS THE COPYRIGHTS IN THE ASSERTED MAPS

### A.   Chain of Title

1.   <u>The 1973 asset purchase documents unambiguously establish that all pre-June 1, 1973 copyrights were transferred from Sanborn II to Sanborn II.</u>

Whether Sanborn III became the owner (or "proprietor," in the parlance of the 1909 Act) of the pre-June 1, 1973 copyrights as a result of Sanborn III's 1973 acquisition of Sanborn II's map business presents a straightforward inquiry: applying New York contract law, did the 1973 asset purchase documents convey to Sanborn III the "exclusive right [t]o print, reprint, publish, copy, and vend the [Sanborn] copyrighted work[s]" enumerated in Section 1(a) of the 1909 Act. If the answer is "Yes," then, as a matter of copyright law, Sanborn III had the right to sue for infringement (*i.e.*, the right to exclude), which ultimately flowed to Sanborn. *See John Wiley & Sons, Inc. v. DRK Photo*, 882 F.3d 394, 416 (2d Cir. 2018) ("Under the [1909 Act], the 'proprietor' of a copyright was afforded the right to sue for copyright infringement."); *see also Cortner v. Israel*, 732 F.2d 267, 271 (2d Cir. 1984) ("Section 501(b) of the 1976 Act provides that 'the legal or beneficial owner of an exclusive right under a copyright' is entitled to sue for infringement."). ERIS readily acknowledges this. *See* Br. at 3 (quoting 17 U.S.C. §501(b)). As

demonstrated below, the record evidence establishes that the answer to the above question is a resounding "Yes."

   a.   *The intrinsic evidence*

"In interpreting a contract, courts 'should examine the entire contract and consider the relation of the parties and the circumstances under which it was executed.  Particular words should be considered, not as if isolated from the context, but in the light of the obligation as a whole and the intention of the parties as manifested thereby.'" *Holland Loader Co., LLC v. FlSmidth A/S*, 313 F. Supp. 3d 447, 469 (S.D.N.Y. 2018) (citing *MBIA Ins., Corp. v. Patriarch Partners VIII, LLC*, 842 F. Supp. 2d 682, 704 (S.D.N.Y. 2012).  Thus, the context and circumstances in which Sanborn III purchased Sanborn II's map business is not parol evidence, but indispensable and must be considered.

The 1973 asset purchase closed on June 1, 1973.  SF ¶ 36; EF ¶ 49.  During that time, Sanborn II was losing money, struggling to turn a profit, and looking for a potential buyer.  SF ¶ 19.  As of May 1973, Sanborn II had discontinued the active operations of its map business and had discharged substantially all of its employees.  SF ¶ 14.  It is undisputed that, as of June 1, 1973, Sanborn II owned the Sanborn map copyrights, which had been assigned to it in 1959 when Sanborn I transferred its map business to Sanborn II.  EF ¶ 42; SF ¶ 11.

In or around 1973, a company named Real Estate Data, Inc. ("REDI") learned that Sanborn II was looking for a buyer.  SF ¶ 19.[2]  REDI's product offerings included county-specific tax maps, tax roll data, assessment records and aerial photography (SF 16) and its customers included real estate developers, brokers, appraisers, surveyors, title companies, and

---

[2] The 1973 APA permitted REDI to take title to Sanborn II's assets in the name of a wholly-owned subsidiary.  SF ¶ 40.  To that end, on June 1, 1973, REDI incorporated Sunshine Map Company, Inc. ("Sunshine"), a wholly-owned subsidiary of REDI.  SF ¶ 41-42.  After the closing, Sunshine changed its name to Sanborn Map Company, Inc., which both Sanborn and ERIS refer to as "Sanborn III."  EF ¶ 47.

others who leveraged REDI's data in various ways, including for the purpose of determining property value and preparing property listings.  SF ¶ 17.  REDI was interested in acquiring Sanborn II because it believed that the integration of Sanborn maps into REDI's existing real estate data offering would add value for REDI's clients.  SF ¶ 20.  In addition to continuing the existing Sanborn map business, REDI envisioned publishing Sanborn maps alongside REDI's existing tax maps and tax data, thereby providing real estate professionals with a convenient way of reviewing all of this information on a parcel-by-parcel basis.  SF ¶ 21.

The intrinsic evidence recognizes that the 1973 transaction would culminate in Sanborn II's exit from, and liquidation of, its map business.  *See, e.g.*, SF ¶ 14 (Sanborn III "acknowledges that it is fully aware of the fact that [Sanborn II] has discontinued the active operation of its map business . . . ."); SF ¶ 33 (pending the closing, Sanborn II "(i) *will not undertake any new mapping business*");[3]  SF ¶ 34 ("on and after the Closing [Sanborn II] *will cease the use of the name Sanborn Map Company or any name similar thereto* except in connection with *the liquidation of its affairs*"); SF ¶ 32 (Sanborn II agreed to forward to Sanborn III "all inquiries regarding potential and future sales of maps and mapping product"); SF ¶ 39 (confirming that between March 21, 1973 and the closing, "it is understood that [REDI] shall be authorized *to resume and engage in the insurance map business substantially in the same manner as such business was conducted by [Sanborn II] prior to the time it ceased operations . . .* "); SF ¶ 37 (Sanborn II agreed to deliver "a complete and accurate list of the names and addresses of all persons to whom [Sanborn II] has sold maps since January 1, 1972 and all persons from whom [Sanborn II] has purchased raw material or supplies since January 1, 1972").  Thus, the backdrop for the 1973 transaction was Sanborn II's exit from, and liquidation

---

[3] Unless otherwise noted, all italics have been added for emphasis.

of, its map business and Sanborn III's desire to augment its existing map business via acquisition of the Sanborn II map business.

On May 7, 1973, Sanborn II and REDI entered into an asset purchase agreement (the "1973 APA"). SF ¶ 25; EF ¶ 46. The transaction was structured as an asset purchase pursuant to which Sanborn II "*shall sell, transfer, convey and deliver* to [Sanborn III], and [Sanborn III] s*hall buy, free from all liens, encumbrances and liabilities*" the assets to be sold under the 1973 APA. SF ¶ 29.[4] Accordingly, in Paragraph 1 of the 1973 APA, entitled "Assets to be Acquired," Sanborn II agreed that it "*shall sell, transfer, convey and deliver*" . . . "the following assets and property used by [Sanborn II] and AAS [a subsidiary of Sanborn II] in the conduct of said map business[5] at Pelham, New York":

> (a) The machinery, tools, appliances and equipment used in said business and located in or about the premises occupied by [Sanborn II] at 629 Fifth Avenue, Pelham, New York, as described in Exhibit "A" to be signed by the parties, attached hereto and incorporated by reference for all purposes;
>
> (b) All inventory of finished maps, corrections and partly finished maps, the Sanborn Insurance Map Library, all raw materials consisting of film, drafting paper, acetate and miscellaneous supplies of [Sanborn II] on hand at said premises as described in Exhibit "B" attached hereto and incorporated by reference for all purposes;
>
> (c) The airplane described in Exhibit "C" attached hereto and incorporated herein by reference for all purposes;
>
> (d) All office furniture, fixtures and equipment as listed in Exhibit "D" attached hereto;

---

[4] *E.g.*, SF ¶ 31 ("[t]he *assets to be sold* under [the 1973 APA] *shall be transferred and conveyed* to [Sanborn III] by the delivery at the Closing of a Bill of Sale'"); SF ¶ 32 (Sanborn II represented and warranted that it "has complete and unrestricted power and the unqualified right *to sell, assign, transfer and deliver* to [Sanborn III]" and "[Sanborn III] *will acquire, good, valid and marketable title to, the assets to be transferred* to [Sanborn III]"); SF ¶ 32 (Sanborn II represented and warranted that the "Bill of Sale and the endorsements, assignments and other instruments to be executed and delivered" . . . "*will effectively vest in [Sanborn III] good, valid and marketable title to the assets of [Sanborn II] to be sold hereunder*.").

[5] "Said map business" refers to Sanborn II's "business of manufacturing, revising and selling maps" in the first recital of the 1973 APA. SF ¶ 32. *See United States v. Hamdi*, 432 F.3d 115, 123 (2d Cir. 2005) (recitals "may shed light on, but are distinct from, the contract's operative promises to perform.").

(e) All of the following assets of [Sanborn II's] map business, whether reflected on [Sanborn II's] books or otherwise: all tradenames, including the name 'Sanborn map', order records, sales data and customer lists, and the rights to market products from the map library to existing and potential customers;

(f) It is intended that the within sale shall include only the assets set forth in subdivisions (a) through (e) of this Paragraph 1, and that there is specifically excluded from the within sale, the accounting books and records of [Sanborn II] and AAS, and all cash, photogramatic works in process, note and accounts receivable and any other outstanding claims payable to [Sanborn II] and AAS.

SF ¶¶ 29-30.

Consistent with the language in its second recital stating Sanborn II's "desire to sell *certain of the assets*," Paragraph 1(f) of the 1973 APA above specifically excluded certain assets necessary for the winding down of Sanborn II's map business.  SF ¶ 30.  Exhibit D to the 1973 APA (as well as to the 1973 Bill of Sale) also excluded "two IBM typewriters and one calculating machine."  SF ¶ 50.  And, title to the Pelham Facility was also excluded from the transaction. [6]  Other than these assets, none of Sanborn II's map business assets were excluded.

On June 1, 1973, the transaction closed and Sanborn II executed a Conveyance and Bill of Sale (the "1973 Bill of Sale") pursuant to which it "*sold, assigned, transferred, conveyed and delivered*" to Sanborn III the same five categories of assets labeled (a)-(e) in the 1973 APA "TO HAVE AND TO HOLD, unto [Sanborn III], its successors and assigns, FOREVER."  SF ¶ 44.[7] The 1973 Bill of Sale has four exhibits, A-D, detailing asset categories (a)-(c) and (e).  Exhibit A lists, by description and quantity, of sixty different types of "machinery, tools, appliances and equipment," clearly used for printing, reprinting, publishing, copying and vending Sanborn maps.  Exhibit "B" lists "personal property" at the Pelham Facility, also used for printing,

---

[6] Upon closing, Sanborn II changed its name to SMC Realty Company, Inc. ("SMC") (SF ¶ 51), which held the title to the office and publishing facility at 629 Fifth Avenue, Pelham, New York (the "Pelham Facility") previously used by Sanborn II, and leased it to Sanborn III.  SF ¶ 55

[7] Categories (d) and (e) in the 1973 APA are reversed in the 1973 Bill of Sale.

reprinting, publishing, copying and vending Sanborn maps, including "The Sanborn map

Library."  SF ¶ 47.  Exhibit C describes an airplane and its equipment.  SF ¶ 48.  Exhibit D lists

"office furniture and equipment" at the Pelham Facility. SF ¶¶ 49-50.

      The above intrinsic evidence establishes that there is no genuine issue that Sanborn II

(liquidating its map business) *sold, assigned, transferred, conveyed and delivered* the Assets to

be Acquired, to which Sanborn III (augmenting its map business) *took title in perpetuity,*

including the "Sanborn Insurance Map library" and the "rights to market products from the map

library."  All such rights were accompanied by "good, valid and marketable title" and were

acquired "free and clear of all . . . encumbrances or charges of any kind."  SF ¶ 32.  Sanborn II

represented and warranted that it "is not restricted by agreement from carrying on its business

anywhere in the world" (SF ¶ 32), meaning that, following the closing, Sanborn III would not

face any contractual restrictions in conducting Sanborn II's map business as a going concern.  In

addition, Sanborn II represented and warranted that "no products manufactured or sold by

[Sanborn II] infringes on any patents, trademarks or copyrights, or any other rights, of any

person" (SF ¶ 35), which provided assurances that Sanborn III's own publication and sale of

Sanborn II products would not result in an infringement claim.  Moreover, the assets excluded in

the transaction were expressly limited, and did not include any Sanborn map copyrights.

      This same evidence shows that there is no genuine issue that the copyright rights for

Sanborn III to exclusively print, reprint, publish, copy, and vend the Sanborn maps in perpetuity

were subsumed in the Assets to be Acquired.  *See, e.g.*, *Shugrue v. Continental Airlines, Inc.*,

977 F. Supp. 280, 285 (S.D.N.Y. 1997) (finding that the conveyance of "all right, title and

ownership" in software "confirm[ed] that the parties intended for the intellectual property rights

to be transferred"); *John G. Danielson, Inc. v. Winchester-Conant Props.*, 186 F. Supp. 2d 1, 12

(D. Mass. 2002) ("the combination of the sweeping language of ownership granted to [plaintiff] along with the reference to publication suggests that [plaintiff] became the owner not only of the physical plans, but also of the copyrights embedded within them"); *Schiller & Schmidt, Inc. v. Nordisco Corp*., 969 F. 2d 410, 413 (7th Cir. 1992) ("Although the agreement does not mention the word 'copyright,' its wording leaves little doubt that [the alleged transferor] sold all the assets of Spotline Studios, tangible and intangible alike."); *see also Vargas v. Viacom Intl., Inc.*, No. 18 Civ. 474 (LLS), 2018 WL 6920769, at *11 (S.D.N.Y. Nov. 30, 2018) (additional citations omitted) (a writing to transfer copyright "need not contain elaborate explanation nor any particular magic words, but must simply show an agreement to transfer copyright.").

*Estate of Shaw v. Marcus*, while decided on the pleadings, is instructive.  No. 7:14-cv-3849 (NSR), 2015 WL 5610959 (S.D.N.Y. Sept. 22, 2015).  The court found that a settlement agreement that did not include the words "copyright," "exclusive rights," "all right, title, and interest," or any analogous terms, and that expressly divested the transferors of their right to market or "make any type of deal" with respect to the copyrighted photographs could plausibly be construed as the transfer of "the exclusive, perpetual, irrevocable right to market copies of the subject photographs, images, transparencies, and negatives (without the payment of any royalties to any other person), which subsumes one or more (or all) of the exclusive rights granted to copyright owners."  *Id.* at *6-7.  The court rejected defendants' argument that the settlement agreement conveyed a mere license, finding that it was devoid of the typical elements of a license: the settlement agreement did not reserve any rights to the transferors, nor did it include any provision for the payment of royalties, "which the parties certainly would not have left wholly unaddressed had they intended to convey a license." *Id*. at *7.  Further, the court found that interpreting the settlement agreement to convey "the right to sell" without the "right to

market" the copyrighted photographs would be "nonsensical" in the context of the transferee's business model and "would not be particularly valuable" to the transferee. *Id*.

ERIS' contention that the 1973 transaction amounted to a license (Br. at 13-17) is clearly wrong.  The intrinsic evidence does not bear any single one of the hallmarks of a license: a grantor, scope of licensed rights, reservation of rights, royalties, sublicensing, limitations on duration or time, derivative work creation, geographic scope, assignment rights, and termination rights.  *See* 3 Nimmer on Copyright § 10.01[B].  *First*, Sanborn II did not reserve any rights, including payment of royalties or a lease back.  *See, e.g.*, *First Fin. Marketing Serv. Group, Inc. v. Field Promotions, Inc.,* 286 F. Supp. 295, 298 (S.D.N.Y. 1968); *Gardner v. Nike, Inc.*, 279 F.3d 774, 778 (9th Cir. 2002)).  To the contrary, Sanborn II conveyed and sold (not licensed) everything, except for the assets expressly excluded.  Moreover, if it were a license, then there would had to have been a licensor, but ERIS has not identified one, let alone proffered evidence regarding what the terms of such a license purportedly were.[8]  *Second*, no limitations on the duration of time were imposed on the Assets to be Acquired.  *See, e.g.*, *Sabatini v. Commissioner*, 98 F.2d 753, 755 (2nd. Cir. 1938); *Hirshon v. United Artists Corp.*, 243 F.2d 640, 643 (D.C. Cir. 1957). To the contrary, the Bill of Sale provides that they were conveyed in perpetuity.  SF ¶ 44.  *Third*, the Assets to be Acquired were not subject to any geographic limitations.  *See, e.g.*, *First Fin. Marketing Serv. Group, Inc.,* 286 F. Supp. at 298; *Misbourne Pictures, Ltd. v. Johnson*, 90 F. Supp. 978, 981-82 (S.D.N.Y. 1950).[9]

---

[8] In September 1978, SMC (previously Sanborn II) was merged out of existence.  SF ¶ 53.
[9] The case ERIS relies upon is inapposite.  Br. at 13.  *See P.C. Films Corp. v. MGM/UA Home Video Inc*., 138 F.3d 453 (2d Cir. 1998) (agreement expressly reserved rights to novelization, sequelization and legal title in the copyrighted work to the transferor).  ERIS also cites *Lantern Press, Inc. v. Am. Publishers Co.*, 419 F. Supp. 1267, 1271 (E.D.N.Y. 1976) for the unremarkable proposition that, under the 1909 Act, a "copyright was not identical with the copyrighted work but existed separately from it as the intangible right to exclude all others from printing, publishing, copying, or vending the work."  Br. at 15 n. 10.  Here, it is undisputed that the maps themselves were transferred to Sanborn III and ERIS does not argue

Tellingly, ERIS never even argues that Sanborn III did not acquire the exclusive rights to print, reprint, publish, copy, and vend the copyrighted Sanborn maps. *See* Br. at 13-17. Nor could ERIS do so with a straight face. The intrinsic evidence indisputably establishes that the core purpose of the transaction was to enable Sanborn III to do all of these things – that was precisely what the Assets to be Acquired, including the Sanborn maps themselves, the machinery, tools, appliances and equipment at the Pelham Facility, and the "rights to market products from the map library," among others, were designed to do.

Rather, ERIS theorizes that some unidentified licensor to Sanborn III arose out of the 1973 asset purchase who had the right to sue and, thus, Sanborn does not have standing in this case. Br. at 14-15. That argument fails both as a matter of fact and law. As a matter of fact, the 1973 Bill of Sale expressly conveyed the right to sue vis-à-vis all of the Assets to Acquired: "[Sanborn II] hereby authorizes [Sanborn III] to take any and all action in connection with any of such property and assets, in the name of [Sanborn II] or in its [Sanborn III's] name or any other name." SF ¶ 45. And, as explained above, Sanborn III took title to and became the owner of all of Assets to be Acquired, including the exclusive rights to print, reprint, publish, copy, and vend the Sanborn maps, in perpetuity. By operation of copyright law, the right to exclude is appurtenant to the rights conveyed in Section 1(a) of the 1909 Act, and a bare right to sue does not confer standing. *Gardner v. Nike, Inc*., 110 F. Supp. 2d 1282, 1258 (C. D. Ca. 2000) (quoting 3 Nimmer on Copyright § 10.01 [A]) ("The purpose of [indivisibility under the 1909 Act] was to protect alleged infringers from the harassment of successive law suit. This result was achieved because only the copyright proprietor (which would include an assignee but not a

---

that the exclusive copyright rights set forth in Section 1(a) of the 1909 Act were not transferred to Sanborn, only that the right to exclude is absent.

licensee) had standing to bring an infringement action."); *see also Eden Toys, Inc. v. Florelee Undergarment Co., Inc.*, 697 F.2d 27, 32 n.3 (2d Cir. 1982) (same vis-à-vis the 1976 Act).

ERIS also argues that the presence of the terms "copyright" and "exclusive right" in Paragraph 13 of the APA and the absence of those terms in Paragraph 1(e) means that the Sanborn map copyrights were not transferred because "where contract provisions use different language, courts must assume the parties intended different meanings." Br. at 15-16 (citations omitted). On the one hand, Paragraph 1(e) defines a category of Assets to be Acquired, including the "name 'Sanborn map' and broad "rights to market products from the map library to existing and potential customers" SF ¶ 29. On the other hand, Paragraph 13 is a representation and warranty by Sanborn II on the discrete issue of "Use of Name Sanborn," including that it does not "infringe on any patents, trademarks, or copyrights, or any other rights," and that "[Sanborn II] has the sole and exclusive right to manufacture and market its maps" under the Sanborn name. . . ." SF ¶ 35. Paragraphs 1(e) and 13 address completely different topics and, therefore, employ different words.[10]

Finally, interpreting the 1973 asset purchase as a license would "produce a result that is absurd, commercially unreasonable or contrary to the reasonable expectations of the parties.'" *Atlas Partners, LLC v. STMicroelectronics, Int'l N.V.*, No. 14-cv-7134 (VM), 2015 WL

---

[10] ERIS' cited cases support this. *Bank of N.Y. Mellon Tr. Co., N.A. v. Morgan Stanley Mortg. Capital, Inc.*, 821 F.3d 297, 309-10 (2d Cir. 2016) (improper to apply a three-day time limitation to two different uses of the word "promptly" where the deadline was present in one provision and not the other); *NFL Enters, LLC v. Comcast Cable Commc'ns, LLC*, 851 N.Y.S.2d 551, 556-57 (N.Y. App. Div. 2008) (finding that two provisions offering different options, though similarly worded, did not have the same meaning); *Kleinberg v. Radian Grp., Inc.*, No. 01 Civ. 9295 (RMB)(GWG), 2002 WL 31422884, at *6 (S.D.N.Y. Oct. 29, 2002) (finding that interpretation of the term "as applicable" to mean "the greater of" was "completely at odds with the ordinary meaning of the term 'applicable,'" and the agreement used the term "the greater of" elsewhere); *Bausch & Lomb Inc. v. Mimetogen Pharms., Inc.*, No. 14-CV-6640-FPG, 2017 WL 2835250, at *12 (W.D.N.Y. June 30, 2017) ("the language in section 1.41(b)(2) is *completely* different from the language in the definitions for other outcomes.") (emphasis in original).

4940126, at *4 (S.D.N.Y. Aug. 10, 2015); *see Lipper Holdings, LLC v. Trident Holdings, LLC*, 1 A.D.3d 170, 171, 766 N.Y.S.2d 561, 562 (N.Y. App. Div. 2003).  For example, this would mean that Sanborn II and Sanborn III, a licensee under ERIS' theory, negotiated and entered in the 1973 asset purchase, with all of its concomitant asset purchase documentation, but did not negotiate and agree to any customary licensing terms.  Under ERIS' theory, the parties would have been in the dark about all of these things and their future commercial relationship.

   b. *The extrinsic evidence confirms that all pre-June 1,1973 copyrights were transferred from Sanborn II to Sanborn III*

   To the extent that the Court finds the 1973 asset purchase documents ambiguous, the undisputed extrinsic evidence confirms that Sanborn II and Sanborn III intended for all pre-June 1, 1973 copyrights to be conveyed to Sanborn III.  *See Apollo Global Mgmt., LLC v. Bokf, NA (In re MPM Silicones, L.L.C.)*, 874 F.3d 787, 796-97 (2d Cir. 2017) (additional citations omitted) ("[Extrinsic] evidence can include the parties' apparent intention, what would be commercially reasonable, and the 'parties' interpretation of the contract in practice, prior to litigation").  The extrinsic evidence includes the unrebutted testimony of Steven L. Pease.  SF ¶¶ 15-24, 55-57.

   From 1972-1978, Mr. Pease was a Vice President and later Executive Vice President and COO of REDI and responsible for REDI's strategic acquisitions.  SF ¶ 15.  On behalf of REDI, Mr. Pease and its COO negotiated the letter of intent to purchase Sanborn II with the President of Pictorial Productions, Inc., Sanborn II's parent company at the time.  SF ¶ 22.  Mr. Pease also worked with REDI's outside counsel to finalize the terms of the deal with Sanborn II and prepare the purchase documents.  SF ¶ 23.  Mr. Pease signed the 1973 APA on behalf of REDI.  SF ¶ 26. Following the closing until 1978, Mr. Pease was also the President of Sanborn III, during which he supervised its day-to-day affairs.  SF ¶ 56.

Mr. Pease testified that the 1973 transaction had three core components: (1) REDI, through a special purpose vehicle (*i.e.*, Sunshine Map Company, which changed its name and became Sanborn III), would steps into the shoes of Sanborn II, by acquiring all of the assets necessary to run the existing Sanborn map business as a going concern, including all of the exclusive rights to reproduce and distribute existing maps from the Sanborn library catalog, prepare and distribute updates to those maps, produce and distribute new Sanborn maps, and integrate existing Sanborn maps and data into REDI products; (2) Sanborn II would retain only the accounting books and records, all cash, protogramatic work in process, notes and accounts receivable and any other outstanding claims payable to Sanborn II and thus, those assets were excluded from the transaction; and (3) Sanborn II would change its name and exit the Sanborn map market, by ceding this business to REDI.  SF ¶ 24.

Mr. Pease also testified that one of the primary reasons for conducting the 1973 asset purchase was to effectuate the transfer of all assets necessary to continue operating the Sanborn map business as a going concern, including the rights to market the maps, which necessarily included the copyright rights, and the deal accomplished that.  SF ¶¶ 24, 116.  Mr. Pease explained that, without the Sanborn map copyrights, it would have been impossible for Sanborn III to stand in the shoes of Sanborn II by selling reproductions of existing Sanborn maps to customers, updating the maps based on pre-existing maps or integrating existing Sanborn maps with REDI's data to create new products. SF ¶ 24. Sanborn II, REDI (and its corporate parent, Pictorial Productions) and Sanborn III understood that, as part of the transaction, the exclusive rights to do this would be transferred to Sanborn III.  SF ¶ 24.  Mr. Pease also explained that, during his tenure as Sanborn III's President from 1973-1978, it carried out the business of Sanborn II, including continuing one of its core service offerings of creating and updating

14

Sanborn maps for clients.  SF ¶ 56.; *see New York Marine & Gen. Ins. Co. v. Lafarge N. Am., Inc.*, 599 F.3d 102, 119 (2nd Cir. 2010) ("'[T]here is no surer way to find out [the intent of the parties to a contract] . . . than to see what they have done.'").

ERIS has not come forward with a shred of extrinsic evidence, let alone any rebutting Mr. Pease's testimony or casting doubt on his credibility.[11]  Where, as here, "the extrinsic evidence illuminating the parties' intended meaning of the contract is so one-sided that no reasonable person could decide to the contrary," summary judgment is routinely granted.  *N.Y. Marine*, 599 F.3d at 115 (internal quotations omitted); *see, e.g., Gilbert v. Related Mgmt. Co.*, 162 F.3d 1147 (2d Cir. 1998); *Dreni v. PrinterOn Am. Corp.*, No. 1:18-cv-12017-MKV, 2021 WL 4066635, at *8 (S.D.N.Y. Sept. 3, 2021); *Dreyfuss v. eTelecare Glob. Sols.-U.S., Inc.*, No. 08 Civ. 1115 (RJS), 2010 WL 4058143, at *7 (S.D.N.Y. Sept. 30, 2010); *Bank of N.Y. Tr., N.A. v. Franklin Advisers, Inc.*, 674 F. Supp. 2d 458, 470 (S.D.N.Y. 2009).

<div style="text-align:center">

c.  *The "map library" referred to in the 1973 APA is not limited to Sanborn maps at the Pelham Facility as of June 1, 1973.*

</div>

ERIS alternatively argues that if the Court finds that the pre-June 1, 1973 copyrights transferred to Sanborn III, such assigned copyrights should be limited to only those associated with maps in "the map library" referred to in Paragraph 1(e) of the 1973 APA.  ERIS asserts that this is because "[t]he use of the definite article 'the' in front of 'map library' in Paragraph 1(e) necessarily refers to the 'Sanborn map Library' at [the Pelham Facility] introduced in Paragraph 1(b)."  Br. at 17.  This argument is easily disposed of.

*First*, the terms "the map library" and "Sanborn Insurance Map library" (erroneously referred to by ERIS as "Sanborn map library" (Br. at 17) in paragraph 1 of the APA use different

---

[11] ERIS opted not to take Mr. Pease's deposition.

language.  Thus, ERIS' argument flies in the face of the case law it cites standing for the proposition that the use of different language in a contract implies that the parties intended different meanings, as well as the argument it makes, one page earlier in its brief.  *See* Br. at 16 and n. 11.[12]  *Second*, when Sanborn II and Sanborn III intended for one term to be defined by another term, they knew how to do so and did so.  Specifically, they used the word "said."[13] *Third*, ERIS' argument totally ignores the 1973 Bill of Sale, in which Sanborn II "sells, assigns, conveys and delivers" to Sanborn III five categories of assets labelled (a)-(e).  Category (a) (corresponding to Exhibit A), category (b) (corresponding to Exhibit B) and category (e) (corresponding to Exhibit D) are each expressly tied to the Pelham Facility.  SF ¶ 44.  However, category (d), which recites "the map library," is not tied to the Pelham Facility. *Id*.  And, unlike categories (a), (b) and (e), category (d) has no associated exhibit that ties the items on it to the Pelham Facility. *Id*.  ERIS' "the map library" argument fails to consider all of the intrinsic evidence and considers particular words in isolation, and should be rejected.  *See Holland Loader Co.,* 313 F. Supp. 3d at 469.

      d.    *The pre-June 1, 1973 Sanborn maps were at the Pelham Facility.*

Even if the Court were to limit "the map library," there is no genuine issue that all of the pre-June 1, 1973 Sanborn maps were at the Pelham Facility as of that date.  The Pelham Facility has been at the same address in Pelham, New York since at least as early as 1959 and, in a 1976

---

[12] *Post v. Killington*, 424 Fed. Appx. 27, 29 (2d Cir. 2011) is inapposite.  Br. at 17. There, the court found that the article "the" could only refer to defendant corporation because "it was the only corporation previously identified" in the agreement.

[13] *E.g.*, SF ¶ 29 ("said map business" in Paragraph 1 of the 1973 APA refers to "the business of manufacturing, revising and selling maps" in the first recital of the 1973 APA); SF ¶ 29 ("said premises" in Paragraph 1(b) of the 1973 APA refers to "the premises occupied by the Seller at 629 Fifth Avenue, Pelham, New York" in Paragraph 1(a) of the 1973 APA).

letter, Sanborn III's Executive Vice President confirmed that Sanborn III had "over a million maps."  SF ¶ 58.

> 2.    <u>The 1996 asset purchase documents unambiguously establish that all of the Sanborn map copyrights were transferred from Sanborn III to EDR Sanborn.</u>

ERIS contends that the 1996 asset purchase "could only have effectively transferred maps that were in" the Pelham Facility as of the June 20, 1996 closing.  Br. at 21.  ERIS then argues that Sanborn has not come forward with evidence showing which maps were in the Pelham Facility as of the closing.  *Id*.  ERIS can only make the first argument by putting its head in the sand and totally ignoring one of the central pieces of intrinsic evidence – the 1996 Bill of Sale – which expressly conveys title to all Sanborn map copyrights to the buyer, EDR Sanborn, Inc. ("EDR Sanborn").  The second argument is predicated on the first argument, and crumbles once the first argument is found to fail, which it should.  There is no genuine issue that all of the Sanborn map copyrights were transferred in 1996.  And, even if there were such an issue, the evidence shows that the maps were on-site at the Pelham Facility.

> a.    *The intrinsic evidence*

On June 20, 1996, TRW REDI Property Data ("TRW REDI") and EDR Sanborn entered into an Asset Purchase Agreement (the "1996 APA"), the "Effective Date" of which is June 20, 2016.  SF ¶ 69; EF ¶ 80.  The transaction closed on the same date, and a Bill of Sale and Assignment ("1996 Bill of Sale") and Assignment of Copyrights ("1996 Copyright Assignment"), each dated June 20, 1996, were executed and delivered to EDR Sanborn, among other closing documents.  SF ¶¶ 84-91. [14]

---

[14] This is known as a "simultaneous sign and close," where title to the assets is transferred and the purchase price is paid at the same time that the agreement is signed.  *See* Lou R. Kling & Eileen T. Nugent, Negotiated Acquisitions of Companies, Subsidiaries and Divisions § 1.04 (2009).

17

In the 1996 APA, the parties agreed that "[EDR Sanborn] will purchase and acquire from TRW REDI, and TRW REDI will sell, convey, transfer, and assign to [EDR Sanborn], *all of the Acquired Assets free and clear of all Encumbrances*."  SF ¶ 72.[15]  Section 2.2 of the 1996 APA defines "Acquired Assets" to mean "all assets, properties, and rights held by Sanborn [III] as of the Closing which relate primarily to TRW REDI's conduct of Sanborn [III], including, without limitation, all assets reflected on the balance sheet of Sanborn [III] as of the Closing, but excluding the Excluded Assets."  SF ¶ 73.[16]  Section 2.2 of the APA also provides, in pertinent part: "Without limiting the generality of the foregoing [definition of Acquired Assets], the Acquired Assets will include all of TRW REDI's right, title, and interests in and to the following assets used by TRW REDI primarily in its conduct of Sanborn as of the Closing":

> (c) All inventories, wherever located, including, without limitation, the Sanborn Fire Insurance Maps, and other maps and abstracts thereof, which are permanently located in the Sanborn Facility in whatever storage media, inventories of raw materials, components, work-in-process, finished goods, replacement goods, operating supplies, and packaging;

> (i) Subject to the provisions of Section 2.3 hereof, to the extent assignable, all Intellectual Property (whether as owner, inventor, employer of an inventor, licensor, licensee or otherwise) including, without limitation, the names and trademarks of "Sanborn," "Sanborn Map Company" and "Sanborn mapping and Geographic Service;"of Sanborn as of the Closing, but excluding the Excluded Assets."  SF ¶ 74.

The 1996 APA defines (1) "Intellectual Property" to include: "all copyrightable works, all copyrights and all applications, registrations, and renewals in connection therewith;" (2) "Sanborn Fire Insurance Maps" to mean: "Those certain maps produced by Sanborn, or its predecessors or Bromley, Perris, Browne, Hopkins and Barlow or their respective predecessors,

---

[15] The recitals of the 1996 APA are in accord: "[EDR Sanborn] desires to purchase from TRW REDI, and TRW REDI desires to sell to [EDR Sanborn], *all of the assets and certain of the liabilities of Sanborn*. . ." SF ¶ 71.
[16] "Excluded Assets," embrace assets of TRW REDI that were unrelated to Sanborn III's map business. SF ¶ 78.  Exhibit B to the 1996 APA excludes certain bank accounts and a car.  SF ¶ 79.  None relate to Sanborn maps or Sanborn map copyrights.

located at the Sanborn Facility"; and (3) "Sanborn Facility" to mean: "The offices and warehouse space located at 629 Fifth Avenue, Pelham, New York, 10803, which houses Sanborn and its operations."  SF ¶¶ 75-77.

The 1996 Bill of Sale – which ERIS fails to cite or mention – could not be any clearer in establishing that all Sanborn map copyrights were conveyed to EDR Sanborn: "TRW REDI *hereby grants, sells, transfers, assigns, and conveys to [EDR Sanborn], its successors and assigns forever, all of [TRW REDI's] right, title and interest in and to the Acquired Assets* as defined [in the 1996 APA]" . . . "TO HAVE AND TO HOLD, all and singular, the aforesaid Assets unto [EDR Sanborn], its successors and its assigns, to and *for their own use and benefit forever*." SF ¶ 90.  The 1996 APA defines "Acquired Assets" to include all "Intellectual Property . . ." SF ¶ 74; *accord* Br. at 22.  The 1996 APA defines "Intellectual Property" to include "all copyrightable works, all copyrights and all applications, registrations, and renewals in connection therewith."  SF ¶ 75; *accord* Br. at n. 14.  The copyrights are not Excluded Assets. SF ¶ 78.[17]  The inquiry should end here.

Nevertheless, ERIS argues that the Sanborn map copyrights were not "assignable" because it is "not possible to 'assign' a piece of property for which the assignor does not have valid title."  Br. at 23.[18]  ERIS relies on TRW REDI's representation and warranty in the 1996 APA that it "has good and marketable title to the Acquired Assets, except for those listed in Exhibit E, provided that title to the Sanborn Insurance Maps only means physical possession

---

[17] The 1996 Copyright Assignment assigned "all right, title, and interest in the copyrights in the Sanborn Fire Insurance Maps (as defined in [the 1996 APA]) and the registrations, if any, thereof, free from any notice or claim asserted or threatened by any third party due to the infringement of any copyright of any person or organization."  SF ¶ 91.  The 1996 Copyright Assignment does not operate to scale back all of the Sanborn map copyrights conveyed in the 1996 Bill of Sale.  The 1996 Copyright Assignment was for, among other things, recordal in the Copyright Office.

[18] ERIS does not dispute that the Sanborn map copyrights were properly assigned by Sanborn I to Sanborn II in 1959 (EF ¶ 42; SF ¶ 11) and thus, Sanborn II had valid title to them in 1973.

thereto" SF ¶ 80.  The pertinent portion of Exhibit E incorporated into this representation and warranty states the same: "[EDR Sanborn] will only obtain physical title to the Sanborn Fire Insurance Maps."  SF ¶ 81.  This representation and warranty is expressly made as to "Sanborn Fire Insurance Maps" that are part of the 1996 APA Section 2.2(c)'s "inventories, wherever located . . . ."  SF ¶ 80.  Exhibit E is tied to Section 2.2(c)'s "inventories" in the very same way. SF ¶ 74.  Thus, this language simply reflects what TRW REDI was willing to represent and warrant  for purposes of the transaction with respect to the physical Sanborn maps that made up part of the "inventories" at the Pelham Facility or "wherever located."  It has nothing to do with the "Intellectual Property" defined in Section 1.1 of the 1996 APA, including the Sanborn copyright rights.

ERIS' further argument that the 1996 APA is not a "present assignment" of the Sanborn map copyrights is based on the total fiction of the non-existence of the 1996 Bill of Sale, which effectuated transfer, and must be rejected for this reason alone.  Moreover, the 1996 asset purchase was a "simultaneous sign and close," where all of the transaction documents were dated June 20, 1996, the closing date, and all of the transactions contemplated and conditions precedent took effect and/or were satisfied at the moment of closing.  SF ¶ 85.  The cases cited by ERIS[19] are all disputes between parties to an agreement (not a stranger, like ERIS) and stand for the unremarkable proposition that "[u]pon compliance with the conditions specified in the plan and agreement, the contract will be consummated," *Geiler v. Brooklyn-Manhattan Transit Corp*

---

[19] *See also Small v. Weissberg*, 7 Misc. 2d 492, 495-96 (City Ct. 1957) (finding that plaintiffs could not recover commissions under the contract because they did not introduce defendants to "prospective purchasers"); *Neponsit Holding Corp. v. Ansorge*, 215 A.D. 371, 379 (N.Y. App. Div. 1926) (finding that the seller "did not obligate itself to part with its property" until conditions were completed); *Bd. of Trs. of Leland Stanford Junior Univ. v. Roche Molecular Sys., Inc.*, 583 F.3d 832, 841-42 (Fed. Cir. 2009), *aff'd*, 563 U.S. 776 (2011) (finding that a clause stating that a party "agree[d] to assign or confirm in writing" right, title, and interest in inventions was not a present assignment.).

18 N.Y.S.2d 788, 791 (Sup. Ct. 1939), which is exactly what happened at the June 20, 1996

closing.[20]

>        b.       *The extrinsic evidence*

Following the and 1996 asset purchase, for the past 27 years, EDR Sanborn and then

Sanborn have continued uninterrupted the business of printing, reprinting, publishing, copying,

licensing and selling Sanborn maps.  SF ¶¶ 102-103.  There is no evidence that, during that time,

anybody other than EDR Sanborn or Sanborn has claimed to be the owner of the Sanborn map

copyrights.  Moreover, Ms. Tina Cressia-Thomas, a former long-time EDR employee, whose

responsibilities included maintaining the Sanborn map copyrights and who was hired by ERIS,

testified during her deposition (represented by ERIS' counsel) that the Sanborn map copyrights

transferred in 1996.  SF ¶¶ 97-101.

>        c.       *All asserted Sanborn maps were at the Pelham Facility as of June*
>                 *20, 1996*

Even if the Court were to find that the 1996 asset purchase effectuated a sale of the

copyrights for only the Sanborn maps at the Pelham Facility as of June 20, 1996 , there is no

genuine issue that the Sanborn maps were there as of that date.  For example, the due diligence

materials from the 1996 asset purchase establish that the maps were "on-site" at the Pelham

Facility.  SF ¶¶ 92-96.  Indeed, pursuant to the terms of Sanborn's license agreements with UPA

and Chadwyck-Healey, Sanborn received copies of the full microfilm collections.  SF__.

Moreover, Ms. Cressia-Thomas testified that the collection of the maps themselves as well as the

microfilm were there.  SF ¶¶ 64-68.

---

[20] ERIS' throwaway argument regarding standard language in asset purchase agreements to the effect that the seller will cooperate with the buyer if the buyer asks for  additional instruments of conveyance (Br. at 22) also does not detract from the legal effect of the Bill of Sale.  The 1973 APA contains the same type of standard language.

3.   There is no genuine issue that Sanborn is the owner of all of the asserted copyrights.

The other transactions that complete the Sanborn map copyrights chain of title are not challenged on ERIS' motion.  EF at n. 5 and 6.  In support of Sanborn's cross-motion, we briefly describe them: prior to the 1973 asset purchase, the Sanborn map copyrights were owned by the original Sanborn map and Publishing Company, incorporated in New York in 1875 ("Sanborn I").  SF ¶¶ 1-7 ; EF ¶¶35-40.[21]  In 1959, Sanborn I transferred its map business and assigned the copyrights to Sanborn II.  SF ¶ 11; EF ¶ 42.  After the 1996 asset purchase, in December 1998, EDR Sanborn, Inc. merged with and into The Sanborn Library, LLC, which effectuated the transfer of the copyrights to The Sanborn Library, LLC.  SF ¶ 102.  The surviving entity was The Sanborn Library, LLC, the plaintiff in this case.  SF ¶ 103.

**B.   All 6,162 Asserted Works are Works for Hire**

ERIS claims that 263 asserted works created on or after January 1, 1978 and subject to the 1976 Act (the "Post-1978 maps") do not qualify as works for hire.  SF ¶ 105.  ERIS does not challenge the 5,873 works created before January 1, 1978 subject to the 1909 Act (the "Pre-1978 maps").  Sanborn produced the copyright registration certificates for all 6,162 asserted works, stating that the registered work is a work for hire.  SF ¶ 107.  All 5,873 Pre-1978 maps are entitled to the presumption that they are works for hire.  Six of the Post-1978 maps (*see* SF ¶ 109) were registered within 5 years after publication of the work and are also automatically entitled to the presumption.  For the 257 Post-1978 maps not registered within 5 years after publication, the Court can exercise its discretion and find that those certificates are also *prima facie* evidence of the validity.  *See Yurman Design, Inc. v. Golden Treasure Imports, Inc.*, 275 F.

---

[21] In 1889, Sanborn I changed its name to Sanborn-Perris Map Company (Limited) (SF ¶ 2; EF ¶ 36); in 1902, it changed its name to Sanborn Map Company (SF ¶ 3; EF ¶ 37); and, in 1959, it changed its name to First Pelham Corporation.  SF ¶ 6; EF ¶ 39.

Supp. 2d 506, 516 (S.D.N.Y. 2003).  Nothing in the record suggests that the Sanborn employer-employee relationship abruptly changed as of January 1, 1978, when the 1976 Act went into effect.  To the contrary, the evidence shows that, prior to and including the time period from January 1, 1978 through 1994 Sanborn's map-making business used its employees to create Sanborn maps.  In fact, ERIS concedes that Sanborn maps "were updated frequently . . . by a Sanborn Map Company employee."  EF 104.  The Court should deny ERIS' motion as to the Post-1978 maps, and grant Sanborn's cross motion that all 6,162 asserted works are works for hire.

       1.     <u>The post-1978 maps are works made for hire under the 1976 Act.</u>

ERIS' sole "evidence" in support of its argument that the Post-1978 maps are not works for hire is a sentence in a due diligence document associated with the 1996 asset purchase transaction that reads: "all field surveyors are regular Sanborn employees with the exception of some part time contractors who just do some piece work." EF 72.  The sentence does not support ERIS' assertion.  On its face, it shows that Sanborn's surveyors "are regular Sanborn employees," and does not say anything about "independent contractors."  The Court can stop here to resolve the work for hire issue in Sanborn's favor, particularly given the presumption of validity.

To the extent the Court reaches the work for hire factors in *Cmty. for Creative Non-Violence v. Reid*, 490 U.S. 730, 751–52 (1985), they all favor finding for Sanborn.  The most significant factors are: "(1) the hiring party's right to control the manner and means of creation; (2) the skill required; (3) the provision of employee benefits; (4) the tax treatment of the hired party; and (5) whether the hiring party has the right to assign additional projects to the hired party."  *Aymes v. Bonelli*, 980 F.2d 857, 861 (2d Cir. 1992).

- Sanborn had the right to control the manner and means of creation (SF ¶ 110), including approval of the locations where work could take place as well as whether an employee could take on additional work (SF ¶¶ 111-112);  dictating how the work was to be finished and shipped (SF ¶ 113); fixing the hours and days when work would take place (SF ¶ 114); and, providing the materials, equipment, tools and location.  SF ¶ 115.  This factor weighs heavily in Sanborn's favor.  *See Aymes*, 980 F.2d at 862.

- Sanborn provided benefits, including wages and salaries, employee benefit plan, medical, dental, disability, and life insurance benefits, pension plans, vacation time and sick leave, workers' compensation, W-2s, travel and entertainment expenses, severance, rights under the "WARN" Act, and withheld taxes, contributions, and premiums.  SF ¶ 127.  This factor weighs in Sanborn's favor of finding.  *See Langman Fabrics*, 160 F.3d 106, 113 (2d Cir. 1998); *Martha Graham Sch. & Dance Found., Inc. v. Martha Graham Ctr. of Contemporary Dance, Inc.*, 380 F.3d 624, 641 (2d Cir. 2004).

- Sanborn withheld payroll taxes, contributions, and premiums and provided W-2s.  SF ¶ 128.  This weighs heavily in Sanborn's favor.  *See Langman Fabrics*, 160 F.3d at 113; *Martha Graham*, 380 F.3d at 641.

- Sanborn had the right to assign additional projects to its employees.  And, Sanborn's long-time employees created and updated Sanborn maps.  SF ¶¶ 118.  Sanborn approved the locations where work could take place as well as whether an employee could take on additional work.  SF ¶ 112.  Employees even assisted with Sanborn's customer service.  SF ¶ 126. This factor weighs strongly in Sanborn's favor.  *Aymes*, 980 F.2d at 863.

- Job titles of Sanborn employees included "Drafter," "Paster," "Field Supervisor," "Field Surveyor," "Cartographer," and "Map Finisher," and on-site visual physical inspections required minimal training.  SF ¶ 123.  To the extent some of these are deemed "highly skilled," they may be found to be employees where, as here, the other most significant *Reid* factors weigh in favor of such finding.  *Martha Graham*, 380 F.3d at 641-42. [22]

---

[22]The other *Reid* factors also favor Sanborn.  The source of the instrumentalities and tools and location of the work favors Sanborn because it maintained materials, equipment and tools at the Pelham Facility  SF ¶ 115.  The duration of the relationship between the parties factor is also favorable because Sanborn employed long-time employees.  SF ¶ 57.  The extent of the hired party's discretion over when and how long to work and the method of payment factors are also favorable since Sanborn fixed the hours and days when work would take place and paid its employees' salaries and hourly wages, among other compensation.  SF ¶¶ 125, 127.  The hired party's role in hiring and paying assistants favors Sanborn because it, not its employees, hired and paid assistants, including researchers, admin support, a statistician, clerks, a receptionist, and secretaries.  SF ¶ 124.  Whether the work is part of the regular business of the hiring party and whether the hiring party is in business favor finding that the hired parties were employees: since 1875, Sanborn has been in the business of creating, revising, manufacturing, and selling Sanborn maps.  SF ¶ 28.  The case cited by ERIS, *Waite v. UMG Recordings, Inc.*, No. 19-cv-01091 (LAK), 2023 WL 1069690 at *3, 8-12 (S.D.N.Y. Jan. 27, 2023) was in the context of a Fed. R. Civ. P. 23 motion for class certification that raised "artist specific" questions for the proposed class members where they were arguing that song recordings were not works for hire.  Here, the registration

2.      The pre-1978 maps are works made for hire under the 1909 Act.

"In determining whether a work is a work for hire under the 1909 Act, [the Second

Circuit] ha[s] generally applied the 'instance and expense' test." *Martha Graham*, 380 F.3d at

634. "A work is made at the hiring party's 'instance and expense' when the employer induces

the creation of the work and has the right to direct and supervise the manner in which the work is

carried out." *Id.* This test is easily satisfied here. Sanborn was in the business of creating,

revising, manufacturing, and selling Sanborn maps. SF ¶ 28. Just like the Post-1978 maps, the

Pre-1978 maps were made by Sanborn employees within the scope of their employment, in

furtherance of Sanborn's business interests, and under Sanborn direction and supervision. The

employees were paid by Sanborn and not paid royalties. SF ¶ 127; *Playboy Enters., Inc. v.*

*Dumas*, 53 F.3d 549, 555 (2d Cir. 1995)*, cert. denied,* 516 U.S. 1010, 116 S. Ct. 567, 133 L. Ed.

2d 491. Given this, the presumption of validity, and the fact that ERIS does not challenge the

Pre-1978 maps, the Court should find they are works for hire.

**C.      Copyright Notice on all 6,162 Asserted Works is Proper**

Each of the 6,162 asserted works has an associated certificate of registration or renewal

(SF ¶¶ 129-131), entitling Sanborn to a presumption that each bore proper notice.[23] *See supra* p.

2. Nevertheless, ERIS argues that "a number" do not have proper notice and, thus, copyright is

either invalid or the works have fallen into the public domain. Br. at 26; EF ¶103.

ERIS' motion does not adequately identify which works it is challenging, in violation of

Fed. R. Civ. P. 56(a) and (c)(1). Instead, ERIS refers the Court to MacLean Ex. 5[24] and asks it to

---

certificates state that the Sanborn maps are works for hire and that Sanborn is the author, and there are no class action specific issues.

[23] Sanborn respectfully requests that the Court take judicial notice of the registration and renewal certificates for each of the 6,162 asserted works. SF ¶ 130; *see* Sanborn's Request for Judicial Notice.

[24] MacLean Ex. 5 is a schedule ERIS provided in response to Sanborn's Seventh Set of Interrogatories on May 2, 2022.

filter multiple columns to figure out which works are challenged. Not only is MacLean Ex. 5 disorganized and confusing, it is outdated and includes works that Sanborn is no longer asserting. As best as Sanborn can divine, ERIS challenges 850 out of the 6,162 asserted works, (SF ¶¶132-134, 140, 152, 158, 165, 169), as follows:

|  | Total Asserted Works | Total Challenged Works: Improper Notice | Challenged Works: Notice on Correction Slips | Challenged Works: Omitted Notice | Challenged Works: Missing Pages | Challenged Works: Dispersed or Illegible Notice |
|---|---|---|---|---|---|---|
| **Total** | 6,162 | 850 | 820 | 636 | 29 | 156 |
| **1909 Copyright Act** | 5,907 | 694 | 689 | 532 | 29 | None |
| **1976 Copyright Act** | 168 | 156 | 131 | 104 | None | 156 |

ERIS' motion is also defective because it proffers only 2 works in full, 10 excerpts of works, and 4 excerpts of Sanborn maps that are not asserted all. ERIS does not explain how any findings on these exemplary works apply to the other 838 challenged works. Evidence of omitted or improper notice on one work cannot support the same finding on another, different work. *See Nat'l Comics Publs., Inc. v. Fawcett Publs., Inc.*, 191 F.2d 594, 599 (2d Cir. 1951).

    1.    <u>820 works are not separate publications that require separate notice.</u>

ERIS challenges 820 works because their correction slips purportedly do not bear proper notice. SF ¶ 134; Br. at 26. Correction slips are slips of paper that depict, among other things, new map attributes applied on top of outdated map attributes, like a sticker, in the course of updating each map. SF ¶¶ 138-139. However, ERIS proffers only 2 exemplary works with correction slips. EF ¶105; SF ¶¶ 135-137; SCF ¶¶ 105. One work is subject to the 1909 Act and the other to the 1976 Act. Both works have proper notice, listing the required elements and proper placement in accordance with the relevant Act. *Id*.

ERIS argues that each correction slip is a separate publication for notice purposes.[25]  Br. at 26.  This is incorrect.  The copyrighted work, *i.e.*, the map book as a whole, is one publication that requires one notice.  *Lydiard-Peterson Co. v. Woodman*, 204 F. 921, 924-25 (8th Cir. 1913) (finding that a directory along with a map included in the side pocket of the directory constitute "one publication").[26]

### 2.   For 636 Challenged Works Based on Omitted Notice, Handwritten Dates Were Not Omitted From Copies of the Asserted Works.

ERIS challenges 636 works for omitted notices, 532 of which are subject to the 1909 Act and 104 of which are subject to the 1976 Act.  SF ¶ 140.

#### a.   *532 Works Subject to the 1909 Copyright Act Did not Omit Notice*

ERIS argues that notice was required on *each* published copy of the work.[27]  Br. at 28. This ignores the statutory requirement.  Under the 1909 Act, notice is proper "[w]here the copyright proprietor seeks to comply with the provisions of this title with respect to notice[,]" even if there is "omission by accident or mistake of the prescribed notice from a particular copy or copies" of the works. 17 U.S.C. § 20 (1909); 17 U.S.C. § 21 (amended 1947).  Hence, ERIS

---

[25] Both the 1909 Act and 1976 Act require notice upon publication of the work, and accepted distribution of the work to the public as "publication." Compendium (I) at 3.1.1(II); 17 U.S.C. §§ 101, 401(a) (1976); *Patterson v. Century Productions, Inc.*, 93 F.2d 489, 492 (2d Cir. 1937).

[26] Even if the law requires divisible parts of a work to have notice because each part published separately (it does not), correction slips were not actually published separately from the map book. SF ¶¶ 138-139. As ERIS concedes, Sanborn applied the updates to the existing map books as a service to its customers. Br. at 26; SF ¶ 139.  Sanborn then returned the updated Sanborn map book, as a whole, to its customers. SF ¶ 139.  This distribution of the updated book, not the individual correction slips, to the public is "publication" under the 1909 and 1976 Copyright Acts.  The updated book is thus the "one publication" on which the notice was properly affixed. *Lydiard-Peterson*, 204 F. at 924-25.

[27] ERIS also briefly accuses Sanborn of lying to the Copyright Office.  Br. at 28.  However, self-serving incredulity by the alleged infringer is not evidence of omission of notice under either Act, particularly when the owner has provided copies of the works with valid notice. *See Gaste v. Kaiserman*, 863 F.2d 1061, 1065 (2d Cir. 1988); *Dollcraft Indus. v. Well-Made Toy Mfg. Co.*, 479 F. Supp. 1105, 1116 (E.D.N.Y. 1978).

must show that omission of the handwritten date was not "by accident or mistake" or that the date was omitted from more than "a particular copy or copies" to invalidate the copyright. *Id*.

ERIS fails to show either. ERIS did not identify a copy of any asserted work that did not have the handwritten date.[28]  Instead, ERIS compares four exemplary asserted works, which it concedes contain valid handwritten dates, to four non-asserted Sanborn maps that purportedly do not have a handwritten date.  Br. at 28-29; EF ¶110; SCF ¶¶ 109-115, SF ¶¶ 136, 141-151. These non-asserted Sanborn maps are not registered, so there is no reason to expect them to have proper notice.  Evidence of improper notice on these non-asserted maps is irrelevant as to whether there is proper notice on copyrighted maps.  *Nat'l Comics*, 191 F.2d at 599.  Moreover, even if these non-asserted Sanborn maps were somehow relevant, they would not be enough to show that more than "a particular copy or copies" omitted notice or that any omission was not due to "accident or mistake." 17 U.S.C. § 20 (1909); 17 U.S.C. § 21 (amended 1947); *Gaste*, 863 F.2d at 1065; *see also Thomas Wilson & Co. v. Irving J. Dorfman Co.*, 433 F.2d 409, 411-12 (2d Cir. 1970).

> b.   *104 Works Subject to the 1976 Act Did Not Omit Notice*

ERIS argues that notice was required on *each* published copy of the work under the 1976 Act.  Br. at 28.  Under the 1976 Act, notice is proper "if the notice has been omitted from no more than a relatively small number of copies . . . distributed to the public."  17 U.S.C. § 405(a)(1) (1976).  Thus, ERIS must show omission of notice on more than "a relatively small number of copies." *Id*.; *Dollcraft Indus.*, 479 F. Supp. at 1116; SF ¶¶ 130, 131.  ERIS proffers only one work with, as it concedes, proper notice.  Br. at 28-29; EF ¶110; SCF ¶¶ 109-115; SF ¶¶

---

[28] In fact, ERIS otherwise accepts that Sanborn consistently applied each correction slip and updated the correction record with (handwritten) initials and dates. EF ¶104.

137, 141-143, 147-151.  ERIS again compares this example to the same four non-asserted

Sanborn maps above. This comparison is equally irrelevant.  *Nat'l Comics*, 191 F.2d at 599.

And, even if the non-asserted Sanborn maps were relevant under the 1976 Act, they are not

enough to show omission on more than "a relatively small number of copies." 17 U.S.C. §

405(a)(1) (1976); *E. Mishan & Sons, Inc. v. Marycana, Inc.*, 662 F. Supp. 1339, 1343 (S.D.N.Y.

1987).

> 3.   <u>For 29 challenged works based on missing pages, none are missing, and</u>
>       <u>notice was properly affixed to the title page or page immediately after.</u>

ERIS challenges 29 works subject to the 1909 Act for missing pages.  SF ¶ 152.  ERIS

proffers 3 excerpts of works with allegedly missing pages.  EF ¶ 117.  All three works have

proper notice, with the required elements and proper placement under the 1909 Act.  SF ¶ 153-

157.

ERIS "suggests" that an additional, missing title page and at least one extra index page

preceded the page with the otherwise proper notice.  Br. at 30.  These two allegedly missing

pages would bump the placement of the notice from the title page to two pages immediately after

the title page, outside the recommended placement on the "title page or the page immediately

after."  17 U.S.C. § 19 (1909); 17 U.S.C. § 20 (amended 1947).  But, there are no missing pages.

Some maps, like the three exemplary works, were published in unbound form and do not have an

decorative title page found in bound books.  SCF ¶¶ 117; SF ¶ 154.  Contrary to ERIS'

speculation that the notice page is an "interior" page, the notice page is actually the title page,

because it has the title on it.  *See Freeman v. The Trade Register*, 173 F. 419, 424 (C.C.W.D.

Wash. 1909); *Am. Travel & Hotel Directory Co. v. Gehring Publishing Co.*, 4 F.2d 415, 415

(S.D.N.Y. 1925).

Even if pages were missing (they are not), copyright notice would nevertheless be valid. For multi-page maps or atlases, the Copyright Office recommended, but did not require, notice to be placed on the title page or page immediately after.  17 U.S.C. § 19 (1909); 17 U.S.C. § 20 (amended 1947); Compendium (I) § 4.3.6 (IV).  Indeed, the Compendium provides that notice only needs to be "readily seen."  *Id.*  Whether notice is on the first or third page, notice is apparent here.  *See Pinkham v. Sara Lee Corp.*, 983 F.2d 824, 835 (8th Cir. 1992) (citing *Fleisher Studios, Inc. v. Ralph A. Freundlich, Inc.*, 73 F.2d 276, 277 (2d Cir. 1934)).

4.    <u>For 156 challenged works based on dispersed or illegible notice, all elements are reasonably a part of the notice and are legible.</u>

ERIS challenges 156 works subject to the 1976 Copyright Act. SF ¶ 158. ERIS proffers 4 excerpts of works purportedly with dispersed notice and/or illegible notice, one of which is not asserted or listed in MacLean Ex. 5.[29]  SF ¶¶ 159-163. All four exemplary works have proper notice under the 1976 Act. *Id.*

ERIS argues notice is improper because the notice elements are "too widely separated" or dispersed. Br. at 30. The statutory requirement is not a demanding one. 17 U.S.C. § 401(c) (providing that notice shall be affixed "in such manner and location as to give reasonable notice of the claim of copyright"). Separation of elements or the presence of intervening matter does not invalidate copyright notice. *Block*, 87 F. Supp. at 53; *Ada Design Alliance, Inc. v. Renberg*, Nos. 90-35493, 1991 WL 158675, at *1 (9th Cir. Aug. 20, 1991); Compendium (II) § 1006.05.  Here, all elements are located on the same page in large letters and are arranged such that there is reasonable notice of copyright. SCF ¶¶ 119-120; SF ¶¶ 160-161.

---

[29] ERIS also seems to argue that notice is improper because of uncertainty created by the presence of earlier dates but proffers no example of such. Br. at 30. To the extent ERIS relies on this argument, ERIS misinterprets the law. Courts have found that superfluous elements do not invalidate notice. Compendium (II) § 1006.06; *Wrench v. Universal Pictures Co.*, 104 F. Supp. 374, 378-79 (S.D.N.Y. 1952); *Block v. Plaut*, 87 F. Supp. 49, 53 (N.D. Ill. 1949).

ERIS also argues that notice is too tiny and illegible. Br. at 30. Notice is improper when it is hidden or otherwise egregiously inscrutable to the naked eye. *See*, *e.g.*, *Puddu v. Buonamici Statuary, Inc.*, 450 F.2d 401, 403-05 (2d Cir. 1971). This is not the case here. ERIS has forgotten the true size of the Sanborn maps, which were printed on extra-large 21" by 25" map sheets. The purportedly illegible copyright notice language in the examples ERIS provides is about 6 point to 7.7 point font in size, all caps, italicized, and conspicuously located beneath the map scale. SCF ¶¶ 120-124; SF ¶¶ 161-163. This is not hidden or illegible. *Puddu*, 450 F.2d at 403-05.

### 5.   Copyright notice is proper as to all asserted works.

Independent of the presumption, copyright notice is valid as to all 6,162 asserted works. SF ¶ 129-130.  For the 5,907 works subject to the 1909 Copyright Act, the required notice elements are present in each work and notice is affixed to the title page or page immediately thereafter.[30]  SF ¶¶ 165-168.  For the 168 works subject to the 1976 Copyright Act, all required notice elements are present in each work and notice is affixed in such "manner and location as to give reasonable notice of the claim of copyright."[31]  17 U.S.C. §410(c); *see* Compendium (II) at § 1013.04; SF ¶¶ 169-170.  87 works subject to the 1976 Act after the implementation of the Berne Convention were not required to have copyright notice.  SF ¶ 171.  Accordingly, Sanborn's motion for partial summary judgment of proper notice for all 6,123 asserted works should be granted.

## II.   ERIS' EQUITABLE ESTOPPEL DEFENSE FAILS

"Estoppel is a drastic remedy and must be used sparingly." *Cooley v. Penguin Group (USA), Inc.*, 31 F. Supp. 3d 599, 613 (S.D.N.Y. 2014).  As an affirmative defense, ERIS bears

---

[30] Under the 1909 Copyright Act, the notice elements for Class F works, *i.e.*, maps, are "Copyright," "Copr.," or "©", and the copyright proprietor. A third element, year of publication, was optional. Br. at 8.
[31] Under the 1976 Copyright Act, the notice elements are (1) "Copyright," "Copr.," or "©", (2) the copyright proprietor, and (3) the date of publication. 17 U.S.C. § 401(b).

the burden of proving equitable estoppel by a preponderance of the evidence.  *AT&T Corp. v. Microsoft Corp.,* No. 01 Civ. 4872 WHP, 2004 WL 188078, at *1 (S.D.N.Y. Feb. 2, 2004).  "[I]n ruling on a motion for summary judgment, the judge must view the evidence presented through the prism of the substantive evidentiary burden." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 254 (1985).  ERIS must demonstrate that: (1) Sanborn had knowledge of ERIS' infringing acts; (2) Sanborn either (a) intended that ERIS rely on Sanborn's acts or omissions or (b) acted (or failed to act) in such a manner that ERIS had a right to believe that Sanborn intended ERIS to rely on Sanborn's conduct, (3) ERIS was ignorant of the true facts; and (4) ERIS relied on Sanborn's conduct to its detriment.  *ABKCO Music, Inc. v. Sagan*, 50 F.4th 309, 321 (2d Cir. 2022) (additional citations omitted)*. See also Petrella v. MGM*, 572 U.S. 663, 684 (2014).

### A.   ERIS Was Not Ignorant of Sanborn's Copyrights

Whether ERIS was ignorant of the true facts asks whether ERIS was ignorant of "[Sanborn's] claim of copyright proprietorship." *Lottie Joplin Thomas Trust v. Crown Publrs., Inc.*, 456 F. Supp. 531, 535 (S.D.N.Y. 1977). *See also Lego v. A/S v. Best-Lock Constr. Toys, Inc.*, 874 F. Supp. 2d 75, 85-86 (D. Conn. 2012) *("Lego I")*. [32]  ERIS cannot possibly feign ignorance when it repeatedly and consistently acknowledged the existence of Sanborn's rights and the possibility that Sanborn might enforce them.

First, ERIS was aware that Sanborn claimed copyright and would need Sanborn's permission to exploit Sanborn maps under copyright. *See* SF ¶¶ 178-203; 216-223; 228; 231-238. ERIS was made aware of this as early as 2010 when it hired a former EDR employee as a

---

[32] ERIS argues that it "did not know of the 'true fact' that EDR believed ERIS' conduct was unlawful and would file suit," but that is not the correct inquiry.  Rather, "the weight of authority suggests that" a defendant knows of the "true facts" when they simply become aware of the copyrights at issue.  *See Lego I*, 874 F. Supp. 2d at 85–86 (collecting cases).  Nevertheless, as described below, ERIS was also aware that Sanborn could and would file suit at any time.  SF ¶¶ 226-238, 252-254.

consultant. SF ¶¶ 183-185 .  Before purchasing the UPA collection, ERIS asked whether permission was necessary to resell the maps. SF ¶ 182  ERIS was warned to obtain a license from Sanborn. SF ¶¶ 183-185.  Prior to making the purchase, ERIS even acknowledged that it would need "a letter stipulating [*sic*] the use of maps." SF ¶ 186.  It never received one. SF ¶¶187-188.  In 2011, **after** agreeing to purchase another collection of approximately 660,000 Sanborn maps on microfilm from EDR's licensee, ProQuest, ERIS signed a document acknowledging that it did not receive a license.  SF ¶ 203.  Instead, ERIS was informed that its ability to use the maps would be dictated by copyright law.  *Id.*  In other words, ERIS agreed not to violate the law.  *Id.*  In 2013, Sanborn explicitly warned ERIS to respect Sanborn's copyrights as it entered the U.S. market.  SF ¶¶ 235-238. It evidently did not.[33]   SF ¶ 243

Second, ERIS repeatedly acknowledged that certain maps are protected by copyright. ERIS' copyright attorney advised ERIS as early as 2010 that maps published on or after January 1, 1964 are "alive" SF ¶ 216.  ERIS was reminded of that advice again in 2018.  SF ¶ 216.  ERIS also acknowledged that "depending on the years, [Sanborn] may have some copyright privilege." SF ¶ 219.  Despite this, ERIS sold all maps it could get its hands on.  SF ¶ 234

Third, ERIS repeatedly acknowledged that it was infringing and recognized the risk of litigation.  The record on this is extensive.  SF ¶¶ 226-233.  For example: (1) in 2013, ERIS told the FTC that "*ERIS continues to have concerns of potential legal action by EDR*"; (2) also in 2013, ERIS' president observed that "*there could be some litigation coming our way*"; (3) in 2017, ERIS acknowledged that "*all they need to do is register to sue us*"; (4) in 2017, ERIS

---

[33] Even in the absence of such facts, courts consistently hold that the existence of a copyright notice may suffice to defeat an equitable estoppel defense because a notice charges a party with constructive knowledge.  *See Lego I,* 874 F. Supp. 2d, at 85; *Pavlica v. Behr,* 397 F. Supp. 2d 519, 527 (S.D.N.Y. 2005). *See also* 17 U.S.C. § 401(d).  As discussed, the asserted maps were affixed with notice.  SF ¶¶ 164-171.

remarked "[t]here has *always been a degree of risk . . . [w]e kind of took a leap of faith that it would be alright . . . .* Technically, *EDR can come after us*"; (5) in 2018, ERIS' president also remarked, "I remember that when we bought the collection, *we weighed the risk* and decided *we had enough going for us to make it difficult* for [EDR] . . . So we went ahead. . . . *I guess we carry on and see what happens*." (6) also in 2018, in the context of discussing ERIS' efforts to fill gaps in its map collection by secretly copying maps at libraries, ERIS observed, "[w]e obviously want to make sure we aren't pushing [the libraries] too hard, *just in case EDR comes back at us with a lawsuit*, on the other hand we need these maps." SF ¶¶ 226-233, 254 (emphasis added). ERIS simply assumed that Sanborn Library would not "bother" because proving infringement is "so onerous." *Id.*

There is thus no genuine issue that ERIS was not ignorant of the true fact that Sanborn claimed to be the copyright owner, that certain of the maps were protected by copyright, and that ERIS could be sued at any time.  ERIS' estoppel defense should be dismissed based on this alone.  *See, e.g.*, *Pavlica v. Behr*, 397 F. Supp. 2d 519, 527 (S.D.N.Y. 2005); *Tolliver v. McCants*, 684 F. Supp. 2d 343, at 349 (S.D.N.Y. 2010).

**B.      There Was No Justifiable Reliance on Sanborn's Conduct or Inactions**

ERIS cannot be heard to complain that it relied on conduct or inaction by Sanborn or that it "believed," improvidently, that Sanborn "was bluffing."  "Reliance is not justifiable if the party invoking estoppel had the means by which with reasonable diligence [it] could acquire the knowledge so that it would be negligence on [its] part to remain ignorant by not using those means." *AP v. Meltwater U.S. Holdings, Inc.*, 931 F. Supp. 2d, 537, 565 (S.D.N.Y. 2013)

(quoting *In re Becker*, 407 F.3d 89, 99 (2d Cir. 2005)).  *See also Hampton v. Paramount Pictures Corp.,* 279 F.2d 100, 104-05 (9th Cir. 1960).

ERIS always had the means to inquire with Sanborn.[34]  As ERIS concedes, it chose not to based on its view that "the maps were [not] copyrightable or copyrighted." SF ¶ 223.  That supposed belief stands in contrast to what ERIS now claims: it did make the inquiry because it secured very limited advice from an attorney, obtained "a license" from ProQuest, and responded to Sanborn's warning letter in 2013.

ERIS acknowledged, internally, that its attorney's advice was not "thorough" and that it only covered a portion of the ProQuest collection through the 1950s.[35]  ERIS could not have reasonably relied on this advice to bless its ability to sell all of the copyrighted maps, much less those (1) created after that point, (2) from the UPA collection or (3) covertly collected from local libraries, when its attorney's advice did to address any of these maps  SF ¶¶ 204-220.  In addition, ERIS' major investments – the purchase and digitization of the LexisNexis and ProQuest collections – occurred long before Sanborn's 2013 warning letter and ERIS' alleged response.  SF ¶ 190, 194; EF ¶ 242, 266.  ERIS could not have detrimentally relied on this correspondence when these investments had already occurred.  *See Tolliver,* 684 F. Supp. 2d, at 350.  Moreover, ERIS could not have reasonably relied on the ProQuest agreement because it explicitly states that ERIS would not be receiving a license at all and could only use the maps to the "extent allowed under applicable copyright law."  SF ¶ 203.  In fact, ERIS did not rely on it:

---

[34] Ironically, ERIS  claims that it solicited a separate license from Sanborn for city directories in 2014.  It also regularly procured licenses for other software and data.  SF ¶¶ 274

[35] In conjunction with that advice, ERIS' attorney testified that neither he nor his law firm performed any manual searches of the registration or renewal records on file with the Library of Congress.  SF ¶ 213. Instead, he hired an outside vendor to research the copyright registration status for a "discrete" number of works, *i.e.*, approximately "15 to 17" works out of the many thousands of asserted registrations and the hundreds of thousands of maps in the ProQuest collection. SF ¶ 242.

its attorney never cited the document in his written opinion or in responding to Sanborn's warning. SF ¶¶ 211-212; EF ¶ 290.

The same is true for the 2013 letter from ERIS' attorney, allegedly sent by facsimile to Sanborn's parent company, DMGI.  Neither Sanborn nor DMGI have any record of receiving this letter.  SF ¶ 240.  Nor did they expect to: DMGI's letter was not a "cease and desist letter" – it did not allege that ERIS was infringing and did not call for a response.  SF ¶ 239.  It merely warned ERIS to respect Sanborn's copyrights as it entered the market.  Such a warning letter regarding future infringement is insufficient to trigger an equitable estoppel defense.  *See, e.g., Pavlica v. Behr*, 397 F. Supp. 2d 519, 523-24 (S.D.N.Y. 2005); *Hemstreet v. Computer Entry Sys. Corp.*, 972 F.2d 1290, 1292 (Fed. Cir. 1992); *Meyers v. Asics Corp.*, 974 F.2d 1304, 1308 (Fed. Cir. 1992).  Regardless, ERIS could not have reasonably relied on any non-response because ERIS did not know whether Sanborn received the letter (it did not) or that its silence reflected Sanborn's acquiescence. [36]  *See Cherry River Music Co. v. Simitar Enm't, Inc.*, 38 F. Supp. 2d 310, 319 (S.D.N.Y. 1999).

Even if ERIS justifiably relied on each of these things in 2013, they do not explain why ERIS was so concerned about a lawsuit years later. [37] SF ¶¶ 228-233, 252-254.  Evidently, there was no reliance at all. Instead, ERIS' own internal documents reveal that while ERIS knew it faced liability, it assumed that Sanborn would not "bother" to bring a claim because it is "so

---

[36] In fact, the fax cover sheet that accompanied the response does not even reference Sanborn or ERIS, but instead discusses a patent prosecution matter for an unrelated client of ERIS' attorney. SF ¶ 242.

[37] ERIS' throwaway "evidentiary prejudice" argument rings hollow.  ERIS does not argue that it relied on anything Mr. Walker told Ms. Le Noury in 2014 and ERIS' documents do not indicate that either. Despite that exchange, ERIS feared litigation in the ensuing years.  SF ¶¶ 228-233, 252-254. Moreover, ERIS makes no attempt to explain how it has suffered evidentiary prejudice, other than to speculate. ERIS must go "beyond merely incanting generalized claims of lost witnesses and faded memories" and "state exactly what particular prejudice it suffered."  *Cornell Research Found., Inc. v. Hewlett-Packard Co.*, No. 5:01–CV–1974 (NAM/DEP), 2007 WL 4349135, *43 (N.D.N.Y. Jan. 31, 2007).

onerous" and because ERIS could "make it difficult" for Sanborn to enforce its copyrights.  SF ¶ 229.  Here too, in the years that followed DMGI's warning letter, ERIS could have inquired with Sanborn before making further investments in its business.  It just chose not to.  Any detrimental reliance was entirely of ERIS' own making.

Significantly, ERIS does not point to any documents indicating that it relied on any conduct or inaction by Sanborn, other than to rely on self-serving witness statements drafted long after the fact.  Its own documents confirm this was a business decision (SF ¶¶ 202, 231-232), which cannot constitute detrimental reliance.  *Hemstreet,* 972 F.2d, at 1294-95; *Gasser Chair Co. v. Infanti Chair Mfg. Corp.,* 60 F.3d 770, 776 (Fed. Cir. 1995).  It was ERIS who bore the risk.  *See, e.g., Cooley v. Penguin Grp. (USA) Inc.*, 31 F. Supp. 3d 599, 613 (S.D.N.Y. 2014) (granting summary judgment dismissing estoppel defense because "[t]he party asserting estoppel must use due care and not fail to inquire as to rights where that would be the prudent course of conduct.").

### C.    Sanborn Was Never Silent and Did Not Make Any Misrepresentations

The second element of the estoppel defense requires that Sanborn "either intended that [ERIS] rely on [its] acts or omissions or acted or failed to act in such a manner that [ERIS] had a right to believe that it was intended to rely on [Sanborn's] conduct." *Dallal v. New York Times Co.*, No. 05-2924, 2006 WL 463386, at *1 (2nd Cir. 2006).  In other words, ERIS must show that it had a right to believe (or that Sanborn intended for ERIS to believe) that it could use the Sanborn maps, or that it would not be sued for doing so.  To satisfy this element, ERIS must point to an intentionally misleading representation by Sanborn to ERIS suggesting that ERIS was authorized. *Petrella*, 572 U.S., at 684.  Silence or inaction, standing alone, is rarely enough and must be coupled with a legal or contractual relationship or explicit overt act. *See, e.g., Meltwater*, 931 F. Supp. 2d at 565; *Aukerman,* 960 F.2d, at 1042.

37

Here, there is no evidence of misleading representations. The only written representation Sanborn made to ERIS regarding the maps was the 2013 letter in which Sanborn warned ERIS not to infringe, and specifically reserved its right to take action "against anyone who infringes." SF ¶ 238. The 2013 letter could not have reasonably been construed as consent. The only other interactions that ERIS points to also could not have served as a permission slip to infringe. First, ERIS relies on a 2013 interaction between employees of ERIS and Sanborn at an ASTM conference. But during that interaction, it was ERIS who assured Sanborn that it hired an attorney to ensure that it was operating within the bounds of the law by not using any Sanborn maps under copyright. EF ¶¶ 283-284. The only apparent misrepresentations were those made by ERIS, who gave Sanborn false assurances that it was respecting Sanborn's copyrights. Regardless, following that interaction, Sanborn reiterated its request that ERIS do so. SF ¶¶ 235-238. Second, ERIS could not have relied on 2014 discussions between DMGI and ERIS regarding a potential business transaction. As ERIS admits, those discussions had nothing to do with Sanborn maps at all and the maps were not discussed. EF ¶ 308. Thus, Sanborn could not have misstated its intentions during these discussions, and ERIS has not come forward with any evidence indicating that ERIS believed it was authorized in the wake of them. *See Meltwater*, 931 F. Supp. 2d, at 565 ("Meltwater has not offered any evidence that it actually held the belief that AP had authorized it to publish the excerpts it took").

Absent any affirmative representations, ERIS must rely on Sanborn's silence. But, Sanborn was never silent about its rights, including during the alleged period of inaction. As ERIS complains, Sanborn openly touted the existence of its rights as part of a "███████ ███████" EF ¶ 212. In ERIS' telling, Sanborn "has widely stated, including via advertisements, its websites, and statements to customers and potential customers, that the copyrights in the

Sanborn maps are valid, subsisting, and owned by Sanborn . . . to keep competitors such as ERIS out of the market."  ECF 153 ¶ 57; *see also* ECF 153, Ex. A ; ¶¶ 126-28.  Even though Sanborn did not sue until 2019, Sanborn was hardly silent. [38]

### D.    ERIS' Extensive, Willful Copying Tip the Equities in Sanborn's Favor

Even if ERIS were to satisfy its burden on all four elements, courts must consider "all pertinent factors" and "any other evidence and facts respecting the equities of the parties in exercising its discretion and deciding whether to allow the defense of equitable estoppel to bar the suit."  *Aukerman*, 960 F.2d, at 1043.  One such factor is whether the infringer "has engaged in particularly egregious conduct which would change the equities significantly in plaintiff's favor.  *Gasser Chair Co*., 60 F.3d, at 775.  As ERIS' own cited case acknowledges, courts decline to find equitable estoppel where "a defendant is guilty of egregious conduct such as copying or willful infringement." *Aspex Eyewear, Inc.*, 2008 WL 5049744, at *12 (citing *Wafer Shave Inc. v. Gillette Co.*, 857 F. Supp. 112, 119 (D. Mass. 1993)).  *See also Sprint Communs. Co. L.P. v. Time Warner Cable, Inc.*, No. 11-2686-JWL, 2017 WL 978107, at *7 (D. Kan. Mar. 14, 2017).  It is undisputed that ERIS engaged in extensive, verbatim copying and the evidence

---

[38] To transform silence into an affirmative misrepresentation, there must be an affirmative duty to speak because of some pre-existing legal or contractual relationship between the parties, or because of an overt act, neither of which exist here. *See Clear Channel Outdoor, LLC v. City of New Rochelle*, No. 20-cv-9296 (NSR) (AEK), 2022 WL 17249412, (S.D.N.Y. Nov. 28, 2022); *DeCarlo v. Archie Comic Publ'ns, Inc.*, 127 F. Supp. 2d 497, 510-511 (S.D.N.Y. 2001). Also, where silence is preceded by correspondence between the parties, such correspondence must contain a "vigorous or immediate" threat of enforcement, which also does not exist here.  *See Hottel Corp. v. Seaman Corp.*, 833 F.2d 1570, 1574 (Fed. Cir. 1987). ERIS' own cited cases are not to the contrary.  *See, e.g.*, *Aukerman*, 960 F.2d, at 1042 ("plaintiff's inaction must be combined with other facts respecting the relationship between the parties. . ."); *Byron v. Chevrolet Motor Div. of Gen Motors Corp.*, No. 93 CIV. 1116 (AJP), 1995 WL 465130, at *9 (S.D.N.Y. Aug. 7, 1995) (plaintiff sent two "cease and desist" letters, the second of which threatened to initiate an infringement suit if no response was received within 48 hours); *Aspex Eyewear, Inc. v. Clariti Eyewear, Inc.*, No. 07 Civ. 2373(DC), 2008 WL 5049744, at *5-6 (S.D.N.Y. Nov. 26, 2008), *aff'd*, 605 F.3d 1305 (Fed. Cir. 2010) (plaintiff sent letters declaring its "policy and intention to 'fully and vigorously enforce'" its rights, and "characteriz[ing] the matter as 'very urgent and serious.'").  *See also Advanced Hydraulics, Inc. v. Otis Elevator Co*., 525 F.2d 477, 481 (7th Cir. 1975) (plaintiff's counsel sent a letter threatening "immediate legal action, if [defendant] sent no reply within 20 days.").

shows that it did so without regard for, and in spite of, Sanborn's copyrights.  As ERIS concedes, it "took a leap of faith" in choosing to ignore Sanborn's warnings. SF ¶ 231. In view of ERIS' egregious, sweeping infringement, the scales of equity must tip, decidedly, in Sanborn's favor and ERIS' Ninth Defense must be dismissed.

## III.    ERIS VIOLATED THE DMCA

### A.    ERIS Violated Section 1202(a) by Falsifying CMI

1.    ERIS' "distinct" derivative work argument lacks statutory and evidentiary support and is not recognized by the Second Circuit or any circuit court.

ERIS claims that Second Circuit law shields it from liability under Section 1202(a) because the CMI at issue – which is unquestionably false on its face – relates to "distinct" derivative works created by ERIS.  But that is not the law of this Circuit or any other circuit.  And even if it were, ERIS makes no attempt to explain how its FIM Reports – which consist entirely of Sanborn maps – are derivative works in the first place.

Instead, ERIS overstates disparate district court decisions that have been roundly criticized for the exception's complete lack of statutory support, and perhaps worse, by blithely ignoring the CMI that is actually at issue here.  That CMI relates not to "distinct" works at all, but "*Individual* Fire Insurance Maps." EF ¶ 182 (emphasis added).  The CMI violates Section 1202(a) not simply because ERIS associates its name with the maps, but because ERIS imposes terms and restrictions on the use of maps, including a license, which it knows it cannot grant.  Thus, the exception that ERIS advocates for does not even apply in this case.  A close reading of ERIS' cited cases, the CMI, and the ERIS FIM Reports exposes each of these fallacies.

*First*, ERIS relies on a smattering of district court cases to argue that the act of associating one's name with a "distinct" derivative work does not amount to a Section 1202(a) violation.  As ERIS concedes, all of those cases concern the act of affixing one's *name* to an infringing derivative work. *See, e.g.*, *Crowley v. Jones*, 608 F. Supp. 3d 78, 91 (S.D.N.Y. 2022);

40

*Michael Grecco Prods. v. Time USA, LLC*, No. 20 Civ. 4875 (NRB), 2021 WL 3192543

(S.D.N.Y. July 27, 2021); *Jeehoon Park v. Skidmore, Owings & Merrill LLP*, No. 17-cv-4473

(RJS), 2019 WL 9228987, at *11 (S.D.N.Y. Sept. 30, 2019); *Faulkner Press LLC. v. Class

Notes, LLC.*, 756 F. Supp. 2d 1352, 1359 (N.D. Fla. 2010).[39]  None involve the use of **terms and

conditions language** purporting to license infringed works to end-users.  And none involve

wholesale copying, like the kind that occurred here.

    ***Second,*** the Northern District of Florida decision that apparently created the exception,

*Faulkner*, which ERIS cites at n.23, provides no statutory basis for the exception.  Instead, the

opinion perfunctorily concludes that by affixing the defendant's name to an infringing derivative

work (*i.e.*, packages of class notes summarizing plaintiff's lectures transcribed by hand), nothing

was falsified.  *See Faulkner Press, LLC v. Class Notes, LLC*, 756 F. Supp. 2d at 1352, 1359-60

(N.D. Fla. 2010).  That case hardly stands for the proposition that all "distinct" derivative works

are immune from a Section 1202 violation for all categories of CMI, and its foundation is

questionable.

    The same is true for *Park*, the first Southern District decision to cite *Faulkner*'s "distinct"

derivative work exception favorably, albeit in the context of a motion to dismiss.  That case

made no attempt to analyze *Faulkner's* rationale and did not attempt to tie the "distinct"

derivative exception to the language of Section 1202.  Instead, it merely found *Faulkner* "to be

persuasive" and then, without explanation, relied on that case to conclude that the act of

associating the defendant's name with the accused work – the completed One World Trade

Center skyscraper – was not a DMCA violation because One World Trade Center is

---

[39] A fourth case cited by ERIS did not even involve a falsification claim, but rather a removal claim under Section 1202(b), and held only that the particular CMI at issue – a plaintiff's product name "Fischer's Bee-Quick" buried in ad copy was not CMI.  *Fischer v. Forrest*, 968 F.3d 216 (2d Cir. 2020).

"unquestionably distinct" from the plaintiff's model façade of a similar, but not identical, skyscraper. *Park v. Skidmore*, No. 17-cv-4473 (RJS), 2019 WL 9228987, at *11 (S.D.N.Y. Sept. 30, 2019).[40]

    ***Third***, district courts that have scrutinized *Faulkner* and its progeny have all reached the conclusion that no statutory basis exists for the "distinct" derivative work exception to Section 1202. As one court aptly noted:

> Even the faintest scrutiny unravels the defendants' attempts to argue by analogy to these cases. Neither *Fischer* nor *Faulkner Press* nor any of the other cases cited by the defendants stands for the broad proposition that derivative or collaborative works are categorically excluded from protection . . . . Indeed, the "original work" language on which the defendants precariously rest their entire argument does not even appear in the statute.

*GC2 Inc. v. Int'l Game Tech*, 391 F. Supp. 3d 828, 833-34 (N.D. Ill. 2019).[41]

    This conclusion is supported by a plain reading of the statute. ERIS baldly asserts that the exception is grounded in Section 1202(c)'s definition of CMI, which references "copies." The same argument was rejected in *Huffman* and *ADR* for its lack of support. *Huffman,* 2020 WL 8678493, at *12; and *ADR Int'l Ltd.*, 2023 WL 2719446, at *8-9. Section 1202(c) merely states that to qualify as CMI, first, it must fall into one of the categories of "information" found in Section 1202(c)(1)-(8) and second, it must be "conveyed in connection with copies . . . of a

---

[40] The other two district court cases on which ERIS relies, *Time USA* and *Crowley*, are just as flawed and just as off-point. Neither case questioned *Park's* rationale and both presumed it was sound. *See Time USA,* No. 20 civ. 4875 (NRB), 2021 WL 3192543, at *5; *Crowley v. Jones*, 608 F. Supp. 3d 78, 90-91 (S.D.N.Y. 2022). Indeed, *Time USA* simply referenced *Park* in *dicta* as an alternative basis for dismissal, but ultimately dismissed the DMCA claim for a different reason: the use at issue was explicitly covered by the parties' existing license agreement. *Time USA*, 2021 WL 3192543, at *5. Neither case was concerned with wholesale copying of unaltered works made available pursuant to terms and conditions language.

[41] *See also ADR Int'l Ltd. v. Inst. for Supply Mgmt., Inc.*, No. 4:22-CV-01914, 2023 WL 2719446, at *12 (S.D. Tex. Feb. 24, 2023), *report and recommendation adopted*, 2023 WL 2719446 (S.D. Tex. March 30, 2023); *Huffman v. Activision Publ.*, No. 2:10-cv-00050-RWS-RSP, 2020 WL 8678493, at *12 (E.D. Tex. Dec. 14, 2020), *report and recommendation adopted*, *Huffman v. Activision Publ'g*, No. 2:19-cv-00050-RWS-RSP, 2021 WL 2141352 (E.D. Tex. May 26, 2021).

work . . . ."  17 U.S.C. § 1202(c); *see also* 17 U.S.C. § 101.  Section 1202(c) does not state that

the copy in question must be a plaintiff's work, a defendant's work, derivative, or even distinct.

Indeed, Section 1202(c) is totally silent as to the source of the "copies" in question.

      **Fourth**, even if ERIS was correct about Section 1202(c) – that it is limited to "copies" of

works by a plaintiff and does not apply to "distinct" derivative works – lest there be any doubt,

ERIS conveyed the CMI in connection with copies of **Sanborn's** works, **not ERIS'**, and there is

no genuine issue that those works were copied verbatim.  EF ¶¶ 189, 191. Moreover, ERIS

makes no attempt to explain how or why its FIM Reports should qualify as distinct "derivative

works" under Section 101.  To constitute a derivative work, ERIS must show that it "recast,

transform[ed], or adapt[ed]" the Sanborn maps, such that ERIS' contributions "represent an

original work of authorship," *i.e.,* that the contributions, themselves, are independently

copyrightable.  17 U.S.C. § 101.  *See also Woods v. Bourne Co.,* 60 F.3d 978, 990 (2d Cir.

1995)*.*  ERIS' conduct does not give rise to the creation of a distinct derivative work because it

was akin to tearing tens of thousands of pages out of books, photocopying or scanning them, and

in some cases, taping them together in sequential order, without any alteration or modification

whatsoever to the original expression.  EF ¶¶ 189, 191, 194, 196.  As ERIS admits, its FIM

Reports "consist primarily of" Sanborn maps.  EF ¶ 169.  ERIS further admits (Br. at 45) that in

order to prepare them, it merely "excerpt[s]" the maps and "compiles" them "into a single

document" based on geographic proximity to a customer's target property.  *See* EF ¶ 174-176.

There is nothing creative about what ERIS does.  *See generally Durham Industries, Inc. v. Tomy

Corp.*, 630 F.2d 905, 910 (2d Cir. 1980); *Matthew Bender & Co. v. West Publ. Co.*, 158 F.3d

693, 699 (2d Cir. 1998); *Peter Mayer Publrs. v. Shilovskay*, 11 F. Supp. 3d 421, 426-27

(S.D.N.Y. 2014).

**Finally**, ERIS' derivative work exception does not apply for the simple fact that the particular CMI at issue does not refer to ERIS' FIM Reports or ERIS generally, but to the specific Sanborn maps sold to ERIS customers.  It is undisputed that every FIM Report distributed by ERIS contains the following disclaimer:

> Individual Fire Insurance Maps for the subject property and/or adjacent sites are included with the ERIS environmental database report to be used for research purposes only and cannot be resold for any other commercial uses other than for use in a Phase I environmental assessment

EF¶ 182 (the "FIM Report CMI").  Further, the CMI is unquestionably false on its face.  ERIS has no authority to grant end-users permission to resell the individual maps for commercial purposes as part of a Phase I environmental site assessment or to restrict their use in other commercial contexts.  Yet, this CMI purports to do both.  These "terms and conditions" are a protected category of CMI under Section 1202(c)(6) and they are false.  *See generally Pierson v. Infinity Music & Entm't, Inc.*, 300 F. Supp. 3d 390, 395 (D. Conn. 2018).

It is also undisputed that each FIM Report is delivered together with a database report, as part of the overall report package order provided to customers.  SF ¶ 159.  This CMI does not purport to relate to separate distinct works, but to each of the individual components within the report, each of the accompanying "Report(s)" (plural, inclusive of the FIM Reports), and the "data used in" each of these "Report(s)" (*e.g.*, the Sanborn maps).  EF ¶165, 166; SF ¶ 154, 159, 162, 164.  That language, which qualifies as CMI under Section 1202(c)(3) and (6), states:

> This Service and Report(s) are protected by copyright owned by ERIS Information Inc. Copyright in data used in the Service or Report(s) (the "Data") is owned by ERIS or its licensors. The Service, Report(s) and Data may not be copied or reproduced in whole or in any substantial part without prior written consent of ERIS.[42]

---

[42] The Database Report CMI imposes additional terms that are false.  For example, it warns that "Using this Service and/or its reports in a manner contrary to this Notice . . . will be in breach of copyright and contract and ERIS may obtain damages for such mis-use, and gives ERIS the right . . . to rescind your

EF ¶ 157 (the "Database Report CMI").  ERIS knows that certain of the Sanborn maps are

protected by copyright.  SF ¶ 173.  ERIS also knows that it is not the Sanborn map copyright

owner.  SF ¶¶ 173, 183, 185, 204.  ERIS has repeatedly been informed that Sanborn is the

copyright owner and faces copyright liability.  SF ¶¶ 178, 231-233, 237-238, 252-254.  ERIS

admits that it never sought or obtained a license from Sanborn. SF ¶ 185, 223.  Thus, ERIS

cannot possibly make the copyright statements contained in the disclaimer and cannot impose

restrictions on the use of "Data" – like Sanborn maps – or condition their use on the prior written

consent of ERIS.  This too is false.

> 2.    <u>The record is replete with evidence that ERIS had the requisite scienter.</u>

ERIS also makes no attempt to confront the deluge of evidence that unquestionably

demonstrates scienter.  Despite knowing that the CMI contents are false, ERIS nevertheless

distributed the CMI to customers with the intent of enabling, facilitating or concealing an

infringement.  This is all that is required to trigger a Section 1202(a) violation.  *Ward v. Nat'l

Geographic Soc.*, 208 F. Supp. 2d 429, 449 (S.D.N.Y. 2002).

ERIS asks this Court to find that no genuine issue exists with respect to scienter, but to do

so would require it to set aside an extensive evidentiary record.  ERIS' attempt to introduce self-

serving contradictory witness declarations to explain-away or deflect the evidence undermines its

own credibility and is improper, especially when knowledge and intent are inherently subjective,

and turn on witness credibility.  *Pierson*, 300 F. Supp. 3d at 396 (quoting *ITC Ltd. v. Punchgini,

Inc.,* 482 F.3d 135, 150 (2d Cir. 2007)); *see Quinn-Nolan v. Schulte, Roth & Zabel*, No. 00 CIV.

---

license to any previous reports."  EF ¶23.  In other words, the Database Report CMI warns customers that
ERIS can sue them for infringement, even though ERIS knows it does not own the copyrights for any of
the Sanborn maps in its reports (and certainly not for any maps that lapsed into the public domain).

7936(SHS), 2002 WL 1758920, at *5 (S.D.N.Y. 2002) (citation omitted) ("Plaintiff cannot

manufacture an issue of fact to defeat summary judgment by contradicting herself.")  For this

reason, such determinations are typically reserved for the trier of fact.  *Pierson,* 300 F. Supp. 3d

at 396-397;  *Iconics, Inc. v. Massaro*, 192 F. Supp. 3d 254, 273; *Petersen v. Diesel Power Gear*

*LLC*, No. 1:21-cv-08827 (SDA), 2023 WL 2430407, at *1 (S.D.N.Y. March 9, 2023). *See also*

*SellPoolSuppliesOnline.com LLC v. Ugly Pools Ariz. Inc.*, No. CV-15-01856-PHX-BSB, 2017

WL 6420464, at *22-23 (D. Ariz. June 9, 2017).

Based on the evidence described below – and set forth more fully in SF ¶¶ 178, 274; EF

182-184– a reasonable juror could conclude that: (1) ERIS not only had reason to know,[43] *it*

*knew*, that it does not own any Sanborn copyrights, never received a license to reproduce and

distribute copyrighted Sanborn maps, and does not have the right to grant third parties, like its

customers, permission to do the same and; (2) ERIS acted with intent to enable, facilitate and/or

conceal its own infringement (and by granting its customers a sub-license, infringement by its

customers) because it wanted to encourage, not dissuade, its customers, to buy Sanborn maps

from ERIS.

**ERIS knows that its CMI is false.**  Despite the claims made in the FIM Report CMI and

Database Report CMI, ERIS knows that it does not own or have a license to distribute, or

authorize others to distribute, any of the copyrights.  The evidence on this point is extensive.

*See, e.g.*, SF ¶¶ 178-274.  For example,

- ERIS knew that Sanborn controlled the copyrights.  SF ¶¶ 261, 219, 228, 231 It was
  warned to obtain a license but never did. SF ¶ 183.

---

[43] Willful blindness can serve as a proxy for knowledge.  *See, e.g., Viacom Int'l, Inc. v. YouTube, Inc.,*
676 F.3d 19, 34–35 (2d Cir. 2012) (quoting *Tiffany (NJ) Inc. v. eBay, Inc.,* 600 F.3d 93, 110 n. 16 (2d Cir.
2010) (collecting cases)).

- After buying the maps, ERIS obtained a written opinion from a lawyer, but the advice was very limited, based on a "spot check" of 15-17 maps, which ERIS acknowledged was not "thorough," and did not analyze UPA Collection. The opinion makes no mention of "fair use" or a license from ProQuest.  SF ¶¶ 204-219.

- ERIS always knew that "all [Sanborn need[s] to do is register [its copyrights] to sue [ERIS]."  SF ¶ 228.  ERIS assumed Sanborn would not "bother" because proving infringement is "so onerous."  SF ¶ 229.

- ERIS knows there "always [has] been a degree of risk . . . . We kind of took a leap of faith . . . . Technically, EDR can come after [ERIS]."  SF ¶ 231.

- ERIS  "weighed the risk and decided" it could make things "difficult for [Sanborn] to enforce copyright.  So we went ahead . . . . I guess we carry on and see what happens." SF ¶ 233.

These admissions are completely incompatible with ERIS' argument that its conduct was authorized by ProQuest or its lawyer.  An authorized licensee has no need to procure maps in secret, no need to obtain an attorney opinion, and would not fear liability, as ERIS did.  In the face of these admissions, ERIS cannot argue that it did not know its CMI was false.  ERIS knows it cannot stand in Sanborn's shoes and proclaim, as it does in its CMI, that both ERIS, its customers, and end-users are authorized to reproduce the individual maps, or impose any restrictions of any kind with respect to their use.[44]

   ***ERIS intended to enable, facilitate, or conceal an infringement***.  Second, ERIS clearly intended to distribute its FIM Reports to further enable, facilitate or conceal an infringement. Based on the evidence described above, there can be no dispute that ERIS intended to sell as many FIM Reports as possible, and intended for ERIS customers to distribute the maps to end-

---

[44] ERIS separately tries to suggest that its CMI is somehow exempt from Section 1202(c)(3) because the language imposes contractual, not copyright restrictions.  This is a red-herring.  First, Section 1202(c)(3) makes no distinction between "terms and conditions" and "copyright terms and conditions."  Second, by authorizing and restricting the resale of maps, the CMI invokes the right of reproduction and distribution, both of which are exclusive rights under Section 106.  *See* 17 U.S.C. 106.  The Database Report CMI is even more explicit, by referencing the words "copyright," "cop[ying]," and "reproduc[tion]." EF ¶ 157.

users in Phase I Environmental Site assessments. SF ¶ 24. This is all that is required to satisfy the second scienter prong. Courts do not require, as ERIS suggests, "specific intent" that the CMI enable, facilitate or conceal infringement. *See Medical Broadcasting Co. v. Flaiz*, No. Civ.A. 02–8554, 2003 WL 22838094, at *3 (E.D. Pa. Nov. 25, 2003). It is enough that ERIS intended for the infringing act to occur. *See Agence France Presse v. Morel ("Morel II")*, No. 10-cv-2730 (AJN), 2014 WL 3963124, (S.D.N.Y. Aug. 13, 2014). But Sanborn has evidence of specific intent too.

First, based on the evidence discussed above and more fully in its SF, a reasonable juror could conclude that the CMI was specifically designed to reassure ERIS' customers that its use of the maps was above board. Indeed, over the years, ERIS' customers expressed concerns about its ability to sell maps under copyright. SF ¶ 169. Second, ERIS' executives admit that the disclaimer was specifically drafted to avoid mentioning copyrights, while encouraging customers to buy Sanborn maps:

> I don't want to put anything in our disclaimer about possible copyright, as it will dissuade [ERIS' customers] from wanting to order and copy the maps for inclusion in their reports.

EF ¶ 183. ERIS separately wrote to its lawyer in Canada:

> We would prefer not to reference copyright, however we want to cover our butts as well. If we say that the maps cannot be reproduced, we are acknowledging copyright . . . Can you please noodle this and come up with some legal wording that would work for us and that we can have put on all the map requests.

*Id.* These emails cannot be interpreted other than an admission that ERIS created the CMI for the specific purpose of enabling infringement. In fact, when ERIS crafted the language, it considered using disclaimer language that *did* reference Sanborn's copyrights, but decided instead to ignore the rights, or perhaps worse, pretended they belonged to ERIS. *Id.* ("Certain

Sanborn Fire Insurance Maps may be copyrighted material and may not be reproduced without the expressed permission of the Sanborn Map Company").

ERIS' advice from its copyright lawyer and the ProQuest terms and conditions do not help it here.  As explained above, that copyright advice was very limited in scope.  The ProQuest terms and conditions do not license anything to ERIS.  In fact, they say the opposite:

> . . . ERIS may use the information contained in the microfilm in connection with research in the ordinary course of its business . . . ***ProQuest expressly does not license to ERIS*** the right to provide to third parties copies of the microfilm in print or digital form ***except as they may have the rights to do so under applicable copyright law –*** including (but not limited to) instances where the underlying materials are out of copyright or the copyright falls within the applicable fair use or fair dealing exemptions . . . .

Importantly, even if ERIS genuinely believed at the time that its activities were blessed by its copyright lawyer and ProQuest, ERIS cannot feign ignorance now.  After four years of litigation, ERIS continues to sell Sanborn maps with the same CMI. EF ¶¶ 154, 180. Based on at least this evidence, a reasonable juror could find that ERIS distributed the Sanborn maps with intent to enable, facilitate or conceal infringement.  *See, e.g.*, *Agence Fr. Presse v. Morel ("Morel I")*, 934 F. Supp. 2d 547, 577-78 (S.D.N.Y. 2013); *Morel II*, 2014 WL 3963124, at *7; *Iconics, Inc. v. Massaro*, 192 F. Supp. 3d, at 273.[45]

### B.    ERIS Violated Section 1202(b) by Distributing Copyrighted Works Knowing CMI Was Removed

ERIS did not simply falsify its own CMI, it removed Sanborn's CMI too, consistent with its desire to sell as many FIM Reports as possible without "dissuading" customers due to potential copyright concerns.  SFEF ¶¶ 191, 195, 206.  As with its arguments on the falsification

---

[45] ERIS claims that *Ward* is "instructive" (Br. at 47), but that case merely found that the evidence of scienter in the record was so lacking that sending the issue to a jury would be a wasted exercise.  *See Ward*, 208 F. Supp. 2d at 450 (S.D.N.Y. 2002).

of CMI, ERIS seeks to avoid liability for its removal of CMI by advancing legal theories that are devoid of statutory support.  Perhaps worse, it analyzes the claim under the wrong subpart, Section 1202(b)(1), in order to place all of the blame on its contractor in India.  While Sanborn's removal claim is sound under any subpart, Section 1202(b)(3) appropriately applies to ERIS' unauthorized distribution of Sanborn maps within the U.S.  Indeed, to sustain a violation under Section 1202(b)(3), Sanborn need only demonstrate: (1) the existence of CMI in connection with its copyrighted Sanborn maps; (2) that ERIS distributed copies of Sanborn maps; (3) while knowing that CMI has been removed or altered without Sanborn's permission. and (4) while knowing or having reasonable grounds to know that such distribution will induce, enable, facilitate or conceal an infringement.  *Mango v. BuzzFeed, Inc.*, 970 F.3d 167, 171 (2d Cir. 2020) ("*Mango II*").  ERIS' motion on this claim must be denied.

      1.    <u>ERIS "removed" five categories of CMI from identical Sanborn maps.</u>

ERIS removed the following categories of CMI under 1202(c):

- **Map Copyright Notices**. Copyright notices in the front-matter of the maps qualify as CMI (the "Sanborn map Copyright Notices").  *See* 17 U.S.C. §1202(c)(3).  ERIS acknowledges the removal. EF ¶ 31.  It admits that in the course of digitizing the maps for resale, it reproduced them in full but discarded information it deemed "completely irrelevant," like the Sanborn map Copyright Notices. EF ¶¶ 200-202

- **Map Terms and Conditions.** Terms and conditions printed directly on the Sanborn maps qualify as CMI. *See* 17 U.S.C. §1202(c)(6). ERIS acknowledges the removal. EF ¶ 31, 200-202. The specific CMI, described in SCF 25-32, makes clear that "no part of this map" may be reproduced without permission (the 'Sanborn map Terms and Conditions").

- **Microfilm Terms and Conditions.**  Terms and conditions language contained in the microfilm products sold by ProQuest and UPA qualify as CMI.  *See* 17 U.S.C. § 1202(c)(6). ERIS acknowledges the removal. EF ¶ 31, 200-202. The specific CIM, which is described in SCF 25-32, prohibits the reproduction of copyrighted maps without permission (the "Microfilm Terms and Conditions"). ERIS does not dispute that the Microfilm Terms and Conditions were copied and delivered to GISC for processing, but they too were deemed "irrelevant" and omitted from ERIS reports. EF ¶ 200.

- **Map Sheet Copyright Notices.** Copyright notices appearing on individual map sheet pages qualify as CMI (the "Map Sheet Copyright Notices"). 17 U.S.C. §1202(c)(3).

ERIS acknowledges the removal. EF ¶ 31, 200-202.  While ERIS claims (Br. at 57) that the omission is a byproduct of an automated process in the course of generating reports, the evidence in this case confirms that GISC, acting under ERIS' supervision, removed this CMI in the course of creating geo-referenced map mosaics for ERIS by manually cropping and stitching the maps together. EF ¶¶ 196, 203.

- **Compass Rose**. The compass rose printed on maps identifying Sanborn as the original author and owner (the "Compass Rose") qualifies as CMI. *See* 17 U.S.C. §1202 (c)(2)-(3). ERIS acknowledges the removal. EF ¶ 31, 200-202. ERIS argues that the omission of the Compass Rose is automatic, and occurs when a FIM Report is generated.  The evidence, however, confirms that GISC, acting under ERIS' supervision, removed this CMI by manually cropping and stitching the maps together, such that the ERIS FIM Reports generated from ERIS' geo-referenced map database do not contain this CMI. EF ¶ 196; SF ¶ 205.

While ERIS concedes that all five categories of CMI are "missing" from its FIM Reports, ERIS bizarrely contends that the CMI was not actually "removed" within the meaning of Section 1202(b).  ERIS does not explain why that must be so, cites no legal authority supporting this theory, and makes no effort to apply the law to the facts of this case.  Instead, it plays word games by relying on a series of dictionary definitions for the word "remove."  But each one of those definitions captures, precisely, the conduct that occurred here.  As ERIS admits, "removal" occurs by "pushing [CMI] aside" or by "taking [CMI] away or off" of a work. Br. at 49.  ERIS concededly reproduced the entire ProQuest collection, the entire UPA collection and an assortment of maps collected from libraries across the country with all of the original CMI intact. EF ¶ 191.  ERIS then pushed the CMI aside or took it away, in the course of discarding "irrelevant" information contained in the Sanborn maps, like the Sanborn map Copyright Notices and Sanborn map Terms, or by manually cropping and stitching together maps, resulting in the removal of the Map Sheet Copyright Notices and the Compass Rose.  All of this conduct occurred before ERIS generates a FIM Report consisting of Sanborn maps.

ERIS also claims that because it only "excerpts" portions of the maps each time it distributes a FIM Report, it is immune from DMCA liability.  This argument is a red-herring.

First, there is no "excerpted" work exception to Section 1202(b) and ERIS cites no authority for this proposition.  Instead, it relies on *Kirk Kara*, which merely holds, in the context of similar looking, but not identical, jewelry designs, that no CMI violation occurred because nothing was removed from the infringed work in the course of creating ***a substantially similar copy***.  *Kirk Kara Corp. v. W. Stone & Metal Corp.*, No. CV 20-1931-DMG (Ex), 2020 WL 5991503, *6 (C.D. Cal. Aug. 14, 2020).[46]  In contrast, ERIS is not accused of selling maps that are substantially similar in appearance to the Sanborn maps.  Rather, it is accused of selling ***identical copies*** of Sanborn maps.  *Kirk Kara* is therefore inapposite.  Second, even where ERIS only excerpts portions of complete Sanborn map works to create the infringing FIM Reports, it is still engaged in verbatim copying.  Section 1202(b) does not require, as ERIS suggests, cover-to-cover reproductions to trigger a violation (although ERIS has done that too).  Under ERIS' logic, an infringer could engage in massive piracy, strip CMI, but avoid DMCA liability by distributing anything less than the entirety of a work.  None of ERIS' cases stand for this proposition and it would be incompatible with removal cases that have allowed a Section 1202(b) violation to stand, even when verbatim copies are excerpted from a work.[47]

> 2.   All of the CMI was conveyed in connection with the Sanborn maps.

Next, ERIS argues that three out of the five categories of CMI – the Sanborn map Copyright Notices, Sanborn map Terms and Conditions, and Microfilm Terms and Conditions – were not "conveyed in connection with" the Sanborn maps because they do not appear on or in the area around the works.  In so doing, ERIS concedes that the remaining two, the Map Sheet

---

[46] *Kirk Kara* was recently criticized as "not well reasoned" because "the caselaw it cited does not support its holding" that "the DMCA only applies to identical copies."  *ADR Int'l Ltd.*, 2023 WL 2719446, at *9.
[47] *See, e.g., Iconics, Inc. v. Massaro*, 192 F. Supp. 3d 254, 272 (D. Mass. 2016); *Tomelleri v. Zazzle, Inc.*, No. 13-CV-02576-EFM-TJJ, WL 2015 8375083, at *14 (D. Kan. Dec. 9, 2015).  *See also Janik v. SMG Media, Inc.*, No. 16 Civ. 7308 (JGK) (AJP), 2018 WL 345111, *13 (S.D.N.Y. Jan. 10, 2018).

Copyright Notices and the Compass Rose, *were* "conveyed in connection" with the Sanborn

maps. Regardless, ERIS' argument that the first three categories of Sanborn's CMI "must" be

"on the body of, or in the area around" the works suffers from at least two fatal defects.

*First*, it is not the law in this Circuit. No court in this Circuit has ever recognized that in

order for CMI to be "conveyed in connection with" a work, it must be "on the body of, or in the

area around" it. And no circuit court outside of this Circuit has either. In fact, that language

does not appear anywhere in the statute, and conflicts with the legislative history:

> the term 'conveyed' is used in the broadest sense and is not meant to require any
> type of transfer, physical or otherwise, of the information. It merely requires that
> the information be accessible in conjunction with, or appear with, the work being
> accessed.

*Janik,* 2018 WL 345111, at *13 (S.D.N.Y. Jan. 10, 2018) (quoting S. REP. 105-190 at 35

(1998)). ERIS' own cited cases all found that the particular CMI was not "conveyed in

connection" with the work because the particular language of the CMI gave no indication that it

applied to the asserted works. Unlike the CMI at issue here, they all involved generic copyright

notices or other boilerplate disclaimer language that was meant to cover other matter.[48]

For precisely these reasons, courts have criticized the "body of or area around the work"

requirement for its total lack of statutory support and have declined to adopt it, especially when

the specific CMI makes clear that it relates to the infringed work. As one court noted:

> The Court does not believe that the phrase 'conveyed in connection with copies . . .
> of the work' requires that the information be located immediately adjacent to the
> image to qualify as CMI. Furthermore, in addition to the statutory copyright notice,
> both the cover and title page of the books at issue state that the illustrations are by

---

[48] *See, e.g.*, *Schiffer Publ'g, Ltd. v. Chronicle Books, LLC*, No. Civ.A. 03–4962, 2004 WL 2583817, at
*14 (E.D. Pa. Nov. 12, 2004); *Pers. Keepsakes, Inc. v. PersonalizationMall.com, Inc.*, No. 11 C 5177,
2012 WL 414803, at *7 (N.D. Ill. Feb. 8, 2012); *Alan Ross Mach. Corp. v. Machinio Corp.*, No. 17-cv-
3569, 2019 WL 1317664, at *3-4 (N.D. Ill. Mar. 22, 2019); *Watson v. Kappa Map Group, LLC*, No.
1:14–CV–100–TWT, 2015 WL 3932425 , at *2 (N.D. Ga. June 25, 2015); *Drauglis v. Kappa Map
Group, LLC*, 128 F. Supp. 3d 46, 60-61 (D.D.C. 2015).

> Plaintiff. It seems implausible that an individual reading these books would not
> understand that the phrase 'Illustrations by Joseph R. Tommelleri' would not apply
> to all of the illustrations within the book

*Tomelleri,* 2015 WL 8375083, at *13.[49]

   ***Second,*** in contrast to the CMI at issue in the cases cited by ERIS, the CMI in this case

unquestionably concerns the maps.  Each piece of CMI is located in the "body of or area around

the [maps]."  When this CMI is viewed in context, ERIS' justification for the "body of or area

around the work" exception begins to crumble.  The Sanborn map Copyright Notices appear, as

is required by law, on the title page, in bound volumes consisting entirely of maps (not in a

compilation of pre-existing maps, like the photograph books at issue in *Schiffer*).  *See* 4 Nimmer

on Copyright § 12A.10[B][3] (2022) (notices on dust jackets constitute CMI referring to contents

of  book); *Tomelleri,* 2015 WL 8375083, at *13 (CMI covers and title pages applied to all

illustrations within book).  In some instances, where the Sanborn map work consists of only a

few maps, this notice appears not in the front-matter of a bound volume, but as a medallion

printed directly on the map itself.  ERIS stripped those too.  As for the Sanborn map Terms and

Conditions and Microfilm Terms and Conditions, both categories of CMI specifically reference

the "maps," so there can be no confusion about what they relate to.  *See, e.g.,* EF ¶  27 ("No part

of ***this map*** may be reproduced in any form without written permission") (emphasis added); EF ¶

27 (the "***[m]aps*** . . . are the copyright of the Sanborn Map Company . . . a***nd may not be***

***reproduced except as individual maps for personal study***, without permission in writing")

---

[49] *See also Smith v. Law Off. of Richard St. Paul*, No. 22 CV 5648 (VB), 2023 WL 3570606, at *6
(S.D.N.Y. May 18, 2023); *Bruce Munro & Bruce Munro v. Fairchild Tropical Botanic Garden*, No. 20-
20079-CIV-SINGHAL/LOUIS, 2022 WL 452257, at *10 (S.D. Fla. Jan. 13, 2022); *Advanta-Star Auto.
Research Corp. of Am. v. Reynolds Ford, Inc.*, No. CIV-19-912-G, 2020 WL 5823537, at *3-4 (W.D.
Okla. Sept. 30, 2020) (same).

(emphasis added).[50]  Both were embedded on the microfilm reels obtained by ERIS and both

were removed. EF ¶ 27, 189.

       3.    <u>ERIS cannot escape direct liability under Section 1202(b)(3) by</u>
              <u>improperly recasting Sanborn's claim as one for indirect liability under</u>
              <u>Section 1202(b)(1).</u>

      ERIS cannot hide behind its contractor in India to escape liability under Section 1202(b).

It attempts to do so by arguing that all of the relevant acts relating to the removal of CMI were

performed by GISC, and therefore ERIS can only be found indirectly liable for GISC's conduct.

But that argument rests upon a false premise.  It assumes that Sanborn's removal claim arises

only under Section 1202(b)(1), which targets the act of removing or altering CMI – to the

exclusion of Section 1202(b)(3), which targets ***the distribution*** or ***importation for distribution*** of

copies of works with the CMI removed.  *See Mango II*, 970 F.3d at 171.  These latter acts were

unquestionably undertaken directly by ERIS, not GISC.  EF ¶¶ 143, 144.

      A plain reading of Section 1202(b)(3) makes clear that to directly violate the statute, a

defendant need not remove the CMI itself.  *See* 17 U.S.C. § 1202(b)(3).  Rather, it is enough that

a distribution occurred knowing the CMI was removed. *Sims v. Amazon*, No. 2:20-cv-04389-

FLA (ASx), 2022 WL 739524, at *7 (C.D. Cal. Jan. 27, 2022) (citing *Friedman v. Live Nation*

*Merch., Inc.*, 833 F.3d 1180, 1187 (9th Cir. 2016).  This is precisely what Sanborn alleges in its

complaint.  *See* Dkt. 12 ¶ 54.

      Discovery has borne this out. ERIS admits all of the salient facts to support a Section

1202(b)(3) violation.  It admits that it distributes FIM Reports consisting of Sanborn maps to its

---

[50] ERIS insinuates that the Microfilm Terms and Conditions should not count as CMI because they were "added by the compilers" of the microfilm collections.  This is wrong.  First, the specific CMI was inserted by Sanborn's licensees, not mere compilers. SF ¶¶ 64, 66.  Second, nothing in the plain language of Section 1202(c) precludes licensees from affixing CMI for the benefit of the licensor and copyright holder.

customers in the United States.  EF ¶¶ 162, 169; 174.  It also admits that when it generates a FIM Report, it does not supply the original title page containing the copyright notice or the terms and conditions language promulgated by Sanborn's licensees ProQuest and UPA. EF ¶ 177.  ERIS further admits that additional CMI printed on individual maps have been cropped from FIM Reports distributed to customers. EF ¶178.  ERIS knows that Sanborn's CMI has not been included within FIM Reports provided to ERIS customers. EF ¶¶ 200, 203.  Nothing more is required.

Even if Sanborn's claim was confined to Section 1202(b)(1), pointing the finger at GISC does not absolve ERIS.  As one court observed, a defendant may not avoid copyright liability by offshoring part of their production process.  *See Michael Grecco Prods. v. Valuewalk LLC,* 345 F. Supp. 3d 482, 499 (S.D.N.Y. 2018) (the argument "teeters on frivolity, if it does not cross it.").[51]  *First*, ERIS admits that it had the right and ability to supervise GISC.  For example, ERIS concedes that its parent company contracted with GISC to geo-reference and stitch the Sanborn maps on ERIS' behalf.  EF ¶ 194.  ERIS admits that it supplied GISC with the underlying maps an electronic copy of the entire collection to GISC.  EF ¶ 194.  ERIS guided GISC on the "relevant data ERIS needed to have reflected in the final map mosaic" EF ¶ 196.  ERIS admits that, in its view, customers did not need to see information that ERIS deemed to be "less relevant" or "completely irrelevant" like the CMI.  *See*  EF ¶ 196.  ERIS also admits that it conducted quality control measures and that it "reviewed as many" of GISC's geo-stitched map files as it could "to see if there were any things that [ERIS] wanted to go back to GISC on."  EF

---

[51] Further, courts regularly permit amended pleadings to conform to the evidence offered at summary judgment or trial.  *See, e.g.*, *Clomon v. Jackson,* 988 F.2d 1314, 1323 (2d Cir. 1993).  All of the information germane to a secondary liability theory resides with ERIS and this information was pursued in discovery with ERIS' consent.  *See* Fed. R. Civ. P. 15(b)(2) (permitting amendment when unpleaded issues are litigated with express or implied consent.).

¶ 198.  **Second**, there can be no doubt that ERIS had a direct financial interest in the outcome of GISC's activities.  It is undisputed that ERIS contracted with GISC to help ERIS build its map report offering to sell more maps for profit.  *See* EF ¶¶185, 188, 194 (touting "cost benefits").

4.    The location of removal is irrelevant to a Section 1202(b)(3) violation.

For similar reasons, ERIS cannot rely on extraterritorial conduct in India to excuse its domestic violations.  Once again, ERIS puts so much of the focus on Section 1202(b)(1) that it ignores Section 1202(b)(3).  As discussed above, a Section 1202(b)(3) claim targets distributions, not removals.  *See Mango II*, 970 F.3d at 171; *see also Friedman v. Live Nation Merch., Inc.*, 833 F.3d 1180, 1187 (9th Cir. 2016).  The location of the removal is therefore irrelevant.  *Sims*, 2022 WL 739524, at *7.  Here, there can be no dispute that the only relevant activity, ERIS' distribution, occurred in the U.S.

But even if Sanborn's claim was limited to Section 1202(b)(1), which it is not, ERIS cites no authority for the proposition that a predicate act must be of the same type as the foreign conduct to render the latter actionable.[52]  Thus, there is no basis on which to disregard ERIS' numerous predicate acts occurring in the U.S., especially when those acts included independent violations of the Copyright Act and were in furtherance of the removal of CMI and ERIS' distribution of the works without the CMI.  *See generally Dow Jones & Co. v. Juwai Ltd.*, No. 21-cv-7284 (PKC), 2023 WL 2561588, at *3-5 (S.D.N.Y. Mar. 17, 2023) (allowing removal and infringement claims to proceed in parallel where the alleged predicate acts were the defendant's storage and distribution of the works in the U.S.).  As ERIS concedes, a myriad of predicate acts

---

[52] Indeed, ERIS cites to only one case, *M Seven Sys. Ltd. v. Leap Wireless Int'l, Inc.*, for the proposition that extraterritorial violations of the DMCA are not actionable. No. 12-cv-1424-CAB (RBB), 2014 WL 12026065, at *6 (S.D. Cal. June 4, 2014).  That case did not analyze the extraterritoriality issue or explain what kinds of predicate acts rebut the presumption.  Instead, it merely dismissed the DMCA claim on claim preclusion grounds and noted that the Plaintiff failed to indicate where the removal occurred.  *Id.*

occurred in the U.S. in furtherance of ERIS' removal of CMI in India, culminating with the
distribution of ERIS' reports to customers in the U.S.: (1) ERIS procured the Sanborn maps from
Sanborn's U.S. licensees, ProQuest and LexisNexis, and collected additional copies of maps
from libraries across the country (EF ¶¶ 185, 189, 192); (2) ERIS hired a U.S. company,
Microfacs, based in Minneapolis, Minnesota to digitize all of these maps, by scanning them into
image files (SF ¶ 191); and (3) ERIS transmitted the entire digital repository of Sanborn maps,
created in the U.S., to its contractor to geo-reference and stitch the maps together, for use in
ERIS' reports sold to customers in the U.S. (EF ¶¶ 190, 191; SF ¶ 191).

> 5.   **ERIS knowingly removed CMI and knew (or should have known) that the
> removal would facilitate infringement.**

ERIS cites and applies the wrong scienter standard under Section 1202(b).  On the first
scienter prong, ERIS argues it did not "intentionally" remove CMI.  But unlike a Section
1202(b)(1) violation, a Section 1202(b)(3) violation does not require an "intentional" removal,
but a "knowing" removal without the copyright holder's consent. *See Zuma Press, Inc. v. Getty
Images (US), Inc.*, 845 F. App'x 54, 57-58 (2d Cir. 2021).  Nevertheless, under either subpart,
ample evidence exists to create a triable issue of fact regarding ERIS' knowledge.  Indeed, much
of the same evidence that refutes ERIS' equitable estoppel theory and supports scienter under
Section 1202(a) applies with equal force here.  ERIS cannot dispute that:

- After purchasing the collections, ERIS obtained a copy of "every single document" on
the reels, inclusive of all CMI, and inspected their contents. SF ¶ 189.

- Despite the presence of each category of CMI, ERIS instructed its contractor to discard
anything ***ERIS*** deemed "irrelevant" in the course of stitching the maps together.  EF ¶¶
196, 200, 203; SF ¶ 194.

- ERIS supervised its contractor, providing it with instructions and undertaking quality
control measures to ensure everything was "done properly" in accordance with ERIS'
"guidelines and instructions." SF ¶¶ 194, 196, 203.  As part of this process, ERIS
reviewed "as many" completed files as it could. SF ¶ 203.

- ERIS took a proactive role supervising GISC's "clipping" and stitching, by dictating what information should be preserved or discarded. *See, e.g.,* SF ¶ 194, 196, 198, 201-203.

In other words, ERIS controlled the process by which the CMI was cropped.  ERIS could have instructed GISC to preserve CMI.  It simply chose not to.  From this, a reasonable juror could infer that ERIS knowingly removed the CMI.[53]

The second scienter prong simply requires constructive knowledge – *i.e.,* that ERIS should have known that its actions would "induce, enable, facilitate, or conceal" an infringement. *Mango II*, 970 F.3d, at 172.  Here, ERIS engaged in a pattern of consciously disregarding Sanborn's copyright rights, while assuring its customers that both they, and ERIS, could too. EF ¶¶ 157, 182, 221, 262; SF ¶ 228-233.  The purpose of this was to sell as many as maps as possible and increase ERIS' profits.  SF ¶ 188.  The following facts demonstrate that ERIS knew, or had reasonable grounds to know, that its removal of CMI would facilitate or conceal its infringement: (1) ERIS admits it is not the copyright owners (EF ¶ 132); (2) ERIS knows permission to exploit the maps was required, but never sought it (SF ¶¶ 188-189); (3) ERIS repeatedly worried about its legal exposure. (SF ¶¶ 230-233); (4) ERIS decided to proceed anyway because it "need[ed] the maps" and because proving infringement is "so onerous." (EF ¶ 331) (5) ERIS' actions were undertaken to increase its bottom line (EF ¶183); (6) ERIS did not want "copyright" law to "dissuade" customers from buying maps and made sure not to acknowledge copyright law in its reports SF ¶ 183; (7) When customers inquire about ERIS' ability to supply the maps, it tells

---

[53] ERIS makes much of its automated fulfillment process to argue under *CoreLogic* that the removal of CMI is not actionable.  However, there is nothing in the record to suggest that GISC's process of creating the map database was automated.  This separate "arduous" process precedes ERIS' fulfillment of report orders and occurred over the course of 24 months. SF ¶ 178.  Regardless, *CoreLogic* is inapplicable because there is no evidence that the removal was an "unintended side effect" of a pre-existing automated process of to strip metadata.  *Stevens v. CoreLogic, Inc.*, 194 F. Supp. 3d 1046, 1052-53 (S.D. Cal. 2016).

them – falsely – that it is "legally entitled" to. *See* Br. at 60. From this, a reasonable juror could conclude that ERIS' removal or distribution of works with CMI removed was part of ERIS' plan to either conceal its own infringement or encourage its customers to buy maps without fear of infringement.[54]

## <u>CONCLUSION</u>

For the foregoing reasons, ERIS' motion should be denied and Sanborn's cross-motion should be granted.

---

[54] If that were not enough, continuing violations of the DMCA, like ERIS' post-suit conduct of continuing to distribute FIM Reports without the CMI, satisfies the second scienter element. *Compare Morel II,* 2014 WL 3963124*,* at *8 (continuing distribution of photographs with removed CMI following issuance of "kill-notice" satisfies second scienter prong) *with Zuma Press, Inc., 845 F. App'x*, at 58 (no violation where defendant "launched a full investigation" and promptly removed the works).

Respectfully submitted,

Dated: June 8, 2023

BAKER & McKENZIE LLP

By:      /s/ James S. Blank
         James S. Blank
         Joshua S. Wolkoff
         Catherine K. Stillman
         Ellen Cheong
         452 Fifth Avenue
         New York, New York 10018
         Tel: (212) 626-4100
         James.Blank@bakermckenzie.com
         Joshua.Wolkoff@bakermckenzie.com
         Catherine.Stillman@bakermckenzie.com
         Ellen.Cheong@bakermckenzie.com

         Mark H. Hamer (*pro hac vice*)
         815 Connecticut Avenue, N.W.
         Washington, District of Columbia 20006
         Tel: (202) 452-7000
         Mark.Hamer@bakermckenzie.com

         *Attorneys for The Sanborn Library LLC and*
         *Environmental Data Resources, LLC*

s