UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| THE SANBORN LIBRARY LLC,<br><br>                    Plaintiff and Counterclaim-<br>                    Defendant, and<br><br>ENVIRONMENTAL DATA RESOURCES, LLC,<br><br>                         Counterclaim-Defendant,<br><br>    v.<br><br>ERIS INFORMATION INC., ERIS INFORMATION<br>LIMITED PARTNERSHIP, and ECO LOG<br>ENVIRONMENTAL RISK INFORMATION SERVICES<br>LTD.,<br><br>                    Defendants and Counterclaim<br>                    Plaintiffs. | No. 1:19-cv-02049-JHR-OTW<br><br><br>**HIGHLY CONFIDENTIAL- OUTSIDE<br>COUNSEL'S EYES ONLY** |

### REPLY MEMORANDUM OF LAW IN SUPPORT OF ERIS'
### MOTION FOR SUMMARY JUDGMENT AND IN OPPOSITION TO THE
### SANBORN LIBRARY, LLC'S CROSS-MOTION FOR SUMMARY JUDGMENT

# TABLE OF CONTENTS

PRELIMINARY STATEMENT ................................................................................................... 1

ARGUMENT ............................................................................................................................. 2

I.      EDR FAILS TO RAISE A GENUINE ISSUE OF MATERIAL FACT THAT
        SUPPORTS ITS CLAIM TO OWN THE COPYRIGHTS IN THE ASSERTED
        SANBORN MAPS ....................................................................................................... 2

        A.      The 1973 Asset Purchase Documents Did Not Assign Any Copyrights in the
                pre-June 1973 Sanborn Maps from Sanborn II to Sanborn III .......................... 2

                1.      The Intrinsic Evidence Confirms that the 1973 Documents Did Not
                        Assign the Copyrights in the pre-June 1973 Sanborn Maps ................ 3

                2.      If Extrinsic Evidence Is Permitted, It Demonstrates that the 1973
                        Documents Did Not Assign the Copyrights in the pre-June 1973
                        Sanborn Maps ................................................................................. 5

                        a.      The Declaration of Steven Pease Should Not Be Considered .......... 5
                        b.      Additional Extrinsic Evidence Confirms that the 1973
                                Documents Did Not Assign the Copyrights in the pre-June
                                1973 Sanborn Maps ............................................................. 5

        B.      EDR Fails to Raise a Genuine Dispute of Material Fact as to the Work-for-Hire
                Status of Each Asserted Post-1978 Map ......................................................... 7

        C.      EDR Fails to Raise a Genuine Issue of Material Fact that the 1996 Asset
                Purchase Failed to Transfer All Copyright Rights for Each Asserted Sanborn
                Map ............................................................................................................... 7

        D.      The Mis-Noticed Maps Are in the Public Domain ........................................... 9

                1.      The Correction Slips Do Not Contain Adequate Copyright Notices ....... 9

                2.      The Maps with Mis-Dated Notices Are Also in the Public Domain ........ 10

                3.      The Copyright Notices on Interior Pages Are Insufficient ................. 11

                4.      The Dispersed/Illegible Notices are Insufficient .............................. 12

II.     EDR FAILS TO RAISE A GENUINE DISPUTE OF MATERIAL FACT ON
        ESTOPPEL .............................................................................................................. 12

        A.      ERIS Was Ignorant of the Fact that EDR Considered ERIS' Conduct Unlawful
                and Would Enforce Its Alleged Copyrights in the Sanborn Maps from 2014
                Onward ....................................................................................................... 13

B. Despite a Clear Duty and Opportunity to Speak, EDR Misleadingly Remained Silent and Took No Action Following Vogt's Letter ........................................................ 14

C. ERIS Justifiably Relied on EDR's Silence and Inaction ................................................. 19

D. The Equities Do Not Tip in EDR's Favor ....................................................................... 21

III. EDR FAILS TO RAISE A GENUINE DISPUTE OF MATERIAL FACT THAT ERIS HAS VIOLATED THE DMCA ....................................................................................... 22

A. ERIS is Entitled to Provide Terms and Conditions for the Use of Its Reports, and Does Not Violate Section 1202(a) by Doing So ....................................................... 22

B. EDR Cannot Raise a Triable Issue that ERIS "Knowingly" Provided False CMI "with the Intent to Induce, Enable, Facilitate, or Conceal Infringement" ............ 24

C. EDR Cannot Be Liable Under Any Subsection of Section 1202(b) ............................... 25

1. EDR's Arguments Regarding 17 U.S.C. § 1202(b)(3) Should Be Stricken ....................................................................................................... 25

2. Exterior CMI Was Not "Removed" by ERIS or Anyone Else ......................... 26

3. Interior CMI Was Not Intentionally Removed by ERIS ................................... 27

4. ERIS Did Not Know Interior CMI Had Been Removed ................................... 28

5. EDR Cannot Prove that the Second Half of the Double-Scienter Requirement Is Met under Any Theory with Respect to Interior or Exterior CMI ...................................................................................................... 30

iv

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*A.C. Aukerman Co. v. R.L. Chaides Const. Co.*,
   960 F.2d 1020 (Fed. Cir. 1992)................................................12, 15, 17, 18, 19, 20

*ABB Robotics, Inc. v. GMFanuc Robotics Corp.*,
   52 F.3d 1062 (Fed. Cir. 1995).........................................................................16, 19

*ADA Design Alliance, Inc. v. Renberg*,
   942 F.2d 790 (9th Cir. 1991) ...............................................................................12

*ADR Int'l Ltd. v. Inst. for Supply Mgmt., Inc.*,
   2023 WL 2719446 (S.D. Tex. Mar. 30, 2023).....................................................23

*Allen v. Coughlin*,
   64 F.3d 77 (2d Cir. 1995) ....................................................................................29

*Am. Travel & Hotel Directory Co. v. Gehrine Publ'g Co.*,
   4 F.2d 415 (S.D.N.Y. 1925).................................................................................12

*Anderson v. Liberty Lobby*,
   477 U.S. 242 (1986).............................................................................................29

*AP v. Meltwater U.S. Holdings, Inc.*,
   931 F. Supp. 2d 537 (S.D.N.Y. 2013).................................................................20

*Aspex Eyewear, Inc. v. Clariti Eyewear, Inc.*,
   2008 WL 5049744 (S.D.N.Y. Nov. 26, 2008)........................................14, 15, 18

*Block v. Plaut*,
   87 F. Supp. 49 (N.D. Ill. 1949) ...........................................................................12

*BOKF, N.A. v. Caesars Entm't Corp.*,
   144 F. Supp. 3d 459 (S.D.N.Y. 2015)...................................................................5

*Brown v. Latin Am. Music Co.*,
   498 F.3d 18 (1st Cir. 2007)....................................................................................2

*Burt Rigid Box, Inc. v. Travelers Prop. Cas. Corp.*,
   302 F.2d 83 (2d Cir. 2002)....................................................................................1

*Campbell v. Acuff-Rose Music, Inc.*,
   510 U.S. 569 (1994).............................................................................................20

*Celotex Corp. v. Catrett*,
   477 U.S. 317 (1986)...........................................................................1, 7, 9, 10, 12

*Cherry River Music Co. v. Simitar Entm't, Inc.*,
   38 F. Supp. 2d 310 (S.D.N.Y. 1999)...................................................................18

v

*Chubb Integrated Sys. v. Nat'l Bank of Wash.*,
  658 F. Supp. 1043 (D.D.C. 1987) ........................................................................17

*Columbia Broad Sys., Inc. v. Stokely-Van Camp, Inc.*,
  522 F.2d 369 (2d Cir. 1975) ...................................................................14, 15, 18

*Community for Creative Non-Violence v. Reid*,
  490 U.S. 730 (1989) ..............................................................................................7

*Cooley v. Penguin Grp. (USA) Inc.*,
  31 F. Supp. 3d 599 (S.D.N.Y. 2014) ...................................................................20

*Creazioni Artistiche Musicali, S.r.l. v. Carlin Am., Inc.*,
  747 F. Appx' 3 (2d Cir. 2018) ...............................................................................4

*Dallal v. N.Y. Times Co.*,
  386 F. Supp. 2d 319 (S.D.N.Y. 2005) .................................................................13

*Dallal v. N.Y. Times Co.*,
  2006 WL 463386 (2d Cir. 2006) ..........................................................................13

*Dastar Corp. v. Twentieth Century Fox Film Corp.*,
  539 U.S. 23 (2003) ..............................................................................................29

*Dollcraft Indus., Ltd. v. Well-Made Toy Mfg. Co.*,
  479 F. Supp. 1105 (E.D.N.Y. 1978) ....................................................................11

*Durham Indus., Inc. v. Tomy Corp.*,
  630 F.2d 905 (2d Cir. 1980) ..................................................................................2

*E. Mishan & Sons, Inc. v. Marycana, Inc.*,
  662 F. Supp. 1339 (S.D.N.Y. 1987) ....................................................................11

*Encylopedia Brown Prods., Ltd. v. Home Box Office, Inc.*,
  1998 WL 734355 (S.D.N.Y. Oct. 15, 1998) .......................................................13

*In re Enforcement of Philippine Forfeiture Judgment*,
  442 F. Supp. 3d 756 (S.D.N.Y. 2020) .................................................................26

*Faulkner Press, LLC v. Class Notes, LLC*,
  756 F. Supp. 2d 1352 (N.D. Fla. 2010) ..........................................................22, 27

*Faulkner v. Nat'l Geographic Soc'y*,
  452 F. Supp. 2d 369 (S.D.N.Y. 2006) ...................................................................5

*Feist Publn's, Inc. v. Rural Tel. Serv. Co.*,
  499 U.S. 340 (1991) ..............................................................................................9

*Fischer v. Forrest*,
  286 F. Supp. 3d 590 (S.D.N.Y. 2018) .................................................................22

*Fischer v. Forrest*,
  968 F.3d 216 (2d Cir. 2020) ................................................................................22

*Forest Labs, Inc. v. Abbott Labs.*,
  1999 WL 33299123 (W.D.N.Y. June 23, 1999) ..................................................19

*Freeman v. Trade Register*,
    173 F. 419 (W.D. Wash. 1909) ..................................................................12

*Fujitsu Ltd. v. Fed. Express Corp.*,
    247 F.3d 423 (2d Cir. 2001) ....................................................................29

*GC2 Inc. v. Int'l Game Tech.*,
    391 F. Supp. 3d 828 (N.D. Ill. 2019) ...............................................22, 23

*Glus v. Brooklyn Eastern Dist. Terminal*,
    359 U.S. 231 (1959) ................................................................................13

*Gossen Corp v. Marley Mouldings, Inc.*,
    977 F. Supp. 1346 (E.D. Wis. 1997) ......................................................17

*Greenberg v. Nat'l Geographic Soc.*,
    533 F.3d 1244 (11th Cir. 2008) ..............................................................22

*Handy v. City of New York*,
    2021 WL 4482548 (S.D.N.Y. Aug. 27, 2021) .......................................29

*Hemstreet v. Computer Entry Sys. Corp.*,
    972 F.2d 1290 (Fed. Cir. 1992) ..............................................................17

*Holland Loader Co, LLC v. FLSmidth A/S*,
    313 F. Supp. 3d 447 (S.D.N.Y. 2018) ......................................................5

*Horror Inc. v. Miller*,
    15 F.4th 232 (2d Cir. 2021) ....................................................................11

*Huffman v. Activision Publ.*,
    2020 WL 8678493 (E.D. Tex. Dec. 14, 2020) .......................................23

*Ingersol Mill. Mach. Co. v. M/V BODENA*,
    619 F. Supp. 493 (S.D.N.Y. 1985) ..........................................................5

*J.A. Richards, Inc. v. New York Post, Inc.*,
    23 F. Supp. 619 (S.D.N.Y. 1938) ..........................................................11

*John G. Danielson, Inc. v. Winchester-Connant Props.*,
    186 F. Supp. 2d 1 (D. Mass. 2002) ..........................................................4

*LaSalle Bank Nat'l Ass'n v. Nomura Asset Capital Corp.*,
    424 F.3d 195 (2d Cir. 2005) ......................................................................8

*Lego A/S v. Best-Lock Constr. Toys, Inc.*,
    404 F. Supp. 3d 583 (D. Conn. 2019) .......................................15, 17, 18

*Lipton v. Nature Co.*,
    71 F.3d 464 (2d Cir. 1995) ......................................................................30

*Lottie Joplin Thomas Trust v. Crown Publrs., Inc.*,
    456 F. Supp. 531 (S.D.N.Y. 1977) ........................................................13

*Lydiard-Peterson Co. v. Woodman*,
    204 F. 921 (8th Cir. 1913) ........................................................................9

*Mango v. Buzzfeed, Inc.*,
    970 F.3d 167 (2d Cir. 2020)..................................................................26, 28, 30

*Martin v. Franklin Capital Corp.*,
    546 U.S. 132 (2005)........................................................................................1

*Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*,
    475 U.S. 574 (1986)......................................................................................29

*MBIA Ins. Corp. v. Patriarch Partners VIII, LLC*,
    842 F. Supp. 2d 682 (S.D.N.Y. 2012)............................................................5

*Merchant v. Lymon*,
    828 F. Supp. 1048 (S.D.N.Y. 1993)..............................................................13

*Meyers v. Asics Corp.*,
    974 F.2d 1304 (Fed. Cir. 1992).....................................................................17

*Michael Grecco Prods., Inc. v. Time USA, LLC*,
    2021 WL 3192543 (S.D.N.Y. July 27, 2021) ................................................22

*Michael Grecco Prods., Inc. v. Valuewalk, LLC*,
    345 F. Supp. 3d 482 (S.D.N.Y. 2018)............................................................27

*Munro v. Fairchild Tropical Botanic Garden, Inc.*,
    2022 WL 452257 (S.D. Fla. Jan. 13, 2022) ..................................................26

*Murphy v. Millennium Radio Grp. LLC*,
    650 F.3d 295 (3d Cir. 2011)..........................................................................29

*Nat'l Comics Publs., Inc. v. Fawcett Publs., Inc.*,
    191 F.2d 594 (2d Cir. 1951)..........................................................................10

*Pavlica v. Behr*,
    397 F. Supp. 2d 519 (S.D.N.Y. 2005)............................................................17

*Petrella v. MGM*,
    572 U.S. 663 (2014)......................................................................................14

*Pilla v. Gilat*,
    2022 WL 1003852 (S.D.N.Y Mar. 29, 2022) ................................................22

*Princeton Univ. Press v. Mich. Document Servs., Inc.*,
    99 F.3d 1381 (6th Cir. 1996) ........................................................................21

*Puddu v. Buonamici Statuary, Inc.*,
    450 F.2d 401 (2d Cir. 1971)..........................................................................12

*Schiller & Schmidt, Inc. v. Nordisco Corp.*
    969 F.2d 410 (7th Cir. 1992) ..........................................................................4

*Sem-Torq, Inc. v. K Mart Corp.*,
    936 F.2d 851 (6th Cir. 1991) ..........................................................................2

*Estate of Shaw v. Marcus*,
    2015 WL 5610959 (S.D.N.Y. Sept. 22, 2015)..............................................3, 4

*Shugrue v. Continental Airlines, Inc.*,
  977 F. Supp. 280 (S.D.N.Y. 1997)............................................................4

*Estate of Smith v. Cash Money Records*,
  253 F. Supp. 3d 737 (S.D.N.Y. 2017)......................................................2

*Stambler v. Diebold, Inc.*,
  1988 WL 95479 (E.D.N.Y. Sept. 2, 1988) ..............................................15

*Stevens v. CoreLogic*,
  899 F.3d 666 (9th Cir. 2018) ..................................................................30

*Stevens v. CoreLogic, Inc.*,
  194 F. Supp. 3d 1046 (S.D. Cal. 2016)....................................................27

*Tuff 'N' Rumble Mgmt., Inc. v. Profile Records, Inc.*,
  1997 WL 158364 (S.D.N.Y. Apr. 2, 1997)............................................1, 2

*TVT Records v. Island Def Jam Music Grp.*,
  412 F.3d 82 (2d Cir. 2005).......................................................................8

*Twin Peaks Prods., Inc. v. Publ'ns Int'l, Ltd.*,
  996 F.2d 1366 (2d Cir. 1993)..................................................................21

*United States v. Kahn*,
  5 F. 4th 167 (2d Cir. 2021) .....................................................................11

*United States v. Rowland*,
  826 F.3d 100 (2d Cir. 2016).....................................................................26

*Universal City Studios, Inc. v. Corley*,
  273 F.3d 429 (2d Cir. 2001).....................................................................26

*Victor Elias Photography LLC v. Ice Portal, Inc.*,
  43 F.4th 1313 (11th Cir. 2022) ...............................................................30

*W.W.W. Assocs., Inc. v. Giancontieri*,
  77 N.Y.2d 157 (1990) ...............................................................................5

*Wafer Shave Inc. v. Gillette Co.*,
  857 F. Supp. 112 (D. Mass. 1993)), *aff'd*, 605 F.3d 1305 (Fed. Cir. 2010)
  ................................................................................14, 15, 16, 17, 19

*Waite v. UMG Recordings, Inc.*,
  2023 WL 1069690 (S.D.N.Y. Jan. 27, 2023) ............................................7

*Wechsler v. Hunt Health Sys., Ltd.*,
  1999 WL 672902 (S.D.N.Y. Aug. 27, 1999)............................................26

*Wrench v. Universal Pictures Co.*,
  104 F. Supp. 374 (S.D.N.Y. 1952)...........................................................12

*Yellow Pages Photos, Inc. v. Dex Media, Inc.*,
  2021 WL 799695 (M.D. Fla. Feb. 3, 2021) .............................................22

*Zalewski v. Cicero Builder Dev., Inc.*,
  754 F.3d 95 (2d Cir. 2014)..................................................................21

**Statutes**

17 U.S.C. § 1 ...........................................................................................3

17 U.S.C. § 9 .........................................................................................10

17 U.S.C. § 10 .......................................................................................10

17 U.S.C. § 19 .......................................................................................11

17 U.S.C. § 20 .......................................................................................11

17 U.S.C. § 21 .......................................................................................11

17 U.S.C. § 107 .....................................................................................21

17 U.S.C. § 209 .......................................................................................1

17 U.S.C. § 401(a) .................................................................................10

17 U.S.C. § 405(a)(1) ............................................................................11

17 U.S.C. § 410 .......................................................................................1

17 U.S.C. § 410(c) ...................................................................................1

17 U.S.C. § 1202 ...................................................................................26

17 U.S.C. § 1202(a) ..............................................................................25

17 U.S.C. § 1202(b) ..............................................................................26

17 U.S.C. § 1202(b)(1) ....................................................................27, 30

17 U.S.C. § 1202(b)(3) ......................................................25, 26, 28, 29

**Other Authorities**

Fed. R. Evid. 406 ..................................................................................10

H.R. Report No. 94-1476 (Sept. 3, 1976) ..........................................2, 3

4 *Nimmer on Copyright* § 12A.10[B][1][a] .......................................26

5 *Nimmer on Copyright* § 14.04[B][3][a] .........................................21

## TABLE OF ABBREVIATIONS

| | |
|---|---|
| EDR | Plaintiff The Sanborn Library LLC and Counterclaim-Defendant Environmental Data Resources, LLC, collectively |
| ERIS | Defendants and Counterclaimants ERIS Information Inc., ERIS Information Limited Partnership, and Eco Log Environmental Risk Information Services Ltd., collectively |
| ERIS Br. | ERIS' Brief (Dkt. 239) in Support of its Motion for Summary Judgment |
| Op. Br. | EDR's Opposition Brief (Dkt. 264) to ERIS' Motion for Summary Judgment |
| CSF | ERIS' Objections and Counterstatement to EDR's Rule 56.1 Statement of Facts (filed concurrently with this Reply Brief) |
| RSF | ERIS' Reply to EDR's Counterstatement of Facts (filed concurrently with this Reply Brief) |

## PRELIMINARY STATEMENT

EDR's arguments suffer from two significant flaws. First, EDR mischaracterizes its summary judgment burden. On ownership and the DMCA, EDR, not ERIS, bears the burden of proof at trial. Thus, ERIS meets its summary judgment burden by "pointing out to the district court" an "absence of evidence to support" any element of EDR's claims. *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986). ERIS has done so, with concrete rationale for its positions. EDR repeatedly suggests ERIS has not shown sufficient *evidence*. But there is "no express or implied requirement in Rule 56 that the moving party support its motion with affidavits or other similar materials *negating* the opponent's claim." *Id.* at 323 (emphasis in original). It is on EDR, not ERIS, to "come forward with evidence that would be sufficient to support a jury verdict in its favor." *Burt Rigid Box, Inc. v. Travelers Prop. Cas. Corp.*, 302 F.2d 83, 91 (2d Cir. 2002). EDR has *not* done so. On estoppel, ERIS meets its burden with its evidence, under the undisputed facts, that shows equitable relief is warranted, and that EDR should be estopped from pursuing its claims.[1]

Second, EDR contends the presumption of validity afforded to a certificate of registration applies to *all* of its asserted Sanborn Map copyrights. (Op. Br. at 2 (citing 17 U.S.C. §§ 209 (1947), 410 (1976)). Not so. Only certificates issued "before or within five years" of the work's first publication are given that presumption. 17 U.S.C. § 410(c). *Nearly all* registrations EDR sought after allegedly acquiring the copyrights were *outside* that five-year window. CSF ¶¶ 109, 275. Thus, "the registration does not constitute *prima facie* evidence that the copyright is valid, and [Plaintiff] has the burden of proving the validity of its copyright." *Tuff 'N' Rumble Mgmt., Inc. v. Profile Records, Inc.*, 1997 WL 158364, at *2 (S.D.N.Y. Apr. 2, 1997). EDR argues that the Court may exercise "discretion" to apply the presumption anyway. 17 U.S.C. § 410(c). But "discretion is not whim," and must be "guided by sound legal

---

[1] ERIS has, at a minimum, shown that a reasonable jury could find in its favor on ownership, chain of title, and estoppel, so EDR's cross-motion should be denied in any event.

principles." *Martin v. Franklin Capital Corp.*, 546 U.S. 132, 139 (2005) (cleaned up). EDR offers no reason why the Court *should* afford the certificates any evidentiary weight. There are many reasons why it should not: (1) the registrations issued *well* beyond the five-year statutory time period—sometimes, as late as two or three decades *after* publication;[2] (2) the registrations were filed by persons who had no personal knowledge of the facts in the certificates (EDR was often at least two entities removed from the creator of the mis-noticed maps, RSF ¶ 112, CSF ¶ 276; (3) EDR received "special relief" and was exempted from depositing complete, as-published copies of the Sanborn Maps as is typically required, RSF ¶ 112, CSF ¶ 277; and (4) a conflict of interest arose between EDR and the Library of Congress, which houses the Copyright Office, and which was simultaneously negotiating with EDR on using Sanborn Maps in connection with its larger offerings. CSF ¶ 278. For these reasons, the certificates should be accorded no presumption whatsoever.[3]

## ARGUMENT

I.   **EDR FAILS TO RAISE A GENUINE ISSUE OF MATERIAL FACT THAT SUPPORTS ITS CLAIM TO OWN THE COPYRIGHTS IN THE ASSERTED SANBORN MAPS**

A.   **The 1973 Asset Purchase Documents Did Not Assign Any Copyrights in the pre-June 1973 Sanborn Maps from Sanborn II to Sanborn III.**

The parties do not dispute the text of the 1973 APA or Bill of Sale. The question is whether those documents conveyed, from Sanborn II to Sanborn III, the *entirety* of the *exclusive* rights under the 1909 Act in the pre-June 1973 Sanborn Maps. As a matter of law, the answer to this question is "no." Therefore, EDR does not have valid title to pre-June 1973 Sanborn Maps and cannot prevail on its claims.

---

[2] *See Tuff 'N' Rumble*, 1997 WL 158364, at *2 (no presumption for registration issued 18 years after publication); *Estate of Smith v. Cash Money Records*, 253 F. Supp. 3d 737, 745 (S.D.N.Y. 2017) ("minimal weight" for 31-year delay); *Sem-Torq, Inc. v. K Mart Corp.*, 936 F.2d 851, 854 (6th Cir. 1991) (court "not bound to accept the validity of the copyright" for 6-year delay); *Brown v. Latin Am. Music Co.*, 498 F.3d 18, 24 (1st Cir. 2007) (no "benefit from *prima facie* validity" after 20-year delay); *see also* H.R. Rep. No. 94-1476 at 156 (Sept. 3, 1976) (statutory timeframe was "based on a recognition that the longer the lapse of time between publication and registration the less likely to be reliable are the facts stated in the certificate.").

[3] In any case, any presumption of validity is not irrebuttable. "Where other evidence in the record casts doubt on the question, validity will not be assumed." *Durham Indus., Inc. v. Tomy Corp.*, 630 F.2d 905, 908 (2d Cir. 1980).

1.  **The Intrinsic Evidence Confirms that the 1973 Documents Did Not Assign the Copyrights in the pre-June 1973 Sanborn Maps**

Paragraph 1 of the 1973 APA lists the assets to be conveyed from Sanborn II to Sanborn III, and the Bill of Sale conveyed those assets. RSF ¶¶ 56-57, 66-67. But EDR claims that Sanborn III *broadly* acquired Sanborn II's "map business assets," and that "the assets excluded in the transaction were expressly limited[.]" (Op. Br. at 14.)[4] EDR has it backwards. "[O]nly the assets set forth in subdivisions (a) through (e) of … Paragraph 1" were *included*; everything else was *excluded* by default. RSF ¶ 57. And the recitals express Sanborn II's desire to sell only "certain" of its map business assets—not "all" or even "substantially all" of them. RSF ¶ 54. EDR's analysis starts off wrong, and only gets worse.

EDR claims that the "copyright rights … to exclusively print, reprint, publish, copy, and vend the Sanborn maps in perpetuity were subsumed in the Assets to be Acquired," pointing to Paragraphs 1(b) and (e) for support. (Op. Br. at 8.) But as ERIS noted, Paragraph 1(b) relates to only *tangible* items of personal property; and Paragraph 1(e) merely includes the "rights to market products from the map library." (ERIS Br. at 14-15.) EDR offers no reason why those rights include the "*exclusive* right to print, reprint, publish, copy, and vend the copyrighted work." 17 U.S.C. § 1 (1909). With the right to "market products from the map library," Sanborn III could sell those products. But none of this language entitles Sanborn III to *exclude others* from copying Sanborn Maps, especially when Sanborn II used the words "copyright" and "exclusive rights" to refer to exactly that. RSF ¶¶ 61-62. EDR's attempt to explain why Sanborn II used *different* language in Section 1(e) (Op. Br. at 12) to mean the same thing is pure nonsense.

*Estate of Shaw v. Marcus*, 2015 WL 5610959 (S.D.N.Y. Sept. 22, 2015), cited by EDR, is distinguishable. The verbal agreement there involved settlement of family litigation over the copyrights in family members' photographs. *Id.* at *1. The agreement did "not explicitly mention 'copyright' or

---

[4] *See also id.* at 7 ("Other than these assets, none of Sanborn II's map business assets were excluded."), 10 ("Sanborn II conveyed and sold (not licensed) everything, except for the assets expressly excluded.").)

'exclusive rights," but had a "penalty provision" penalizing the individual members if they tried to make any deal involving the photographs. *Id.* at *2. The court did not *decide* the language was an assignment, but found it "plausible" based on the penalty provision that the individuals "were transferring away whatever individual rights, including copyrights, they each had" in the photographs. *Id.* at *7. In contrast, the 1973 APA **explicitly** mentions "copyright" and "exclusive rights" in Paragraph 13, but not in Paragraph 1(e). And the 1973 APA does not contain a broad "penalty provision" such as the one in *Estate of Shaw*.[5] The other cases EDR cites are also inapposite. The agreements in those cases (unlike the 1973 APA) did not use the words "copyright" or "exclusive right," but another word or phrase in their stead.[6]

EDR's cases are also distinguishable because they relate to assignments under the Copyright Act of 1976, in which copyrights became divisible. Under the Copyright Act of 1909, which applies to the 1973 documents, "a transfer of anything less than the totality of rights commanded by copyright was automatically a license rather than an assignment of the copyright,"[7] and a transfer of "full ownership" of a copyright "necessarily includes the right to create and exploit derivative works." *Creazioni Artistiche Musicali, S.r.l. v. Carlin Am., Inc.*, 747 F. Appx' 3, 5 (2d Cir. 2018) ("*CAM II*"). On its face, the (exclusive or non-exclusive) "right to market products from the map library" does not include any grant of exclusive rights to create derivative versions of the existing maps.[8] Accordingly, the 1973 APA did not convey "the **totality** of rights," and thus could not effectively assign the copyrights from Sanborn II to Sanborn III.

---

[5] The APA had a non-compete provision, but it lasted only for five years, and covered only areas "where such business is *presently* conducted" in 1973. CSF ¶ 279. Of course, Sanborn Maps historically covered a much larger area than Sanborn II's 1973 mapping operations. CSF ¶ 280.

[6] *See Shugrue v. Continental Airlines, Inc.*, 977 F. Supp. 280, 284 (S.D.N.Y. 1997) (conveyance of "all right, title and interest … in and to all programs and software"); *John G. Danielson, Inc. v. Winchester-Connant Props.*, 186 F. Supp. 2d 1, 11 (D. Mass. 2002) (agreement that did "not explicitly mention the word copyright" but used "'publication' … language borrowed from copyright-speak"); *Schiller & Schmidt, Inc. v. Nordisco Corp.* 969 F.2d 410, 413 (7th Cir. 1992) (agreement that did "not mention the word 'copyright'" but "sold all the assets" of a photography studio, including negatives from which the buyer could not have made positives if he had not also acquired the copyrights).

[7] Because the effect of the documents depends on whether less than the entirety of exclusive rights were conveyed, whether a "licensor" is "unidentified" or whether the documents bore other "hallmarks of a license" (Op. Br. at 10-11) is irrelevant.

[8] The 1973 APA's recitals note that Sanborn III is in the business of manufacturing, **revising**, and selling maps. CSF ¶ 28.

**2.   If Extrinsic Evidence Is Permitted, It Demonstrates that the 1973 Documents Did Not Assign the Copyrights in the pre-June 1973 Sanborn Maps**

**a.   The Declaration of Steven Pease Should Not Be Considered**

Not satisfied with the clear, unambiguous language of the 1973 APA, EDR submits a litigation-derived declaration from Steven Pease, purporting to recall events from over 50 years ago, as drafted by EDR's lawyers. It should not be considered. First, Mr. Pease was belatedly disclosed in litigation.[9] Second, Mr. Pease's declaration is "exactly the type of extrinsic evidence of subjective intent that is inadmissible under New York law[.]" *BOKF, N.A. v. Caesars Entm't Corp.*, 144 F. Supp. 3d 459, 471 (S.D.N.Y. 2015); *see also W.W.W. Assocs., Inc. v. Giancontieri*, 77 N.Y.2d 157, 162 (1990) ("Evidence outside the four corners of the document as to what was really intended but unstated or misstated is generally inadmissible to add to or vary the writing."). EDR's attempt to recast it as relating to the "context" of the transaction, such that it "must be considered" and is "not parol evidence" (Op. Br. at 4), is specious, at best.[10] The Court should limit its analysis to the unambiguous text of the 1973 APA.

Second, the Pease Declaration evidences only the ***buyer's*** intent and understanding of the 1973 APA. Such "unilateral expressions of one party's postcontractual subjective understanding of the terms of the agreement … are not probative" in interpreting the contract. *Faulkner v. Nat'l Geographic Soc'y,* 452 F. Supp. 2d 369, 379 (S.D.N.Y. 2006) (Kaplan, J.).[11] Notably, EDR offers ***zero*** evidence as to what the ***seller***, Sanborn II, intended the 1973 APA to convey.

**b.   Additional Extrinsic Evidence Confirms that the 1973 Documents Did Not Assign the Copyrights in the pre-June 1973 Sanborn Maps**

---

[9] *See* CSF ¶¶ 14-24, 26, 32-36, 38-39, 41-42, 44-45, 51-52, 55-57, 116-118, 120-121 (objections); CSF ¶ 286.

[10] The cases EDR cites to support its position. both involve disputes over a "commercially reasonable efforts" clause, which of course require outside, objective evidence of what those "efforts" must entail. *See Holland Loader Co, LLC v. FLSmidth A/S*, 313 F. Supp. 3d 447, 469 (S.D.N.Y. 2018); *MBIA Ins. Corp. v. Patriarch Partners VIII, LLC*, 842 F. Supp. 2d 682, 704 (S.D.N.Y. 2012). The 1973 APA and its associated documents do not contain any such language.

[11] *See also Ingersol Mill. Mach. Co. v. M/V BODENA*, 619 F. Supp. 493, 506 (S.D.N.Y. 1985) ("subjective views" of one party "never communicated" until litigation commenced "cannot be used to establish that [the parties] had such intent and understanding when they entered into the … contract.")

If the Court deems it necessary to look beyond the four corners of the 1973 APA and Bill of Sale, it will find highly probative evidence that the Sanborn Map *copyrights* were not part of the asset purchase.

First, in *other* transactions involving the purchase of the Sanborn Map Company's business, the parties referred to copyrights by expressly using the word "copyrights." In a 1959 "Assignment of Copyrights," Sanborn I assigned to Sanborn II "all of its right, title and interest in and to all *copyrights* owned by it" and other ancillary rights. RSF ¶ 42. Having used the word "copyrights" in obtaining copyright maps created by Sanborn I, there is no reason why Sanborn II would use *different* language in Subparagraph 1(e) of the 1973 APA (while using "copyrights" elsewhere), unless it intended to convey something other than what it obtained in 1959.

Second, in 1973, **the copyrights in Sanborn Maps were not part of Sanborn II's mapping business**. By 1960, the detailed maps and services previously offered by Sanborn were no longer required. CSF ¶ 281. According to Sanborn II's President, Sanborn II stopped creating new maps in 1961 and "limited itself to revision service for existing atlases and graphics prepared on a custom basis for non-insurance clientele." *Id.* ¶ 282. Years before 1973, Sanborn II ceased filing new copyright applications for current maps **and** renewal applications for maps in the 28th year of their original term. *Id.* ¶ 283. This indicates that Sanborn's II's business did not involve excluding others from copying its old maps—and certainly not maps from the 1920s and 30s, which form the bulk of maps asserted against ERIS. *Id.* ¶ 285.[12]  When the 1973 APA reflects Sanborn II's desire "to sell certain of the assets *used by it* … in carrying on [its] business," those assets clearly did not include Sanborn Map copyrights.

EDR argues that interpreting the 1973 transaction as *not* conveying the copyrights in the pre-June 1973 Sanborn Maps would be "absurd, commercially unreasonable or contrary to the reasonable expectations of the parties" (Op. Br. at 12-13 (citation omitted)). That lacks merit for the same reasons.

---

[12] Sanborn III followed the copyright registration practices of its predecessor. *Id.* ¶ 284. This demonstrates that, despite the feeble attempts of EDR to demonstrate otherwise, Sanborn III *also* did not consider copyrights part of the business.

Even if the transaction was intended to allow REDI to carry on Sanborn II's business (Op. Br. at 5, 8), the granted "rights to market products from the map library" allowed Sanborn III to do exactly what Sanborn II had done for years: market and sell copies of maps. It is neither absurd nor unreasonable to interpret "the rights to market products from the map library" as exactly what it says, without now adding conveying the right to exclude others from performing other activities involving the maps.

In any event, EDR *continues* to fail to provide evidence of what maps were in "the map library," or provide support for its view that "the map library" includes all asserted pre-June 1973 Sanborn Maps.

**B.     EDR Fails to Raise a Genuine Dispute of Material Fact as to the Work-for-Hire Status of Each Asserted Post-1978 Map**

The copyright registrations for post-1978 maps enjoy no presumption of validity (*see* Preliminary Statement), so EDR must show they were "made for hire." ERIS provided its rationale for "pointing out to the district court," *Celotex*, 477 U.S. at 325, that EDR cannot adduce evidence to do this: A diligence document stating that some surveyors were "███████████████████████████████." RSF ¶ 72. Thus, EDR cannot meet its summary judgment burden without showing who drafted *each* asserted Sanborn Map. Were they a contractor? Or an employee? This must be done on a drafter-by-drafter basis, examining each person's relationship with the company under the test in *Community for Creative Non-Violence v. Reid*, 490 U.S. 730, 751-52 (1989). *Waite v. UMG Recordings, Inc.*, 2023 WL 1069690, at *5-6 (S.D.N.Y. Jan. 27, 2023).[13] But EDR has not identified *any* surveyor(s) who drafted *any* given post-1978 Sanborn Map, much less how the *Reid* factors apply to those person(s). The "evidence" EDR submitted in opposition to ERIS' motion on this point is woefully insufficient. CSF ¶¶ 104-128. Accordingly, EDR cannot support its claim to ownership of the post-1978 maps.

**C.     EDR Fails to Raise a Genuine Issue of Material Fact that the 1996 Asset Purchase Failed to Transfer All Copyright Rights for Each Asserted Sanborn Map**

---

[13] EDR's attempt to distinguish *Waite* falls flat. (Op. Br. at 24, n. 22.) There is no reason that proving work-for-hire status is any less of an important, individualized inquiry in this case than in that one.

The Bill of Sale accompanying the 1996 APA does not save EDR's day. It only states that TRW REDI conveyed to EDR all of its "right, title and interest in and to the Acquired Assets" as defined in the 1996 APA. CSF ¶ 90. But as ERIS noted in its opening brief, "Acquired Assets" cannot be read by itself. Indeed, the 1996 sale was a "sign and close" transaction, and "all writings which form part of a single transaction and are designed to effectuate the same purpose must be read together." *TVT Records v. Island Def Jam Music Grp.*, 412 F.3d 82, 89 (2d Cir. 2005) (cleaned up). "An interpretation of a contract that has the effect of rendering at least one clause superfluous or meaningless is not preferred and will be avoided if possible." *LaSalle Bank Nat'l Ass'n v. Nomura Asset Capital Corp.*, 424 F.3d 195, 206 (2d Cir. 2005) (cleaned up). Thus, construing the Bill of Sale construed to convey the Sanborn Map copyrights to EDR via its inclusion of "Acquired Assets" would render the accompanying Assignment of Copyrights—with its detailed description of *what* copyrights were to be assigned—superfluous, and would contradict the caveat in Exhibit E (titled "Exceptions to Acquired Assets") that "Purchaser will obtain only physical title to the Sanborn Fire Insurance Maps[.]"[14] The only reasonable way to reconcile the documents forming the 1996 transaction is to read the 1996 Assignment as defining the scope of Sanborn Map copyrights that fell within the otherwise nebulous definition of "Acquired Assets."[15] But that covers only those maps that were "located at the Sanborn Facility" in Pelham as of June 1996. RSF ¶¶ 91-92.

To survive summary judgment, EDR bears the burden to produce admissible evidence that each asserted map was located at the Sanborn Facility in June 1996. EDR should be precluded from doing so, because it refused to respond to ERIS' interrogatory on that precise issue. *Id.* ¶ 96. Moreover, EDR's

---

[14] EDR falsely claims that "Exhibit E is tied to Section 2.2(c)'s inventories" (Op. Br., at 20), but nothing in Exhibit E references "inventories" or connects to Section 2.2(c) at all. Indeed, the reference to maps being in the "public domain"—a copyright-specific term—indicates that the parties *definitely* intended that this statement be directed to more than inventories.

[15] Limiting the copyrights transferred to maps located at the Sanborn Facility is consistent with the "Acquired Assets" including only those that "relate primarily to TRW REDI's conduct of Sanborn." RSF ¶ 82. Sanborn Maps EDR procured from libraries after the acquisition (RSF ¶ 97) could not have been used by TRW REDI, so copyrights thereto could not have been conveyed.

"evidence" allegedly suggesting "all" the maps were "on-site" at the Sanborn Facility does not, in fact, support that claim. CSF ¶¶ 97-101. Other evidence clearly demonstrates that after the acquisition, EDR had to obtain maps from libraries that it did *not* have in its possession. RSF ¶ 97. Accordingly, EDR cannot raise a genuine issue of material fact that it owns each asserted map.

### D.    The Mis-Noticed Maps Are in the Public Domain

As the plaintiff, EDR must prove "ownership of a valid copyright" in *each* of its asserted maps.[16] *Feist Publn's, Inc. v. Rural Tel. Serv. Co.*, 499 U.S. 340, 361 (1991). The validity of copyright in a pre-March 1989 work depends on compliance with the statutory formalities governing copyright notice. (ERIS Br. at 7-10.) To "point[] out to the district court" why EDR cannot show that the notice requirements have been met, ERIS proffers examples showing its rationale; the burden then falls to EDR to adduce admissible evidence otherwise. *Celotex*, 477 U.S. at 325. EDR cannot do so.

### 1.  The Correction Slips Do Not Contain Adequate Copyright Notices

There is no dispute that copyright notices do not appear on correction slips themselves. RSF ¶ 107. Rather, EDR argues the copyright notice for the relevant Sanborn Map *volume*—which the customer would have purchased in a previous vintage—would suffice to provide notice for the slips, even though they were affixed later. (EDR Br. at 27.) This is not the law. In *Lydiard-Peterson Co. v. Woodman*, 204 F. 921, 924-25 (8th Cir. 1913), which EDR cites, a directory (with proper notice) and a map accompanying the directory were published ***together***; the Court was prohibited by stipulation from addressing the situation where the map was sold separately. *Id.* Here, there is no dispute that the slips were published years or even decades after the map books to which they were affixed. RSF ¶ 105. EDR concocts a theory that Sanborn must have attached the slips at its offices and then "returned the updated Sanborn map book, as a whole, to its customers," thus making the updated book as a whole (rather than the correction slips

---

[16] EDR's claims that there are 6,162 "Asserted Works" is improper. EDR identified only 5,239 works at issue in its interrogatory responses. The newly added works should not be considered and EDR's motion should be denied as to them. CSF ¶¶ 104, 129.

themselves) the appropriate published unit. (Op. Br. at 27 n. 26.) This is nonsense. The evidence is to the

contrary. CSF ¶ 139. Thus, the published correction slips themselves required a notice. 17 U.S.C. §§ 9

(1909), 10 (1947). They contained none. Those works fell into the public domain.

### 2. The Maps with Mis-Dated Notices Are Also in the Public Domain

EDR does not challenge the fact that where the year in a copyright notice antedated the actual

date of publication, that earlier date is used to determine the copyright term—even for maps. (ERIS Br.,

Dkt. 239, at 8-10.) Indeed, in its own summary judgment motion, EDR *admits* that 482 additional map

volumes from the LOC Collection both (i) bear antedated notices and (ii) were renewed *after* the twenty-

eighth year following the year in the copyright notice. CSF ¶ 164. *By virtue of those admissions*, these

untimely renewed map volumes from the LOC Collection fell into the public domain.

The presumption of validity does not apply to the maps in the UPA Collection (*see* Preliminary

Statement), which EDR admits were microfilmed from the Sanborn Map Company's *internal archives*.

RSF ¶ 15. Thus, the markings on the initial pages of each volume in the UPA collection—including the

stamped or handwritten dates that EDR claims form part of the notice—are specific to those archival

copies. EDR offers no evidence that *each published copy* of these maps had the same notice, as required

by 17 U.S.C. §§ 9 (1909), 10 (amended 1947), and 401(a) (1976). But ERIS has shown that maps from

*outside* the UPA archives—including the Library of Congress' holdings and other maps "in the wild"—

lack those handwritten, stamped dates. RSF ¶¶ 113-115.[17] These examples "point[] out to the district

court" that EDR cannot produce evidence to prove a critical element of its case. *Celotex*, 477 U.S. at 325.

EDR then argues that a notice was not required on *each* published copy of the works. (Op. Br. at

---

[17] *See also* CSF ¶ 287. ERIS' evidence of the routine practice of the Sanborn Map Company is admissible to show that the published copies of asserted maps in the UPA Collection did not contain handwritten, stamped dates, in accordance with that practice. Fed. R. Evid. 406. *Nat'l Comics Publs., Inc. v. Fawcett Publs., Inc.*, 191 F.2d 594, 599 (2d Cir. 1951), cited by EDR, was not an evidentiary ruling, but relates to the *substantive* question of whether an improper notice on a comic strip "abandons" rights to copyright all comic strips involving the same character. In any case, *Nat'l Comics* pre-dated the enactment of Rule 406.

27-28 (quoting 17 U.S.C. §§ 20 (1909), 21 (amended 1947), 405(a)(1) (1976)). But EDR selectively quotes from limited statutory *exceptions* to the general rule, ignoring the canon that EDR bears the burden of establishing that those exceptions actually apply. *See, e.g.*, *Horror Inc. v. Miller*, 15 F.4th 232, 242-43 (2d Cir. 2021). To do that, EDR must provide evidence that "the copyright proprietor s[ought] to comply with the provisions of this title with respect to notice," that any omission was by "accident or mistake," or that the notice was omitted from "no more than a relatively small number of copies." 17 U.S.C. §§ 20 (1909), 21 (1947), 405(a)(1) (1976). EDR offers no *admissible* evidence on the Sanborn Map Company's notice-affixing practices going back to the 1960s, or the percentages of such copies that contained inadequate notices. RSF ¶ 112. EDR cannot raise a triable issue of fact on this matter.[18] The record shows, at best, that only the *earlier* printed dates (not the handwritten stamped dates) appeared on the published versions of the maps, making renewal required 28 years thereafter. (ERIS Br. at 28.) EDR produced no evidence of timely renewal. The mis-noticed maps are in the public domain.

### 3. The Copyright Notices on Interior Pages Are Insufficient

For printed publications (such as Sanborn Maps), the 1909 Act provides that a copyright notice "*shall* be applied" on the title page or page immediately following. 17 U.S.C. §§ 19 (1909), 20 (1947). "The word 'shall,' in a statute, indicates a command[.]" *United States v. Kahn*, 5 F. 4th 167, 174 (2d Cir. 2021). Thus, "when the Act requires that copyright notice be applied at a particular place in a work (the title page or page next following), the courts may not dispense with the requirement and say that a notice appearing somewhere else is enough." *J.A. Richards, Inc. v. New York Post, Inc.*, 23 F. Supp. 619, 620 (S.D.N.Y. 1938). Contrary to EDR's arguments (Op. Br. at 30), this placement is not optional. Also, the

---

[18] By contrast, in the cases EDR relies on to support its argument, the plaintiffs there produced sworn testimony as to "the strong efforts made by Dollcraft to insure compliance with the statutory notice requirements," and the copies of the works before the court were "in fact the published copies of the works." *Dollcraft Indus., Ltd. v. Well-Made Toy Mfg. Co.*, 479 F. Supp. 1105, 1116 (E.D.N.Y. 1978); *see also E. Mishan & Sons, Inc. v. Marycana, Inc.*, 662 F. Supp. 1339, 1343 (S.D.N.Y. 1987) (evidence adduced that "only about 3,000 out of the 613,000 [copies] sold prior to trial submissions" omitted notice, and that "since [plaintiff] began affixing notices in 1982, all its magnets have borne a notice.").

"title page" does not mean any page that happens to have a title on it (*contra* Op. Br. at 29), but rather reflects the "intention of the law that each book shall … contain one particular page devoted, in whole or in part, especially to the title." *Freeman v. Trade Register*, 173 F. 419, 424 (W.D. Wash. 1909).[19] ERIS has pointed to evidence of a "title page" separate from the keymap page containing the notice on which EDR relies, thus "pointing out to the district court," *Celotex*, 477 U.S. at 325, that EDR cannot adduce evidence of properly placed notices. RSF ¶ 112; CSF ¶¶ 153-157, 159. EDR has failed to meet its burden.

### 4. The Dispersed/Illegible Notices are Insufficient

EDR claims to submit the copyright notice page for *every* asserted map (Op. Br. at 31), though many anomalies exist. CSF ¶¶ 158-170. The Court can view the challenged maps, RSF ¶ 118, and easily determine that as a matter of law, those notices are invalid.[20]

## II.    EDR FAILS TO RAISE A GENUINE DISPUTE OF MATERIAL FACT ON ESTOPPEL

The basic facts underlying ERIS' estoppel are not materially disputed. To avoid summary judgment, and to obtain summary judgment of its own, EDR attempts to impose a set of bright-line rules that, in its view, preclude estoppel. But estoppel requires no "particular factual situation nor [is it] subject to resolution by simple or hard and fast rules." *A.C. Aukerman Co. v. R.L. Chaides Const. Co.*, 960 F.2d 1020, 1041 (Fed. Cir. 1992). EDR's arguments are meritless, and miss the forest for the trees. Fundamentally: Was it *reasonable* that ERIS relied, to its detriment, on EDR's failure to follow up on Paul Vogt's November 2013 letter, or sue until 2019—*given the entire circumstances* in which the parties interacted and competed? The answer is "yes." No reasonable factfinder could conclude otherwise.

---

[19] *Freeman* and *Am. Travel & Hotel Directory Co. v. Gehrine Publ'g Co.*, 4 F.2d 415, 415-16 (S.D.N.Y. 1925), both cited by EDR, support only the idea that a "title page" may be preceded by advertisements and thus may not be the first page of a book.

[20] The case law EDR cites is distinguishable and does not establish any bright-line rules or boundaries on what is acceptable. *See Wrench v. Universal Pictures Co.*, 104 F. Supp. 374, 378-79 (S.D.N.Y. 1952) (derivative work with revised versions of short stories had appropriate copyright notice listing the year the book, not the earliest story, was published); *Block v. Plaut*, 87 F. Supp. 49, 53 (N.D. Ill. 1949) ("surplusage" as to patent and trademark protection not invalidating copyright notice elements from the same area); *ADA Design Alliance, Inc. v. Renberg*, 942 F.2d 790 (9th Cir. 1991) (unpublished table opinion) (erroneous name of owner not invalidating); *Puddu v. Buonamici Statuary, Inc.*, 450 F.2d 401, 403-05 (2d Cir. 1971) (holding notice on statuettes illegible or hidden behind clothing to be invalid, but not purporting to establish outer bounds of illegibility).

**A.      ERIS Was Ignorant of the Fact that EDR Considered ERIS' Conduct Unlawful and Would Enforce Its Alleged Copyrights in the Sanborn Maps from 2014 Onward**

Citing *Lottie Joplin Thomas Trust v. Crown Publrs., Inc.*, 456 F. Supp. 531, 535 (S.D.N.Y. 1977), EDR suggests that "ignorance of the true facts" can *only* mean ignorance that a plaintiff claims copyright ownership, and that ERIS was not ignorant of EDR's claims to own copyrights in the Sanborn Maps. (Op. Br. at 32-33.) EDR's position is not supported. Traditionally, estoppel required the defendant to have been "misled into reasonably and justifiably believing that the plaintiff would not pursue his claims against the defendant." *Merchant v. Lymon*, 828 F. Supp. 1048, 1064 (S.D.N.Y. 1993) (citing *Glus v. Brooklyn Eastern Dist. Terminal*, 359 U.S. 231, 234 (1959)); *Dallal v. N.Y. Times Co.*, 386 F. Supp. 2d 319, 321-22 (S.D.N.Y. 2005) ("*Dallal I*") (quoting *Encyclopedia Brown Prods., Ltd. v. Home Box Office, Inc.*, 1998 WL 734355, at *13 (S.D.N.Y. Oct. 15, 1998)). When "ignorance of the true facts" is discussed *in that context*, the case law refers simply to the mirror image of what the defendant had been "misled" to believe was true—whether that fact was that a plaintiff (i) owned copyright in a work, as in *Lottie Joplin, or* (ii) "would not pursue his claims against the defendant," as in *Merchant*. In fact, in *Dallal v. N.Y. Times Co.*, 2006 WL 463386, at *2 (2d Cir. 2006) ("*Dallal II*"), which reversed *Dallal I*, the "true fact" of which the defendant may not have been ignorant was *not* that the plaintiff owned the copyright in his photograph, but whether defendant's use of the photograph was "authorized." Thus, ERIS' knowledge that EDR may own some copyrights in some Sanborn Maps (especially given EDR's efforts to obfuscate which maps were and were not under copyright, CSF ¶ 303) is not dispositive.

The "true fact" *at issue here*, of which ERIS was indisputably unaware, was that EDR considered ERIS' use of those maps to be an infringement of any copyright rights it may have held. ERIS has always believed that its conduct constitutes fair use. CSF ¶ 292. EDR cannot raise a genuine dispute on ERIS' belief, or posit that the belief is unreasonable. Indeed, ████████████████████████████ ████████████████████████████████████████████████████████████████. RSF ¶¶

299. EDR also claims ERIS' ignorance is disproven by internal discussions on the "risk" of obtaining and supplying fire insurance maps. (Op. Br. at 33-34.) But EDR cites no case law holding that estoppel requires a defendant to believe its litigation risk was completely reduced to *zero*. Risk is a matter of degree, and the only documents quantifying ERIS' risk describe that degree as "small" or "less than negligible." RSF ¶ 263; CSF ¶ 232.  Anyone can misuse the court system to harass competitors by filing frivolous claims—for example, that ERIS' collection of maps dating to the 19th century "is built *entirely* of [EDR's] *copyrighted* maps" (Dkt. 12 ¶ 5), or that ERIS infringed a 1952 map which *EDR's own records* show was not renewed (*id.* ¶ 34; CSF ¶ 301). The ultimate question on this issue is: Was ERIS aware of a risk that EDR could ***successfully*** sue ERIS? It was not (and there is no evidence that it was).

**B.     Despite a Clear Duty and Opportunity to Speak, EDR Misleadingly Remained Silent and Took No Action Following Vogt's Letter**

Relying on dicta in *Petrella v. MGM*, 572 U.S. 663, 684 (2014), EDR claims: "ERIS must point to an intentionally misleading representation by [EDR] to ERIS suggesting that ERIS was authorized." (Op. Br. at 37.) But in *Petrella*, an intentionally misleading representation was *sufficient*, not *necessary*. "It is immaterial to a claim of estoppel that there was no actual attempt to defraud or mislead." *Columbia Broad Sys., Inc. v. Stokely-Van Camp, Inc.*, 522 F.2d 369, 378 (2d Cir. 1975) ("*CBS*"). Rather, whether a copyright holder's conduct is "misleading is evaluated from the perspective of the alleged infringer," ERIS. *Aspex Eyewear, Inc. v. Clariti Eyewear, Inc.*, 2008 WL 5049744, at *4 (S.D.N.Y. Nov. 26, 2008) ("*Aspex I*") (citing *Wafer Shave Inc. v. Gillette Co.*, 857 F. Supp. 112, 119 (D. Mass. 1993)), *aff'd*, 605 F.3d 1305 (Fed. Cir. 2010) ("*Aspex II*").

EDR next argues that "[s]ilence or inaction, standing alone, is rarely enough and must be coupled with a *legal or contractual relationship or explicit overt act*." (Op. Br. at 37 (emphasis added); *id.* at 39 n.38.) EDR again misstates the law. Under *Aukerman*, cited by EDR, inaction need only be "combined with other *facts respecting the relationship or contacts between the parties* to give rise to the necessary

inference that the claim against the defendant is abandoned." 960 F.2d at 1042 (emphasis added). Such "facts respecting [EDR's and ERIS'] relationship or contacts" are not as limited as EDR claims, and are repeatedly present here. RSF ¶¶ 283-315. And EDR's proposed limitation ignores recognized instances where the duty to speak was not "purely legal," but "founded in principles of ethics and good faith." *CBS*, 522 F.2d at 378. Estoppel applies when "one party in a relationship with another has an opportunity to speak in order to avoid harm or injury to the other party and fails to do so," *id.*, and EDR does not genuinely dispute that it has had several such opportunities.

First, EDR "specifically object[ed] to the allegedly infringing activities" through emails and Vogt's letter in Fall 2013, and "then fail[ed] to follow up for years" following that letter (and ERIS' response, which EDR concedes was sent, regardless of whether Vogt actually reviewed it).[21] *Lego A/S v. Best-Lock Constr. Toys, Inc.*, 404 F. Supp. 3d 583, 620 (D. Conn. 2019) ("*Lego II*"); RSF ¶ 295. Second, EDR's President, Rob Barber, was involved in commercial negotiations between EDR's and ERIS' parent companies in 2014 (in which potential licensing of other IP was discussed). RSF ¶¶ 306-312. EDR failed to raise the alleged infringement of Sanborn Maps despite a clear "opportunity" to do so, *CBS*, 522 F.2d at 378, another data point that led ERIS to "infer[] that [EDR's] claim against [ERIS was] abandoned." *Aukerman*, 960 F.2d at 1042. Third, EDR participated on committees that developed and updated the ASTM Standard Practice for Environmental Site Assessments: Phase I Environmental Site Assessment Process ("ASTM Standard")—another "opportunity to speak" to ERIS and others about its alleged copyright rights. *CBS*, 522 F.2d at 378. RSF ¶¶ 131-133. But EDR chose to stay mute. In an analogous case, at least one court has held that "plaintiff's silence was intentionally misleading." *Stambler v. Diebold, Inc.*, 1988 WL 95479, at *6 (E.D.N.Y. Sept. 2, 1988).[22] EDR's silence before the

---

[21] This admission is an important one, because whether EDR's conduct is misleading is evaluated from ERIS' perspective. *Aspex I*, 2008 WL 5049744, at *4; *Wafer Shave*, 857 F. Supp. at 119.

[22] In *Stambler*, the court found that plaintiff-patentee knew his patent rights were implicated by national standards and participated on the relevant "standards committee after concluding that" the "standards infringed his patent," but "left the

ASTM was *even more* misleading, in light of the other instances where EDR failed to speak.

EDR makes a number of meritless arguments about some of these estoppel-triggering events. None affect the ultimate outcome. For example, EDR argues that its silence following Vogt's November 2013 letter could not be "transform[ed] into an affirmative misrepresentation" because a "'vigorous or immediate' threat of enforcement" did not exist. (Op. Br. at 39 n.38.) But the premise that a "vigorous or immediate threat of enforcement" is *required* is legally erroneous. *See, e.g.*, *ABB Robotics, Inc. v. GMFanuc Robotics Corp.*, 52 F.3d 1062, 1064 (Fed. Cir. 1995) (rejecting similar argument, holding that the fact "that an immediate threat of enforcement followed by silence may be the most common scenario does not mean that it is the only set of facts which can support a finding of misleading silence").

In reality, Vogt's letter did represent such an enforcement threat. EDR's claim to the contrary— that it was merely a "warning letter regarding future infringement" because "it did not allege that ERIS was infringing and did not call for a response" (Op. Br. at 36)—is specious. It is irrelevant that specific text ("we believe you're infringing" or "stop or we will sue you") does not explicitly appear in Vogt's letter. The letter nevertheless promised that EDR would "take all actions" including those "under the US Copyright Laws, to enforce its copyrights and to obtain damages against anyone who infringes or misappropriates such copyrights." RSF ¶287. It came in the context of an interaction only days earlier, where EDR accused ERIS of "copyright *violations*," stating that "[o]ur counsel will follow up as a matter of formality." CSF ¶ 297. After the fact, EDR repeatedly referred to Vogt's letter (including in the filename of its PDF image) as a "███████████"—an idiom meaning a "statement or gesture intended to frighten someone into *changing their course of action*," CSF ¶¶ 235-239, 298-299 (emphasis added)—and discussed the hope that ERIS *would* stop selling Sanborn Maps. *Id.* Even EDR's outside

---

committee without notifying it" of his patent rights. *Id.* The court held that "[u]nder these circumstances, plaintiff had a duty to speak out and call attention to his patent," and his failure to do so "could reasonably interpreted as an indication that plaintiff had abandoned its patent claims." *Id.*

counsel referred to the letter as a "cease and desist letter," until that description proved harmful to EDR's contentions. *Id.* Given all of the foregoing facts, the message conveyed by Vogt's letter was nothing less than a clear threat of enforcement. *See Aspex II*, 605 F.3d at 1311 (rejecting plaintiff's argument "that its letters did not threaten suit," because viewing "the correspondence as a whole," the trial court correctly found defendant "reasonably viewed" the letters as a threat of an infringement suit).[23] The situation here is vastly different from the cases relied on by EDR, which involve either licensing negotiations between non-competitors[24] or alleged revocation of a previously granted license,[25] not a specific objection to alleged infringement and failure to follow up, as is the case here. *See LEGO II*, 404 F. Supp. 3d at 620 (describing this as the "most common case" of estoppel); *Aukerman*, 960 F.2d at 1042 (same).

While EDR contends that its letter "did not call for a response," the law does not require such a response be called for or made for estoppel to apply. Nonetheless, ERIS' counsel *did* respond, asking EDR to substantiate its claims and identify "the copyright registration (and renewal information)." RSF ¶ 290. EDR claims to have no "record of receiving" the response. (Op. Br. at 36.) But that denial alone is not sufficient to raise a genuine dispute of material fact, given the legal presumption that it was received (*see* ERIS Br. at 34 n.20),[26] Carol LeNoury's follow-up with Jon Walker about it, and EDR's bogus

---

[23] *See also Gossen Corp v. Marley Mouldings, Inc.*, 977 F. Supp. 1346, 1354 (E.D. Wis. 1997) (plaintiff's letter "did not explicitly accuse Marley of infringement or threaten suit," but its "clear implication was to put Marley on notice that Gossen believed Marley's" product infringed "and that it would enforce its rights"); *Chubb Integrated Sys. v. Nat'l Bank of Wash.*, 658 F. Supp. 1043, 1048 (D.D.C. 1987) (plaintiff's later "internal memoranda clearly indicate that the implication was intended").

[24] *See Hemstreet v. Computer Entry Sys. Corp.*, 972 F.2d 1290, 1295 (Fed. Cir. 1992) (rejecting estoppel where "the parties were not in an adversarial stance," and thus the plaintiff "had less reason to be vigilant in pressuring [defendant] for a response"); *Meyers v. Asics Corp.*, 974 F.2d 1304, 1309 (Fed. Cir. 1992) (rejecting estoppel where initial letter was "merely an invitation to enter into a business relationship," and phone call discussing alleged infringement was "not followed by silence" but by "several letters passed between" plaintiff and defendant over a 14-month period).

[25] In *Pavlica v. Behr*, 397 F. Supp. 2d 519, 522-24 (S.D.N.Y. 2005), the plaintiff had previously worked with defendants and consented to their use of his copyrighted manual in the course of their work, but revoked that consent after they parted ways, as communicated in letters from his counsel. The defendants' claim was that plaintiff was "estopped from asserting a copyright infringement action because he consented to the use of the manual in the grant application and workshops" *before* the attorney's letters were sent. *Id.* at 527. It was not based on any period of misleading silence *following* those letters, so regardless of how the letters are characterized, *Pavlica* is inapposite to the instant case.

[26] EDR does not even address the legal authority for the presumption, much less question its validity. And while EDR claims not to have received the response, it does not dispute that ERIS' counsel sent an inquiry, or that he received a fax confirmation from EDR indicating it had been received. RSF ¶ 291.

excuse that the fax machine was kept "in a small utility closet." RSF ¶¶ 292-293, CSF ¶ 240. EDR attempts to establish a bright-line rule that would require ERIS to repeatedly follow up with EDR to ensure it reached Mr. Vogt. (Op. Br. at 36.) But the law EDR cites does not support that rule,[27] which would bar any estoppel in the "most common case"—where the rightsholder "specifically objects to the allegedly infringing activities and then fails to follow up for years." *LEGO II*, 404 F. Supp. 3d at 620; *Aukerman*, 960 F.2d at 1042. Thus, if EDR's duty to speak was only triggered by a "response" to the Vogt letter, that requirement has been met. Once ERIS did respond, "[t]he ball plainly was in [EDR's] court to follow up about those or any other [copyrights] they believed [ERIS] might have been infringing." *Aspex I*, 2008 WL 5049744, at *6. The "opportunity to speak in order to avoid harm or injury to" ERIS thus presented itself; EDR "fail[ed] to do so," giving rise to estoppel. *CBS*, 522 F.2d at 378.

EDR's duty to speak was magnified during 2014, when EDR's and ERIS' parent companies discussed a variety of potential business relationships or transactions, including the acquisition of ERIS, and the licensing of *other* intellectual property. RSF ¶¶ 306, 308. EDR argues ERIS cannot rely on these discussions for its estoppel defense because they relate to other matters, not the Sanborn Maps. (Op. Br. at 38.) But that is exactly the point. Those discussions, which included IP-related topics, presented an opportune time for EDR to follow up on Vogt's letter (another IP-related topic). Indeed, "principles of ethics and good faith" compelled EDR to do so. *CBS*, 522 F.2d at 378. But EDR did not follow up. These are additional "facts respecting the relationship or contacts between the parties" which, under all of the circumstances noted above, gave "rise to the necessary inference that [EDR's] claim against [ERIS had

---

[27] In *Cherry River Music Co. v. Simitar Entm't, Inc.*, the court held that the defendant "had no reason to assume that Cherry Lane's silence in response to its license requests reflected acquiescence" because it did not know if the faxes reached "the relevant person" at Cherry Lane. 38 F. Supp. 2d 310, 319 (S.D.N.Y. 1999). But here, unlike in *Cherry River*, ERIS had no duty to follow up to check if Mr. Vogt had received its letter because ERIS was not asking Mr. Vogt for a license that it believed to be needed—rather, ERIS was disputing Mr. Vogt's and Mr. Walker's claim that ERIS had infringed any valid rights. Also, ERIS reasonably believed the letter reached Mr. Vogt because the letter was sent to the fax number on Mr. Vogt's own letterhead, and was confirmed as being received by EDR's fax machine.

been] abandoned." *Aukerman*, 960 F.2d at 1042. Courts have held that when a party has accused another of infringement, and it is "followed by inaction," and then "other negotiations … took place between" the parties regarding the licensing of *other* rights, these were all factors supporting a finding of misleading inaction. *ABB Robotics,* 52 F.3d at 1064.[28] After Vogt's November 2013 letter, between ERIS' December 2013 letter response, the January 2014 meeting between Jon Walker and Carol Le Noury, RSF ¶¶ 290-295, 306-312 and the monthslong discussions between the parties and their parent companies, each of those events was "an important instance of misleading conduct by" EDR. *Forest Labs, Inc. v. Abbott Labs.,* 1999 WL 33299123, at \*11, \*12 (W.D.N.Y. June 23, 1999).

Finally, EDR claims it was "never silent about its rights, including during the alleged period of inaction"—noting it "openly touted the existence of its rights as part of a ▮▮▮▮▮▮▮▮." (Op. Br. at 38.) Again, this is not the test. While EDR represented to the marketplace for years that it owns copyrights to all Sanborn Maps in its collection (it does not), the issue here is whether EDR was silent *to ERIS* about its belief that *ERIS' conduct* was infringing, following Vogt's 2013 letter. On that issue, it is undisputed that EDR "ghosted" ERIS. RSF ¶¶ 290-295, 305-312. It is that silence that was misleading.

**C.     ERIS Justifiably Relied on EDR's Silence and Inaction**

EDR still identifies no genuine dispute that ERIS, in fact, relied on EDR's silence and inaction to its detriment. (ERIS Br. at 39-40; RSF ¶¶ 316-334.) EDR argues that ERIS' "major investments" occurred "long before" the Vogt exchange. (Op. Br. at 35.) But EDR does not *genuinely* dispute ERIS' substantial additional investments continued unabated afterward—the pre-letter investments pale in comparison. RSF ¶¶ 316-332. It would not have undertaken these investments had EDR been more diligent in asserting its alleged copyright rights. *Id.* ¶¶ 333-334. Accordingly, there is no genuine dispute

---

[28] *See also Aspex II*, 605 F.3d at 1311 (treating a sequence of communications in which an earlier letter that referenced only infringement of a first patent, followed by a letter identifying only two other patents, was "fairly viewed as a tacit withdrawal of the [first] patent, or as misleading silence with respect to the [first] patent," in either case making it "reasonable for [defendant] to infer that [plaintiff] was not continuing the accusation of infringement as to the [first] patent.").

that ERIS incurred severe economic prejudice.[29]

EDR instead argues that ERIS' "detrimental reliance was entirely of ERIS' own making" because ERIS could have "inquired" with EDR and "sought a license from" it. (Op. Br. at 37, 35, 1.) This is nonsense. Setting aside that such an inquiry would have been futile,[30] EDR provides no support for claiming that inquiring with EDR was the *only* justifiable action ERIS could have taken. Under EDR's cases, a "party invoking estoppel" need only undertake "reasonable diligence," *AP v. Meltwater U.S. Holdings, Inc.*, 931 F. Supp. 2d 537, 565 (S.D.N.Y. 2013), or "due care," *Cooley v. Penguin Grp. (USA) Inc.*, 31 F. Supp. 3d 599, 613 (S.D.N.Y. 2014).

Given ERIS' good-faith belief that its activities constituted fair use,[31] the diligence activities ERIS *did* undertake to inform itself that EDR did not believe it could legitimately assert a copyright claim were more than reasonable. *See* RSF ¶¶ 207-273, 283-295, 305-315, 327-328. One of those activities was, in fact, an "inquiry": ERIS' counsel responded to Vogt's November 2013 letter. *Id.* ¶¶ 289-293. As explained in Section II.B above, EDR should be deemed to have received the response. There is no "inquiry" requirement for ERIS' reliance to be justifiable, but even if there were, it was satisfied.

Finally, EDR insinuates that ERIS did not rely on EDR's misleading conduct from 2013 because of internal documents mentioning litigation risk years later. (Op. Br. at 36-37.) But, as noted in Section II.A above, estoppel does not require that all mentions of "risk" be eliminated. In fact, the document that EDR quotes to supposedly support its position demonstrates that ERIS *did* rely on EDR's failure to

---

[29] ERIS' evidentiary prejudice is not a "throwaway" (Op. Br. at 36 n.37) but a well-recognized reason for estopping dilatory plaintiffs. *Aukerman*, 960 F.2d at 1031-33. Walker was indisputably a key figure in proving that EDR knew of ERIS' qualms with Vogt's letter, but also had knowledge of EDR's anticompetitive sales schemes to dupe the industry into believing that all Sanborn Maps were under copyright and could be used only if purchased from EDR. RSF ¶ 335. Moreover, the relevance of EDR's computer database of copyright registrations and rejections is beyond question. RSF ¶ 336.

[30] EDR has never *licensed* a competing environmental data provider to offer Sanborn Maps, and certainly not in electronic form; rather, ███████████████████████████████████████████████████████████████████ CSF ¶ 188.

[31] If a party's use of a copyrighted work is a fair use, "then no permission need be sought or granted.". *Campbell v. Acuff-Rose Music, Inc.*, 510 U.S. 569, 585 n.18 (1994). This Supreme Court precedent would be rendered meaningless if the same failure to request permission would categorically bar a defendant from invoking estoppel, based on its reasonable belief that it made fair use of a work, the other reasonable diligence it performed, and other circumstances at bar.

"come after us," viewing it as a signal that EDR had abandoned the claims it made back in 2013—especially because the "Fair Use issue works in our favour." RSF ¶ 331, CSF ¶¶ 228-229.

### D.      The Equities Do Not Tip in EDR's Favor.

EDR claims the equities tip in its favor because of ERIS' purported "willful infringement." (Op. Br. at 39-40.) But while EDR claims that "ERIS has engaged in extensive, verbatim *copying*[]" (*id.* at 39), infringement requires not just that a "defendant copied his work," but also "that the copying was wrongful," and "not all copying is wrongful." *Zalewski v. Cicero Builder Dev., Inc.*, 754 F.3d 95, 100 (2d Cir. 2014). "Wrongful" copying does not consist of copying "unprotected elements" of a work, *id.* at 102, and "fair use … is not an infringement." 17 U.S.C. § 107. "The standard" for *willful* infringement is "whether the defendant had knowledge that its conduct represented infringement or perhaps recklessly disregarded the possibility." *Twin Peaks Prods., Inc. v. Publ'ns Int'l, Ltd.*, 996 F.2d 1366, 1382 (2d Cir. 1993).[32] EDR has provided no evidence of "wrongful" copying or the unreasonableness of any of ERIS' defenses; ███████████████████████████████████████████████████████
███████████████████████. RSF ¶¶ 297-300. The Court should disregard EDR's argument.

On the other side, the inequitable nature of EDR's wanton, anticompetitive conduct is blatantly observable even from public filings. EDR alleged that ERIS' map collection "is built *entirely* of [EDR's] *copyrighted* maps" (Dkt. 12 ¶ 5), where *EDR's own records* show otherwise (*id.* ¶ 34; CSF ¶ 301). The court has already found probable cause "to suspect the perpetration of a fraud," based on EDR's knowledge "that at least some of its maps were out of copyright" but "attempted to hide or omit mention of which maps are in or out of copyright" to "induce customers to obtain maps only from EDR and not other sources." (Dkt. 210 at 4.) This finding was based on an extensive record of which the Court is

---

[32] "[O]ne who has been notified that his conduct constitutes copyright infringement, but who reasonably and in good faith believes the contrary, is not 'willful' for these purposes." 5 Nimmer on Copyright § 14.04[B][3][a]. This can include a reasonable, good-faith belief that a defendant's use is a fair one. *Princeton Univ. Press v. Mich. Document Servs., Inc.*, 99 F.3d 1381, 1392 (6th Cir. 1996).

already aware. (*See* Dkt. 159-164.) The balance of equities tips decidedly in ERIS' favor. To the extent it

is considered, it favors granting summary judgment to ERIS.

## III.   EDR FAILS TO RAISE A GENUINE DISPUTE OF MATERIAL FACT THAT ERIS HAS VIOLATED THE DMCA

### A.   ERIS is Entitled to Provide Terms and Conditions for the Use of Its Reports, and Does Not Violate Section 1202(a) by Doing So

There is no genuine dispute as to how ERIS' FIM Reports and Database Reports are created for

each customer, and what they include. RSF ¶¶ 137-206. *Numerous* courts within the Second Circuit and

elsewhere hold that a defendant's providing its *own* CMI in connection with its *own* distinct work—

precisely what ERIS is doing here—is not subject to DMCA liability, even where that work incorporates

a plaintiff's work in an allegedly infringing manner.[33] While EDR disagrees with those cases, it cannot

distinguish them because their central holdings apply with full force. Notably, EDR has not addressed or

rebutted ERIS' arguments linking the "distinct work" rationale used in this district with the statutory text

or legislative history of the DMCA. (ERIS Br. at 45-46.) EDR also ignores the mandate of the Second

Circuit: "context matters." *Fischer v. Forrest*, 968 F.3d 216, 224 (2d Cir. 2020) ("*Fischer II*").

Instead, EDR simply criticizes the respected jurists of this District as wrong and insufficiently

scrutinous, and cites to a minority of courts from outside the Second Circuit that adopt EDR's preferred

views. (Op. Br. at 40-42.) EDR's arguments are meritless. For example, in *GC2 Inc. v. Int'l Game Tech.*,

391 F. Supp. 3d 828, 843 (N.D. Ill. 2019), cited by EDR, the court did not disagree with *Fischer I* and

---

[33] *See* cases cited in ERIS Br. at 44-45 & n.23; *see also, e.g.*, *Fischer v. Forrest*, 286 F. Supp. 590, 610 (S.D.N.Y. 2018) ("*Fischer I*") (rejecting plaintiff's theory under the DMCA, in part for failing "to identify any case support that DMCA liability encompasses" a "composite 'work'" made when a defendant prepared its own work by "dr[awing] upon various materials.") (citing *Faulkner Press, LLC v. Class Notes, LLC*, 756 F. Supp. 2d 1352, 1359 (N.D. Fla. 2010)); *Pilla v. Gilat*, 2022 WL 1003852, at *26 (S.D.N.Y Mar. 29, 2022) ("[A] party that puts its own CMI on [a] work distinct from [a] work owned by a copyright holder is not liable under § 1202(a), even if the party's work incorporates the copyright holder's work") (quoting *Michael Grecco Prods., Inc. v. Time USA, LLC*, 2021 WL 3192543, at *5 (S.D.N.Y. July 27, 2021)); *Yellow Pages Photos, Inc. v. Dex Media, Inc.*, 2021 WL 799695, at *7 (M.D. Fla. Feb. 3, 2021) (holding that, where CMI was "about [defendant's] directories as a whole" and "separate and apart from any preexisting work included therein," defendant was "entitled to convey copyright management information about its own work") (citing *Greenberg v. Nat'l Geographic Soc.*, 533 F.3d 1244, 1249–50 (11th Cir. 2008)).

*Faulkner Press*, but distinguished them factually—in *Fischer I*, the "allegedly violative materials reproduced only tiny portions of the protected works," which could not "be characterized as a wholesale reproduction of the plaintiff's work," and in *Faulkner Press*, liability was "inappropriate where a defendant creates a 'different product' using 'materials from' a plaintiff's copyrighted materials without attribution." *See id*. at 843. Here, the facts follow *Fischer I* and *Faulkner*, not *GC2*. Each ERIS FIM Report excerpts only a fraction of the map sheets from any entire copyright-registered Sanborn Map volume. It is not a wholesale reproduction of that volume.[34]

EDR also attempts to distinguish the cases ERIS cites on the ground that they "concern the act of affixing one's name to an infringing derivative work," and not "terms and conditions language." (Op. Br. at 40-41.) This is a distinction without a difference. EDR does not explain why one form of CMI should be treated any differently than any other form, or cite authority holding that ERIS is not entitled to provide its own terms and conditions for the use of its reports. More importantly, ERIS' terms and conditions are not false. As EDR concedes, ERIS' Disclaimers *truly do* state the obligations that an ERIS customer undertakes in consideration for its access to ERIS' data and receipt of the FIM Report and Database Report. RSF ¶¶ 155, 181. That those obligations might limit how individual items of data (including maps, copyrighted or not)[35] *within* ERIS' reports might be used do not make them "false" as applied to the overall reports, despite any alleged lack of "authority to grant end-users permission to resell the individual maps for commercial purposes as part of a Phase I environmental site assessment or to

---

[34] *Huffman v. Activision Publ.* and *ADR Int'l Ltd. v. Inst. for Supply Mgmt., Inc.*, also cited by EDR, are likewise distinguishable. *See Huffman*, 2020 WL 8678493, at *12-13 (E.D. Tex. Dec. 14, 2020) (holding that in *Faulkner*, it was "perfectly reasonable" to find no DMCA violation where "the defendant had created its own product even though it used some of the [plaintiff's] materials," which "led the court to conclude that the CMI on the defendant's product was not false"); *ADR*, 2023 WL 2719446 at *9-10 (S.D. Tex. Mar. 30, 2023) (holding complaint plausibly alleged a DMCA violation where defendant's products "represent copies of [plaintiff's] work with only superficial alterations," and distinguishing case law from this District that involved, as here, "unquestionably a distinct work" from the plaintiff's that did "not inappropriately claim authorship over any of Plaintiff's copyrighted materials.") (cleaned up).

[35] There is no *genuine* dispute: the Database Report contains no fire insurance maps, and ERIS' FIM Reports refer to many supplied fire insurance maps that are in the public domain—to which the FIM Report Disclaimer, on its face, also applies. RSF ¶¶ 152, 180-183.

restrict their use in other commercial contexts." (Op. Br. at 44.)

Finally, EDR's argument that the "distinct work" rationale should not apply to ERIS' reports because they are insufficiently original to be copyrightable "derivative works" in themselves (Op. Br. at 43) is wholly unsupported. There is no dispute that ERIS compiled data and selected and arranged that data in a highly successful and useful way for ERIS' clients. RSF ¶¶ 148-151, 162-165, 174-176. In this context, no court in this District has undertaken a *copyrightability analysis* of a defendant's product before determining whether its alleged CMI applies to that distinct product. Moreover, as discussed below, only the "knowing" provision of false CMI is prohibited. This means that, to be liable, ERIS would have to *know* that the product it created did not exhibit enough originality to legally qualify as a "derivative work." While ERIS does not believe this (RSF ¶ 180), more fundamentally, this shows the absurdity of requiring a copyrightability analysis in the first place. ERIS' allegedly false CMI appears on the initial pages of the reports. RSF ¶¶ 154, 180. It therefore applies to the reports, despite allegedly infringing material accompanying them. *See* ERIS Br. at 44-45; *see also* fn. 32, *supra*.

**B.      EDR Cannot Raise a Triable Issue that ERIS "Knowingly" Provided False CMI "with the Intent to Induce, Enable, Facilitate, or Conceal Infringement"**

EDR claims that ERIS "knows" the Disclaimers were false because: (i) ERIS knew that EDR "controlled the copyrights" in *some* unidentified Sanborn Maps; (ii) ERIS obtained a limited *written* opinion "based on a 'spot check'" of maps from the LOC Collection that did not mention fair use"; and (iii) ERIS knew that EDR could "register" its copyrights and "sue" but took the "risk" that a lawsuit wouldn't occur. (Op. Br. at 46-47.) Even assuming all of this is true (it isn't), EDR fails to explain how these three elements connect to the alleged knowledge of falsity of ERIS' terms and conditions (because they don't). Again, ERIS' terms and conditions are *truly* the obligations it requires its customers to incur in exchange for access to and use of ERIS' *reports*, regardless of EDR's alleged ownership of copyright in some maps supplied with those reports. EDR assumes the only way ERIS could have the "authority"

(Op. Br. at 44) to impose those terms is if ERIS were itself the copyright owner of the allegedly copyrighted maps accompanying the FIM Report. But EDR provides no support for its position. For example, ERIS holds the specific belief that its conduct constitutes fair use of the maps, *see* RSF ¶¶ 231-235, 331, and EDR raises no genuine issue of material fact that ERIS *doesn't* hold that belief.[36] EDR cites no law prohibiting ERIS from contractually restricting customers from certain uses of the maps as a condition for use of ERIS' products—despite ERIS' use being a fair use.[37]

For the same reason, EDR raises no genuine dispute of fact that ERIS *intended* to induce, enable, facilitate, or conceal infringement. EDR first argues that "all that is required to satisfy the second scienter prong" is that ERIS "intended for the infringing act to occur." (Op. Br. at 48.) This is meritless and contravenes the plain text of the statute. Section 1202(a) requires that a defendant intend to aid *infringement*, not intend to aid lawful copying. The *sole* document that EDR identifies to show ERIS' intent in drafting the disclaimer in fact states the reason ERIS didn't "want to put anything in [its] disclaimer about possible copyright": "Jovan's dissertation claiming we can digitize and print individual maps when used with a database report for environmental analysis and research," and "ProQuest's claim that we can reproduce the individual maps for our business purposes." RSF ¶ 184. Even if ERIS was wrong in that assessment, its *intent* was benign and does is not at the level required to violate the DMCA.

**C.    EDR Cannot Be Liable Under Any Subsection of Section 1202(b)**

**1.    EDR's Arguments Regarding 17 U.S.C. § 1202(b)(3) Should Be Stricken**

EDR *now* asserts a new theory of liability under 17 U.S.C. § 1202(b)(3), for the alleged

---

[36] Neither ERIS' alleged awareness of EDR's ownership of copyrights to Sanborn Maps, that EDR could file a lawsuit against ERIS, nor the contents of ERIS' lawyer's *written* opinion regarding certain Sanborn Map copyright terms, negates ERIS' unrebutted testimony in its reasonable belief that its and its customers' conduct constitutes fair use (CSF ¶ 292), much less that ERIS knew its Disclaimers would "induce, enable, facilitate, or conceal infringement." EDR cites no case holding such miniscule knowledge meets the DMCA's double scienter standard.

[37] Similarly, if ERIS doesn't intend to make the connection between the Database Disclaimer and the fire insurance maps accompanying an associated report, the fact that EDR *does* make this connection to support its litigation position does not mean ERIS' Database Disclaimer is *knowingly* false.

distribution of works knowing that CMI has been unauthorizedly removed therefrom (by someone else). This theory appears nowhere in EDR's contention interrogatory responses on ERIS' alleged DMCA violations, which focus *solely* on ERIS' alleged removal of CMI. RSF ¶ 25. This new theory should therefore be disregarded. *See Wechsler v. Hunt Health Sys., Ltd.*, 1999 WL 672902, at *2 (S.D.N.Y. Aug. 27, 1999). RSF ¶ 20. Even if considered, however, EDR's newly minted § 1202(b)(3) claim cannot survive summary judgment, either, as discussed below.

### 2. Exterior CMI Was Not "Removed" by ERIS or Anyone Else

EDR faults ERIS for allegedly playing "word games by relying on a series of dictionary definitions for the word 'remove.'" (Op. Br. at 51.) But, "[a] court may use a dictionary to determine the 'ordinary, common-sense meaning of the words'" of a statute. *In re Enforcement of Philippine Forfeiture Judgment*, 442 F. Supp. 3d 756, 761 (S.D.N.Y. 2020) (quoting *United States v. Rowland*, 826 F.3d 100, 108 (2d Cir. 2016)). At least three different federal courts, including one in this District, have used this time-honored method of statutory construction. (ERIS Br. at 49.) When considering dictionary definitions, the persuasive authority that applies them (*id.*), the legislative history and context,[38] and the leading copyright treatise,[39] it is clear that, as a matter of law, excerpting one or more map *sheets* from the interior of a Sanborn Map *volume* does not "remove" Exterior CMI from that volume, as that term is used in the DMCA. To the extent the cases cited by EDR to the contrary (Op. Br. at 52 n.47) are even relevant, they do not undertake the statutory interpretation analysis performed by ERIS' cited cases, and thus should be rejected as unpersuasive.

There is no genuine dispute that the Exterior CMI was not "affirmatively removed from the plaintiff's original work," thus making § 1202(b) inapplicable. *Munro v. Fairchild Tropical Botanic*

---

[38] See *Mango v. Buzzfeed, Inc.*, 970 F.3d 167, 171 (2d Cir. 2020) ("Congress sought to combat copyright piracy in its earlier stages, before the work was even copied.") (quoting *Universal City Studios, Inc. v. Corley*, 273 F.3d 429, 435 (2d Cir. 2001)).

[39] *See* 4 Nimmer on Copyright § 12A.10[B][1][a] (Section 1202 prohibits, e.g., "defacing or altering the title page of a book" or "deletion of the electronic information that may accompany a computer file containing a copyrighted composition.").

*Garden, Inc.*, 2022 WL 452257, at *9 (S.D. Fla. Jan. 13, 2022) (citing *Faulkner Press*, 756 F. Supp. 2d at 1359). EDR raises no genuine dispute that the Exterior CMI is not all still in the same place, on the LOC Collection or UPA Collection Microfilm (or the fire insurance map volumes found in various libraries) as they always have been. RSF ¶¶ 189-192. There is further no genuine dispute that the act of creating the digitized Sanborn Map mosaics now used in ERIS' database (which do not contain the Exterior CMI) were not done by ERIS, but by GISC in India. *Id.* ¶¶ 194-206. [40] Accordingly, ERIS cannot be liable for violating § 1202(b)(1) *or* (3) by failing to include the Exterior CMI in its reports.

### 3.   Interior CMI Was Not Intentionally Removed by ERIS

For each accused instance of Interior CMI ("Map Sheet Copyright Notices" and "Compass Rose") not appearing in a sheet for an ERIS order (where it allegedly appeared in a corresponding original Sanborn Map sheet), there is no *genuine* dispute that this is due to one of two reasons. The first is that GISC cropped that Interior CMI when georeferencing and stitching the map images together to form a mosaic, RSF ¶¶ 196-201; it is undisputed that ERIS did not perform this cropping, and ERIS thus cannot be liable under § 1202(b)(1). The second reason is that ERIS' automated, proprietary GIS algorithms cropped the mosaic to provide only those portions of map sheets that fall within a buffer distance from a target property. RSF ¶¶ 174-179. To the extent this results in the alleged "removal" of Interior CMI in the larger mosaic files falling outside the buffer, as a matter of law, that alleged removal did not occur "intentionally," as opposed to being an unintended consequence of the automated algorithms and the customer's selection of its target property. (*See* ERIS Br. at 57 and cases cited therein).[41]

---

[40] While EDR pleads with the Court to hold ERIS liable on a direct theory of liability under Section 1202(b)(1) (Op. Br. At 56), that is impermissible for the reasons previously stated in ERIS' opening brief. (ERIS Br. at 52-54.) *Michael Grecco Prods., Inc. v. Valuewalk, LLC*, 345 F. Supp. 3d 482, 499 (S.D.N.Y. 2018), cited by EDR, is inapposite as it dealt with publication, distribution, and display of photos in the United States; the court rejected the defendant's argument that hiring a "foreign contractor to choose photographs to include in a website directed at United States consumers" absolved the defendants of liability. EDR's DMCA theory, and ERIS' defenses thereto, present a completely different situation.

[41] EDR halfheartedly tries to distinguish *Stevens v. CoreLogic, Inc.*, 194 F. Supp. 3d 1046 (S.D. Cal. 2016), and does not address the other two cases cited by ERIS. (Op. Br. at 59 n.53.) And while it argues that "there is nothing in the record" to suggest automation, ERIS has submitted sworn testimony from its own employees with knowledge about how its FIM Reports are

### 4.   ERIS Did Not Know Interior CMI Had Been Removed

To the extent the Court considers EDR's belated theory under 17 U.S.C. § 1202(b)(3), the theory fails. § 1202(b)(3) requires that a defendant (i) distributed works or copies of works; (ii) while *knowing* that the CMI has been removed or altered without the authority of the copyright owner or the law; and (iii) while knowing, or having reasonable grounds to know, that such distribution will induce, enable, facilitate, or conceal an infringement. *Mango*, 970 F.3d at 171. While "actual or constructive knowledge" is sufficient for element (iii) above, only "actual knowledge" is sufficient for element (ii). *Id.*

For example, EDR contends that the FIM Report for Order No. 20180905285 omitted an "Interior Page Copyright Statement" ("Copyright 1929 by the Sanborn Map Co") and a "Compass Rose" that were present in the asserted Sanborn Map sheet for CA, Berkeley, V.4, 1929. RSF ¶ 204. Thus, under EDR's new theory, ERIS is liable for distributing this report, containing the allegedly infringing map sheet, while *knowing* the "Interior Page Copyright Statement" and "Compass Rose" were removed therefrom without authority of *either* EDR or the law. EDR makes the same contention for each of the orders listed on Schedule B-2 of its contention interrogatory responses. RSF ¶¶ 29-30.

EDR has adduced no evidence that ERIS had the *actual* knowledge required to satisfy the first half of § 1202(b)(3)'s double-scienter requirement. There is no evidence that ERIS knows which of EDR's map sheets have this Interior CMI, or that the cropping operations performed by either GISC or ERIS' automated algorithms resulted in the Interior CMI not appearing. For example, there is no evidence that ERIS had any idea that the asserted map sheet allegedly reproduced in Order No. 20180905285 (or any other accused order) originally had the identified "Interior Page Copyright Statement" and "Compass Rose" on it, much less that ERIS knew that GISC or ERIS' automated processes had removed such CMI. RSF ¶ 204. And because there is no evidence that ERIS *knew* the CA, Berkeley, V.4, 1929 remained

---

generated. RSF ¶¶ 174-179. EDR has not met its burden to raise a genuine dispute as to the veracity of ERIS' sworn statements.

copyrighted, and it is undisputed that ERIS believes that its and its customers' uses of fire insurance maps in these reports are at least fair uses, RSF ¶¶ 231-235, 331, there is no evidence that ERIS *actually knew* that any removal would have been "without authority of … the law." 17 U.S.C. § 1202(b)(3).[42]

As EDR concedes, on many occasions, Interior CMI is *retained* in the stitched, seamless mosaic and is visible in ERIS FIM Reports. RSF ¶ 179. In addition, many Sanborn Maps use a different compass rose other than the "Compass Rose" that EDR claims to be Interior CMI. *Id*. Given the uneven presence of Interior CMI on original Sanborn Maps and the way in which ERIS' FIM Reports are created, it is wholly implausible that ERIS *could have* actual knowledge that any identified Interior CMI had been removed from any FIM Report that ERIS distributed. While EDR makes much of ERIS' supervising GISC and conducting quality control (Op. Br. at 56, 58), there is no evidence that any of ERIS' activities have ever extended to identifying CMI or instructing GISC to remove it. RSF ¶¶ 176, 178, 194, 198, 201-203. ERIS' alleged actual knowledge of the presence or removal of Interior CMI is not a "reasonable inference[]" that can be drawn from the evidence of ERIS' general quality-control activities. *Handy v. City of New York*, 2021 WL 4482548, at *3 (S.D.N.Y. Aug. 27, 2021) (Wang, M.J.) (quoting *Allen v. Coughlin*, 64 F.3d 77, 79 (2d Cir. 1995). Rather, EDR's arguments amount to the very "scintilla of evidence," "metaphysical doubt as to the material facts," "conclusory allegations," or "unsubstantiated speculation," that are insufficient to defeat summary judgment. *Id.* (quoting *Anderson v. Liberty Lobby*, 477 U.S. 242, 252 (1986), *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986), and *Fujitsu Ltd. v. Fed. Express Corp.*, 247 F.3d 423, 428 (2d Cir. 2001), respectively).

---

[42] Once a copyright has expired, the right to "copy without attribution … passes to the public." *Dastar Corp. v. Twentieth Century Fox Film Corp.*, 539 U.S. 23, 33 (2003). Thus, without actual knowledge that any given map was under copyright—an especially high burden with respect to pre-1964 maps for which renewal is not apparent—ERIS would not have actual knowledge that Interior CMI had been removed without lawful authority. Similarly, there is no legal requirement that fair uses of copyrighted material retain any associated CMI. *See Murphy v. Millennium Radio Grp. LLC*, 650 F.3d 295, n.8 (3d Cir. 2011) ("The Station Defendants point out that most fair uses will involve the removal of CMI. However, unlike § 1201, § 1202 applies only when a defendant knows or has reasonable grounds to know that the removal will 'induce, enable, facilitate, or conceal' an infringement. Thus, those intending to make fair use of a copyrighted work are unlikely to be liable under § 1202.").

**5. EDR Cannot Prove that the Second Half of the Double-Scienter Requirement Is Met under Any Theory with Respect to Interior or Exterior CMI**

EDR does not seriously engage with the requirement that ERIS have "actual or constructive knowledge" that its actions would "induce, enable, facilitate, or conceal" an infringement under either § 1202(b)(1) or (3). *Mango*, 970 F.3d at 171. Again, EDR does not adduce any, much less sufficient evidence on this point. (ERIS Br. at 43-44, 58-60.) The sum total of EDR's counterargument amounts to alleged evidence that ERIS generally "knows" it infringes and did not want to dissuade its customers from doing business with ERIS. (Op. Br. at 59-60.) That is not true. But even if it were, as a matter of law, that is not enough: There must be "some identifiable connection" between the alleged wrong (here, distributing reports *lacking Exterior or Interior CMI*) "and the infringement or the likelihood of infringement." *Victor Elias Photography LLC v. Ice Portal, Inc.*, 43 F.4th 1313, 1325 (11th Cir. 2022).[43] EDR fails to explain how the absence of any Sanborn Map volumes' title pages, the terms and condition hidden in the LOC or UPA microfilm, or copyright notices or fancy compass roses on map sheets, would aid or conceal specific infringement—much less that ERIS, in distributing its reports, had actual or constructive knowledge of that connection.

In short, like so many DMCA cases (*see* ERIS Br. at 3 n.1), this is an instance where "there are sufficient undisputed material facts on the record to make the question" of ERIS' mental state "appropriate for summary judgment." *Lipton v. Nature Co.*, 71 F.3d 464, 472 (2d Cir. 1995). The Court should grant ERIS' motion based on EDR's failure to adduce proof that ERIS meets the double-scienter requirement of the DMCA, along with all of the other bases for ERIS' motion for summary judgment.

---

[43] *See also Stevens v. CoreLogic*, 899 F.3d 666, 674 (9th Cir. 2018) ("universal possibility of encouraging infringement" not enough; "specific allegations as to how identifiable infringements 'will' be affected are necessary").

Respectfully submitted,

New York, NY
August 28, 2023

**GREENBERG TRAURIG, LLP**

By: _/s/ *Justin A. MacLean*_____

Richard D. Harris (*pro hac vice*)
harrisr@gtlaw.com
Barry R. Horwitz (*pro hac vice*)
Barry.Horwitz@gtlaw.com
Jacqueline Brousseau (*pro hac vice*)
Jacqueline.Brousseau@gtlaw.com
GREENBERG TRAURIG, LLP
77 West Wacker Drive, Suite 3100
Chicago, IL 60601
Tel: (312) 456-8400

Justin A. MacLean
Justin.MacLean@gtlaw.com
Li-Yu Jade Chen
chenja@gtlaw.com
One Vanderbilt Avenue
New York, NY 10017
Tel.: (212) 801-9200

Gregory J. Casas (*pro hac vice*)
casasg@gtlaw.com
300 West 6th Street, Suite 2050
Austin, TX 78701
Tel.: (512) 320-7200

*Attorneys for Defendants ERIS Information Inc.,*
*ERIS Information Limited Partnership and Eco Log*
*Environmental Risk Information Services Ltd.*