UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

-------------------------------------------------------------x
                                                             :
THE SANBORN LIBRARY LLC,                                     :
                                                             :
                                    Plaintiff,               :      19-CV-2049 (JHR) (OTW)
                                                             :
                    -against-                                :      **<u>REPORT & RECOMMENDATION TO</u>**
                                                             :      **<u>THE HONORABLE JENNIFER H.</u>**
ERIS INFORMATION INC., et al.,                               :      **<u>REARDEN</u>**
                                                             :
                                    Defendants.              :
                                                             :
                                                             :
-------------------------------------------------------------x

**ONA T. WANG, United States Magistrate Judge:**

I.    INTRODUCTION

This copyright infringement case is about a collection of fire insurance maps used in the environmental risk assessment industry. Plaintiff/counterclaim-defendant The Sanborn Library LLC ("Sanborn") alleges copyright infringement and Digital Millennium Copyright Act ("DMCA") claims against Defendants/counterclaim-plaintiffs ERIS Information Inc., Eco Log Environmental Risk Information Services, Ltd., and ERIS Information Limited Partnership (collectively, "ERIS"). ERIS has also brought counterclaims against Sanborn and Environmental Data Resources, LLC ("EDR"), a provider of environmental risk assessment data and Sanborn's licensee. ERIS, also a provider of data for environmental risk assessments, is a direct competitor of EDR.[1]

---

[1] ERIS has asserted counterclaims against Sanborn and counter-defendant EDR seeking declaratory relief and alleging antitrust violations of the Sherman Act and Clayton Act; false advertising under the Lanham Act; and defamation, product disparagement, trade libel, deceptive practices, false advertising, and tortious interference with prospective business relations under New York law. (ECF 31). On August 30, 2021, I issued a Report & Recommendation recommending dismissal of ERIS's product disparagement, trade libel, and tortious interference claims, and allowing the remaining claims to proceed with limitations. (ECF 132). On September 15, 2021, after no objections were filed to the Report & Recommendation, the District Judge adopted the Report & Recommendation. (ECF 136).

The parties have cross moved for summary judgment on three issues: 1) whether Sanborn has standing to raise its copyright infringement claims; 2) whether Sanborn is equitably estopped from pursuing its infringement claims; and 3) whether ERIS violated the DMCA.

For the reasons set forth below, I respectfully recommend that Defendants' motion for summary judgment be **GRANTED** with respect to their equitable estoppel defense, and that Plaintiff's Complaint be dismissed in its entirety.[2]

## II.   BACKGROUND

Sanborn[3] purports to own a collection of roughly one million Sanborn fire insurance maps (the "Sanborn Maps") contained in 6,162 volumes. Sanborn's Rule 56.1 Statement of Undisputed Material Facts ("SF") ¶104 (ECF 265); Sanborn Motion for Summary Judgment ("Sanborn MSJ") at 1, (ECF 253). The Sanborn Maps consist of several sub-collections, including: the "Library of Congress" ("LOC") collection; the "University Publications of America" ("UPA") collection; and the "EDRS" collection." ERIS's Rule 56.1 Statement of Undisputed Material Facts ("EF") ¶¶ 12-13 (ECF 233). Fire insurance maps are specialized maps that show the use of property tracts at a specific point in time. EF ¶ 132. The Sanborn Maps are used by environmental professionals conducting site assessments to protect owners of real property from environmental risk, and to comply with environmental site assessment laws standards.

---

[2] Sanborn's motion for summary judgment would then be **DENIED** in all respects. In the alternative, I recommend that both parties' motions for summary judgment be **DENIED** in all respects.

[3] For simplicity, "Sanborn" is used to refer to Plaintiff The Sanborn Library, LLC, its sister company EDR, and both companies' many predecessors, including The Sanborn Map Company.

*See* EF ¶¶ 7-9, 125-36. EDR, Sanborn's sister company, competes with ERIS in the US market to provide environmental professionals with report packages of "environmental risk assessment data" ("ERAD") which include fire insurance maps—used for conducting environmental site assessments. *See* EF ¶¶ 207-315.

On March 6, 2019, Sanborn sued ERIS for copyright infringement under 17 U.S.C. § 101 *et seq*. and violation of the DMCA, 17 U.S.C. § 1202, alleging, *inter alia*, that ERIS has acquired a collection of fire insurance maps "built entirely of Sanborn Library's copyrighted maps," "infringed [Sanborn's] copyrights in each of the Sanborn Maps," and replaced Sanborn's copyright management information ("CMI") with ERIS's own, false CMI on each map. (ECF 12 ¶¶ 1, 5, 26, 38, 43, 52, Prayer for Relief A).[4]

On March 3, 2023, ERIS moved for summary judgment against Sanborn, arguing that: 1) Sanborn lacks standing to sue for copyright infringement of the Sanborn Maps because it does not own any or all of the copyrights asserted; 2) Sanborn's claims are barred under the doctrine of equitable estoppel; and 3) Sanborn's DMCA claims are deficient as a matter of law. ERIS Motion for Summary Judgment ("ERIS MSJ") (ECF 227). On June 9, 2023, Sanborn cross moved for summary judgment, arguing that: 1) ERIS's motion should be denied in its entirety; 2) Sanborn's motion for summary judgment should be granted with respect to ownership of the asserted copyrights; and 3) ERIS's defenses of invalidity or expiration of copyright, estoppel,

---

[4] The parties dispute how many maps are at issue. ERIS states that TSL has only asserted copyright infringement claims over 5,239 map volumes in total (3,237 of which were incorporated into ERIS "fire insurance map reports" ("FIM Reports"), and 2,002 which were included in ERIS's "fire insurance map database"). EF ¶¶ 17-18. TSL alleges copyright infringement of 6,162 map volumes in total. SF ¶ 104.

and non-ownership of copyright should be dismissed. Sanborn Motion for Summary Judgment

("Sanborn MSJ") (ECF 253). The motions were fully briefed as of October 10, 2023. (ECF 328).

## III.    DISCUSSION

### A.  Summary Judgment Standard

Summary judgment is proper "only if 'there is no genuine dispute as to any material fact

and the movant is entitled to judgment as a matter of law.' " *Urbont v. Sony Music Entm't*, 831

F.3d 80, 88 (2d Cir. 2016) (quoting Fed. R. Civ. P. 56(a)). The movant's initial burden is to

provide evidence on each material element of his claim or defense illustrating his entitlement

to relief. *Vt. Teddy Bear Co. v. 1–800 Beargram Co.*, 373 F.3d 241, 244 (2d Cir. 2004). A fact is

"material" if it "might affect the outcome of the suit under the governing law[.]" *Anderson v.*

*Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). The non-moving party must respond to the

adverse party's pleading with "specific facts showing that there is a genuine issue for trial." *Ricci*

*v. Stefano*, 557 U.S. 557, 586 (2009) (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986)).

An issue of fact is "genuine" if the evidence presented "is such that a reasonable jury could

return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 248.

"When deciding a summary judgment motion, a court must construe all the evidence in

the light most favorable to the nonmoving party . . . and draw all inferences and resolve all

ambiguities in that party's favor." *Topps Co. v. Cadbury Stani S.A.I.C.*, 526 F.3d 63, 68 (2d Cir.

2008). A motion for summary judgment prevails "'[o]nly when no reasonable trier of fact could

find in favor of the nonmoving party[.]' " *White v. ABCO Engineering Corp.*, 221 F.3d 293, 300

(2d Cir. 2000) (quoting *Taggart v. Time Inc.*, 924 F.2d 43, 46 (2d Cir. 1991)). The nonmoving

party must advance more than mere "conclusory statements, conjecture, or speculation" to

successfully defeat a motion for summary judgment. *Kulak v. City of New York*, 88 F.3d 63, 71

(2d Cir. 1996); *see also Anderson*, 477 U.S. at 249–50 ("If the evidence is merely colorable, or is

not significantly probative, summary judgment may be granted.") (internal citations omitted).

The party moving for summary judgment must "cit[e] to *particular parts of materials* in the

record" as well as "show[] that the materials cited do not establish the absence or presence of a

genuine dispute, or that an adverse party cannot produce admissible evidence to support the

fact." Fed. R. Civ. P. 56(c)(1)(A-B) (emphasis added).

"The same standard[s] appl[y] where, as here, the parties filed cross-motions for

summary judgment[.]" *Morales v. Quintel Entm't, Inc.*, 249 F.3d 115, 121 (2d Cir. 2001).

"[W]hen both parties move for summary judgment, asserting the absence of any genuine issues

of material fact, a court need not enter judgment for either party. Rather, each party's motion

must be examined on its own merits, and in each case all reasonable inferences must be drawn

against the party whose motion is under consideration." *Id.* (internal citations omitted); *accord*

*Mindspirit, LLC v. Evalueserve Ltd.*, 15-CV-6065 (PGG), 2018 WL 4759736, at *13 (S.D.N.Y. Sept.

30, 2018).

### B.  Equitable Estoppel

ERIS argues that Sanborn is barred from asserting its copyright claims by the doctrine of equitable estoppel; Sanborn argues that ERIS's equitable estoppel defense should be barred as a matter of law. For the following reasons, I respectfully recommend that ERIS's motion for summary judgment be **GRANTED** as to its equitable estoppel defense.

#### 1.  Factual Background

In early 2013, Sanborn learned that ERIS planned on expanding into the US market. EF ¶¶ 274-76. On or about November 13, 2013, following a meeting and exchange of emails between representatives of EDR and ERIS (EF ¶¶ 283-86), ERIS received a letter from Paul Vogt, the general counsel for EDR-Sanborn's parent company, DMG Information. EF ¶ 287.[5] The letter alleged that:

> EDR maintains copyrights within its Sanborn Map collection and that absent EDR's express written permission, ERIS is not permitted to copy or use any of the Sanborn Maps under copyright. EDR will take all actions it deems appropriate, including actions under the US Copyright Laws, to enforce its copyrights and to obtain damages against anyone who infringes or misappropriates such copyrights.
>
> *Id.*

In response to Mr. Vogt's letter, Jovan Jovanovic, an intellectual property attorney ERIS had previously retained to investigate EDR's copyright claims in the Sanborn Maps, sent a letter on or about December 4, 2013, stating in part:

---

[5] "EDR-Sanborn" is used to refer to EDR acting in its capacity as a licensee and sister company of The Sanborn Map Library, LLC. "EDR-Sanborn" is not to be confused with "EDR Sanborn, Inc.," which was merged out of existence in December 1998. SF ¶ 103.

> Notably, your letter fails to identify a single allegation of copyright infringement, and we do not believe that any such allegations exists. . . . If you have such an allegation that ERIS has infringed any valid unexpired copyright right, please bring the same to our attention. With any such allegation, please bring the same to our attention. With any such allegation, please provide the copyright registration (and renewal information) along with a copy of the work itself.

EF ¶ 290. Mr. Jovanovic sent his letter by fax, and received confirmation it had been received. EF ¶ 291. Mr. Vogt did not reply to Mr. Jovanovic's letter. EF ¶¶ 294-95. The next communication from EDR indicating it intended to file a copyright infringement suit came in February 2019 from EDR's current trial counsel. EF ¶ 313.

In the intervening six years, ERIS moved forward with its expansion into the US market, incorporating Sanborn Maps into its product offerings. *See* EF ¶¶ 316-37. Well into this expansion, ERIS employees expressed concern that EDR-Sanborn could file a copyright infringement suit. For example, in 2017, ERIS' President Carol LeNoury wrote in an email that she was "aware" that certain Sanborn Maps were in copyright and that ERIS could be sued for infringement, "but because proving it is so onerous and the Fair Use issue works in our favour, they haven't bothered." SF ¶¶ 228-29; ERIS Objections and Counterstatement ¶ 228 ("ERIS Obj.") (ECF 297). Ms. LeNoury also wrote in 2017, "[t]here has always been a degree of risk with the acquisition of these maps. . . . Technically, EDR can come after us, however, they have to prove with each individual map that is [sic] has been registered, and explain why they haven't gone after other companies and get around the fair use." SF ¶ 231; ERIS Obj. ¶ 230-31. In a 2017 document titled "ERIS Report of Affairs," ERIS stated that the company had been advised by Mr. Jovanovic that ERIS was "of small risk to continue using the maps as we have been." SF ¶ 232; ERIS Obj. ¶ 232. Finally, in a 2018 email, Ms. LeNoury wrote that when ERIS had acquired the Sanborn Maps, the company had "weighed the risk and decided we had enough going for

7

us to make it difficult for [EDR-Sanborn] to enforce copyright" and "I guess we carry on and see what happens." SF ¶ 233; ERIS Obj. ¶ 233.

Sanborn filed this lawsuit on March 6, 2019. (ECF 1).

### 2. Legal Standard and Analysis

The "affirmative defense [of equitable estoppel] 'is properly invoked where the enforcement of rights of one party would work an injustice upon the other party due to the latter's justifiable reliance upon the former's words or conduct.' " *ABKCO Music, Inc. v. Sagan*, 50 F.4th 309, 321 (2d Cir. 2022), cert. denied, 144 S. Ct. 77, 217 L. Ed. 2d 13 (2023) (quoting *Veltri v. Building Serv. 32B-J Pension Fund*, 393 F.3d 318, 326 (2d Cir. 2004)). To prevail on an equitable estoppel defense in the copyright context, the party asserting the defense must show that:

> (1) plaintiff had knowledge of the defendant's infringing conduct; (2) plaintiff either (a) intended that defendant rely on plaintiff's acts or omissions suggesting authorization, or (b) acted or failed to act in such a manner that defendant had a right to believe it was intended to rely on plaintiff's conduct; (3) defendant was ignorant of the true facts; and (4) defendant relied on plaintiff's conduct to its detriment.

*Id.* "The accused infringer ultimately must prove equitable estoppel 'by a preponderance of the evidence.' " *Kewazinga Corp. v. Google LLC*, No. 20-CV-1106 (LGS), 2021 WL 466877, at *3 (S.D.N.Y. Feb. 9, 2021) (quoting *Gasser Chair Co. v. Infanti Chair Mfg. Corp.*, 60 F.3d 770, 773 (Fed. Cir. 1995)).

As to the second element, "a defendant must show the [copyright holder], through misleading conduct, led the defendant to reasonably infer that the [copyright holder] did not

8

intend to enforce its [copyright] against the defendant." *Aspex Eyewear, Inc. v. Clariti Eyewear, Inc.*, No. 07-CV-2373 (DC), 2008 WL 5049744 at *4 (S.D.N.Y. Nov. 26, 2008), *aff'd*, 605 F.3d 1305 (Fed. Cir. 2010) (citing *A.C. Aukerman Co. v. R.L. Chaides Constr. Co.*, 960 F.2d 1020, 1028 (Fed.Cir.1992) (en banc)).[6] "Such conduct may include 'specific statements, action, inaction, or silence where there was an obligation to speak.' " *Id.* "Whether a patentee's conduct is misleading is evaluated from the perspective of the alleged infringer." *Id.* (citation omitted). Courts have generally deemed unfulfilled threats to enforce a copyright or patent misleading conduct. *See*, *e.g., Aspex*, 2008 WL 5049744 at *6; *Aukerman*, 960 F.2d at 1042; *Wafer Shave Inc. v. Gillette Co.*, 857 F.Supp. 112, 119-20 (D.Mass.1993), *aff'd per curiam*, 26 F.3d 140 (Fed. Cir. 1994); *cf. LEGO A/S v. Best-Lock Constr. Toys, Inc.*, 404 F. Supp. 3d 583, 592 (D. Conn. 2019) ("Nor had Lego ever threatened or initiated litigation against Best-Lock in the United States prior to this lawsuit.").

As to the third element, the defendant must demonstrate that it was "ignorant of the true facts," which in the copyright context means the plaintiff's ownership of the asserted copyrights. *LEGO A/S v. Best-Lock Constr. Toys, Inc.*, 404 F. Supp. 3d 583, 621–22 (D. Conn. 2019) (citations omitted). "[A] party asserting estoppel must 'use due care and not fail to inquire as to rights where that would be the prudent course of conduct.' " *Id.* (quoting *Cooley v. Penguin Group (USA), Inc.*, 31 F. Supp. 3d 599, 613 (S.D.N.Y. 2014)).

---

[6] *Aspex Eyewear* is a patent case, not a copyright case. However, "the elements and circumstances relevant to the equitable estoppel defense are much the same in copyright and patent cases[.]" *LEGO A/S v. Best-Lock Constr. Toys, Inc.*, 404 F. Supp. 3d 583, 617 (D. Conn. 2019).

Finally, as to the fourth element, "a defendant must show that it actually relied on the [copyright holder's] misleading conduct" and was lulled into a false sense of security by such conduct. *Aspex*, 2008 WL 5049744 at *4 (citing *Aukerman*, 960 F.2d at 1043).

There is no dispute that the first element of an equitable estoppel defense, Sanborn's knowledge of ERIS's infringing conduct, is satisfied. Accordingly, it is necessary to analyze only the second, third, and fourth elements in depth.

### a.      Sanborn's conduct was misleading

The second element of ERIS's equitable estoppel defense is satisfied because ERIS has shown that Sanborn's conduct in the lead-up to filing this lawsuit was misleading. EDR-Sanborn's general counsel sent a letter threatening to sue ERIS in November 2013. EDR-Sanborn then failed to follow up on that threat in any form until February 2019. [7] ERIS, from its perspective, could have reasonably inferred from EDR-Sanborn's five-plus years of inaction that EDR did not intend to enforce its purported copyrights. *Compare Aspex Eyewear*, 2008 WL 5049744, at *6 (conduct was misleading when patent holder did not follow up about any patents for more than three years after sending initial letter threatening litigation), *with SimplexGrinnell LP v. Integrated Systems & Power, Inc.*, 642 F.Supp.2d 167, 193 (S.D.N.Y. 2009) (conduct was not misleading when copyright holder filed suit within nine months of sending

---

[7] Perhaps unsurprisingly, the parties dispute whether EDR received Mr. Jovanovic's letter. This dispute is immaterial. Regardless of whether Mr. Jovanovic's letter was received, Mr. Vogt's *November 2013* letter would still have amounted to a threat to sue that was intended to chill ERIS's expansion into the US, and was not clarified or acted upon until *February 2019*. *See* EF ¶ 302 (February 2015 email from EDR employee referring to sending an additional warning letter a "sending a shot across their bow."); MacLean Decl. Ex. 147 ("Guess our letter didn't intimidate them (poke)[.]"). Accordingly, EDR's conduct was misleading under either scenario.

initial letters). EDR's failure to take any action to protect its purported copyrights during this period is sufficient, on its own, to render its conduct misleading. *See DeCarlo v. Archie Comic Publications, Inc.*, 127 F.Supp.2d 497, 510 (S.D.N.Y. 2001) ("Silence of inaction in the face of an explicit contrary assumption by the opposing party may be sufficient to induce justifiable reliance by a defendant that a plaintiff will not later assert a claim.")

In addition, the actions that EDR *did* take make its inaction even more misleading. In between November 2013 and February 2019, EDR and ERIS engaged in lengthy discussions about a potential agreement for ERIS to license technology from EDR for use in Canada, and for DMGI, EDR's parent company, to acquire substantially all of ERIS's assets. *See* EF ¶¶ 308-310. In the course of those negotiations, EDR at no point raised the topic of ERIS infringing on any of its copyrights. *Id.* ERIS's inference that EDR did not intend to sue for copyright infringement over its use of Sanborn Maps, and that the November 2013 letter was merely "bluffing," was especially reasonable and justifiable given the context of this apparent rapprochement.

Accordingly, ERIS has shown that EDR-Sanborn's conduct was misleading, and the second element of ERIS's equitable estoppel defense is satisfied.

### b. ERIS was ignorant of the true facts

The third element of ERIS's equitable estoppel defense is also satisfied because ERIS has shown that it was ignorant of the "true facts" – that is, Sanborn's actual ownership of the Sanborn Map copyrights.

For the reasons discussed at length in Section III.C of this Report & Recommendation, the question of which copyrights Sanborn owns, and which of those copyrights are valid and enforceable, remains unresolved in 2024. There is also substantial evidence in the record showing that, as far back as 1996 and up to the date this lawsuit was filed in February 2019, EDR and its representatives expressed considerable uncertainty on numerous occasions about which Sanborn Maps were under copyright. Several occasions in particular stand out.

In 1996, EDR signed an acknowledgement as part of its acquisition of the Sanborn Map Library that "many [Sanborn Maps] are in the public domain" and that they would only acquire physical title to the complete collection. SF ¶ 81. In a 2017 presentation, EDR included a slide titled "Sanborn Copyright" containing three bullet points: "Mystique", "Weaknesses", and "Infringement." Declaration of Justin A. MacLean ("MacLean Decl.") Ex. 168 (ECF 288). The slide also contained a pie chart in which 60% of the Sanborn Maps – those created from 1923 through 1989 – are labeled "Uncertain." *Id. See* Appendix "B". As late as April 2018, EDR expressed internal uncertainty as to whether it could establish that the Sanborn Maps copyrights were transferred from Sanborn II to Sanborn III in 1973. A slide from an internal EDR presentation from that year states: "B&M[8] can't proceed until Sanborn Ownership Chain of Custody is fully documented. We are working on finding the last few documents now. We are good from 1996 to current. It is what happened before EDR bought Sanborn that we haven't been able to fully document yet." EF ¶ 68; MacLean Decl. Ex. 95.  Moreover, the record contains numerous examples of mid-to-high-level EDR employees expressing a high degree of

---

[8] The term "B&M" is undefined but likely refers to Sanborn's counsel of record, Baker McKenzie.

uncertainty as to which Sanborn Maps were under copyright in between November 2013 and February 2019. *See* EF ¶¶ 297-300.[9]

In sum, the evidence is overwhelming that both at the time EDR sent its warning letter in November 2013, and up to at least April 2018, if not later, EDR's knowledge of which Sanborn Maps copyrights it owned, and which copyrights were valid and enforceable, was, at best, flimsy and uncertain. When ERIS reached out to EDR to seek clarification on which copyrights EDR believed were being infringed, EDR did not respond. Accordingly, it is beyond the realm of plausibility that ERIS could have known with precision which Sanborn Maps copyrights EDR intended to enforce when EDR *itself* did not know, and did not tell ERIS, which copyrights it could enforce.

Sanborn points to multiple places in the record where ERIS employees, including the company's president, express awareness and concern about the possibility of a future copyright infringement lawsuit between 2013 and 2019. *See* SF ¶¶ 228-29 (awareness that some Sanborn Maps were copyrighted); SF ¶ 231 (acknowledging "a degree of risk" with acquiring and using Sanborn Maps); SF ¶ 232 (summarizing counseled advice that use of Sanborn Maps presented "small risk"); SF ¶ 233 (stating that ERIS had "weighed the risk and decided we had enough going for us to make it difficult for [EDR-Sanborn] to enforce copyright" and "I guess we carry on and see what happens.").

---

[9] On February 12, 2014, J.B., a Managing Director at EDR, wrote "Sure some of [the Sanborn Maps] are in the public domain and copyright doesn't apply but most have copyright[.]" MacLean Decl. Ex. 147. On July 22, 2014, C.M., a Product Manager at EDR, wrote: "Has EDR always known that so many Sanborns were not copyrighted? (btw…no good answer here)[.]" MacLean Decl. Ex. 165. On February 20, 2015, C.M. wrote "Sanborn really dropped the ball in their copyright registration." MacLean Decl. Ex. 166. On March 21, 2016, in response to an email from J.B., stating "Need to sue [ERIS]. But that's just me. 😊" C.M. wrote "Sue them for what? We don't know they are violating copyright." MacLean Decl. Ex. 167.

But these communications do not have any bearing on the "true facts" for this element: which valid copyrights Sanborn owned. They show that ERIS was aware that there was some small risk that EDR-Sanborn could bring an infringement suit given that they had, in the past, threatened to do so. They do not speak to ERIS's ignorance of the relevant, most important "true fact," which is which copyrights EDR-Sanborn had standing to sue over. *See LEGO A/S*, 404 F.Supp.3d at 621–22.

In sum, I find that ERIS has shown that it was ignorant of the true facts of Sanborn's copyright ownership, and the third element of ERIS's equitable estoppel defense is satisfied.

c.    ERIS relied on Sanborn's misleading conduct

Finally, the fourth element of ERIS's equitable estoppel defense is satisfied because ERIS has shown that it relied on EDR-Sanborn's misleading conduct to its detriment. Here, the record reflects that ERIS proceeded with large-scale investments in the US market in part because of its belief that the risk of EDR bringing infringement litigation was negligible. *See* EF ¶¶ 316-37. These investments included expensive "georeferencing" projects to "stitch together" Sanborn Maps (EF ¶ 318), expanding the geographical reach of its product offerings in the US (EF ¶ 319), and acquiring a business that provides aerial photography (EF ¶ 320). Had Sanborn filed its lawsuit within a reasonable timeframe after sending its warning letter, ERIS would have weighed the risks of using the Sanborn Maps differently. *See* SF ¶ 233 (stating that ERIS had "weighed the risk and decided we had enough going for us to make it difficult for [EDR-Sanborn] to enforce copyright" and "I guess we carry on and see what happens."). The remote risk of a lawsuit based on a threat that was not acted upon for more than five years is different

14

in kind from the risk posed by an ongoing, potentially meritorious lawsuit. Accordingly, ERIS has

shown that it relied on EDR-Sanborn's misleading conduct, and the fourth element of ERIS's

equitable estoppel defense is satisfied.

Because I find that ERIS has shown that all four elements of its equitable estoppel

defense are satisfied, I recommend that ERIS's motion for summary judgment be **GRANTED**

with respect to its equitable estoppel defense, that Sanborn's motion for summary judgment

be **DENIED**, and that the Court enter an order dismissing Sanborn's Complaint in its entirety.

For the sake of completeness, however, I analyze the remaining issues in the parties' motions

for summary judgment below.

### C.  Sanborn's Standing and Ownership of Valid Sanborn Maps Copyrights[10]

ERIS argues that Sanborn lacks standing to assert its copyright infringement claims. ERIS

proffers a menu of arguments as to why Sanborn does not own all or some of the Sanborn

Maps copyrights; and that, out of the copyrights Sanborn owns, many of them are invalid and

unenforceable.

"[O]nly the copyright owner, or the owner of exclusive rights under the copyright, as of

the time the acts of infringement occur, has standing to bring an action for infringement of such

rights." 3 Nimmer on Copyright § 12.02. In copyright infringement actions, the burden is on the

---

[10] Granting Defendant's motion for summary judgment as to its equitable estoppel defense and dismissing Plaintiff's Complaint in its entirety would resolve both motions for summary judgment. If the District Judge does not adopt my Report & Recommendation as to equitable estoppel, however, I recommend that both parties' motions for summary judgment be **DENIED** in their entirety, for the reasons that follow.

plaintiff to prove ownership of the copyrights at issue. *Feist Publ'ns, Inc. v. Rural Tel. Serv. Co.*, 499 U.S. 340, 361 (1991). When the plaintiff in an infringement action is not the original author of the works at issue, it must establish that the copyrights were legally transferred to them. *See Int'l Media Films, Inc. v. Lucas Ent'mt, Inc.*, 703 F.Supp.2d 456, 462 (S.D.N.Y. 2010).[11]

ERIS's arguments fall broadly into two buckets. The first bucket of arguments has to do with which copyrights, if any, have been properly transferred to Plaintiff. The second bucket of arguments has to do with whether the copyrights that *were* transferred are valid and enforceable. I find that genuine issues of material fact exist both as to which copyrights were transferred and which copyrights are valid and enforceable. Accordingly, I respectfully recommend that both parties' motions for summary judgment be **DENIED** as to Sanborn's standing to assert its copyright infringement claims.

### 1.  Legal Standard and Analysis (Transfer of Copyright)

Under the 1909 Act, copyrights could be assigned only via a signed writing. 3 Nimmer on Copyrights § 10.03[A]; 17 U.S.C. § 28 (1909 Act). The 1909 Act "spoke of a single 'copyright' " that consisted of a "bundle" of rights that courts held were indivisible. 3 Nimmer on Copyrights § 10.01[A]; *Tasini v. New York Times Co.*, 206 F.3d 161, 168 (2d Cir. 2000). Transfer of anything

---

[11] The Copyright Act of 1909 (the "1909 Act") governs works published prior to the January 1, 1978, which is the effective date of the 1976 Copyright Act (the "1976 Act"). *See, e.g., Martha Graham School & Dance Found., Inc. v. Martha Graham Ctr. of Contemporary Dance, Inc.*, 380 F.3d 624, 631–33 (2d Cir. 2004) (applying 1909 Act to works published prior to 1978), *cert. denied*, 544 U.S. 1060, 125 S.Ct.2518 (2005); 3 Patry on Copyright § 6:9 (2013) ("The 1909 Act governs the question of publication for works first published between March 4, 1909 and December 31, 1977."). The 1976 Act is non-retroactive. *Id.*

less than the complete indivisible copyright was considered to constitute a "license" rather than an assignment. *P.C. Films Corp. v. MGM/UA Home Video Inc.*, 138 F.3d 453, 456 (2d Cir. 1998), *cert. denied*, 525 U.S. 1017, 119 S. Ct. 542, 142 L. Ed. 2d 450 (1999). Although a transfer of copyright under the 1909 Act required a signed writing, "[p]rior to 1978, exclusive licenses could be granted orally or by conduct." *Weinstein Co. v. Smokewood Entm't Group, LLC*, 664 F.Supp.2d 332, 339 (S.D.N.Y. 2009).

Whether a contract transfers copyright ownership is a question of contract law. As with any contractual provision, courts must interpret purported copyright transfer agreements to give effect to the intentions of the parties. *Apollo Global Mgmt., LLC v. Bokf, NA (In re MPM Silicones, L.L.C.)*, 875 F.3d 787, 795 (2d Cir. 2017); 3 Nimmer on Copyrights § 10.03[A][2] ("As with all matters of contract law, the essence of the inquiry here is to effectuate the intent of the parties."). If the plain meaning of the language within a contract is susceptible to more than one interpretation, the contract is ambiguous. *Mellon Bank, N.A. v. United Bank Corp. of N.Y.*, 31 F.3d 113, 115 (2d Cir. 1994); *Int'l Multifoods Corp. v. Comm. Union Ins. Co.*, 309 F.3d 76, 83 (2d Cir. 2002). Copyright transfer provisions need not "be long or elaborate" so long as the contract "explicitly convey[s] a party's intention to sign away [its] copyright interest." *Tjeknavorian v. Mardirossian*, 56 F.Supp.3d 561, 565 (S.D.N.Y. 2014); 3 Nimmer on Copyrights § 10.03[A][2]. Transfer of ownership of a material object containing a copyrighted work does not, by itself, transfer copyright ownership of the work. *Design Options, Inc. v. BellePointe, Inc.*, 940 F.Supp. 86, 91 (S.D.N.Y. 1996) (citing 17 U.S.C. § 202); 3 Nimmer on Copyrights § 10.09[A].

Whether a contractual provision is clear or ambiguous is a question of law. *Mellon Bank, N.A. v. United Bank Corp. of New York*, 31 F.3d 113, 115 (2d Cir. 1994). Once the court has

17

determined that a contractual provision is ambiguous, "its interpretation becomes a question of fact and summary judgment is inappropriate." *Id. Accord SCO Group, Inc. v. Novell, Inc.*, 578 F.3d 1201, 1215 (10th Cir. 2009) ("[W]hen conflicting evidence is presented such that the ambiguities in a contract could legitimately be resolved in favor of either party, it is for the ultimate finder of fact—not the court of summary judgment—to interpret the contract.").

> a. The 1973 Documents are ambiguous as to whether the Sanborn Map copyrights were transferred from Sanborn II to Sanborn III

ERIS argues that there are two breaks in the "chain of title" of the Sanborn Maps copyrights that lead to Sanborn's lacking standing to bring infringement claims. The first of these breaks has to do with the 1973 acquisition of certain assets of Sanborn II by Real Estate Data, Inc. ("REDI"). In that transaction, Sanborn II transferred certain assets to the "Sunshine Map Company, Inc.", a wholly-owned subsidiary of REDI that was subsequently renamed "Sanborn Map Company, Inc." SF ¶¶ 41-44, 52. This entity is referred to by the parties as "Sanborn III."

Since the original "Sanborn Map and Publishing Company" ("Sanborn I") was established in 1875, several entities have borne the Sanborn name and purported to own the intellectual property rights in the Sanborn Map Library.[12]

---

[12] *See* Appendix "A", a timeline constructed by my law clerk from a deep review of the parties' 56.1 statements. If this case were to proceed to trial of Plaintiff's case in chief, a timeline may be necessary to trace the ownership of the copyrights alleged to have been infringed.

The Sanborn Map and Publishing Company, Limited ("Sanborn I") was incorporated in 1875. SF ¶1. In 1959, Sanborn I became "First Pelham Corporation" and transferred its map business, including "all copyrights owned by it," to "Pelham Map Company, Inc.," ("Sanborn II"), a fully-owned subsidiary. SF ¶¶ 7-11.[13] Sanborn II's main office and publishing facility was located at 629 Fifth Avenue, Pelham, New York (the "Pelham Facility"). SF ¶ 12. ERIS does not dispute that "any ownership rights in the Sanborn Maps that Sanborn I might have had" were transferred to Sanborn II. EF ¶ 42 n.4.

Sanborn asserts that all of the copyrights owned by Sanborn II were assigned to Sanborn III by an Asset Purchase Agreement dated May 7, 1973 ("the 1973 APA"), and a Bill of Sale dated June 1, 1973 ("Bill of Sale") (collectively, the "1973 Documents"). Paragraph 1 of the 1973 APA provides, in relevant part, that Sanborn II would "sell, transfer, convey and deliver" . . . "the following assets and property":

(a) The machinery, tools, appliances and equipment used in said business and located in or about the premises occupied by [Sanborn II] at 629 Fifth Avenue, Pelham, New York. . .

(b) All inventory of finished maps, corrections and partly finished maps, the Sanborn Insurance Map Library, all raw materials consisting of film, drafting paper, acetate and miscellaneous supplied of [Sanborn II] on hand at said premises. . .

(e) All of the following assets of [Sanborn II's] map business, whether reflected on [Sanborn II's] books or otherwise: all tradenames, including the name 'Sanborn map', order records, sales data and customer lists, and the rights to market products from the map library to existing and potential customers;

(f) It is intended that the within sale shall include only the assets set forth in subdivisions (a) through (e) of this Paragraph 1, and that there is specifically excluded from the within sale, the accounting books and records of [Sanborn II] and AAS [a subsidiary], and all cash, photogramatic works in process, notes

---

[13] Sanborn I was dissolved in March 1961. SF ¶7.

and accounts receivable and any other outstanding claims payable to [Sanborn II] and AAS.

SF ¶ 44. In addition to the assets specifically excluded from the sale in Paragraph 1(f), the APA also excluded title to the Pelham Facility, and "two IBM typewriters and one calculating machine." SF ¶ 50. The assets enumerated in Paragraph 1 of the APA were conveyed to Sanborn III by the 1973 Bill of Sale dated June 1, 1973. SF ¶ 43. As part of the transfer, Sanborn II represented and warranted that the "rights to market products from the map library" were accompanied by "good, valid and marketable title" and acquired "free and clear of all . . . encumbrances or charges of any kind"; and that "no products manufactured or sold by [Sanborn II] infringes on any patents, trademarks or copyrights, or any other rights, of any person." SF ¶ 35.

Sanborn largely relies on the assertion that Sanborn II expressed a clear intent in the 1973 APA to exit the mapping industry entirely and transfer its mapping business to Sanborn III, and that such a transfer must have included the Sanborn Map copyrights. In particular, Paragraph 1(b) of the APA purported to transfer all maps, finished and unfinished, to Sanborn III. Sanborn II also expressed its intent to transfer the entirety of its mapping business, Sanborn argues, by conveying the Sanborn Map Library, the Sanborn tradenames, and the means necessary to produce and market Sanborn Maps. Sanborn MSJ at 4-11. Crucially, Paragraph 1(e) of the 1973 APA transfers to Sanborn III the "right to market products from the map library." SF ¶ 44. Transfer of only the right to market Sanborn Maps, rather than the entirety of the Sanborn Maps copyrights, would amount to an exclusive license. If, as Sanborn argues, Sanborn II intended to cease all mapping operations entirely, there would have been no licensor remaining after the transaction.

20

Paragraph 1 of the 1973 APA makes clear that Sanborn II did not intend to transfer *all* of its assets to Sanborn III. Sanborn acknowledges this fact. Herein lies the first and most important ambiguity in the contract. Paragraph 1(b) transfers the physical inventory of the Sanborn Map Library, including "partly finished maps." But Paragraph 1(f) excludes from the transaction "photogramatic works in process." "Photogramatic" is the adjectival form of the term "photogrammetry." "Photogrammetry" is "the science used to obtain reliable dimensional information using photographs." The Claim Adjuster's Automobile Liability Handbook, § 9:16 Photogrammetry. In other words, it is the discipline of transferring real-world surveying data into a usable form – by, for example, making a map. In sum, the 1973 APA both *in*cludes "partially finished maps" while also *ex*cluding "photogramatic works in process," which is synonymous with the term "partially finished maps."

This is an ambiguity in the contract that is not resolvable on summary judgment. Sanborn II excluded from the 1973 Transaction all "photogramatic works in progress"; title to the Pelham Facility where the Sanborn Maps were held; and "accounts receivable and any other outstanding claims payable to [Sanborn II] and AAS" (SF ¶ 44). A reasonable factfinder could conclude from these excluded assets that Sanborn II left itself an opening to continue on in the mapmaking business in some limited form.[14] As part of this carve-out, Sanborn II plausibly may have retained ownership of its copyrights in the Sanborn Maps for some possible, unspecified future use.

---

[14] Elsewhere in the APA, Sanborn II represents that it "will not undertake any *new* mapping business," which similarly may not have completely precluded Sanborn II from continuing in any *existing* mapping business that it had not expressly transferred to Sanborn III, or transforming its unfinished "photogramatic works" into maps. SF ¶ 33 (emphasis added).

However, a reasonable factfinder could also conclude that, even in the absence of an explicit copyright transfer provision, the 1973 Documents reflect the intent of Sanborn II to transfer the copyrights in its Sanborn Maps to Sanborn III. Sanborn II included the "right to market" Sanborn Maps;[15] the tools and machinery to copy and produce maps; the physical Sanborn Maps inventory at the Pelham Facility; and the "Sanborn" tradename as part of the 1973 Transaction. SF ¶ 44. The inclusion of these assets, coupled with Sanborn II's purported intent to exit the mapping industry entirely, *could be* sufficient to show that the 1973 Transaction transferred the entirety of the Sanborn Maps copyrights as well.[16]

In sum, the first genuine issue of material fact is whether the 1973 Documents transferred the entirety of the Sanborn Maps copyrights held by Sanborn II to Sanborn III.

---

[15] In some instances, conveyance of the "right to market" a work can also transfer the complete bundle of rights included in copyright. *See Estate of Shaw v. Marcus*, Nos. 7:14-cv-3849 (NSR); 7:14-cv-5653 (NSR), 2015 WL 5610959, at *7 (S.D.N.Y. Sept. 22, 2015). Here, however, the specific transfer of the "right to market" must be viewed in the context of other assets that were excluded from the 1973 Transaction, including "accounts receivable and any other outstanding claims payable to [Sanborn II] and AAS", and title to the Pelham Facility where the Sanborn Maps were held. SF ¶ 44. With this context, it is ambiguous whether the entirety of the copyrights in the Sanborn Maps were transferred from Sanborn II to Sanborn III along with the "right to market" Sanborn Maps.

[16] The extrinsic evidence Sanborn proffers does not resolve the ambiguity in the 1973 Documents. In particular, Sanborn proffers testimony by Steven L. Pease, a former executive at TRW REDI with knowledge of the 1973 Transaction, that the Transaction was intended to transfer all copyrights from Sanborn II to Sanborn III. Sanborn MSJ 13-14. ERIS has argued that Mr. Pease's testimony should be stricken. *See* Transcript of Proceedings re: Conference Held on 9/21/2023 (ECF 315). Because I find that genuine issues of material fact exist as to whether the 1973 Documents transferred copyrights in the Sanborn Maps from Sanborn II to Sanborn III, it is unnecessary to consider Mr. Pease's testimony at length, and any motion to strike his testimony would be premature, and is an evidentiary issue to be resolved before trial. Even were the Court to consider this evidence, Mr. Pease's unrebutted testimony is not enough, on its own, to resolve the ambiguity in the 1973 Documents to the extent that granting summary judgment in Sanborn's favor on this issue would be appropriate. Ambiguous contract provisions may only be resolved as a matter of law with the aid of extrinsic evidence "when the 'words and actions that allegedly formed a contract [are] so clear themselves that reasonable people could not differ over their meaning.'" *Krumme v. WestPoint Stevens Inc.*, 143 F.3d 71, 83 (2d Cir. 1998) (quoting *Bourque v. FDIC*, 42 F.3d 704, 708 (1st Cir. 1994)). That is not the case here. The words and actions of Sanborn II and Sanborn III are susceptible to different interpretations and present genuine issues of material fact.

The second genuine issue of material fact is which copyrights the 1973 Documents purported to transfer. Paragraph 1(b) of the 1973 APA transfers "the Sanborn Insurance Map Library . . . on hand at [the Pelham Facility]"; Paragraph 1(e) transfers "the rights to market products from the map library." SF ¶ 44.  Paragraph 1(b) is about maps at the Pelham Facility; the parties dispute whether "the map library" in Paragraph 1(e) 1973 APA is limited to maps at the Pelham Facility, or includes *all* Sanborn Maps in existence at the time of closing. ERIS MSJ at 17-18; Sanborn MSJ at 15-16. ERIS argues the term is tied to the Pelham Facility; Sanborn argues that the term is not. It is settled law that transfer of ownership of a material object does not also transfer copyright ownership of the work. *Design Options, Inc. v. BellePointe, Inc.*, 940 F.Supp. 86, 91 (S.D.N.Y. 1996) (citing 17 U.S.C. § 202). What this means is that, if the copyrights in the Sanborn Maps were transferred, they would have been transferred in Paragraph 1(e), not in 1(b).

The question of whether "the map library" in Paragraph 1(e) refers only to maps at the Pelham Facility, or all maps in existence wherever located, is in a sense a red herring. This is because neither party has been able to define what precisely was included within "The Sanborn Map Library" as of the closing date of the 1973 Transaction. ERIS asserts that Sanborn has produced no evidence that *any* of the pre-1973 Sanborn Maps over which Sanborn has asserted copyright were at the Pelham Facility; Sanborn asserts that *all* of the pre-1973 Sanborn Maps were at the Pelham Facility. ERIS MSJ at 17-18; Sanborn MSJ at 16.[17] But although Sanborn has

---

[17] Among the many evidentiary issues plaguing this litigation is the question of whether making an inventory of the Sanborn Maps at the Pelham Facility in 1973 is feasible, or even possible. For example, in support of Sanborn's argument that all pre-1973 Sanborn Maps were at the Pelham Facility, Sanborn cites to a letter from Sanborn III's Executive Vice President written in 1976 stating that Sanborn had "over a million maps." Sanborn MSJ at 17. This is far from a shining exemplar of precision.

produced a catalog of map volumes over which it has asserted copyright infringement claims, and various documents showing when certain copyrights were registered, Sanborn has not produced a definitive inventory of what the "Sanborn Map Library" contained in 1973. Resolving what was meant by the term "the map library" in Paragraph 1(e) must therefore include resolution of whether the term refers only to the Sanborn Maps at the Pelham Facility, as well as which maps were included in the map library, however it is defined. These genuine issues of material fact must be resolved by a jury, or through a stipulation before trial. They are not resolvable on summary judgment.

In conclusion, I find that genuine issues of material fact exist as to whether the 1973 Documents transferred the copyrights in the Sanborn Map Library to Sanborn III; and, if so, which copyrights were included within the Sanborn Map Library.

b.   The 1996 Documents are ambiguous as to which Sanborn Maps copyrights were transferred to EDR Sanborn

The next break in Sanborn's chain of title ERIS alleges has to do with the 1996 acquisition of certain assets of Sanborn III by EDR Sanborn, Inc. ("EDR Sanborn"). Between 1973 and 1996, REDI became part of a general partnership named "TRW REDI Property Data" ("TRW REDI"). SF ¶ 68. TRW REDI became the owner of Sanborn III and Sanborn III's assets. Sanborn argues that TRW REDI transferred all of the copyrights it owned in the Sanborn Maps to EDR Sanborn in the 1996 Transaction. ERIS argues that the Sanborn Maps copyrights were excluded from the 1996 Transaction.

On June 20, 1996, TRW REDI and EDR Sanborn entered into an Asset Purchase Agreement (the "1996 APA"). SF ¶ 69. On the same date that transaction closed, the parties executed a Bill of Sale and Assignment (the "1996 Bill of Sale") and Assignment of Copyrights ("1996 Copyright Assignment"), along with other closing documents (collectively, the "1996 Documents"). SF ¶ 89.

The 1996 Bill of Sale states that "TRW REDI hereby grants, sells, transfers, assigns, and conveys to [EDR Sanborn], its successors and assigns forever, all of [TWR REDI's] right, title and interest in and to the Acquired Assets as defined [in the 1996 APA]" . . . "TO HAVE AND TO HOLD, all and singular, the aforesaid Assets unto [EDR Sanborn], its successors and its assigns, to and for their own use and benefit forever." SF ¶ 90. The 1996 APA, in turn, defines the Acquired Assets as including both, "All inventories, wherever located, including, without limitation, the Sanborn Fire Insurance Maps," as well as other physical materials; and "all Intellectual Property (whether as owner, inventor, employer of an inventor, licensor, licensee or otherwise) including, without limitation, the names and trademarks of 'Sanborn,' 'Sanborn Map Company' and 'Sanborn mapping and Geographic Service;' of Sanborn as of the Closing, but excluding the Excluded Assets." SF ¶ 74; Sanborn MSJ at 18 n.16. "Intellectual Property" is further defined in the 1996 APA as including "all copyrightable works, all copyrights and all applications, registrations, and renewals in connection therewith." SF ¶ 75.

Read as a whole, the 1996 Documents evince the clear intent of the parties that TRW REDI would transfer the entirety of its intellectual property in the Sanborn Maps, including copyrights, to EDR Sanborn. However, the inquiry does not end here.

ERIS proffers evidence that the 1996 Transaction only encompassed transfer of the physical Sanborn Map collection. Specifically, ERIS points to the 1996 APA, Exhibit E, "Exceptions to Acquired Assets." EF ¶ 89. Exhibit E states, in relevant part: "2. Purchaser will obtain only physical title to the Sanborn Fire Insurance Maps; the parties acknowledge that many are in the public domain." SF ¶ 81. ERIS argues that Exhibit E limits the scope of the entire transfer of Sanborn Maps to the physical maps themselves. This is not so. The "Acquired Assets" defined in the 1996 APA, and transferred in the 1996 Bill of Sale, expressly include "all copyrightable works, all copyrights and all applications, registrations, and renewals in connection therewith." SF ¶ 75. The broader assignment of intellectual property functions as a valid transfer of copyright, and takes priority over the narrower assignment of physical property as defined in Exhibit E. *See LaSalle Bank Nat. Ass'n v. Nomura Asset Capital Corp.*, 424 F.3d 195, 206 (2d Cir. 2005). ERIS has not established that there is a genuine issue of material fact as to whether the parties intended that the Sanborn Maps copyrights would be transferred from TRW REDI to EDR Sanborn.

Exhibit E does, however, establish another genuine issue of material fact. As part of the 1996 Transaction, TRW REDI and EDR Sanborn agree that "many [Sanborn Maps] are in the public domain." SF ¶ 81. Although Exhibit E does not contradict the parties' *intent* to transfer "all copyrightable works" (emphasis added), this acknowledgment that many maps are not under copyright does shed light on the parties' uncertainty as to which Sanborn Maps were "copyrightable." Similar to the 1973 Transaction, the 1996 Transaction is ambiguous as to which Sanborn Map copyrights were included in the intended transfer (if, in fact, the 1973 Documents did express an intent to transfer copyright ownership). Also similarly, Sanborn has not proffered

26

an inventory of which maps were located at the *Pelham Facility in 1996*,[18] much less a complete inventory of all copyrighted Sanborn Maps then in existence. EF ¶¶ 94-96. What Exhibit E of the 1996 APA suggests is that TRW REDI and EDR Sanborn knew even at the time of the closing that such an inventory of copyrighted works did not exist, or was impossible to produce.

In sum, I find that while there is no genuine issue of material fact that the 1996 Documents show the intent of the parties to transfer the Sanborn Maps copyrights to EDR Sanborn, there is a genuine issue of material fact as to which Sanborn Maps copyrights were transferred.


### 2. Legal Standard and Analysis (Works Made for Hire)

As discussed above, several genuine issues of material fact exist as to which Sanborn Maps copyrights Sanborn owns. ERIS's next argument concerns a number of maps[19] created after 1978. ERIS argues Sanborn has not shown that they own the copyrights in these maps because Sanborn not shown those maps were "works made for hire."

The ordinary rule in copyright law is that the initial author of a work owns the copyright in that work, unless that work has been transferred by a signed, written instrument. The "work

---

[18] In the course of discovery, Sanborn has asserted that "[t]he physical possession and/or location of maps at Sanborn Map Company's facility in Pelham, New York on June 20, 1996, including with respect to any maps not asserted in the case, has no bearing on any of the claims or defenses in this case[.]" EF ¶ 96.

[19] Specifically, ERIS asserts this claim as to 263 asserted works. The Court takes judicial notice of the existence of copyright registrations issued by the Copyright Office. Six of these maps were registered within five years after publication, entitling them to a stronger presumption of validity than the remainder of the works, which were registered more than five years after publication. *See* 17 U.S.C.S. § 410. Because Sanborn has not proffered any evidence that each of the 263 maps was prepared by an employee or was expressly transferred to them by a signed writing as required by the 1976 Act, *see infra*, the presumption of validity is overcome as to all 263 maps created on or after January 1, 1978.

made for hire" provision is a statutory exception to that rule. Under the 1976 Act, copyrights in

"works made for hire" are owned by "the employer or other person for whom the work was

prepared." *Marvel Characters, Inc. v. Kirby*, 726 F.3d 119, 136-37 (2d Cir. 2013); 1 Nimmer on

Copyrights § 5.03[A] (quoting 17 U.S.C. § 201(b)). The 1976 Act defines a "work made for hire"

as either "a work prepared by an employee within the scope of his or her employment," or a

work that was specially ordered or commissioned. 17 U.S.C. § 101; *Aldon Accessories Ltd. V.

Spiegel, Inc.*, 738 F.2d 548, 551-52 (2d Cir. 1984); 1 Nimmer on Copyrights § 5.03[B]. When

works have been made by different creators with different relationships to the purported

owner of a copyright, the "work made for hire" determination must be made on an

individualized basis. *See Waite v. UMG Recordings, Inc.*, No. 19-CV-1091 (LAK), 2023 WL

1069690, at *5-6 (S.D.N.Y. Jan. 27, 2023).

> a. Sanborn cannot show that all of the maps created after 1978 were "works made for hire"

The maps at issue were all created on or after January 1, 1978, the date the 1976

Copyright Act came into force. ERIS argues that Sanborn does not own the copyrights in these

maps because Sanborn has not proffered any evidence that those maps were "works made for

hire" by showing, on an individualized basis, that those maps were prepared by an employee or

transferred to Sanborn by a signed writing. ERIS proffers certain due diligence materials

prepared for EDR Sanborn as part of the 1996 Transaction. TRW REDI represented to EDR

Sanborn that "all field surveyors are regular Sanborn employees *with the exception of some

part time contractors who just do some piece work.*" EF ¶ 72; Sanborn MSJ 23 (emphasis

added). The term "some piece work" is undefined. This due diligence excerpt raises a genuine issue of material fact as to whether all Sanborn Maps were created by employees, or if some Sanborn Maps were created by independent contractors.

Sanborn does not proffer any individual contracts with employees or independent contractors; nor has Sanborn provided a log of which maps were prepared by employees and which may have been prepared by independent contractors. Instead, Sanborn argues that the Court should presume that the copyright registrations for the post-1978 maps, deeming them "works made for hire" are valid. This is because the pre-1978 maps with valid copyright registrations were also "works made for hire." Those copyright registrations are presumed to be valid, as are the facts underlying the registrations.[20] Sanborn argues that these registrations show that Sanborn Maps created before 1978 were prepared by company employees, and ERIS has not proffered any evidence that the firm's employment relationship with its map creators changed in 1978. Sanborn argues the Court should infer from this that the maps created after 1978 were also prepared by Sanborn employees, and are thus "works made for hire."

This is not an inference the Court can make. To make such an inference would be to ignore that the 1976 Copyright Act strengthened the requirements to show when a work was a

---

[20] A "certificate of a registration made before or within five years after first publication of the work shall constitute prima facie evidence of the validity of the copyright and of the facts stated in the certificate." 17 U.S.C § 410(c). "Possession of a certificate of registration provides its holder with a rebuttable presumption of ownership of a valid copyright ... [and] that all facts stated in the certificate are true." *R.F.M.A.S., Inc. v. So*, 619 F. Supp. 2d 39, 52 (S.D.N.Y. 2009). *See also Chic Home Design, LLC v. New Journey Group Limited*, No. 15-CV-9468 (JPO), 2017 WL 3738775, at *3 (S.D.N.Y. Aug. 30, 2017) ("[A] valid registration does two things: It allows the registrant to sue, and it gives the registrant an evidentiary advantage in that litigation."). The evidentiary weight to be accorded certificates of registration made *after* five years from first publication is within the discretion of the Court. 17 U.S.C. § 410(c).

"work made for hire," while certificates of registration issued under the 1909 Act were issued when the works made for hire standard was weaker than under the 1976 Act. The 1996 due diligence language indicates that some maps created after 1978 were prepared by independent contractors. Sanborn has not proffered any evidence of a signed writing transferring any maps created by independent contractors to Sanborn.[21] To grant summary judgment solely on the basis of certificates of registration issued under the weaker standard, when ERIS has proffered contrary factual evidence, would be inappropriate.

In sum, I find that a genuine issue of material fact exists as to whether the Sanborn Maps created after 1978 were "works made for hire," and as to whether Sanborn owns the copyrights in these maps.

### 3.  Legal Standard and Analysis (Copyright Notice)

ERIS's remaining arguments have to do with several alleged deficiencies in the copyright notices on Sanborn Maps.[22] Specifically, ERIS challenges the validity of these copyrights on four different notice grounds: omission of notice on Sanborn Map "correction slips"; omission of

---

[21] Sanborn proffers detailed evidence of the employer-employee relationship with its full-time surveyors. *See* SF ¶¶ 110-128. But this does not address the requirement that the "work made for hire" analysis must be made on an individualized basis. The maps that are in dispute as being works made for hire would have been, by definition, *not* created by Sanborn employees. Sanborn must show either that all of the post-1976 maps were created by Sanborn employees, or provide individualized evidence that each map was either created by a Sanborn employee or signed over in writing to Sanborn by an independent contractor.

[22] It is difficult for the Court to determine with certainty which maps ERIS is challenging on notice grounds. Its briefing papers lead the reader down a labyrinthine rabbit hole of value-sorted spreadsheets and lengthy exhibits, some of which the Court has had difficulty opening. *See* Transcript of Proceedings re: Conference Held on 9/21/2023 (ECF 315). Indeed, ERIS has apparently tied itself in knots, seeing as they have since requested leave to amend their exhibits because their list of maps was incorrect. *See* ECF 303.

updated handwritten/stamped notice on revised maps; omission of notice on Sanborn Maps

"title pages"; and illegibility of copyright notice.

I find that ERIS has established the existence of a genuine issue of material fact as to

whether Sanborn habitually failed to affix updated notices to all of its revised maps, and

whether those maps with omitted updated notices are now valid and enforceable.[23]

a.  Copyright notice requirements

"Under the 1909 Act, the publication of a work, with a proper notice, secured statutory

copyright protection." *Shoptalk, Ltd. v. Concorde–New Horizons Corp.*, 168 F.3d 586, 590 (2d

Cir. 1999), *cert. denied*, 527 U.S. 1033, 119 S.Ct. 2399 (1999); *see* 17 U.S.C. § 10 (1909 Act)

("Any person entitled thereto by this title may secure copyright for his work by publication

thereof with the notice of copyright required by this title; and such notice shall be affixed to

each copy thereof published or offered for sale in the United States by authority of the

copyright proprietor."); 2 Nimmer on Copyright § 7.02[C][1] (2014) ("Under the 1909 Act, a

work had to bear a valid copyright notice upon publication in order to secure copyright

protection.").

Under the 1909 Act, failure to attach a proper notice at the time of publication caused a

work to enter the public domain. *Stewart v. Abend*, 495 U.S. 207, 233, 110 S.Ct. 1750, 1766

(1990) ("Under the 1909 Act, it was necessary to publish the work with proper notice to obtain

---

[23] For the reasons detailed below, I find that no genuine issues of material fact exist as to omission of notice on Sanborn Maps "correction slips," omission of notice from title pages, and illegibility of copyright notice.

31

copyright. Publication of a work without proper notice automatically sent a work into the public domain."). Although the 1909 Act did not require notices to contain a year, when a copyright notice did contain a year (or multiple years), and a subsequent, updated notice does not contain a year, the error is "in favor of the public," and the statutory term is measured from the latest year stated in the notice. *Leigh v. Gerber*, 86 F.Supp. 320, 322 (S.D.N.Y. 1949); *see also* 2 Nimmer on Copyright § 7.08[C][2].

The 1976 Act imposed additional requirements for the form a copyright notice must take. The 1976 Act required a copyright notice to be "placed on all publicly distributed copies from which the work can be visually perceived[.]" 17 U.S.C. § 401(a) (1976). The notice must contain: 1) the symbol ©, the word "Copyright", or the abbreviation "Copr."; 2) the year of first publication of the work; and 3) the name of the copyright owner. *Id.* at § 401(b). The notice must be "affixed to the copies in such manner and location as to give reasonable notice of the claim of copyright." *Id.* at § 401(c).

In some instances, omission of copyright notice from certain copies of a work may be excused and does not invalidate an otherwise valid copyright. Under the 1909 Act, "the omission by accident or mistake of the prescribed notice from a particular copy or copies" may be excused "[w]here the copyright proprietor has sought to comply with the provisions of [the 1909 Act] with respect to notice." *See Schellberg v. Empringham*, 36 F.2d 991 (S.D.N.Y. 1929). Under the 1976 Act, omission of notice "from no more than a relatively small number of copies or phonorecords distributed to the public" is excused. 17 U.S.C. § 405(a)(1); *Princess Fabrics, Inc. v. CHF, Inc.*, 922 F.2d 99, 102 (2d Cir. 1990); 2 Nimmer on Copyright § 7.13[A].

32

b.  Rule 406 habit evidence

Federal Rule of Evidence 406 provides that "[e]vidence of a person's habit or an organization's routine practice may be admitted to prove that on a particular occasion the person or organization acted in accordance with the habit or routine practice." "Habit" evidence is related to, but distinct from, "character" evidence that is prohibited by Federal Rule of Evidence 404(a). "Character may be thought of as 'a generalized description of one's disposition,' while habit 'is more specific': '[i]t describes one's regular response to a repeated specific situation.' " Crawford v. Tribeca Lending Corp., 815 F.3d 121, 125 (2d Cir. 2016) (quoting Fed. R. Evid. 406 advisory committee's note to 1972 proposed rule). In order for evidence to be admissible as habit evidence, "the offering party must establish 'the degree of specificity and frequency of uniform response' that demonstrates not simply that the party has a mere tendency to act in a given manner, but rather that his conduct is 'semi-automatic in nature.' " Loussier v. Universal Music Grp., Inc., No. 02-CV-2447 (KMW), 2005 WL 5644420, at *2 (S.D.N.Y. Aug. 30, 2005) (quoting Simplex Inc. v. Diversified Energy Sys., 847 F.2d 1290, 1293 (7th Cir. 1988)). The "examples offered to establish such a pattern of conduct or habit" must be "sufficiently numerous to permit the inference of systematic conduct[.]" Id.

In BWP Media USA, Inc. v. Gossip Cop Media, Inc., 196 F.Supp.3d 395 (S.D.N.Y. 2016), the court held that habit evidence was admissible to show that the plaintiff had a routine method of handling copyright applications, and could be used to prove that the plaintiff had received certificates of copyright registration for the images at issue. In BWP Media, the court inferred from the plaintiff's use of "specific naming conventions when filing copyright applications" that the employee responsible for submitting applications "followed [the

33

plaintiff's] regular business practice when submitting those applications," and that the images at issue were properly registered. *Id.* at 403.

          c.    ERIS has shown the existence of a genuine issue of material fact as to whether Sanborn habitually omitted updated handwritten/stamped notices from certain maps

In addition to the copyright notices printed at the initial time of publication, some Sanborn Map volumes contained handwritten or stamped years, typically preceded by the word "Revised" or the abbreviation "Rev." EF ¶ 110. 636 of the maps over which Sanborn asserts copyright infringement claims contain handwritten or stamped dates. EF ¶ 108; Sanborn MSJ at 27. A number of maps in the UPA Collection, one of the collections comprising the complete Sanborn Map Library, contain updated handwritten or stamped notices. EF ¶ 110. When EDR registered the Sanborn Maps with the Copyright Office in 1997, EDR represented that each revised Sanborn Map contained a handwritten, stamped year date "applied at first publication for the revision." EF ¶ 111.

ERIS has proffered evidence that this is not the case. Specifically, ERIS compares maps from the UPA Collection with the same maps in the LOC Collection, as well as copies of those same maps in the possession of third parties. EF ¶¶ 113-15. Although the UPA Collection maps contain handwritten or stamped dates, the LOC Collection and third party maps do not. *Id.* Accordingly, ERIS argues, the copyright terms of those maps must be calculated from the earlier date that was published on all map copies, rather than the later date that was only published on some copies. ERIS MSJ at 28-29. Because Sanborn has not proffered evidence that those

34

copyrights were renewed within a year of expiration of the earlier copyright,[24] those earlier

copyrights have lapsed, and those maps have fallen into the public domain.

It is true that "omission by accident or mistake . . . from a particular copy or copy" may

be excused under the 1909 Copyright Act when "the copyright proprietor [has sought to]

comply with" the Act's notice provisions. *Schellberg*, 36 F.2d at 994. But Sanborn has offered

little to no evidence that Sanborn and its predecessors sought to comply with the Act by

actually affixing handwritten or stamped notice to every revised map. The record reflects only

that the UPA Collection maps contain handwritten or stamped notices, and that EDR obtained

copyright registrations by representing to the Copyright Office that all revised maps contained

handwritten or stamped dates.[25]

It is also true that the particular examples from the LOC Collection and third party

collections proffered by ERIS are not maps over which Sanborn has asserted copyright

infringement claims. But this speaks only to the relevance and probative value of these

examples, not to their admissibility as evidence of Sanborn's habits with respect to affixing

handwritten or stamped notice to revised maps. There is direct evidence that several maps in

the UPA Collection contained handwritten or stamped dates, and their counterparts in other

collections do not.

---

[24] For example, a copyright dated 1955 would have expired in 1983, and would have needed to be renewed by 1984, within a year of expiration.

[25] This does not amount to an accusation that EDR lied to or defrauded the Copyright Office as there is no evidence to suggest that EDR knew this representation to be false at the time the representation was made.

In sum, ERIS has sufficiently shown the existence of genuine issue of material fact as to whether Sanborn habitually did not affix handwritten or stamped notice to each copy of each revised map. The copyright registrations proffered by Sanborn are, nevertheless, presumed to be valid. *See* 17 U.S.C § 410(c); *R.F.M.A.S., Inc. v. So*, 619 F. Supp. 2d 39, 52 (S.D.N.Y. 2009). ERIS must still rebut this presumption at trial by presenting its habit evidence. Sanborn should also be permitted to introduce habit evidence that it and its predecessors sought to comply with the statutory notice requirements by habitually affixing handwritten or stamped notice to revised maps; and that any omission of notice was accidental and only from "particular copies."

ERIS's remaining arguments as to copyright notice do not raise genuine issues of material fact.

> d.  ERIS has not shown the existence of a genuine issue of material fact as to whether each correction slip required separate notice

Throughout the twentieth century, Sanborn had a practice of updating customers' maps with acetate "correction slips." SF ¶¶ 138-39. These updates were cut and pasted by Sanborn employees onto pre-existing map sheets with outdated information. SF ¶ 138. A customer would send their map volumes to Sanborn, and Sanborn employees would then return the updated map, with the correction slips applied, to the customer. SF ¶ 139; EF ¶ 104. In some cases, Sanborn employees would visit customers' businesses and affix the correction slips on-site. ERIS Reply at 9-10; Sanborn Reply at 14-15.

ERIS argues that each correction slip constitutes a "new publication" for which notice was required under both the 1909 and 1976 Copyright Acts because each correction slip was

36

affixed separately. ERIS MSJ at 26-27; ERIS Reply at 9-10. Sanborn contends that each map

volume is a single publication that required only one notice at the time of its initial publication.

Sanborn MSJ at 26-27.

The Copyright Act defines publication as follows:

> "Publication" is the distribution of copies or phonorecords of a work to the public by sale or other transfer of ownership, or by rental, lease, or lending. The offering to distribute copies or phonorecords to a group of persons for purposes of further distribution, public performance, or public display, constitutes publication. A public performance or display of a work does not of itself constitute publication.

17 U.S.C. § 101. The definition in the 1976 Copyright Act "represents a 'codification of

the definition evolved by case law prior to the adoption of the current Act.'" *Archie MD, Inc. v.*

*Elsevier, Inc.*, 261 F. Supp. 3d 512, 517 n.4 (S.D.N.Y. 2017) (quoting

1 Nimmer on Copyright § 4.03). "[M]ost courts have followed *sub silentio* a rule that only one

notice is required for all copyrightable works contained in a single commercial unit . . . if such

works . . . *as reproduced in the unit*, could not be separately used or exploited." 2 Nimmer on

Copyright § 7.10[D]. *Wales Indus. Inc. v. Hasbro Bradley, Inc.*, 612 F.Supp. 510 (S.D.N.Y. 1985), a

case about a "Transformer" toy with two different configurations, is instructive. In *Wales*, the

district court found that because "the date of first publication [was] stamped on an integral,

nondetachable part of each toy and is easily visible when the toy is manipulated into its robot

configuration, as it is intended to be," the notice had "fully satisfie[d] the statutory requirement

that reasonable notice of a copyright claim be given." 612 F.Supp. at 519.

The Court cannot locate any appropriate analogues, in caselaw or elsewhere, for the

Sanborn correction slips. As such, this issue appears to be a case of first impression.

37

Nevertheless, there is no genuine issue of material fact that each Sanborn Map volume was a "single publication." ERIS acknowledges, and otherwise relies on, the fact that each collection of maps required a title page containing copyright notice, which strongly indicates that the map collections were published, sold, and distributed to customers as a single commercial unit. ERIS MSJ at 29-30. Sanborn updated its maps by volume, rather than one individual map sheet at a time, as indicated by the affixed "Correction Records" to map volumes containing corrected maps. EF ¶ 105. In sum, all of the evidence shows that Sanborn Maps were published as part of comprehensive sets as a single commercial unit. The precise mechanism by which the correction slips were applied – at the Sanborn offices or on-site at customers' offices – does not bear on the question of whether each Sanborn Map volume was a "single commercial unit." ERIS thus has not shown the existence of a genuine issue of *material* fact as to whether Sanborn was required to affix updated notice to each individual correction slip.

    e. ERIS has not shown the existence of a genuine issue of material fact
      as to whether Sanborn omitted notice from title pages

Next, ERIS argues that Sanborn failed to affix copyright notice to the "title page" of a number of pre-1978 maps, and that those map volumes are not protected by copyright. ERIS MSJ at 29-30. The crux of ERIS's argument is that many Sanborn Map books contain a title page, and the ones that do not presumably had the title page removed. This conclusion does not follow. Some collections of Sanborn maps were published in "unbound" form without a decorative title page, and with an interior notice page serving as the "title" page. SF ¶ 154; Sanborn MSJ 29. There is no stringent requirement that each collection of maps contain a "title

38

page" containing copyright notice, so long as copyright notice is affixed at the beginning of the collection in such a manner as to give reasonable notice of copyright. 17 U.S.C. § 401(c), 402(c). Under the 1909 Act, "the title page must be one that is readily found without examining every page in the work," and is "not necessarily the first page of a book." 2 Nimmer on Copyright § 7.10[B][1] (2023). ERIS has not shown that the contested volumes were "missing" a title page and did not contain adequate notice. Accordingly, I find that ERIS has failed to raise a genuine issue of material fact as to whether Sanborn omitted necessary notice from title pages.

     f. ERIS has not shown the existence of a genuine issue of material fact that Sanborn Maps contained illegible notice

Finally, ERIS argues that the copyright notices on several post-1978 maps are invalid because they are illegible, or the elements of notice are dispersed. Sanborn maps are very big; notice may be very small without being invalid. *See* 2 Nimmer on Copyright § 7.11[B] (2023) ("[I]f a notice is in fact legible, it is not rendered invalid by the fact that it may appear in smaller type than the other printed material contained in the work, or that close examination is required to locate or read the notice."). ERIS proffers multiple examples of purportedly illegible notices. *See* EF ¶¶ 118-26. In each example, the necessary elements of notice are either small but legible, or larger and dispersed while still being close enough to each other to provide reasonable notice of copyright. *See* 2 Nimmer on Copyright § 7.11 (2023) ("[I]t is not necessary that the name of the copyright owner appear immediately contiguous to the other elements of the notice. It is sufficient if the relationship between the owner's name and the copyright symbol and year is such as to give reasonable notice that the several elements are intended as

a single entity giving notice of copyright."). Accordingly, ERIS has not shown the existence of a

genuine issue of material fact as to whether the contested copyright notices are legible.

### D.  Digital Millenium Copyright Act ("DMCA")

ERIS's third and final argument in its motion for summary judgment is that Sanborn

cannot, as a matter of law, establish its claims that ERIS violated the DMCA. For the reasons

below, I respectfully recommend that summary judgment on these claims be **DENIED** as

premature.

Sanborn brings DMCA claims under both Sections 1202(a) and 1202(b) of the DMCA.

Section 1202(a) of the DMCA provides that:

> No person shall knowingly and with the intent to induce, enable, facilitate, or conceal infringement--(1) provide copyright management information that is false, or(2) distribute or import for distribution copyright management information that is false.

> 17 U.S.C. § 1202(a).

> Section 1202(b) provides that:

> No person shall, without the authority of the copyright owner or the law (1) intentionally remove or alter any copyright management information, (2) distribute or import for distribution copyright management information knowing that the copyright management information has been removed or altered without authority of the copyright owner or the law, or (3) distribute, import for distribution, or publicly perform works, copies of works, or phonorecords, knowing that copyright management information has been removed or altered without authority of the copyright owner or the law, knowing, or . . . having reasonable grounds to know, that it will induce, enable, facilitate, or conceal an infringement of any right under this title.

> 17 U.S.C. § 1202(b).

A civil action may be brought under either section of the DMCA by "[a]ny person injured

by a violation of section . . . 1202 . . . in an appropriate United States district court for such

40

violation." 17 U.S.C. § 1203. In accordance with this statutory language, courts have required that, in order to have standing, plaintiffs bringing DMCA claims must show either that they are the owners of copyright interests in the infringed work, or were otherwise injured by the violation. *Sheldon v. Plot Commerce*, 2016 WL 5107072, at *10 (E.D.N.Y. Aug. 26, 2016); *Echostar Satellite, L.L.C. v. Viewtech, Inc.*, 543 F.Supp.2d 1201, 1205-1206 (S.D. Cal. 2008) (collecting cases).

As set forth above, I have recommended that Sanborn be estopped from prosecuting its copyright infringement claims; if Sanborn's claims can move forward, that there exist several genuine issues of material fact as to which copyrights Sanborn owns and may enforce. In the event that Sanborn owns some quantity of enforceable copyrights, then Sanborn would have clear standing to bring DMCA claims. Another possibility is that the 1973 Documents conveyed the exclusive "right to market" the Sanborn Maps, in which case Sanborn may have standing on the grounds that it was injured by ERIS's alleged DMCA violations. The parties, however, have not briefed the question of whether the holder of only some of the rights that comprise the bundle of copyrights has standing to bring DMCA claims. Until the question of TSL's copyright ownership is settled one way or the other, it is unnecessary to do so.[26, 27]

---

[26] It is also equally unnecessary to consider at this time whether Sanborn has properly asserted its arguments that ERIS violated 17 U.S.C. § 1202(b)(3), which ERIS argues in its reply memorandum of law (ECF 298 at 25) should be stricken. The Court notes, however, that ERIS's "Reply Rule 56.1 Statement" which it cites in support of its argument was not properly submitted under Local Rule 56.1. "While Local Rule 56.1 does not expressly prohibit a reply in further support of a Rule 56.1 statement, it does not permit such a submission either." *Mayaguez S.A. v. Citigroup, Inc.*, No. 16-CV-6788(PGG) (JLC), 2021 WL 1799653, at *8 (S.D.N.Y. Apr. 30, 2021). Such a reply is "procedurally improper." *Id.*

[27] In the event Sanborn does have standing to raise its DMCA claims, the Court notes that, based on the record before it, those claims may also present genuine issues of material fact, given the difficulty of satisfying the DMCA's "double scienter" requirement. *See also* Sanborn MSJ at 3 ("The DMCA's double-scienter requirement must be left for the factfinder.").

### IV.    CONCLUSION

For the foregoing reasons, I respectfully recommend that Defendants' motion for summary judgment be **GRANTED** as to the issue of equitable estoppel, and Plaintiff's motion for summary judgment **DENIED** in all respects. I further recommend that Plaintiff be estopped from pursuing its copyright infringement claims, and that Plaintiff's Complaint be dismissed in its entirety. In the alternative, I recommend that both parties' cross-motions for summary judgment be **DENIED** in all respects as set forth above.

The Clerk of Court is respectfully directed to file this Report & Recommendation to **Court and party view only**.

### V.    OBJECTIONS

Pursuant to 28 U.S.C. § 636(b)(1) and Rule 72(b) of the Federal Rules of Civil Procedure, the parties shall have fourteen (14) days (including weekends and holidays) from service of this Report to file written objections. *See also* Fed. R. Civ. P. 6 (allowing three (3) additional days for service by mail). A party may respond to any objections within fourteen (14) days after being served. Such objections, and any responses to objections, shall be addressed to the Honorable Jennifer H. Rearden, United States District Judge. Any requests for an extension of time for filing objections must be directed to Judge Rearden.

FAILURE TO FILE OBJECTIONS WITHIN FOURTEEN (14) DAYS WILL RESULT IN A WAIVER OF OBJECTIONS AND WILL PRECLUDE APPELLATE REVIEW. (*See Thomas v. Arn*, 474 U.S. 140, 155 (1985); *IUE AFL-CIO Pension Fund v. Herrmann*, 9 F.3d 1049, 1054 (2d Cir. 1993); *Frank v.*

*Johnson*, 968 F.2d 298, 300 (2d Cir. 1992); *Wesolek v. Canadair Ltd.*, 838 F.2d 55, 58 (2d Cir. 1988); *McCarthy v. Manson*, 714 F.2d 234, 237-38 (2d Cir. 1983)).

Respectfully submitted,

_s/ Ona T. Wang_

Dated: March 25, 2024                           Ona T. Wang
      New York, New York                United States Magistrate Judge

**Appendix "A": Sanborn Maps Timeline**[28]

- 1875: Sanborn Map and Publishing Company, Limited ("Sanborn I") incorporated in New York.

- 1889: Sanborn I changes name to Sanborn-Perris Map Company (Limited).

- 1902: Sanborn I changes name to Sanborn Map Company.

- November 20, 1959: Pelham Map, Company, Inc. incorporated in New York, headquartered at 629 Fifth Avenue, Pelham, New York (the "Pelham Facility").

- November 27, 1959: Sanborn I changes name to First Pelham Corporation.

- December 31, 1959: Sanborn I, as holder of all outstanding shared of Pelham Map Company, Inc., changes name of Pelham Map Company, Inc. to Sanborn Map Company, Inc. ("Sanborn II"). Sanborn I transfers map business to Sanborn II, including copyrights.

- March 1961: Sanborn I is dissolved.

- October 23, 1968: Pictorial Productions, Inc. acquires Sanborn II.

- May 7, 1973: Sanborn II enters into an asset purchase agreement (the "1973 APA") with Real Estate Data, Inc. ("REDI") to sell "certain of the assets used by it . . . in carrying on [its map] business."

- May 30, 1973: Sunshine Map Company, Inc. ("Sanborn III"), a fully-owned subsidiary of REDI, is incorporated in New York.

- June 1, 1973: Sanborn II and Sanborn III execute a Conveyance and Bill of Sale. Sanborn II changes name to S M C Realty, Inc. S M C Realty, Inc. continues to hold title to the Pelham Facility and leases it to Sanborn III.

- June 20, 1973: Sanborn III changes its name from Sunshine Map Company, Inc. to Sanborn Map Company, Inc.

- October 1988: REDI, including Sanborn III, is sold to Congressional Information Services ("CIS"), a subsidiary of Elsevier Holding, Inc.

---

[28] Facts are taken from SF ¶¶ 1-103 and EF ¶¶ 34-102.

- November 7, 1988: Realty Information Service, Inc. ("RIS") is incorporated in Delaware.

- November 16, 1988: RIS merges with Sanborn III.

- December 1988: RIS changes its name to Elsevier Realty Information, Inc.

- August 31, 1991: Elsevier Realty Information, Inc. forms a general partnership with TRW Inc. under Ohio law named TRW REDI Property Data ("TRW REDI").

- June 20, 1996: TRW REDI and EDR Sanborn, Inc. ("EDR Sanborn") enter into an asset purchase agreement (the "1996 APA") to sell to EDR Sanborn "all assets, properties, and rights held by Sanborn" with the exception of certain excluded assets.

- July 21, 1997: The 1996 assignment of copyrights is recorded, purporting to provide a list of all Sanborn Map copyrights held by EDR Sanborn.

- December 1998: EDR Sanborn merges "with and into" The Sanborn Library, LLC, a limited liability company under Delaware law. The surviving entity is The Sanborn Library, LLC, a "sister company" and licensor of the Sanborn Maps to Environmental Data Resources, LLC ("EDR").

**Appendix "B": 2017 EDR Slide Deck Excerpt**[29]



---

[29] *See* MacLean Decl. Ex. 168.